# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CLOVER COFFIE, individually and on behalf of
all others similarly situated; JENNIE THOMPSON,
individually and on behalf of all others similarly situated,

      Plaintiffs,

vs.

FLORIDA CRYSTALS CORPORATION,
a Delaware corporation;
SUGAR CANE GROWERS COOPERATIVE OF FLORIDA,
a Florida not for profit corporation;
UNITED STATES SUGAR CORPORATION,
a Delaware Corporation
FLO-SUN INCORPORATED, a Florida corporation;
AMERICAN SUGAR REFINING, INC.,
a Delaware corporation
OKEELANTA CORPORATION, a Delaware corporation;
OSCEOLA FARMS, a Florida corporation;
SUGARLAND HARVESTING CO.,
a Florida not for profit corporation,
TRUCANE SUGAR CORPORATION,
a Florida corporation; INDEPENDENT
HARVESTING, INC., a Florida corporation;
KING RANCH, INC., a Delaware corporation;
J & J AG PRODUCTS, INC., a Florida corporation;
and DOES 1-50;

      Defendants.

Case No.
CLASS ACTION
Jury Trial Demanded

_____/

## CLASS ACTION COMPLAINT

Named Plaintiff, CLOVER COFFIE, on behalf of himself and on behalf of all others

similarly situated, and Named Plaintiff JENNIE THOMPSON, on behalf of herself and on behalf

of all others similarly situated, bring this Class Action Complaint against Defendants FLORIDA

CRYSTALS CORPORATION, a Delaware corporation; SUGAR CANE GROWERS

COOPERATIVE OF FLORIDA, a Florida not for profit corporation; UNITED STATES

1

SUGAR CORPORATION, a Delaware Corporation; FLO-SUN INCORPORATED, a Florida corporation; AMERICAN SUGAR REFINING, INC., a Delaware corporation; OKEELANTA CORPORATION, a Delaware corporation; OSCEOLA FARMS, a Florida corporation; SUGARLAND HARVESTING CO., a Florida not for profit corporation; TRUCANE SUGAR CORPORATION, a Florida corporation; INDEPENDENT HARVESTING, INC., a Florida corporation; KING RANCH, INC., a Delaware corporation; J & J AG PRODUCTS, INC., a Florida corporation; and DOES 1-50, to obtain redress for those damaged by Defendants' sugarcane agriculture activities. The allegations in this Complaint are based on the personal knowledge of the Named Plaintiffs, as to themselves, and upon information and belief as to all other matters.

## <u>INTRODUCTION</u>

1.       This class action arises from Defendants' sugarcane agriculture activities, including the pre-harvest burning of sugarcane, in and around the area south of Lake Okeechobee and the towns of Belle Glade, South Bay, Pahokee and others.

2.       Defendants' sugarcane agriculture activities, including the pre-harvest burning of sugarcane, caused pollutants, including smoke, particulate matter ("PM"), dioxins, polycyclic aromatic hydrocarbons ("PAHs"), volatile organic compounds ("VOCs"), carbon monoxide, sulfur oxides, nitrogen oxides, ammonia, elemental carbon and organic carbon, to migrate onto, through, to be deposited upon, and to contaminate Named Plaintiff's and Class Members properties and exposed Named Plaintiff and Class Members to those pollutants.

3.       Defendants farm sugarcane on approximately 400,000 acres in the area south of Lake Okeechobee.

4.       The Affected Area is defined as that area of Florida contained within the zip codes for 33430, 33476, and 33493.

## PARTIES

5.     Named Plaintiff CLOVER COFFIE ("COFFIE") is a resident of Palm Beach County, Florida. Named Plaintiff COFFIE resides at and owns real property located at 34 NE Avenue H, Belle Glade, FL 33430, which is in close proximity to many of Defendants' sugarcane fields. Named Plaintiff COFFIE'S property is located within the Affected Area.

6.     Named Plaintiff JENNIE THOMPSON ("THOMPSON") is a resident of Palm Beach County, Florida. Named Plaintiff THOMPSON lives in the Affected Area and has been exposed to hazardous and dangerous pollutants from Defendants' sugarcane agriculture activities.

7.     Defendant FLORIDA CRYSTALS CORPORATION ("FLORIDA CRYSTALS") is a Delaware corporation with its principal place of business located at One North Clematis Street, Suite 200, West Palm Beach, FL 33401. At all relevant times Defendant FLORIDA CRYSTALS, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material, that damaged Named Plaintiffs and Class Members.

8.     Defendant SUGAR CANE GROWERS COOPERATIVE OF FLORIDA ("SCGC") is a Florida not-for-profit corporation with its principal place of business located at 1500 West Sugarhouse Road, Belle Glade, FL 33430. Defendant SCGC is composed of about 44 member farms that cultivate sugarcane in the area south of Lake Okeechobee. At all relevant times Defendant SCGC, by and through its constituent member farms, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material, that damaged Named Plaintiffs and Class Members. The constituent member farms of Defendant SCGC are included in this Class Action Complaint as DOES 1-50.

3

9.      Defendant UNITED STATES SUGAR CORPORATION ("U.S. SUGAR") is a Delaware corporation with its principal place of business located at 111 Ponce De Leon Avenue, Clewiston, FL 33440. At all relevant times Defendant U.S. SUGAR, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material, that damaged Named Plaintiffs and Class Members.

10.      Defendant FLO-SUN INCORPORATED ("FLO-SUN") is a Florida corporation with its principal place of business located at One North Clematis Street, Suite 200, West Palm Beach, FL 33401. At all relevant times Defendant FLO-SUN, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material, that damaged Named Plaintiffs and Class Members.

11.      Defendant AMERICAN SUGAR REFINING, INC. ("ASR") is a Delaware corporation with its principal place of business at One North Clematis Street, Suite 200, West Palm Beach, FL 33401. At all relevant times Defendant ASR, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material, that damaged Named Plaintiffs and Class Members.

12.      Defendant OKEELANTA CORPORATION ("OKEELANTA CORP.") is a Delaware corporation with its principal place of business location at One North Clematis Street, Suite 200, West Palm Beach, FL 33401. At all relevant times Defendant OKEELANTA CORP., and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted

sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material, that damaged Named Plaintiffs and Class Members.

13.     Defendant OSCEOLA FARMS is a Florida corporation with its principal place of business location at One North Clematis Street, Suite 200, West Palm Beach, FL 33401. At all relevant times Defendant OSCEOLA FARMS, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material, that damaged Named Plaintiffs and Class Members.

14.     Defendant SUGARLAND HARVESTING CO. ("SUGARLAND") is a Florida not for profit corporation with its principal place of business location at 1023 Fox Lane, Moore Haven, FL 33471. At all relevant times Defendant SUGARLAND, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material, that damaged Named Plaintiffs and Class Members.

