## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CLOVER COFFIE, ELIJAH SMITH, and
SHANTE LEGRAND, each individually and on behalf of all others similarly situated;

       Plaintiffs,

vs.

FLORIDA CRYSTALS CORPORATION,
a Delaware Corporation;
SUGAR CANE GROWERS COOPERATIVE OF FLORIDA,
a Florida not for profit corporation;
UNITED STATES SUGAR CORPORATION,
a Delaware corporation;
FLO-SUN INCORPORATED, a Florida corporation;
AMERICAN SUGAR REFINING, INC.,
a Delaware corporation
OKEELANTA CORPORATION, a Delaware corporation;
OSCEOLA FARMS CO, a Florida corporation;
SUGARLAND HARVESTING CO.,
a Florida not for profit corporation;
TRUCANE SUGAR CORPORATION,
a Florida corporation; INDEPENDENT
HARVESTING, INC., a Florida corporation;
KING RANCH, INC., a Delaware corporation;
J & J AG PRODUCTS, INC., a Florida corporation;
and DOES 1-50;

       Defendants.

_____/

Case No. 9:19-cv-80730-RS-MM
CLASS ACTION
Jury Trial Demanded

## **FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, CLOVER COFFIE, ELIJAH SMITH, and SHANTE LEGRAND (collectively

the "Named Plaintiffs"), on behalf of themselves, and all others similarly situated, bring this First

Amended Class Action Complaint against Defendants FLORIDA CRYSTALS

CORPORATION, a Delaware Corporation; SUGAR CANE GROWERS COOPERATIVE OF

FLORIDA, a Florida not for profit corporation; UNITED STATES SUGAR CORPORATION, a

Delaware corporation; FLO-SUN INCORPORATED, a Florida corporation; AMERICAN

SUGAR REFINING, INC., a Delaware corporation; OKEELANTA CORPORATION, a Delaware corporation; OSCEOLA FARMS CO, a Florida corporation; SUGARLAND HARVESTING CO., a Florida not for profit corporation; TRUCANE SUGAR CORPORATION, a Florida corporation; INDEPENDENT HARVESTING, INC., a Florida corporation; KING RANCH, INC., a Delaware corporation; J & J AG PRODUCTS, INC., a Florida corporation; and DOES 1-50, to obtain redress for those damaged by Defendants' sugarcane agriculture activities. The allegations in this Complaint are based on the personal knowledge of the Named Plaintiffs, as to themselves, and upon information and belief as to all other matters.

## <u>INTRODUCTION</u>

1.     This class action arises from Defendants' use of an archaic and environmentally damaging method of harvesting sugarcane, namely the burning of its vast acreage of sugarcane within and adjacent to this District as part of the pre-harvest process.  Defendant's wrongful and damaging acts have caused and will continue to cause property damage, economic damage, nuisance, and medical issues for those living in and around the areas south and east of Lake Okeechobee and the towns of Belle Glade, South Bay, Pahokee, Clewiston, Moore Haven, and others.

2.     The annual maps of burn activities demonstrate that the communities most affected by the burning are some of the poorest in Florida, comprised of a population without the resources to effectively fight the nuisance, dangers, and economic effects the unnecessary six month burn season literally rains down upon them.

3.     The pre-harvest burning, which Defendants cling to because it is allows them to make more profit, causes pollutants, including smoke, particulate matter ("PM"), dioxins, polycyclic aromatic hydrocarbons ("PAHs"), volatile organic compounds ("VOCs"), carbon

monoxide, sulfur oxides, nitrogen oxides, ammonia, elemental carbon and organic carbon, to migrate onto, to be deposited upon, and to contaminate Named Plaintiff's and Class Members properties, and expose Named Plaintiffs and Class Members to those pollutants.

4.      Defendants allow this environmental travesty and nuisance to continue despite knowledge of a "green" alternative that has been used effectively in places such as Brazil for over a decade, and which has even resulted in greater yields from the fields.

5.      Defendants farm sugarcane on approximately 400,000 acres in the area south and southeast of Lake Okeechobee, resulting in a huge swath of continuing harm.

6.      The "Affected Area" for purposes of this action,  is defined as that area of Florida contained within the following township ("T") and range ("R") areas: T39S, R37E; T39S, R38E; T39S, R39E; T40S, R37E; T40S, R38E; T40S, R39E; T41S, R32E; T41S, R37E; T41S, R38E; T42S, R30E; T42S, R31E; T42S, R32E; T42S, R33E; T42S, R36E; T42S, R37E; T42S, R38E; T43S, R33E; T43S, R34E; T43S, R35E; T43S, R36E; T43S, R37E; T44S, R35E; T44S, R36E; T44S, R37E. .

## PARTIES

7.      Plaintiff CLOVER COFFIE ("COFFIE") is a resident of Palm Beach County, Florida. COFFIE resides at and owns real property located at 34 NE Avenue H, Belle Glade, FL 33430, which is in close proximity to many of Defendants' sugarcane fields. Named Plaintiff COFFIE'S property is located within the Affected Area.

8.      Plaintiff ELIJAH SMITH ("SMITH") is resident of Clewiston, Florida.  SMITH resides at and owns real property located at 1006 Virginia Avenue, Clewiston, FL 33440, which is in close proximity to many of Defendants' sugarcane fields, and which, upon information and

belief, is harmed by burning fields in Palm Beach County. SMITH's property is located within the Affected Area

9. Plaintiff SHANTE LEGRAND ("LEGRAND") resides in Belle Glade, Palm Beach County, and in close proximity to many of Defendants' sugarcane fields. LEGRAND lives in the Affected Area and has been exposed to hazardous and dangerous pollutants from Defendants' sugarcane agriculture activities.

10. Defendant FLORIDA CRYSTALS CORPORATION ("FLORIDA CRYSTALS") is a Delaware corporation with its principal place of business located at One North Clematis Street, Suite 200, West Palm Beach, FL 33401. At all relevant times Defendant FLORIDA CRYSTALS, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Affected Area and adjacent to the Affected Area, that damaged Named Plaintiffs and Class Members.

11. Defendant SUGAR CANE GROWERS COOPERATIVE OF FLORIDA ("SCGC") is a Florida not-for-profit corporation with its principal place of business located at 1500 West Sugarhouse Road, Belle Glade, FL 33430. Defendant SCGC is composed of about 44 member farms that cultivate sugarcane in the area south of Lake Okeechobee. At all relevant times Defendant SCGC, by and through its constituent member farms, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Affected Area and adjacent to the Affected Area, that damaged Named Plaintiffs and Class Members. The constituent member farms of Defendant SCGC are included in this Class Action Complaint as DOES 1-50.

12.     Defendant UNITED STATES SUGAR CORPORATION ("U.S. SUGAR") is a Delaware corporation with its principal place of business located at 111 Ponce De Leon Avenue, Clewiston, FL 33440. At all relevant times Defendant U.S. SUGAR, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Affected Area and adjacent to the Affected Area, that damaged Named Plaintiffs and Class Members.

13.     Defendant FLO-SUN INCORPORATED ("FLO-SUN") is a Florida corporation with its principal place of business located at One North Clematis Street, Suite 200, West Palm Beach, FL 33401. At all relevant times Defendant FLO-SUN, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Affected Area and adjacent to the Affected Area, that damaged Named Plaintiffs and Class Members.

14.     Defendant AMERICAN SUGAR REFINING, INC. ("ASR") is a Delaware corporation with its principal place of business at One North Clematis Street, Suite 200, West Palm Beach, FL 33401. At all relevant times Defendant ASR, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Affected Area and adjacent to the Affected Area, that damaged Named Plaintiffs and Class Members.