15.     Defendant TRUCANE SUGAR CORPORATION ("TRUCANE") is a Florida corporation with its principal place of business location at 625 N. Flagler Drive, Suite 507, West Palm Beach, FL 44301. At all relevant times Defendant TRUCANE, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material, that damaged Named Plaintiffs and Class Members.

16.     Defendant INDEPENDENT HARVESTING, INC. is a Florida corporation with its principal place of business located at US Highway 27, South, Moore Haven, FL 33471. At all relevant times Defendant INDEPENDENT HARVESTING, INC., and/or its subsidiaries, agents,

and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material, that damaged Named Plaintiffs and Class Members.

17.     Defendant KING RANCH, INC. ("KING RANCH") is a Delaware corporation with its principal place of business located at Three Riverway, Suite 1600, Houston, TX 77056. Defendant KING RANCH is the largest member of Defendant SCGC. At all relevant times Defendant KING RANCH, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material, that that damaged Named Plaintiffs and Class Members.

18.     Defendant J & J AG PRODUCTS, INC. ("J & J AG PRODUCTS") is a Florida corporation with its principal place of business located at 1813 Davidson Rd., Clewiston, FL 33440. At all relevant times Defendant J & J AG PRODUCTS, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material, that damaged Named Plaintiffs and Class Members.

19.     Defendants DOES 1-50 include as of yet unknown entities that  at all relevant times have conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material, that that damaged Named Plaintiffs and Class Members.

**JURISDICTION AND VENUE**

20.     This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000, there exists minimal diversity between parties in that the majority of class

members are citizens of Florida, and at least one Defendant is incorporated and has its principal place of business in a state other than Florida, and there are over 100 putative class members.

21.     This Court has personal jurisdiction over Defendants because Defendants conduct substantial activities in Florida and this District and have sufficient minimum contacts in Florida and this District to render the exercise of jurisdiction by this Court permissible.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the events or omissions giving rise to Named Plaintiff's and Class Members' claims occurred in this District. Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact substantial business in this District.

## GENERAL ALLEGATIONS

### History of Defendants' Sugarcane Agriculture

23.     Acquiring a true and sufficient understanding of the current climate of sugarcane agricultural processes and activities in Florida, including in the Affected Area,  necessitates a thorough apprehension of the inexorable progression of the sugar industry in the state, as well as the involved parties responsible for this unprecedented proliferation.

24.     In 1960, Alfonso "Alfy" and Jose "Pepe" Fanjul immigrated to Palm Beach County, Florida from Cuba, where their family had built and established a sugar empire on the island dating back to the 19th Century.  The family company, Fanjul Corp., initially consisted of numerous large businesses in sugar cane mills, refineries, distilleries, and real estate.  The company's growth mushroomed even more upon arrival to the United States.

25.     Fanjul Corp. purchased 1,000 acres of land in western Palm Beach County, Florida upon their arrival in the country in 1960 and produced 10,500 tons of sugar in 1961-62.

Today, the Fanjul brothers own 190,000 acres in Palm Beach County, where they grow sugar cane, sweet corn, and rice.

26.     The Fanjul Brothers also operate two sugar mills, a sugar refinery, a rice mill, a packaging and distribution center for various items, and the largest biomass renewable power plant in North America, all in Palm Beach County, Florida.

27.     Fanjul Corp. continues to operate today as a sugar and real estate empire of the Fanjul Brothers in both the United States and the Dominican Republic.  Its primary company holdings include Domino Sugar, Florida Crystals, C+H Sugar, Redpath Sugar, American Sugar Refining, La Romana International Airport, and numerous resorts in La Romana, Dominican Republic.  The company's current net worth is estimated at $8.2 billion and is ranked as the third largest private company in Florida.  Currently, the sixth generation of Fanjuls works for the family sugar business.

28.     The Fanjuls own approximately 400,000 acres of sugar plantations: 50% in Florida and 50% in Dominican Republic.  The latter serves as one of the top sugar exporters to the United States, with 63% of the country's entire sugar export allocated for the Fanjul sugar empire.  In essence, the Fanjul subsidiary companies in Dominican Republic sell sugar to its concomitant subsidiary companies in the United States.

29.     One of the Fanjuls' sugar companies, Defendant FLORIDA CRYSTALS, alone grows and harvests approximately 187,000 acres of sugar cane, employs over 2,000 workers in Palm Beach County, and produces over 660,000 tons of sugar.

30.     The Fanjuls' primary sugar holding company is ASR Group, which is a subsidiary of Defendant FLORIDA CRYSTALS.  The two commingling companies also cohabitate the

same office building in West Palm Beach, Florida.  The CFO of Defendant FLORIDA CRYSTALS, Luis Fernandez, is also a co-president of ASR Group.

31.     ASR Group, which Defendant FLORIDA CRYSTALS owns in a partnership, is the world's largest cane sugar refining company, with refineries in Louisiana, California, New York, Maryland, Canada, Mexico, England, Italy, and Portugal.

32.     ASR Group's initial primary purpose or function when founded in 1998 was large scale refining of the harvested raw sugar.  Today, ASR Group annually ships more than four million tons of sugar to over 80 countries.  The company's revenues routinely exceed $5 billion a year and it employs nearly 4,000 people worldwide.

33.     ASR Group supplies sugar and specialty items to companies such as: Kraft, Hershey, Kellogg's, Pepsi, and Nestle, as well as to major chain grocery stories like Costco, Sam's Club, Publix, Kroger, and Aldi.  In total, ASR Group produces more than 750 consumer-related products that enter the stream of commerce as goods.

34.     In 1931, Charles Stuart Mott purchased assets near Clewiston, Florida from the bankrupt Southern Sugar Company to form Defendant U.S. SUGAR.

35.     Today, Defendant U.S. SUGAR farms about 230,000 acres of sugarcane in Florida.

36.     Defendant SCGC, which was created in 1960, is now composed of about 45 member grower-owners who grow a total of about 70,000 acres of sugarcane.

37.     Together, Defendants FLORIDA CRYSTALS, U.S. SUGAR, and SCGC have come to be known as "Big Sugar" for their production, profitability, and political clout.

38.    With specific regards to the subject region, approximately 90% of Florida's 400,000-plus acres of sugar cane is grown in western Palm Beach County.  In fact, more sugar is produced in Florida than anywhere else in the United States.

**Sugarcane Burning Process/Effects**

39.    A typical sugar cane harvest in Florida will yield approximately 17 million tons of pure sugar cane, which in turn can be milled, processed, and otherwise produced into approximately two million tons of sugar.

40.    Prior to harvesting the sugar cane stalks from the hundreds of thousands of acres of land in western Palm Beach County, as well as the counties of Glades and Hendry, the sugar companies first complete a procedure called pre-harvest burning.  This process consists of setting large fires to whole sugarcane fields to burn off the outer leaves from the cane stalks, which are full of water and thus do not ignite or burn.

41.    Pre-harvest burning, which occurs during the months of October-March and beyond, is performed for the express purpose of making the harvesting and processing of sugar can stalks quicker and easier.  More specifically, pre-harvest burning is practiced: a) to facilitate the harvesting process by quickly and cheaply removing excess biomass (trash"), b) to reduce dangers from snakes and insects, c) and to increase the sugar content of the stalk by water evaporation.