15.     Defendant OKEELANTA CORPORATION ("OKEELANTA CORP.") is a Delaware corporation with its principal place of business location at One North Clematis Street, Suite 200, West Palm Beach, FL 33401. At all relevant times Defendant OKEELANTA CORP., and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste

5

material in the Affected Area and adjacent to the Affected Area, that damaged Named Plaintiffs

and Class Members.

16.     Defendant OSCEOLA FARMS CO is a Florida corporation with its principal

place of business location at One North Clematis Street, Suite 200, West Palm Beach, FL 33401.

At all relevant times Defendant OSCEOLA FARMS CO, and/or its subsidiaries, agents, and

entities over which it exercised operational control, conducted sugarcane cultivation activities,

including burning of sugarcane fields and sugarcane waste material in the Affected Area and

adjacent to the Affected Area, that damaged Named Plaintiffs and Class Members.

17.     Defendant SUGARLAND HARVESTING CO. ("SUGARLAND") is a Florida

not for profit corporation with its principal place of business location at 1023 Fox Lane, Moore

Haven, FL 33471. At all relevant times Defendant SUGARLAND, and/or its subsidiaries,

agents, and entities over which it exercised operational control, conducted sugarcane cultivation

activities, including burning of sugarcane fields and sugarcane waste material in the Affected

Area and adjacent to the Affected Area, that damaged Named Plaintiffs and Class Members.

18.     Defendant TRUCANE SUGAR CORPORATION ("TRUCANE") is a Florida

corporation with its principal place of business location at 625 N. Flagler Drive, Suite 507, West

Palm Beach, FL 44301. At all relevant times Defendant TRUCANE, and/or its subsidiaries,

agents, and entities over which it exercised operational control, conducted sugarcane cultivation

activities, including burning of sugarcane fields and sugarcane waste material in the Affected

Area and adjacent to the Affected Area, that damaged Named Plaintiffs and Class Members.

19.     Defendant INDEPENDENT HARVESTING, INC. is a Florida corporation with

its principal place of business located at US Highway 27, South, Moore Haven, FL 33471. At all

relevant times Defendant INDEPENDENT HARVESTING, INC., and/or its subsidiaries, agents,

and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Affected Area and adjacent to the Affected Area, that damaged Named Plaintiffs and Class Members.

20.     Defendant KING RANCH, INC. ("KING RANCH") is a Delaware corporation with its principal place of business located at Three Riverway, Suite 1600, Huston, TX 77056. Defendant KING RANCH is registered to do business in Florida, and conducts substantial business in Florida, including the conduct complained of herein.  Defendant KING RANCH is the largest member of Defendant SCGC. At all relevant times Defendant KING RANCH, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Affected Area and adjacent to the Affected Area, that that damaged Named Plaintiffs and Class Members.

21.     Defendant J & J AG PRODUCTS, INC. ("J & J AG PRODUCTS") is a Florida corporation with its principal place of business located at 1813 Davidson Rd., Clewiston, FL 33440. At all relevant times Defendant J & J AG PRODUCTS, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Affected Area and adjacent to the Affected Area, that damaged Named Plaintiffs and Class Members.

22.     Defendants DOES 1-50 include as of yet unknown entities that  at all relevant times have conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material, that that damaged Named Plaintiffs and Class Members.[1]

---

[1] Plaintiffs reserve the right to name additional Defendants, and serve them, should they be found in the course of discovery.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this class action pursuant to the

Class Action Fairness Act of 2005 (CAFA) and 28 U.S.C. § 1332(d). The matter in controversy,

exclusive of interest and costs, exceeds the sum or value of $5,000,000, there exists minimal

diversity between parties in that the majority of class members are citizens of Florida, and at

least one Defendant is incorporated and has its principal place of business in a state other than

Florida, and there are over 100 putative class members.

24.      This Court has personal jurisdiction over Defendants because Defendants

conduct substantial activities, including the conduct causing harm to Named Plaintiffs and Class

Members, in Florida and this District and have sufficient contacts in Florida and this District to

render the exercise of jurisdiction by this Court permissible.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (c)

because a substantial part of the events or omissions giving rise to Named Plaintiff's and Class

Members' claims occurred in this District. Venue is also proper under 18 U.S.C. § 1965(a)

because Defendants transact substantial business in this District.

## GENERAL ALLEGATIONS

26.     There is no reason for imposing the dangers and nuisance of pre-harvest cane

burning for six months a year on the communities in the Affected Area, other than Defendants'

greed, and their archaic belief that well known and established green harvesting methods will be

less convenient and more expensive.  Established green harvesting methods have been in use for

over three decades, and have been studied against the burn method. The results of these studies

and decades of experience in other major sugarcane producing countries has demonstrated that

green harvesting actually improves profits and yields after a brief adjustment period, and better preserves the soil for future crops.

27.     The population of the Affected Area, which is poverty stricken to begin with, is faced with this constant nuisance, property damage, danger to their health, and economic pain, because "Big Sugar" is well aware that the communities are ill-equipped to fight it.

### History of Defendants' Sugarcane Agriculture

28.     A sufficient understanding of the current climate of environmentally harmful and unnecessarily damaging sugarcane harvesting process in Florida and the Affected Area, necessitates an overview of the inexorable progression of the sugar industry in the state, as well as the involved parties responsible for this unprecedented proliferation and nuisance.

29.     In 1960, Alfonso "Alfy" and Jose "Pepe" Fanjul (the "Fanjul brothers") immigrated to Palm Beach County, Florida from Cuba, where their family had built and established a sugar empire on the island dating back to the 19th Century.  The family company, Fanjul Corp., initially consisted of numerous large businesses in sugar cane mills, refineries, distilleries, and real estate.  The company survived leaving Cuba and its growth even mushroomed even more upon arrival of the Fanjul brothers to the United States.

30.     Fanjul Corp. purchased 1,000 acres of land in western Palm Beach County, Florida upon their arrival in the country in 1960 and produced 10,500 tons of sugar in 1961-62. Today, the Fanjul brothers own 190,000 acres in Palm Beach County, where they grow sugar cane, sweet corn, and rice.

31.     The Fanjul brothers also operate two sugar mills, a sugar refinery, a rice mill, a packaging and distribution center for various items, and the largest biomass renewable power plant in North America, all in Palm Beach County, Florida.

32.     Fanjul Corp. is today a sugar and real estate empire  in both the United States and the Dominican Republic.  Its primary company holdings include Domino Sugar, Florida Crystals, C+H Sugar, Redpath Sugar, American Sugar Refining, La Romana International Airport, and numerous resorts in La Romana, Dominican Republic.  The company's current net worth is estimated at $8.2 billion and is ranked as the third largest private company in Florida. Currently, the sixth generation of the Fanjul family works for the family sugar business.

33.     The Fanjuls own approximately 400,000 acres of sugar plantations: 50% in Florida and 50% in Dominican Republic.  The latter allows Fanjul to be one of the top sugar exporters to the United States, with 63% of the Dominican Republic's sugar exports attributable to the Fanjul sugar empire.  The Fanjul subsidiary companies in Dominican Republic sell sugar to its Fanjul Corp.'s concomitant subsidiary companies in the United States.

34.     The Fanjul's FLORIDA CRYSTALS subsidiary grows and harvests approximately 187,000 acres of sugar cane, employs over 2,000 workers in Palm Beach County, and produces over 660,000 tons of sugar per year.

35.     The Fanjuls' primary sugar holding company is ASR Group, which is a subsidiary of FLORIDA CRYSTALS.  The two commingling companies  are both located in the same office building in West Palm Beach, Florida.  Moreover, the Chief Financial Officer, Luis Fernandez, FLORIDA CRYSTALS is also a co-president of ASR Group.