42.    These burns are generally conducted on 40-80 acre tracts of land at a time throughout the entire six month pre-harvesting period of October-March and are ostensibly regulated by the Florida Forest Service.

43.     These pre-harvest burns emit billows of thick black smoke and a stench into the air, and cause small pieces of black ash rain down over the surrounding contiguous counties of Palm Beach, Glades, and Hendry.

44.     Pollutants produced by Defendants' pre-harvest sugarcane burns include particulate matter ("PM"), dioxins, polycyclic aromatic hydrocarbons ("PAHs"), volatile organic compounds ("VOCs"), carbon monoxide, sulfur oxides, nitrogen oxides, ammonia, elemental carbon and organic carbon.

45.     Many hazardous compounds are produced by sugarcane burning, including but not limited to benzo[*a*]pyrene (classified by the International Agency for Research on Cancer (IARC) as a confirmed human carcinogen), naphthalene (classified by IARC as a possible human carcinogen), acenaphthylene, acenaphthene, flourene, phenanthrene, anthracene, flouranthene, pyrene, benzo[*a*]anthracene (classified by IARC as a possible human carcinogen), benzo[*k*]flouranthene (classified by IARC as a possible human carcinogen), indenol[1,2,3-*cd*]pyrene (classified by IARC as a possible human carcinogen), benzol[*g,h,i*]perylene, formaldehyde, acetaldehyde, propionaldehyde, benzene, toluene, ethylbenzene, styrene, and *o,m,p*-xylene.

46.     The toxic smoke and ash (referred to as "black snow") emitted from the pre-harvest fires travel through and get deposited onto properties in the Affected Area, and have negatively impacted the workers in the fields as well as community residents.  Falling "black snow" ash not only causes and manifests medical conditions such as respiratory problems within the community, it also discolors cars, homes, and office buildings.  Because of the damage to real property caused by the smoke plumes, many homes must be pressure washed annually.

47.     Of all the contiguous United States, Florida has the most crop burning residue emissions, emitting 17% of the total national $CO_2$, CO and $PM_{2.5}$[1] emissions, 12% of all annual $PM_{10}$ emissions, and 9.5% of all $CH_4$ emissions from crop residue burning.

48.     The contamination in the subject communities has proximately caused and/or in the future will cause injury and harm to Plaintiffs' interests in the market value, use value, and/or beneficial enjoyment value of their residences and/or owned real property, as well as consequent annoyance, inconvenience, diminished quality of life, and stigma.

49.     As a direct result of Defendant's discharge of toxic pollutants into the air and onto the land, including the introduction of noxious smoke replete with benzene and formaldehyde created by pre-harvest burnings and blown through and deposited onto Plaintiffs' real properties by wind and air, Plaintiffs have suffered a diminution of their property value, perhaps by as much as rendering the value of the real properties worthless.

50.     There exists a reasonable and feasible pre-harvesting method, known as "green harvesting," that can alleviate the harmful exposure and contamination of real property caused by Defendant.

51.     In green harvesting, the sugarcane is harvested without burning and a thick, leafy harvest residue mulch layer remains on the soil surface.

52.     When Defendants' applications for open burn authorization of their sugarcane fields are denied they utilize green harvesting techniques rather than bear the cost of moving the harvesting equipment to another location and leaving the field unharvested.

53.     Plaintiffs' property exposure to toxic and hazardous substances is the result of tortious, negligent, and otherwise culpable conduct for which Defendants are liable.  As a

---

[1] Particulate matter can be denoted as "PM" with a subscript indicating the diameter of the particles, such as $PM_{2.5}$ (particulate matter with a diameter of less than 2.5 micrometers), $PM_{10}$ (diameter of less than 10 micrometers), or $PM_{0.5}$ (diameter of less than 0.5 micrometers).

proximate result of such exposure, Plaintiffs have experienced significant diminution of real property value and will continue to experience these diminutions so long as Defendants' continue utilizing the hazardous and dangerous pre-harvest burning process.

**Pesticide, Fungicide, and Herbicide Use**

54.     Sugarcane growers in Florida, including Defendants, utilize a number of pesticides, fungicides, and herbicides to manage insects, mites, fungal diseases and weeds in sugarcane crops.

55.     Two organophosphate insecticides, phorate and ethoprop, are used on sugarcane seed pieces in open furrow planting.

56.     A mix of lamda-cyhalothrin and chlorantraniliprole is commonly used on sugarcane foliage.

57.     A number of fungicides are used to manage orange and brown rust, including pyraclostrobin, azoxystrobin, metconazole, and propiconazole, as well as mixes of these chemicals.

58.     The herbicides commonly used on Florida sugarcane include atrazine, metribuzin, ametryn, 2, 4-D amine, asulam pendimethalin, mesotrione, trifloxysulfuron, dicamba and glyphosate.

59.     Defendants apply various pesticides, fungicides, and herbicides (all three classes of chemicals will be hereinafter referred to as "pesticides") to their crops via methods that include spraying from crop-dusting aircraft and using large tractor sprayers in the fields.

60.     Defendants' pesticides migrate through and onto Named Plaintiffs' and Class Members properties, exposing Named Plaintiffs and Class Members to those hazardous and dangerous chemicals and detrimentally affecting their property values.

**Property Use/Value Effect of Sugarcane Burning**

61.     The cities of Belle Glade, Pahokee, and South Bay, part of Palm Beach County, Florida, are included as part of Enterprise Florida's Heartland Counties area as part of an effort to stimulate economic development of Florida's rural areas.[2]

62.     Businesses willing to move to Belle Glade and invest in the area are given incentives from Palm Beach County in the form of ad valorem tax exemptions and potentially contributions from the State of Florida as well.[3]

63.     However, these efforts notwithstanding, between 2015 and 2016 the median household income for Belle Glade declined 11.4% and 37.4% of Belle Glade's population lives below the poverty line.

64.     Between 2015 and 2016, the median household income for the State of Florida increased by 2.9%.

65.     Defendants' sugarcane burning activities have discouraged investment of businesses in the towns of Belle Glade, Pahokee and South Bay and the surrounding areas and have contributed to economically depressing the towns.

**Health Effects of Sugarcane Burning**

66.     Upon information and belief, as a result of exposure to the air pollution created by Defendants' pre-harvest sugarcane burning, residents of the Affected Area are at higher risk compared to the rest of the population for developing various diseases, including respiratory conditions.

_____

[2] https://www.enterpriseflorida.com/thefutureishere/inland-florida/ (visited 4/23/19)
[3] https://www.palmbeachpost.com/business/manufacturing-facility-belle-glade-create-nearly-200-jobs/Q1AYllbjVjIZboGZl9BcaM/ (visited 4/23/19)

67.     Upon information and belief the residents of the Affected Area have experienced a much higher incidence of adverse health effects, including respiratory conditions such as asthma, due to the air pollution created by Defendants' pre-harvest sugarcane burning.