36.     ASR Group, which FLORIDA CRYSTALS owns in a partnership, is the world's largest cane sugar refining company, with refineries in Louisiana, California, New York, Maryland, Canada, Mexico, England, Italy, and Portugal.

37.     ASR Group's initial primary purpose or function when it was founded in 1998, was the large scale refining of harvested raw sugar.  Today, ASR Group ships more than four

million tons of sugar to over 80 countries annually.  The company's revenues routinely exceed $5 billion a year and it employs nearly 4,000 people worldwide.

38.     ASR Group supplies sugar and specialty items to companies such as:  Kraft Heinz, Hershey, Kellogg's, PepsiCo, and Nestle, as well as to major chain grocery stores like Costco, Sam's Club, Publix, Kroger, and Aldi.  In total, ASR Group produces more than 750 consumer-related products.

39.     In 1931, Charles Stuart Mott purchased assets near Clewiston, Florida from the bankrupt Southern Sugar Company to form Defendant U.S. SUGAR.

40.     Today, U.S. Sugar farms over 230,000 acres of land in the counties of Hendry, Glades and Palm Beach. It is the largest producer of sugar cane in the United States by volume, producing over 700,000 tonnes of raw sugar per year. It also a large sugar refiner.

41.     Defendant SCGC, which was created in 1960, is now composed of about 45 member grower-owners who grow a total of about 70,000 acres of sugarcane.

42.     Together, Defendants FLORIDA CRYSTALS, U.S. SUGAR, and SCGC have come to be known as "Big Sugar" for their production, profitability, and political clout.

43.     Approximately 90% of Florida's 400,000-plus acres of sugar cane is grown in western Palm Beach County.  In fact, more sugar is produced in Florida than anywhere else in the United States.

**Sugarcane Burning Process/Effects**

44.     A typical sugar cane harvest in Florida will yield approximately 17 million tons of pure sugar cane, which in turn is milled, processed, and otherwise produced into approximately two million tons of sugar.

11

45.     Prior to harvesting the sugar cane stalks from the hundreds of thousands of acres of land in the Affected Area, the sugar companies first conduct a pre-harvest burning process, which is the reason for this action.  This process consists of setting large fires to whole sugarcane fields to burn off the outer leaves from the cane stalks.  The stalks are full of water and thus, do not ignite or burn.

46.     Pre-harvest burning occurs primarily during a six month period from October through March, and is performed because Defendants believe it is the cheapest way to make the harvesting and processing of sugar cane stalks quicker and easier.  More specifically, pre-harvest burning is practiced: (a) to facilitate the harvesting process by quickly and cheaply removing the excess leaves around the stalks or biomass (referred to in the industry as the "trash"); (b) to reduce dangers from snakes and insects: and (c) to increase the sugar content of the stalk by water evaporation.

47.     These pre-harvest burns are generally done on 40-80 acre tracts of land at a time throughout the six month burn period, and are ostensibly regulated by the Florida Forest Service.

48.     These pre-harvest burns emit billows of thick black smoke and a stench into the air, and cause small pieces of black ash rain to down over the surrounding Affected Area.

49.     A review of the annual burn maps demonstrates that the burns disproportionately affect the poorer communities, and that burning is more curtailed on the eastern fringes of the sugarcane acreage, near the wealthy Palm Beach communities, and around certain big business such as Wal-Mart.

50.     Pollutants produced by Defendants' pre-harvest burns include particulate matter ("PM"), dioxins, polycyclic aromatic hydrocarbons ("PAHs"), volatile organic compounds

("VOCs"), carbon monoxide, sulfur oxides, nitrogen oxides, ammonia, elemental carbon and organic carbon.

51.     Many hazardous compounds are produced by sugarcane burning, including but not limited to benzo[*a*]pyrene (classified by the International Agency for Research on Cancer (IARC) as a confirmed human carcinogen), naphthalene (classified by IARC as a possible human carcinogen), acenaphthylene, acenaphthene, flourene, phenanthrene, anthracene, flouranthene, pyrene, benzo[*a*]anthracene (classified by IARC as a possible human carcinogen), benzo[*k*]flouranthene (classified by IARC as a possible human carcinogen), indenol[1,2,3-*cd*]pyrene (classified by IARC as a possible human carcinogen), benzol[*g,h,i*]perylene, formaldehyde, acetaldehyde, propionaldehyde, benzene, toluene, ethylbenzene, styrene, and *o,m,p*-xylene.

52.     The toxic smoke and ash emitted from the pre-harvest fires (referred to as "black snow") travels through and gets deposited onto properties in the Affected Area, negatively impacting the workers in the fields as well as area residents.  The "black snow" not only causes and manifests medical conditions such as respiratory problems within the communities, it also discolors cars, homes, and office buildings.  Because of the damage to real property caused by the smoke plumes, many homes must be pressure washed annually.  The "black snow" is known to travel for miles from the area of the burn.

53.     Of the 48 contiguous U.S. states, a recent study has shown that Florida consistently ranks as the top contributor to crop burning emissions nationwide,  largely due to the harvesting activities.  Florida is responsible for annually producing 17% of the total national

$CO_2$, CO and $PM_{2.5}$[2] burn emissions, 12% of the $PM_{10}$ burn emissions, and 9.5% of the $CH_4$ burn emissions.[3]

54.   Air quality studies have shown that during the winter sampling period, when pre-harvest burns are at their peak, $PM_{10}$ levels were 50% or higher than otherwise measured, indicating that sugarcane harvesting and processing is a major local source for $PM_{10}$.[4]  During the sugarcane harvesting season at Belle Glade, the concentrations of PAHs associated with $PM_{10}$ were up to 15 times higher than those measured during the summer growing season, indicating a substantially higher exposure of the rural population to these often mutagenic and carcinogenic compounds.[5]

55.   The contamination in the Affected Area has proximately caused and/or will continue to cause injury and harm to Plaintiffs' interests in the market value, use value, and/or beneficial enjoyment value of their residences and/or owned real property, as well as consequent nuisance, annoyance, inconvenience, diminished quality of life, and stigma.

56.   As a direct result of Defendants' pre-harvest burnings, toxic pollutants, including the introduction of noxious smoke replete with benzene and formaldehyde, are discharged, blown through, and deposited onto Plaintiffs' real properties, such that Plaintiffs have suffered a diminution of their property value, perhaps to zero, or alternatively, have been unable to

---

[2] Particulate matter is denoted as "PM" with a subscript indicating the diameter of the particles, such as $PM_{2.5}$ (particulate matter with a diameter of less than 2.5 micrometers), $PM_{10}$ (diameter of less than 10 micrometers), or $PM_{0.5}$ (diameter of less than 0.5 micrometers).

[3] Jessica L. McCarty, *Remote Sensing-Based Estimates of Annual and Seasonal Emissions from Crop Residue Burning in the Contiguous United States,* J. OF THE AIR & WASTE MGMT. ASSOC., Vol 61, pp. 22–34 (2011).

[4] Orhan Sevimoglua and Wolfgang F. Rogge, *Seasonal size-segregated $PM_{10}$ and PAH concentrations in a rural area of sugarcane agriculture versus a coastal urban area in Southeastern Florida, USA,* PARTICUOLOGY, Vol. 28, pp. 52–59 (2016).

[5] *Id.*

participate in the general rise in property values, and economic stimulus programs, by virtue of their proximity to such noxious pollutants.

### The Green Alternative to Burning That Defendants Refuse to Embrace

57.     Defendants are well aware that a reasonable and feasible alternative ("green harvesting") to the pre-harvest burning process exists and has been in use in other countries for decades.  Indeed, they are sometimes, on a very limited basis, forced to use it themselves, when the Florida Forest Service occasionally denies a burn permit for a particular tract, or when, upon information and belief, they cater to the wealthier communities to the east and certain big businesses that have the economic power and clout to upset their "cheap," "easy," archaic and entrenched methods.