68.     Many studies have shown adverse health effects from air pollution.

69.     Defendants' sugarcane burning activities raise the airborne particulate matter, as well as many other pollutants.

70.     There are significant associations between air pollution and episodes of respiratory symptoms, and childhood exposure to air pollutants is a major risk factor for health and may have consequences into adulthood.

71.     Studies have shown a connection between the effects of biomass burning, such as the pre-harvest sugarcane Defendants burn, and adverse respiratory health effects.

72.     Defendants' sugarcane burning activities create an enormous amount of particulate matter as well as dioxins, polycyclic aromatic hydrocarbons ("PAHs"), volatile organic compounds ("VOCs"), carbon monoxide, sulfur oxides, nitrogen oxides, ammonia, elemental carbon and organic carbon.

73.     These by-products of Defendants' sugarcane burning activities have caused significant health effects and pose significant health risks to people living and working in the Class Affected Area.

74.     Airborne particulate matter is of health and environmental concern in rural areas that are used for intensive agricultural purposes, such as the Class Affected Area.

75.     In 2015 a study was published in the journal *Particuology* that studied particulate matter and PAH concentrations in Belle Glade, Florida, within the Class Affected Area. During the winter sampling period, when Defendants' burning activities were going on, $PM_{10}$ levels

were at least fifty percent (50%) higher than when otherwise measured, indicating that sugarcane harvesting and processing is a major source for $PM_{10}$ in the Class Affected Area.

76.     During the sugarcane harvesting season, the concentrations of PAHs associated with $PM_{10}$ were up to 15 times higher than PAH concentrations measured during the summer growing season, which indicates that as a result of Defendants' sugarcane burning activities people living and working in the Class Affected Area are exposed to a substantially higher amount of PAHs from sugarcane burning.

77.     The PAHs from sugarcane burning are often mutagenic and carcinogenic.

78.     In addition to direct primary emissions from sugarcane burning, atmospheric chemical reactions of highly reactive volatile organic compounds from sugarcane burning lead to additional formation of secondary particulate matter.

79.     PAHs are mutagenic and carcinogenic and are generally concentrated in particles of less than 1 micrometer in diameter, which is significant because particles of that diameter penetrate more deeply into lung tissue, making them more hazardous.

80.     When sugarcane is burned before harvesting, about 70% of approximately 30 tons of foliage per acre is removed by burning, which releases substantial amounts of gaseous and particulate pollutants into the air.

81.     The *Particuology* study found that during the sugarcane burning season, total PAH levels in Belle Glade were 7.36 nanograms per cubic meter, whereas when the sugarcane burning was not occurring, the total PAH levels in Belle Glade were only 0.49 nanograms per cubic meter, leading the authors of that study to conclude that it was "highly likely that the elevated PAH levels in Belle Glade during the sugarcane harvest season are caused by the pre-harvest burning of sugarcane foliage."

16

82.     Belle Glade, and other population concentrations within the Class Affected Area, is composed mostly of simple homes that offer residents little protection from elevated PAH outdoor concentrations.

83.     Named Plaintiff and Class Members have been and continue to be exposed to the hazardous pollutants produced by Defendants' sugarcane burning activities.

84.     Sugarcane burning activities cause respiratory distress in smoke-exposed regions. A study published in the October 2015 issue of *Environmental Health* found an association between sugarcane burning and acute respiratory illness on the island of Maui. This study also found a clear dose-response relationship between sugarcane burning and respiratory illness; there was a significantly higher incidence of respiratory distress in smoke-affected areas when greater amounts of sugarcane acreage were burned.

85.     Outdoor air pollution is associated with mortality and hospital admissions due to respiratory and cardiovascular disease in both short-term and long-term studies.

86.     The byproduct of burning sugarcane is at least as toxic as pollution produced by traffic, and is more toxic than traffic pollution after repeated exposure.

87.     In Brazil, which enacted a law requiring the gradual elimination of pre-harvest sugarcane burning, the reduction of pre-harvest sugarcane burning has been associated with a decrease in hospitalizations due to respiratory disease.

88.     In 2016 a study was published documenting the effects of sugarcane harvest fires on infant health in Brazil.

89.     Increased *in utero* exposure to smoke from sugarcane fires reduces birth weight as well as gestational age at birth, key metrics for infant health.

90.     Pollution from sugarcane harvest burning causes smaller babies, shorter

pregnancies, and more *in utero* mortality.

91.     A study conducted in Mexico concluded that people living near sugarcane crops

which were burned during the harvest season had a higher incidence of respiratory illness

compared to those at other sites.

92.     A study from Mexico published in 2016 in the *International Journal of*

*Environmental Science and Development* conducted a particle sampling campaign to collect fine

particles ($PM_{2.5}$) and inhalable particles ($PM_{10}$) before and after the sugarcane harvest season in a

small Mexican city situated near a large concentration of sugarcane crops.

93.     That study concluded that concentrations of $PM_{10}$ increased about 41% during the

sugarcane harvest season, when the fields were burned, and that $PM_{2.5}$ increased 32% during the

same time. The study also concluded that most of the particles from sugarcane harvest burning

were in the $PM_{2.5}$ range, which is significant because $PM_{2.5}$ penetrates deeper into the lungs and

can cause more significant and longer-lasting health effects that $PM_{10}$. Furthermore, the study

found that during the sugarcane harvest burning the concentration of carcinogenic PAHs

increased to 50% of the total PAHs present.

94.     $PM_{2.5}$, which is a significant pollution metric produced in large quantities by

Defendants' sugarcane burning activities, can easily penetrate or be deposited on the alveolus

zone of the lung; $PM_{2.5}$ can absorb and bind to numerous toxic compounds, including but not

limited to PAHs, and cause adverse health effects.

95.     The 2016 study from Mexico found that populations living near sugarcane

harvesting operations have a $PM_{10}$ exposure 1.7 times higher, and a $PM_{2.5}$ exposure 1.5 times

higher, during the harvest season than during the growing season.

96.     During the sugarcane harvest burning, 70% of the particles are in the $PM_{2.5}$ range and 82% of the PAHs are in the fine fraction, which increases the risk of respiratory illness because the $PM_{2.5}$ can penetrate deeper into the lungs.

97.     A 2016 study published in the journal *Atmospheric Environment* undertook to estimate occupational exposure levels to $PM_{10}$ during the commercial production of sugar from sugarcane and to assess the impacts on human health.

98.     Studies have associated pre-harvest sugarcane burning with increased occurrence of acute respiratory illness, genotoxicity, and other diseases of the respiratory system.

99.     The impacts of sugarcane burning are particularly pronounced in vulnerable groups such as young children and the elderly.

100.     The detrimental health impacts of sugarcane burning are enhanced in regions where sugarcane cultivation dominates land use, such as the Affected Area.