58.     The purported cheapness and ease, which is actually just a pervasive fiction of Big Sugar, comes at the expense of those in the Affected Area.   Green harvesting has been shown to increase net profits and crop yields over time, while alleviating the harmful exposure, contamination, and damages complained of here.

59.     Green harvesting has been mandated in Brazil for over ten years and all sugar cane burning processes had to be eliminated by 2017.  Australia recognized the problem in 1982, and eliminated over 60% of its pre-harvest burning by 1995.

60.     Australian Andrew Wood, Ph.D., one of the foremost experts on sugarcane harvesting, detailed in his 1991 Wood Report how he had conducted trials in Australia in the 1980s that proved to sugarcane farmers that by leaving the biomass "trash" leaves as a mulch on the field floor, instead of burning them, actually improved cane yields, provided higher sugar content, and resulted in a progressive increase in soil organic matter over time.

61.     In 2001, when Dr. Wood was invited to give a seminar on green harvesting in Belle Glade by a Florida agronomist he had met a symposium, Big Sugar had the seminar cancelled.

62.     Dr. Wood's scholarly reports, as well as reports from Brazil, demonstrate that any disadvantages of green harvesting are far outweighed by its advantages, and that green harvesting actually results in greater net profits, after an initial adjustment period.

63.     Plaintiffs' exposure to toxic and hazardous substances is the result of Defendants ignoring green harvesting, and instead engaging in  tortious, negligent, and otherwise culpable conduct for which Defendants are liable.  As a proximate result of such exposure, Plaintiffs are experiencing, and will continue to experience, damage to their property, unnecessary and substantial nuisance, long term health effects,and damage to their property values, so long as Defendants refuse to embrace green harvesting.

### Pesticide, Fungicide, and Herbicide Hazards

64.     Sugarcane growers in Florida, including Defendants, utilize a number of pesticides, fungicides, and herbicides to manage insects, mites, fungal diseases and weeds in sugarcane crops.

65.     Two organophosphate insecticides, phorate and ethoprop, are used on sugarcane seed pieces in open furrow planting.

66.     A mix of lamda-cyhalothrin and chlorantraniliprole is commonly used on sugarcane foliage.

67.     A number of fungicides are used to manage orange and brown rust, including pyraclostrobin, azoxystrobin, metconazole, and propiconazole, as well as mixes of these chemicals.

68.     The herbicides commonly used on Florida sugarcane include atrazine, metribuzin, ametryn, 2, 4-D amine, asulam pendimethalin, mesotrione, trifloxysulfuron, dicamba and glyphosate.

69.     Defendants apply these various pesticides, fungicides, and herbicides (all three classes of chemicals will be hereinafter referred to as "pesticides") to their crops via methods that include spraying from crop-dusting aircraft and using large tractor sprayers in the fields.

70.     Because of the pre-harvest burning, Defendants' pesticides also migrate as part of the "black snow" through and onto Named Plaintiffs' and Class Members properties, exposing Named Plaintiffs and Class Members to these hazardous and dangerous chemicals and detrimentally affecting their property values and health.

### Property Use/Value Effect of Sugarcane Burning

71.     The cities of Belle Glade, Pahokee, and South Bay, all in Palm Beach County, are included in Enterprise Florida's Heartland Counties area, as part of an effort to stimulate the economic development of Florida's rural areas.[6]

72.     Businesses willing to move to Belle Glade and invest in the area would be given incentives from Palm Beach County in the form of ad valorem tax exemptions and potential contributions from the State of Florida as well.[7]

73.     In spite of such efforts, however, a review of economic statistics shows that the communities in the Affected Areas suffer greatly compared to the rest of Florida.  For instance, as of 2017, the community of South Bay, has a 34.8% poverty rate, compared to the Florida median of 15.5%; a 2.07% *decline* in median household to $28,795 compared to a 3.41% *growth*

---

[6]     https://www.enterpriseflorida.com/thefutureishere/inland-florida/ (visited 4/23/19)
[7]     https://www.palmbeachpost.com/business/manufacturing-facility-belle-glade-create-nearly-200-jobs/Q1AYllbjVjIZboGZl9BcaM/ (visited 4/23/19)

in Florida median income to $52,594; and median property value of $83,500 compared to the

Florida median of $214,000. Belle Glade and Pahokee have similar statistics. The communities

in the Affected Area have not enjoyed any of the economic gains of the past decade.[8]

74.    Defendants' sugarcane burning activities have discouraged investment of

businesses, despite incentives, in the towns of Belle Glade, Pahokee and South Bay and the

surrounding areas, and have contributed to economically depressing the towns.

75.    Defendants' sugarcane burning activities have prevented the Affected Area from

growing economically in the same way much of the rest of Florida has grown. Named Plaintiffs

and Class Members suffer lower property values than they should and are denied an equal

chance of benefitting from overall economic growth and stimulus programs, because it is an

undesirable area, due to the six month "season" of black snow every year.

### Potential Health Effects of Sugarcane Burning

76.    Upon information and belief, as a result of exposure to the air pollution created by

Defendants' pre-harvest sugarcane burning, residents of the Affected Area are at higher risk,

compared to the rest of the population, for developing various diseases, including respiratory

conditions.

77.    Upon information and belief, the residents of the Affected Area have experienced

a much higher incidence of adverse health effects, including respiratory conditions such as

asthma, due to the air pollution created by Defendants' pre-harvest sugarcane burning.

78.    Many studies have shown adverse health effects from air pollution.[9]

---

[8] Figures compiled and maintained by Deloitte and the MIT Media Lab, and available at https://datausa.io/search/?q=&dimension=Geography

[9] Studies used to compile the figures and facts in this section include, but are not limited to: Sevimoglu, et al., PARTICUOLOGY, *supra*; Martin A. Rangel and Tom Vogl, *Agricultural Fires and Infant Health*, NAT'L BUREAU OF ECON. RESEARCH, Working Paper 22955 (Dec. 2016); C.

79.     Defendants' sugarcane burning activities raise the airborne particulate matter, as well as many other pollutants.

80.     There are significant associations between air pollution and episodes of respiratory symptoms, and childhood exposure to air pollutants is a major risk factor for health and may have consequences into adulthood.

81.     Studies have shown a connection between the effects of biomass burning, such as the pre-harvest sugarcane Defendants burn, and adverse respiratory health effects.

82.     Defendants' sugarcane burning activities create an enormous amount of particulate matter as well as dioxins, PAHs, VOCs, carbon monoxide, sulfur oxides, nitrogen oxides, ammonia, elemental carbon and organic carbon.

83.     These by-products of Defendants' sugarcane burning activities have caused and will continue to cause significant health effects and pose significant health risks to people living and working in the Affected Area.

84.     Airborne particulate matter is a special health and environmental concern in rural areas that are used for intensive agricultural purposes, such as the Affected Area.

85.     As previously stated, a study published in the scholarly journal *Particuology*, found 15 times higher PAH concentrations in Belle Glade (as compared to coastal communities), and, generally, $PM_{10}$ levels that were at least fifty percent (50%) higher during the burning season, indicating that sugarcane pre-harvest burns are a major source for $PM_{10}$ in the Affected Area.

---

Mnatzaganian, et al., *Association between sugar cane burning and acute respiratory illness on the island of Maui*, ENV'L HEALTH, Vol. 14, p. 81 (2015).; V. Mugica-Álvarez, et al., *Black Carbon and Particulate Organic Toxics Emitted by Sugarcane Burning in Veracruz, México*, INT'L J. OF ENV'L SCI. AND DEV., Vol. 7, No. 4 (Apr. 2016).