101.     The Defendants' extensive sugarcane burning activities have put the health of residents of the Affected Area at risk, and have caused significant adverse health effects for residents and reduction in their quality of life.

**Political Influence of Defendants**

102.     According to the Center for Responsive Politics, in the 2014 election cycle the sugar industry gave more than $5 million to members of Congress. From 1994 to 2016, the sugar industry has steered $57.8 million in direct and in-kind contributions to state and local political campaigns (that total does not include Federal contributions).

103.     Defendants, as members of the sugar industry, have a significant degree of political influence which has allowed them to persist largely unchallenged in their archaic practice of pre-harvest sugarcane burning, and which has helped Defendants to secure $4 billion

dollars per year in price supports and corporate welfare in an era when most other agricultural industries are having subsidies slashed.

104.    This corporate welfare program for the sugar industry, including Defendants, has been very expensive for taxpayers. From 2000-2001, the sugar program cost taxpayers nearly $500 million, and in 2013 nearly $300 million was charged to taxpayers to, in part, prop up the price of sugar domestically.

105.    The sugar industry's corporate welfare program limits the amount of sugar on the U.S. market in order to keep prices higher than everywhere else, and if there is a glut in the domestic market, the U.S. buys the surplus, which costs taxpayers.

106.    Taxpayers also pay more for food because of the artificially inflated prices of domestic sugar. The average wholesale price of domestically-produced sugar in the U.S. is more than twice the average world price of sugar.

107.    Through the use of price supports, import restrictions and tariffs, the sugar program destroys competition in the market and props up the politically connected sugar industry, including Defendants, at the expense of the public.

108.    To add insult to injury, Defendants turn around and use the money gained through the program's floor-price guarantee and supply management structure (which creates artificially inflated sugar prices) to use archaic sugarcane farming tactics, such as the pre-harvest burning, that further injure the public.

109.    When Defendants burn their sugarcane fields, taxpayer money goes up in smoke and ash, smoke that the public then has to breathe, and ash that they have to watch rain down on their homes and businesses.

110.    The extensive contributions from the sugar industry, including Defendants, to elected officials and candidates for public office, as well as their pervasive and well-funded lobbying operations, have made it very difficult to hold Big Sugar responsible for their rampant pollution.

## CLASS ACTION ALLEGATIONS

111.    Named Plaintiff COFFIE brings this suit as a class action, pursuant to Rule 23, Federal Rules of Civil Procedure, on behalf of a Class, defined as follows:

a.  Property Damage Subclass: All persons and legal entities that are or have been owners of real property located within the Affected Area from June 2015 to the present.

112.    Named Plaintiff THOMPSON brings this suit as a class action, pursuant to Rule 23, Federal Rules of Civil Procedure, on behalf of a Class, defined as follows:

a.  Medical Monitoring Subclass: All current residents of the Affected Area.

113.    Excluded from the Class are the following: (1) the Defendants, and any parent, subsidiary or affiliate organizations, and the officers, directors, agents, servants, or employees of same, and the members of the immediate family of any such person; (2) all persons and entities who timely opt out of this proceeding; (3) all persons who have given valid releases releasing Defendants from the claims asserted in this Complaint; (4) all persons who, prior to the filing of this Complaint, have filed a non-class action claim against the Defendants for the claims asserted in this Complaint; (5) all Judges of any Court in which this action is maintained, as well as employee of those Judges, including law clerks.

114.    Named Plaintiffs bring this action under the Federal Rules of Civil Procedure, Rule 23(a), Rule 23(b)(1), Rule 23(b)(2), and Rule 23(b)(3), as a class action on behalf of

themselves and all others similarly situated. The Class Members are so numerous as to make it impractical to bring them all before this Court. The population of the Affected Area exceeds 40,000 people. The members of the Property Damage Subclass include all past and current property owners in the Affected Area from June 2015 through the present. The members of the Medical Monitoring Subclass include all residents of the Affected Area.

115.    The claims of the Named Plaintiffs raise questions of law and fact common to the questions of law and fact raised by the claims of Class Members.

116.    The questions of law and fact that are common to the claims of the Named Plaintiffs and the claims of each member of the Class include, but are not limited to, the following:

   a.   The scope of Defendants' sugarcane burning activities;

   b.   Whether Defendants' sugarcane burning activities were negligent and/or reckless;

   c.   What pollutants are produced by Defendants' sugarcane burning activities;

   d.   Whether those pollutants are hazardous to human health;

   e.   Whether Defendants' sugarcane burning activities have exposed Class Members to greater than normal background levels of hazardous substances;

   f.   Whether, as a result of such exposure, Class Members are at significantly increased risks, as compared to the general population, of contracting serious latent diseases;

   g.   Whether medical monitoring procedures exist for the early detection of such diseases and whether such procedures are warranted for the Class Members;

   h.   Whether, and to what extent, Defendants' sugarcane burning activities have deposited byproducts of that burning onto Class Members' properties;

i.   Whether, and to what extent, Defendant's sugarcane burning activities have created a nuisance on Class Members' properties;

j.   Whether, and to what extent, Defendants' sugarcane burning activities have caused a trespass on Class Members' properties;

k.   The impact of Defendants' sugarcane burning activities on the surrounding properties;

l.   Whether, and to what extent, Defendants' sugarcane burning activities detrimentally affected the value of Class Members' properties;

m.   Whether, and to what extent, Defendants' sugarcane burning activities have created a stigma surrounding Class Members' properties;

n.   Whether, and to what extent, Defendants' sugarcane burning activities are a hazard to the health of the population of the Affected Area;

o.   Whether and to what extent Class Members have been exposed to Defendants' pesticides;

p.   Whether and to what extent Defendants' pesticides have migrated onto Class Members' properties;

q.   Whether Defendants were negligent in the application of pesticides;

r.   Whether Defendants' pesticide use has damaged Class Members, including whether it has detrimentally affected Class Members' property values;

s.   Whether Defendants are strictly liable for Class Members' exposure to Defendants' pesticides and any detrimental effect Defendant's pesticide use had on Class Members' properties; and

t. Whether Defendants' acts and omissions have entitled the Class Members to the relief requested in this Complaint.

117. The claims of the Named Plaintiffs are typical of the claims of each member of the Class in that:

a. The Named Plaintiffs' claims arise from the same course of conduct of Defendants giving rise to the claims of other Class Members;

b. The claims of the Named Plaintiffs and each member of the Class are based upon the same legal theories;

c. The Named Plaintiffs and each member of the Class have an interest in prevailing on the same legal claims;

d. The types of damages incurred by the Named Plaintiffs are similar to those incurred by the other Class members;

e. The defenses asserted by Defendants will be very similar, if not identical, as to all Named Plaintiffs and Class Member.