86.     The increases indicate that Defendants' sugarcane burning activities expose people living and working in the Affected Area to substantially higher amount of PAHs. These increases from the black snow also contribute to keeping the area economically depressed.

87.     The PAHs from sugarcane burning are often mutagenic (having a tendency to cause mutations, or changes in the DNA of cells) and carcinogenic (having a tendency to cause cancer).

88.     In addition to direct primary emissions from sugarcane burning, atmospheric chemical reactions of highly reactive VOC's lead to additional formation of secondary particulate matter.

89.     PAHs are generally concentrated in particles of less than 1 micrometer in diameter, which is significant because particles of that diameter are able to penetrate more deeply into lung tissue, making them more hazardous.

90.     When sugarcane is burned during pre-harvesting, about 70% of approximately 30 tons of foliage *per acre* is removed by the burning, which in turn releases substantial amounts of gaseous and particulate pollutants into the air as black snow.

91.     The *Particuology* study further revealed that during the sugarcane burning season, total PAH levels in Belle Glade were 7.36 nanograms per cubic meter, whereas when the sugarcane burning was not occurring, the total PAH levels in Belle Glade were only 0.49 nanograms per cubic meter, leading the research authors to conclude that it was "highly likely that the elevated PAH levels in Belle Glade during the sugarcane harvest season are caused by the pre-harvest burning of sugarcane foliage."

92.     Belle Glade and other population concentrations within the Affected Area are mostly composed of simple homes that offer residents little protection from elevated PAH outdoor concentrations.

93.     Named Plaintiffs and Class Members have been and continue to be exposed to the hazardous pollutants produced by Defendants' sugarcane burning activities.

94.     Sugarcane burning activities cause respiratory distress in smoke-exposed regions. A study published in the October 2015 issue of *Environmental Health* found an association between sugarcane burning and acute respiratory illness on the island of Maui. This study also found a clear dose-response relationship between sugarcane burning and respiratory illness; there was a significantly higher incidence of respiratory distress in smoke-affected areas when greater amounts of sugarcane acreage were burned.

95.     Outdoor air pollution is associated with mortality and hospital admissions due to respiratory and cardiovascular disease in both short-term and long-term studies.

96.     The byproduct of burning sugarcane is at least as toxic as pollution produced by traffic and even more toxic after repeated exposure.

97.     In Brazil, which mandated by law the gradual elimination of pre-harvest sugarcane burning, the reduction of pre-harvest sugarcane burning has been associated with a decrease in hospitalizations due to respiratory disease.

98.     In 2016 a study was published documenting the effects of sugarcane harvest fires on infant health in Brazil.  The study found that increased *in utero* exposure to smoke from sugarcane fires reduces birth weight as well as gestational age at birth, key metrics for infant health.

99.    The study further concluded that pollution from sugarcane harvest burning causes smaller babies, shorter pregnancies, and more *in utero* mortality.

100.    A study conducted in Mexico concluded that people living near sugarcane crops which were burned during the harvest season had a higher incidence of respiratory illness compared to those at other sites at which no burning occurred.

101.    A separate study from Mexico published in 2016 in the *International Journal of Environmental Science and Development* conducted a particle sampling campaign to collect fine particles ($PM_{2.5}$) and inhalable particles ($PM_{10}$) before and after the sugarcane harvest season in a small Mexican city situated near a large concentration of sugarcane crops.

102.    The study concluded that concentrations of $PM_{10}$ increased about 41% during the sugarcane harvest season, when the fields were burned, and that $PM_{2.5}$ increased 32% during the same time. The study also concluded that most of the particles from sugarcane harvest burning were in the $PM_{2.5}$ range. This finding is significant because $PM_{2.5}$ penetrates deeper into the lungs and can cause more significant and longer-lasting health effects than $PM_{10}$. Furthermore, the study found that during the sugarcane harvest burning, the concentration of carcinogenic PAHs increased to 50% of the total PAHs present.

103.    $PM_{2.5}$, which is a significant pollution metric produced in large quantities by Defendants' sugarcane burning activities, can easily penetrate or be deposited on the alveolus zone of the lung; $PM_{2.5}$ can absorb and bind to numerous toxic compounds, including but not limited to PAHs, and cause adverse health effects.

104.    The 2016 study from Mexico found that populations living near sugarcane harvesting operations have a $PM_{10}$ exposure 1.7 times higher, and a $PM_{2.5}$ exposure 1.5 times higher, during the harvest season than during the growing season.

22

105.     During the sugarcane harvest burning, 70% of the particles are in the $PM_{2.5}$ range and 82% of the PAHs are in the fine fraction, which increases the risk of respiratory illness because the $PM_{2.5}$ can penetrate deeper into the lungs.

106.     A 2016 study published in the journal *Atmospheric Environment* undertook to estimate occupational exposure levels to $PM_{10}$ during the commercial production of sugar from sugarcane and to assess the impacts on human health.

107.     Studies have associated pre-harvest sugarcane burning with increased occurrence of acute respiratory illness, genotoxicity, and other diseases of the respiratory system.

108.     The impacts of sugarcane burning are particularly pronounced in vulnerable groups such as young children and the elderly.

109.     The detrimental health impacts of sugarcane burning are enhanced in regions where sugarcane cultivation dominates land use, such as the Affected Area.

110.     The Defendants' extensive sugarcane burning activities have put the health of residents of the Affected Area at risk, and have caused significant adverse health effects for residents and reduction in their quality of life. Furthermore, beyond the health effects on the current population, these persistent pollutants contributed to the pervasive economic hardship and lower property values in the Affected Area.

**Political Influence of Defendants**

111.     According to the Center for Responsive Politics, the sugar industry gave more than $5 million to members of Congress in the 2014 election cycle. From 1994 to 2016, the sugar industry steered $57.8 million in direct and in-kind contributions to state and local political campaigns (which does not include Federal contributions).

112.    Defendants, as members of the sugar industry, have a significant degree of

political influence, which has allowed them to persist largely unchallenged in their archaic

practice of pre-harvest sugarcane burning, and which has helped Defendants secure $4 billion

dollars per year in price supports and corporate welfare in an era when most other agricultural

industries are having subsidies slashed — all at the expense of taxpayers.

113.    As reported on the Dow Jones website MarketWatch, a recent analysis by

American Enterprise Institute revealed:

> The U.S. sugar program is a Stalinist-style supply control initiative that limits
> imports through quotas and domestic production through what are called
> marketing allotments.
>
> This strategy substantially increases U.S. prices — on average U.S. sugar prices
> are about twice as high as world prices — ensuring domestic sugar production is
> artificially higher, crowding out other productive uses of irrigable farmland.
> . . .
> The program, which dates back to the 1981 farm bill, generates over $1 billion a
> year in profits for growers, or an average of more than $200,000 per grower,
> according to the AEI report. One Florida family that plays a dominant role in cane
> production is estimated to benefit to the tune of between $150 million and $200
> million a year.
>
> No wonder the U.S. Sugar Alliance, the major lobbying arm for U.S. sugar
> growers, is extremely well funded and uses its resources to maintain a highly
> protectionist, trade-distorting program that costs a family of four between about
> $44 and nearly $50 a year in subsidies.

Vincent H. Smith, *The U.S. spends $4 billion a year subsidizing 'Stalinist-style' domestic
sugar production*, MarketWatch, June 26, 2018.[10]

114.    This "Stalinist" corporate welfare program for the sugar industry, including

Defendants, has been costly to taxpayers.

---

[10] https://www.marketwatch.com/story/the-us-spends-4-billion-a-year-subsidizing-stalinist-style-domestic-sugar-production-2018-06-25.