118. The Named Plaintiffs will fairly and adequately protect the interests of the Class. The Named Plaintiffs are members of the Class they seek to represent. The interests of the Named Plaintiffs are coincident with, and not antagonistic to, those of the other members of the Class they seek to represent, and the Named Plaintiffs will fairly and adequately protect the interests of the Class. The Named Plaintiffs and all Class Members have a similar, if not identical interest in obtaining the relief sought. Proof of the claims of the Named Plaintiffs will also prove the claims of the Class.

119. The claims in this Complaint are maintainable on behalf of a Class pursuant to Rule 23(b)(1), Fed. R. Civ. P., in that the prosecution of separate claims or defenses by or against

individual members of the Class would create the risk of either (a) inconsistent or varying adjudication concerning individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; or (b) adjudications concerning individual members of the Class would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the individual adjudications, or substantially impair or impede the ability of other members of the Class who are not parties to the individual adjudications to protect their interests.

120.    The claims in this Complaint are maintainable on behalf of a Class pursuant to Rule 23(b)(2), Fed. R. Civ. P., in that Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief and/or corresponding declaratory relief is appropriate respecting the Class as a whole.

121.    In the alternative, if the claims in this Complaint are found by the Court to be not maintainable under Rule 23(b)(1) or (b)(2), Fed. R. Civ. P., the claims are maintainable on behalf of a Class pursuant to Rule 23(b)(3), Fed. R. Civ. P., in that the questions of law or fact common to Class Members predominate over any questions affecting only individual Class Members, and that a class action is superior to other available methods for fairly and efficiently adjudicating this controversy in that: (i) neither the size of the Class nor any other factor make it likely that difficulties will be encountered in the management of this class action; (ii) the prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members, is impractical and would create a massive and unnecessary burden on the Court's resources; (iii) the disparity between the resources of Defendants and Class Members would make prosecution of individual actions a financial hardship on Class Members; (iv) all of the properties affected are within this judicial forum, and the injuries complained of occurred in this judicial forum,

making it desirable to concentrate the litigation of the claims in this particular forum; and (v) currently the undersigned counsel is unaware of any other pending litigation regarding this controversy with respect to property damage and medical monitoring.

122.    The Named Plaintiffs have retained counsel experienced in class action litigation and who will adequately represent the interests of the Class. Named Plaintiffs and their counsel have sufficient financial resources to ensure the interests of the Class are not harmed.

123.    Named Plaintiffs' counsel at the time of the filing of this Complaint consists of the undersigned counsel.

124.    Named Plaintiffs have retained the above counsel to represent them in this lawsuit, and are obligated to pay said counsel reasonable attorneys' fees provided recovery is obtained.

125.    Upon information and belief, there are no pending certified class actions concerning the controversy at issue or the claims asserted in this Complaint applicable to Named Plaintiffs or Class Members.

## COUNT I – NEGLIGENCE

126.    Named Plaintiffs incorporate by reference the foregoing allegations in paragraphs 1 through 125 as if fully set forth herein.

127.    Defendants owed a duty to Named Plaintiffs and Class Members to take appropriate precautions and to possess and exercise the degree of care that an ordinarily prudent person would under the same or similar circumstances to avoid exposing Named Plaintiffs and Class Members and their properties to the pollutants produced by Defendants' sugarcane burning activities, including the smoke, particulate matter, dioxins, PAHs, VOCs, carbon monoxide, sulfur oxides, nitrogen oxides, ammonia, elemental carbon and organic carbon, and other hazardous pollutants produced by those activities.

128.    Defendants owed a duty to Named Plaintiffs and Class Members to take appropriate precautions and to possess and exercise the degree of care that an ordinarily prudent person would under the same or similar circumstances to avoid exposing Named Plaintiffs and Class Members and their properties to pesticides, herbicides, insecticides, and other agricultural chemicals applied to Defendants' sugarcane crops.

129.    Defendants breached their duty by failing to take appropriate precautions to avoid the escape of hazardous substances, including pollutants from sugarcane burning activities and pesticides, herbicides, insecticides, and other agricultural chemicals, from Defendants' properties; by failing to adequately train and supervise their employees and agents with regard to proper procedures to prevent the release and spread of hazardous substances, including pollutants from sugarcane burning activities and pesticides, herbicides, insecticides, and other agricultural chemicals, from Defendants' properties; by failing to adequately warn of the escape of hazardous substances, including pollutants from sugarcane burning activities and pesticides, herbicides, insecticides, and other agricultural chemicals, from Defendants' properties'; by failing to utilize other available means of harvesting that did not involve burning the sugarcane; and by otherwise failing to exercise reasonable care in the operation of their sugarcane cultivation businesses to prevent the escape of hazardous substances, including pollutants from sugarcane burning activities and pesticides, herbicides, insecticides, and other agricultural chemicals, from the Defendants' properties onto the properties of the Named Plaintiff and Class Members.

130.    As a result of such breach, Named Plaintiff and Class Members have suffered damages.

WHEREFORE, Named Plaintiff COFFIE, individually and as putative Class Representative, demands judgment against Defendants for:

27

a.      An order certifying this case as a class action;

b.      An order appointing Named Plaintiff as Class Representative of the Class;

c.      An order appointing undersigned counsel as lead counsel for the Class;

d.      Compensatory damages;

e.      Post-judgment interest;

f.      Reasonable attorneys' fees, costs, and expenses; and

g.      Such other relief as this Court deems just, necessary, or appropriate.

## COUNT II – STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITY

131.    Named Plaintiffs incorporate by reference the foregoing allegations in paragraphs 1 through 125 as if fully set forth herein.

132.    The conduct of Defendants in connection with their sugarcane cultivation activities created conditions and circumstances for which Defendants are legally accountable and responsible.

133.    The conduct of Defendants in connection with their sugarcane burning activities constituted an ultrahazardous activity, because that activity created hazardous substances that were not contained or otherwise kept from escaping Defendants' properties.

134.    The conduct of Defendants in connection with the application of pesticide, herbicide, insecticide and other agricultural chemicals to their crops constituted an ultrahazardous activity because that activity utilized and/or created hazardous substances that were not contained or otherwise kept from escaping Defendant's properties.

135.    Defendants owed a duty to Named Plaintiffs and Class Members to take appropriate precautions and to possess and exercise the degree of care that an ordinarily prudent person would under the same or similar circumstances to avoid exposing Named Plaintiffs and

Class Members and their properties to the pollutants produced by Defendants' sugarcane burning activities, including the smoke, PAHs, dioxins, organic carbon, and other hazardous substances produced by those activities.

136.     Defendants owed a duty to Named Plaintiffs and Class Members to take appropriate precautions and to possess and exercise the degree of care that an ordinarily prudent person would under the same or similar circumstances to avoid exposing Named Plaintiffs and Class Members and their properties to pesticides, herbicides, insecticides, and other agricultural chemicals applied to Defendants' sugarcane crops.