115.    The sugar industry's corporate welfare program limits the amount of sugar in the U.S. market to keep prices elevated, and if there is a glut in the domestic market, the U.S. buys the surplus, further burdening taxpayers.

116.    Taxpayers also pay more for food because of the artificially inflated prices of domestic sugar, since the average wholesale price of domestically produced sugar is more than twice the average global price of sugar.

117.    Through the use of price supports, import restrictions, and tariffs, the sugar program destroys competition in the market, and props up the politically connected sugar industry, including Defendants, at the expense of the public.

118.    To add insult to injury, Defendants do not use their artificially inflated profits and substantial subsidies to invest in green harvesting.  Instead, they squeeze every bit of profit they can by clinging to the environmentally damaging  and archaic sugarcane farming tactics, injuring the public for corporate greed.

119.    When Defendants burn their sugarcane fields, taxpayer money literally goes up in smoke, causing the black snow to be breathed in, and causing property damage to homes and businesses

120.    The extensive contributions from the sugar industry, including Defendants, to elected officials and candidates for public office, as well as their pervasive and well-funded lobbying operations, have made it very difficult to hold Big Sugar responsible for their rampant pollution and damaging conduct.

121.    All conditions precedent to the filing of this lawsuit have been met and/or waived by the conduct of Defendants.

## CLASS ACTION ALLEGATIONS

122.     The Named Plaintiffs with claims against Defendants, assert a Property Owner's

Class pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3) and/or 23(c)(4) of the Federal Rules of Civil

Procedure, on behalf of themselves and those similarly situated, against the Defendants for

whom they have standing.  The Named Plaintiffs define the Property Owner's Class as follows:

> All persons and legal entities (past or present) who own or have owned real
> property located within the Affected Area during the applicable statute of
> limitations period, including the period following the filing date of this action.

123.     Named Plaintiff LEGRAND also asserts a Medical Monitoring Class, pursuant to

Rules 23(a), (b)(1), (b)(2), (b)(3) and/or 23(c)(4) of the Federal Rules of Civil Procedure, on

behalf of herself and those similarly situated, against the Defendants for whom they have

standing.  LEGRAND defines the Medical Monitoring Class as follows:

> All persons (past or present) who have resided in the Affected Area for at least
> one pre-harvest sugarcane burn season during the applicable statute of limitations
> period, including the period following the filing date of this action.

124.     Excluded from the Classes are the following: (1) the Defendants, and any parent,

subsidiary or affiliate organizations, and the officers, directors, agents, servants, or employees of

same, and the members of the immediate family of any such person; (2) all persons and entities

who timely opt out of this proceeding; (3) all persons who have given valid releases releasing

Defendants from the claims asserted in this Complaint; (4) governmental entities; (5) all persons

who, prior to the filing of this Complaint, have filed a non-class action claim against the

Defendants (or any of them) for the claims asserted in this Amended Complaint; and (6) the

judge(s) to whom this case is assigned, their employees and clerks, and immediate family

members.

125.     Upon information and belief, the Classes are sufficiently numerous such that the joinder of all members of the Classes in a single action is impracticable.  The population of the Affected Area exceeds 40,000 people, and a substantial majority of those people have been affected by Defendants' wrongful conduct.

126.     There are numerous common questions of law and fact that predominate over any questions affecting only individual members of the Classes and/or Subclasses. Among these common questions of law and fact are the following:

    a.   The scope of Defendants' sugarcane burning activities;

    b.   Whether Defendants' sugarcane burning activities were negligent and/or reckless;

    c.   Whether Defendants' sugarcane burning activities violate established laws;

    d.   What pollutants are produced by Defendants' sugarcane burning activities;

    e.   Whether those pollutants are hazardous to human health;

    f.   Whether, and to what extent, Defendants' sugarcane burning activities have deposited byproducts of that burning onto Class Members' properties;

    g.   Whether, and to what extent, Defendant's sugarcane burning activities have created a nuisance on Class Members' properties;

    h.   Whether, and to what extent, Defendants' sugarcane burning activities have caused a trespass on Class Members' properties;

    i.   The impact of Defendants' sugarcane burning activities on the surrounding properties;

    j.   Whether, and to what extent, Defendants' sugarcane burning activities detrimentally affected the value of Class Members' properties;

    k.   Whether, and to what extent, Defendants' sugarcane burning activities have created a stigma surrounding Class Members' properties;

    l.   Whether and to what extent Defendants' pesticides have migrated onto Class Members' properties;

m.  Whether Defendants' pesticide use has damaged Class Members, including whether it has detrimentally affected Class Members' property values;

n.  Whether Defendants are strictly liable for Class Members' exposure to Defendants' pesticides and any detrimental effect Defendant's pesticide use had on Class Members' properties;

o.  Whether, and to what extent, Defendants' sugarcane burning activities are a hazard to the health of the population of the Affected Area;

p.  Whether and to what extent Class Members have been exposed to Defendants' pesticides;

q.  Whether Defendants were negligent in the application of pesticides;

r.  Whether Defendants' sugarcane burning activities have exposed Class Members to greater than normal background levels of hazardous substances;

s.  Whether, as a result of such exposure, Class Members are at significantly increased risks, as compared to the general population, of contracting serious latent diseases;

t.  Whether medical monitoring procedures exist for the early detection of such diseases and whether such procedures are warranted for the Class Members; and

u.  Whether Defendants' acts and omissions have entitled the Class Members to the relief requested in this Complaint.

127.  The claims of the Named Plaintiffs are typical of the claims of each member of the two Classes in that:

a.  The Named Plaintiffs' claims arise from the same course of conduct of Defendants giving rise to the claims of other Class Members;

b.  The claims of the Named Plaintiffs and each member of the Class are based upon the same legal theories;

c.  The Named Plaintiffs and each member of the Classes have an interest in prevailing on the same legal claims;

d.  The types of damages incurred by the Named Plaintiffs are similar to those incurred by the other Class Members;

e.  The defenses asserted by Defendants will be very similar, if not identical, as to all Named Plaintiffs and Class Members.

128.    Named Plaintiffs are adequate representatives of the Classes in which they participate because, together with their legal counsel, each will fairly and adequately protect the interests of Classes. Named Plaintiffs and all Class Members have a similar, if not identical interest in obtaining the relief sought.  Proof of the claims of the Named Plaintiffs will also prove the claims of the Class.  Named Plaintiffs are not subject to any unique defenses.  Named Plaintiffs have no known conflict with the Class or Subclasses and are committed to the vigorous prosecution of this action.

129.    The undersigned counsel are competent counsel experienced in class action litigation, mass torts, and complex litigation involving such widespread harm. Counsel will fairly and adequately protect the interests of the Classes

130.    The various claims asserted in this action are certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) because prosecuting separate actions by or against individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party opposing the Classes; or adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other Class Members who are not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

131.    The claims for injunctive relief in this case are certifiable under Fed. R. Civ. P. 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief and/or declaratory relief is appropriate respecting the Classes as a whole.

132.     Plaintiffs' legal claims are properly certified pursuant to Rule 23(b)(3) in that: (1) a class action is superior in this case to other methods of dispute resolution; (2) the Class Members have an interest in class adjudication rather than individual adjudication because of their overlapping rights; (3) it is highly desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class Members would protect their rights on their own without this class action case; (4)  the disparity between the resources of Defendants and Class Members would make prosecution of individual actions a financial hardship on Class Members; (5) the prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members is impractical and would create a massive and unnecessary burden on the Court's resources; and (6)  Management of the class will be efficient and far superior to the management of individual lawsuits. Moreover, currently, the undersigned counsel is unaware of any other pending litigation regarding this controversy with respect to the tort claims and medical monitoring claims.