137.     Defendants breached their duty by failing to take appropriate precautions to avoid the escape of hazardous substances, including pollutants produced by sugarcane burning activities and pesticides, herbicides, insecticides, and other agricultural chemicals, from Defendants' properties; by failing to adequately train and supervise their employees and agents with regard to proper procedures to prevent the release and spread of hazardous substances, including pollutants produced by sugarcane burning activities and pesticides, herbicides, insecticides, and other agricultural chemicals, from Defendants' properties; by failing to adequately warn of the escape of hazardous substances, including pollutants produced by sugarcane burning activities and pesticides, herbicides, insecticides, and other agricultural chemicals, from Defendants' properties'; by failing to utilize other available means of harvesting that did not involve burning the sugarcane; and by otherwise failing to exercise reasonable care in the operation of their sugarcane cultivation businesses to prevent the escape of hazardous substances, including pollutants produced by sugarcane burning activities and pesticides, herbicides, insecticides, and other agricultural chemicals, from the Defendants' properties onto the properties of the Named Plaintiffs and Class Members.

138.    Defendants exercised exclusive control over their operations and the handling, storage, and disposal of contaminants and other hazardous materials produced by their operations.  In the normal course of events, contaminants would not escape from Defendants' property if Defendants had used ordinary care.

139.    As a direct and proximate result of Defendants' acts and omissions, the hazardous substances utilized in and/or created by Defendants' sugarcane cultivation activities migrated onto the properties of Named Plaintiffs and Class Members.

140.    As a direct and proximate result of Defendants' sugarcane cultivation activities, Named Plaintiffs and Class Members have suffered damages, including diminution of the value of their real estate and have suffered property stigma damages.

141.    Defendants were aware that a high degree of risk existed in its use and disposal of these materials.  Defendants also knew that a substantial likelihood existed that harm might occur should any such materials be released from their property.

142.    Defendants failed to contain and properly dispose of these contaminants and hazardous materials.  These acts and omissions were undertaken with a conscious disregard or indifference to the rights, welfare, and safety of Plaintiffs, class members, and their properties.

143.    Because Defendants engaged in ultrahazardous activity that caused damages to Named Plaintiffs and Class Members, Defendants are strictly liable to Named Plaintiffs and Class Members for their damages.

WHEREFORE, Named Plaintiff COFFIE, individually and as putative Class Representative, demands judgment against Defendants for:

a.      An order certifying this case as a class action;

b.      An order appointing Named Plaintiff as Class Representative of the Class;

c.      An order appointing undersigned counsel as lead counsel for the Class;

d.      Compensatory damages;

e.      Post-judgment interest;

f.      Reasonable attorneys' fees, costs, and expenses; and

g.      Such other relief as this Court deems just, necessary, or appropriate.

## COUNT III – STRICT LIABILITY UNDER FLA. STA. 376.313

144.    Named Plaintiffs incorporate by reference the foregoing allegations in paragraphs 1 through 125 as if fully set forth herein.

145.    Pursuant to Fla. Stat. 376.313, Defendants are strictly liable for any and all damages emanating from the sugarcane burning activities described in this Complaint.

146.    Defendants exercised exclusive control over their operations and the handling, storage, and disposal of contaminants and other hazardous materials produced by their operations.  In the normal course of events, contaminants would not escape from Defendants' property if Defendants had used ordinary care.

147.    Defendants were aware that a high degree of risk existed in its use and disposal of these materials.  Defendants also knew that a substantial likelihood existed that harm might occur should any such materials be released from their property.

148.    Defendants failed to contain and properly dispose of these contaminants and hazardous materials.  These acts and omissions were undertaken with a conscious disregard or indifference to the rights, welfare, and safety of Plaintiffs, class members, and their properties.

149.    The breaches described in this Count and the incorporated paragraphs caused Named Plaintiff and Class Members damages, including but not limited to diminution in

property value and property stigma damages, which damages are ongoing and continuing in nature.

150.    Pursuant to chapter 376, Named Plaintiff and Class Members may be awarded costs of litigation (including reasonable attorneys' fees and expert fees) if the Court determines such an award is in the public interest. Named Plaintiff has retained the undersigned counsel to prosecute this action on his behalf and has agreed to pay his counsel a reasonable fee and reimburse them for the costs of the prosecution of this case.

WHEREFORE, Named Plaintiff COFFIE, individually and as putative Class Representative, demands judgment against Defendants for:

a.      An order certifying this case as a class action;

b.      An order appointing Named Plaintiff as Class Representative of the Class;

c.      An order appointing undersigned counsel as lead counsel for the Class;

d.      Compensatory damages;

e.      Post-judgment interest;

f.      Reasonable attorneys' fees, costs, and expenses pursuant to Fla. Stat. § 376.313; and

g.      Such other relief as this Court deems just, necessary, or appropriate.

## COUNT IV – TRESPASS

151.    Named Plaintiff COFFIE incorporates by reference the foregoing allegations in paragraphs 1 through 125 as if fully set forth herein.

152.    Named Plaintiff and Class Members own homes and real property within the Affected Area.

32

153.    Defendants, without the consent or authority and against the will of Named Plaintiff and Class Members caused hazardous and unwanted substances to enter and contaminate Named Plaintiff's and Class Members' homes and properties.

154.    Defendants' conduct constitutes a repeated trespass and an unpermitted intrusion onto Named Plaintiff's and Class Members' properties.

155.    As a direct and proximate result of Defendants' actions, Named Plaintiff and Class Members have suffered a diminution in the value of their real estate and have additionally suffered property stigma damages.

156.    Defendants' trespass was the direct, proximate and foreseeable cause of Named Plaintiff's and Class Members' damages.

157.    Defendants knew that a high degree of risk existed in the use and disposal of such pollutants from sugarcane burning. Defendants also knew that a substantial likelihood existed that harm might occur should any such pollutants escape from its properties.

WHEREFORE, Named Plaintiff COFFIE, individually and as putative Class Representative, demands judgment against Defendants for:

a.      An order certifying this case as a class action;

b.      An order appointing Named Plaintiff as Class Representative of the Class;

c.      An order appointing undersigned counsel as lead counsel for the Class;

d.      Compensatory damages;

e.      Post-judgment interest;

f.      Reasonable attorneys' fees, costs, and expenses; and

g.      Such other relief as this Court deems just, necessary, or appropriate.

## **COUNT V – NUISANCE**

33

158.     Named Plaintiff COFFIE incorporates by reference the foregoing allegations in paragraphs 1 through 125 as if fully set forth herein.

159.     Defendants' sugarcane burning activities, which have caused the pollutants produced by sugarcane burning to pass through, be deposited in and around and to enter and remain upon Named Plaintiff's and Class Members' properties, are an obstruction to the free use of Named Plaintiff's and Class Members' properties, interferes with Named Plaintiff's and Class Members' comfortable enjoyment of life and property, and therefore constitutes a nuisance under §386.01, Florida Statutes.

160.     Defendants' application of pesticides, which have caused those pesticides to pass through, be deposited onto, and enter and remain upon Named Plaintiff's and Class Members' properties are an obstruction to the free use of Named Plaintiff's and Class Members' properties, interferes with Named Plaintiff's and Class Members comfortable enjoyment of life and property, and therefore constitutes a nuisance under §386.01, Florida Statutes.