133.     The issues particularly common to the Class Members' claims, some of which are identified above, are alternatively certifiable pursuant to Fed. R. Civ. P. 23(c)(4), as resolution of these issues would materially advance the litigation, and class resolution of these issues is superior to repeated litigation of these issues in separate trials.

134.     Named Plaintiffs have retained the above counsel to represent them in this lawsuit, and are obligated to pay said counsel reasonable attorneys' fees provided recovery is obtained.

## COUNT I – NEGLIGENCE
### (Property Owner Class; Against all Defendants)

135.     Named Plaintiffs COFFIE and SMITH adopt, incorporate by reference, and restate the foregoing allegations in paragraphs 1 through 134, as if fully set forth herein.

136.    Defendants owed a duty to COFFIE, SMITH and the Property Owner Class Members to exercise reasonable care in their sugarcane harvesting processes to avoid exposing Named Plaintiffs and Class Members and their properties to the toxic and damaging "black snow" of pollutants and pesticides that results from pre-harvest burning.

137.    Defendants breached their duty by failing to employ the feasible green harvesting methods available and known to them, to avoid the release and spread of the toxic and damaging "black snow" of pollutants and pesticides from Defendants' properties; by failing to adequately train and supervise their employees and agents with regard to proper procedures to prevent the release and spread of the toxic and damaging "black snow" of pollutants and pesticides from Defendants' properties; by failing to adequately warn of the nature of the toxic and damaging "black snow" of pollutants and pesticides; and by otherwise failing to exercise reasonable care in the operation of their sugarcane cultivation businesses to prevent to prevent the release and spread of the toxic and damaging "black snow" of pollutants and pesticides from Defendants' properties onto the properties of COFFIE, SMITH and Class Members.

138.    Defendants exercised exclusive control over their operations and the handling, storage, and disposal of contaminants and other hazardous materials produced by their burning processes.  In the normal course of events, contaminants would not escape from Defendants' property if Defendants had used reasonable care.

139.    Given the extensive knowledge of green harvesting built up over three or more decades within the sugarcane industry, Defendants knew or should have known that Defendant's conduct could, would, and does cause COFFIE, SMITH and Class Members to suffer harm and damages.

140.     As a direct and proximate cause of Defendants' acts and/or omissions, COFFIE,

SMITH and Class Members have been harmed and have incurred damages, economic harms, and

losses associated with their properties being subjected to the "black snow."

## COUNT II – STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITY
### (Property Owner Class; Against all Defendants)

141.     Named Plaintiffs COFFIE and SMITH adopt, incorporate by reference, and

restate the foregoing allegations in paragraphs 1 through 134, as if fully set forth herein.

142.     The conduct of Defendants in connection with their sugarcane burning activities,

including their pre-burn application of pesticides and fungicides to the crop, constitutes an

ultrahazardous activity under Florida law because:

     a.   the activity involves high degree of risk of harm to the property of others;

     b.   the potential harm is great;

     c.   the risk cannot be eliminated by the exercise of reasonable or utmost care in the

        burning process;

     d.   the activity is not a matter of common usage;

     e.   the activity is inappropriate where conducted; and

     f.   the activity is not of substantial value to community.

143.     The harms to the properties suffered by COFFIE, SMITH and the Property Owner

Class Members are the result of Defendants' ultrahazardous activity, namely the pre-harvest

burning of the sugarcane, which has been treated with pesticides and fungicides, that causes the

"black snow" to fall on the Plaintiffs' and Class Members' properties.

144.     The harms to the properties suffered by COFFIE, SMITH, and Class Members are

within the abnormal risk of physical harm posed by Defendants' ultrahazardous activity.

145.    As a direct and proximate result of Defendants' ultrahazardous activity, the hazardous substances utilized in and/or created by Defendants' sugarcane burning migrated onto the properties of COFFIE, SMITH, and Class Members, damaging the property.

146.    Defendants' conduct in performing the ultrahazardous activity described herein is the proximate cause of the harms to the properties suffered by COFFIE, SMITH and Class Members.

147.    As a direct and proximate result of Defendants' sugarcane burning activities, COFFIE, SMITH, and Class Members have suffered property damages, as well as diminution of the value of their real estate, and property stigma damages.

148.    Defendants were aware that the high degree of risk existed in its cultivation processes.  Defendants also knew that a substantial likelihood existed that harm would occur due to the burning of the sugarcane.

149.    By conducting this ultrahazardous activity, Defendants' acts and omissions demonstrate a conscious disregard or indifference to the rights, welfare, and safety of COFFIE, SMITH, and Class Members, and their properties.

150.    Because Defendants engaged in ultrahazardous activity that caused damages to COFFIE, SMITH, and Class Members, Defendants are strictly liable to them for their damages.

### COUNT III – STRICT LIABILITY PURSUANT TO FLA. STA. § 376.313
**(Property Owner Class; Against all Defendants)**

151.    Named Plaintiffs COFFIE and SMITH adopt, incorporate by reference, and restate the foregoing allegations in paragraphs 1 through 134, as if fully set forth herein.

152.    Pursuant to *Fla. Stat*. § 376.313, Defendants are strictly liable for the damages caused by their sugarcane burning activities (as described herein) .

33

153.    The pollutants, pesticides, fungicides and contaminants that are contained in the "black snow" are a prohibited discharge under § 376.313.

154.    Defendants' pre-harvest burning has occurred and continues to occur during each burning season, causing the prohibited discharge of "black snow" to migrate onto COFFIE's, SMITH's, and the Property Owner Class Members' properties.

155.    The prohibited discharge of the "black snow" has harmed and damaged COFFIE's, SMITH's, and Class Members' properties.   Plaintiff and Class Members have also suffered diminution in property value and property stigma damages, which damages are ongoing and continuing in  nature.

156.    Pursuant to § 376.313 and referenced sections, COFFIE, SMITH, and Class Members are entitled to compensation for the harm to their properties, clean-up and remediation, and the costs of litigation (including reasonable attorneys' fees and expert fees), as it is a matter of public interest

**COUNT IV – TRESPASS**
**(Property Owner Class; Against all Defendants)**

157.    Named Plaintiffs COFFIE and SMITH adopt, incorporate by reference, and restate the foregoing allegations in paragraphs 1 through 134, as if fully set forth herein.

158.    COFFIE, SMITH, and the Property Owner Class Members own homes and real property within the Affected Area.

159.    Defendants, without the consent or authority and against the will of COFFIE, SMITH, and Class Members, voluntarily and intentionally caused the toxic and damaging "black snow" plumes, to enter and contaminate Plaintiffs' and Class Members' homes and properties.

160.    Defendants' conduct constitutes a repeated trespass and an unpermitted intrusion onto Plaintiffs' and Class Members' properties.

161.    As a direct and proximate result of Defendants' trespasses, Plaintiffs' and Class Members' have suffered physical damage and harm to their property, as well as a diminution in the value of their real estate, and property stigma damages.

### COUNT V – NUISANCE
**(Property Owner Class; Against all Defendants)**

162.    Named Plaintiffs COFFIE and SMITH adopt, incorporate by reference, and restate the foregoing allegations in paragraphs 1 through 134, as if fully set forth herein.

163.    Florida law recognizes a private cause of action for nuisance. *Lake Hamilton Lakeshore Owners Ass'n v. Neidlinger*, 182 So. 3d 738 (Fla. 2d DCA 2015).

164.    The acts and/or omissions of Defendants that cause the toxic and damaging "black snow" and its many contaminants (including pesticides and fungicides) to pass through, be deposited on, and to enter and otherwise infiltrate and remain upon COFFIE's, SMITH's and the Property Owner Class Members' properties, have caused injury to Plaintiffs to Class Members by, among other things, depriving Plaintiffs and the Class of the quiet enjoyment of their property.