161.     Defendants used their property so that contaminants and other hazardous pollutants produced by sugarcane burning caused damage to Named Plaintiff's and Class Members property values.

162.     The release of contaminants and other hazardous materials from Defendants' property has materially and substantially interfered with Named Plaintiff's and Class Members' use and enjoyment of their property.

163.     As a direct and proximate result of the foregoing, Named Plaintiff and Class Members have suffered a diminution of the value of their real estate and suffered property stigma damages.

164.    Defendants knew that a high degree of risk existed in the use and disposal of such pollutants from sugarcane burning and pesticide application. Defendants also knew that a substantial likelihood existed that harm might occur should any such pollutants and/or pesticides escape from its properties.

165.    Defendants have received notice of this nuisance on many occasions. Despite repeated notice, Defendants refused, and continue to refuse, to abate the nuisance.

WHEREFORE, Named Plaintiff COFFIE, individually and as putative Class Representative for the Property Damage Subclass, demands judgment against Defendants for:

a.    An order certifying this case as a class action;

b.    An order appointing Named Plaintiff as Class Representative of the Class;

c.    An order appointing undersigned counsel as lead counsel for the Class;

d.    Compensatory damages;

e.    Post-judgment interest;

f.    Reasonable attorneys' fees, costs, and expenses; and

g.    Such other relief as this Court deems just, necessary, or appropriate.

## COUNT VI – MEDICAL MONITORING

166.    Named Plaintiff THOMPSON incorporates by reference the foregoing allegations in paragraphs 1 through 125 as if fully set forth herein.

167.    Named Plaintiff THOMPSON and Class Members seek equitable relief in the form of a Court-established and Court-supervised medical monitoring program solely for the purposes of diagnosing diseases and sharing information with Named Plaintiff THOMPSON and Subclass Members, the establishment of a medical monitoring fund, and further request

injunctive relief compelling Defendants to finance the medical monitoring program. Named

Plaintiff THOMPSON and Class Members specifically request Court supervision and

participation in the medical monitoring program.

168.    Upon information and belief, as a direct and proximate result of Defendants'

wrongful conduct as set forth above, Named Plaintiff THOMPSON and Class Members have

been exposed to hazardous substances, and thereby suffer, and will continue to suffer, a

significantly increased risk of serious injury and diseases as compared to the general public. This

increased risk makes periodic diagnostic medical testing and examinations necessary. Such

medical procedures are different from those normally recommended in the absence of the

aforementioned exposure to the hazardous substances at issue here.

169.    Medical monitoring will reduce the risk of illness by using medical tests to detect

disease caused by Named Plaintiff THOMPSON and resident Class Members exposure to

hazardous substances. Medical monitoring and testing procedures, including clinical

examinations, exist which make early detection of exposure to these hazardous substances, and

early detection of resulting disease, feasible and beneficial.

170.    The increased susceptibility to injuries and irreparable threat to the health of

Named Plaintiff THOMPSON and resident Class Members resulting from their exposure to

hazardous substances can be appropriately mitigated and addressed only by the creation of a

comprehensive, Court-established medical monitoring program supervised by the Court, and

funded by Defendants, that:

        i.   Provides periodic medical testing and examinations designed to facilitate early

            detection of adverse effects related to exposure to hazardous substances; and

      ii.   Gathers and forwards to treating physicians information related to the diagnosis and treatment of injuries and diseases which may result from exposure to hazardous substances produced by Defendants' sugarcane growing and burning activities.

171.    Establishment of a Court-supervised medical monitoring regimen can readily assure that the proceeds of any monitoring trust fund are reserved for the provision of and/or reimbursement for, the above-referenced activities, and those needed examinations and testing procedures the Named Plaintiff THOMPSON and resident Class Members actually undergo, guaranteeing the purely equitable use of any trust funds. The Court's use of its injunctive powers to oversee and direct medical monitoring in this case is an appropriate and necessary method of adjudication.

172.    The precise nature, form, extent and duration of Court-ordered diagnostic monitoring, clinical examinations, research activities and education programs are a matter for the Court to decide, after hearing and consultation with medical, industrial, and other experts, and adjudication that the right to this relief is appropriate and necessary.

173.    The medical monitoring program should be generally supervised by the Court and may be directly managed by Court-appointed and –supervised special masters or trustees.

174.    The program should involve the monitoring of Named Plaintiff THOMPSON, and resident Class Members by designated physicians approved by the Court.

175.    The program could also involve the collection of medical data utilized for group studies and diagnostic testing. The program should be designed to share this data with Named Plaintiff THOMPSON and resident Class Members and their treating physicians.

176.    During program administration, Defendants should address issues implicated by program administration as they develop.

## COUNT VII – INJUNCTIVE RELIEF

177.    Named Plaintiff COFFIE incorporates by reference the foregoing allegations in paragraphs 1 through 125 as if fully set forth herein.

178.    Upon information and belief, Defendants' pre-harvest sugarcane burning as described herein will re-commence in September or October of 2019, in keeping with their historical practice.

179.    This anticipated future pre-harvest sugarcane burning will continue to damage Named Plaintiffs and Class Members, as alleged herein.

180.    Defendants will be responsible for this anticipated future damage related to pre-harvest sugarcane burning, as they have been in the past.

181.    Named Plaintiffs and Class Members are without adequate remedy at law, making injunctive and other equitable relief appropriate.

182.    Named Plaintiffs and Class Members will suffer irreparable harm if the Court does not grant the injunctive and equitable relief requested in this Court.

183.    All future pre-harvest burning within the Affected Area should be enjoined.

WHEREFORE, Named Plaintiff COFFIE, individually and as putative Class Representative, demands judgment against Defendants for:

a.      An order certifying this case as a class action;

b.      An order appointing Named Plaintiffs as Class representatives of the Class;

c.      An order appointing undersigned counsel as lead counsel for the Class;

d.      An order enjoining all future pre-harvest burning of sugarcane in the Affected

Area;

e.      Reasonable attorneys' fees, costs and expenses; and

f.      Such other relief as this Court deems just, necessary or appropriate.

## DEMAND FOR JURY TRIAL

Named Plaintiffs, on their own behalf and on behalf of all others similarly situated,

demand trial by jury on all issues so triable.

Dated this 4th day of June, 2019.

**THE BERMAN LAW GROUP**
*Attorneys for Plaintiff*
P.O. Box 272789
Boca Raton, FL 33427
Telephone: (561) 826-5200
Fax: (561) 826-5201

By: _____/s/ Zachary West_____
Joseph Schulz, Esq.
Fla. Bar No. 660620
Primary: service@thebermanlawgroup.com
Secondary: jschulz@thebermanlawgroup.com

Zachary West, Esq.
Fla. Bar No. 71134
Primary: service@thebermanlawgroup.com
Secondary: zwest@thebermanlawgroup.com