165.    Even if allowed under law, ordinance, or statute, Defendants' acts and/or omissions are wrongful and/or tortious. Defendants knew or should have known that their acts and/or omissions are/were wrongful, and the harm to Plaintiffs and Class is ongoing.

166.    Any public benefit of the sugarcane burning is substantially outweighed by the private harms caused to Plaintiffs and Class Members by the wholly unnecessary activity.

167.    Defendants have used their property in a manner such that the "black snow" produced by sugarcane burning caused damage to Plaintiffs' and Class Members' property values.

168.     As a direct consequence of Defendants' private nuisance Plaintiffs and the Class

have suffered, and continue to suffer, physical and economic damages to their property as

described herein.

169.     As a direct and proximate result of the foregoing, Plaintiffs and Class Members

have suffered a diminution of the value of their real estate and suffered property stigma damages.

170.     Defendants have received notice of this nuisance on many occasions. Despite

repeated notice, Defendants refused, and continue to refuse, to abate the nuisance.

171.     Plaintiffs and Class Members are entitled to all remedies available to them under

the law, including damages.

## COUNT VI – MEDICAL MONITORING
### (Medical Monitoring Class; Against all Defendants)

172.     Named Plaintiff LEGRAND adopts, incorporates by reference, and restates the

foregoing allegations in paragraphs 1 through 134, as if fully set forth herein.

173.     Named Plaintiff LEGRAND and the Medical Monitoring Class Members seek

equitable relief in the form of a Court-established and Court-supervised medical monitoring

program solely for the purposes of diagnosing diseases and sharing information with Plaintiff

and the Class Members;  the establishment of a medical monitoring fund;  and further request

injunctive relief compelling Defendants to finance the medical monitoring program. Plaintiff and

the Class Members specifically request Court supervision and participation in the medical

monitoring program.

174.     Upon information and belief, as a direct and proximate result of Defendants'

wrongful conduct as set forth above, Plaintiff and the Class Members have been exposed to

hazardous substances, and thereby suffer, and will continue to suffer, a significantly increased

risk of serious injury and diseases as compared to the general public. This increased risk makes

36

periodic diagnostic medical testing and examinations necessary. Such medical procedures are different from those normally recommended in the absence of the aforementioned exposure to the hazardous substances at issue here.

175.    Medical monitoring will reduce the risk of illness by using medical tests to detect disease due to Plaintiff and the Class Members exposure to hazardous substances. Medical monitoring and testing procedures, including clinical examinations, exist which make early detection of exposure to these hazardous substances, and early detection of resulting disease, feasible and beneficial.

176.    The increased susceptibility to injuries and irreparable threat to the health of Plaintiff and the Class Members resulting from their exposure to hazardous substances can be appropriately mitigated and addressed only by the creation of a comprehensive, Court-established medical monitoring program supervised by the Court, and funded by Defendants, that:

> i.    Provides periodic medical testing and examinations designed to facilitate early detection of adverse effects related to exposure to hazardous substances; and
>
> ii.   Gathers and forwards to treating physicians information related to the diagnosis and treatment of injuries and diseases which may result from exposure to hazardous substances produced by Defendants' sugarcane growing and burning activities.

177.    Establishment of a Court-supervised medical monitoring regimen can readily assure that the proceeds of any monitoring trust fund are reserved for the provision of and/or reimbursement for, the above-referenced activities, and those needed examinations and testing procedures the Plaintiff and the Class Members actually undergo, guaranteeing the purely

equitable use of any trust funds. The Court's use of its injunctive powers to oversee and direct medical monitoring in this case is an appropriate and necessary method of adjudication.

178.    The precise nature, form, extent and duration of Court-ordered diagnostic monitoring, clinical examinations, research activities and education programs are a matter for the Court to decide, after hearing and consultation with medical, industrial, and other experts, and adjudication that the right to this relief is appropriate and necessary.

179.    The medical monitoring program should be generally supervised by the Court and may be directly managed by Court-appointed and –supervised special masters or trustees.

180.    The program should involve the monitoring of Plaintiff and the Class Members by designated physicians approved by the Court.

181.    The program could also involve the collection of medical data utilized for group studies and diagnostic testing. The program should be designed to share this data with Plaintiff and the Class Members and their treating physicians.

182.    During program administration, Defendants should address issues implicated by program administration as they develop.

### COUNT VII – INJUNCTIVE RELIEF
**(Property Owner and Medical Monitoring Class; Against all Defendants)**

183.    Named Plaintiffs COFFIE, SMITH, and LEGRAND adopt, incorporate by reference, and restate the foregoing allegations in paragraphs 1 through 134, as if fully set forth herein.

184.    Upon information and belief, Defendants' pre-harvest sugarcane burning as described herein will re-commence in September or October of 2019, and will continue every year thereafter, in keeping with their historical practice, unless they are enjoined from doing so.

185.    This anticipated future pre-harvest sugarcane burning will continue to damage Named Plaintiffs and Class Members, as alleged herein.

186.    Defendants will be responsible for this anticipated future damage related to pre-harvest sugarcane burning, as they have been in the past.

187.    Named Plaintiffs and Class Members are without adequate remedy at law, making injunctive and other equitable relief appropriate.

188.    Named Plaintiffs and Class Members will suffer irreparable harm if the Court does not grant the injunctive and equitable relief requested in this Court.

189.    All future pre-harvest burning within the Affected Area should be enjoined.

## DEMAND FOR JURY TRIAL

Named Plaintiffs, on their own behalf and on behalf of all others similarly situated, demand trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, COFFIE, SMITH, and LEGRAND, individually and as putative Class Representatives, demand judgment against Defendants, and pray for relief as follows:

a.    Certification of the Classes under Federal Rule of Civil Procedure 23 and appointment of Plaintiffs as representatives of the respective Classes and their undersigned counsel as Class counsel;

b.    An order appointing Named Plaintiffs COFFIE and SMITH as Class Representatives of the Property Owner Class;

c.    An order appointing Named Plaintiff LEGRAND as Class Representative of the Medical Monitoring Class;

d.      An order requiring that Defendants pay compensatory and other damages to Plaintiffs and the Class Members, for their economic and non-economic damages identified herein, to the full extent permitted by the law;

e.      An order awarding all damages allowed by governing statutes;

f.      An order requiring medical monitoring;

g.      An order for the injunctive relief requested herein;

h.      Statutory pre-judgment and post-judgment interest on any amounts;

i.      Costs and expenses in this litigation, including, but not limited to, expert fees, filing fees, and reasonable attorneys' fees; and

j.      Such other relief as the Court may deem just and proper.


Dated this 28th day of August, 2019.

                              **THE BERMAN LAW GROUP**
                              P.O. Box 272789
                              Boca Raton, FL 33427
                              Telephone: (561) 826-5200
                              Fax: (561) 826-5201

                              By:  */s Zachary West*
                              Joseph Schulz, Esq.
                              Fla. Bar No. 660620
                              Primary: service@thebermanlawgroup.com
                              Secondary: jschulz@thebermanlawgroup.com

                              Zachary West, Esq.
                              Fla. Bar No. 71134
                              Primary: service@thebermanlawgroup.com
                              Secondary: zwest@thebermanlawgroup.com

                              Matthew T. Moore, Esq.
                              Fla. Bar No. 70034
                              MATT MOORE LAW

CASE NO. 9:19-cv-80730-RS-MM

*Of Counsel*
330 N. Andrews Avenue, Ste. 450
Fort Lauderdale, FL 33301
Tel: (954) 908-7766
matthew@mattmoore-law.com