# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

WILLIAM ARMSTRONG, GLORIA ATKINS,
JAMES BROOKS, CLOVER COFFIE, DEBRA
JONES, SHANTE LEGRAND, DONALD
MCLEAN, ROBERT REIMBOLD, ELIJAH
SMITH, and LINDA WELCHER, each individually
and on behalf of all others similarly situated;

       Plaintiffs,

vs.

UNITED STATES SUGAR CORPORATION,
a Delaware corporation; SUGAR CANE
GROWERS COOPERATIVE OF FLORIDA,
a Florida not for profit corporation; FLORIDA
CRYSTALS CORPORATION, a Delaware
corporation; OKEELANTA CORPORATION,
a Delaware corporation; OSCEOLA FARMS CO.,
a Florida corporation; SUGARLAND HARVESTING
CO., a Florida not for profit corporation;
TRUCANE SUGAR CORPORATION,
a Florida corporation; INDEPENDENT
HARVESTING, INC., a Florida corporation; and
J & J AG PRODUCTS, INC., a Florida corporation;

       Defendants

Case No. 19-cv-80730-RS

CLASS ACTION

Hon. Rodney Smith

---

## DEFENDANTS FLORIDA CRYSTALS CORPORATION, OSCEOLA FARMS CO., OKEELANTA CORPORATION'S, AND TRUCANE SUGAR CORPORATION'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT AND <u>SUPPORTING MEMORANDUM OF LAW</u>

Defendants, Florida Crystals Corporation, Osceola Farms Co., Okeelanta Corporation, and Trucane Sugar Corporation hereby move to dismiss Plaintiffs' Second Amended Class Action Complaint ("SAC") pursuant to Fed. R. Civ. P. 8, 12(b)(1), and 12(b)(6). These Defendants have worked diligently with the other defendants in this case to comply with the Court's briefing order dated July 1, 2020 (Dkt. 134) and, accordingly, join in the motion to dismiss filed by United States Sugar Corporation. Our position on other matters is set forth below.

## INTRODUCTION

In the SAC, Plaintiffs not only attempt to cure prior deficiencies, but also attempt to breathe new life into claims the Court already dismissed. Plaintiffs fail at both.

Plaintiffs' new allegations are based on hypothetical models belied by publicly available data, and the new claims inexplicably ignore the Court's prior ruling. The Court dismissed Plaintiffs' First Amended Complaint based on deficiencies in the allegations as to Plaintiffs' injuries and whether those injuries were traceable to each Defendant. (Doc. 120; the "Order"). The Court also ruled Florida's Right to Farm Act barred Plaintiffs' nuisance and trespass claims, and dismissed Plaintiffs' claim for injunctive relief based on primary jurisdiction. Despite the ruling that the acceptable agricultural practice of burning sugarcane was protected by Florida's Right to Farm Act, Plaintiffs now base a Section 1983 claim, including seeking injunctive relief, on the very same practice. Similarly, Plaintiffs now contend that they have added allegations sufficient to show harm traceable to each Defendant, and sufficient to show that Defendants intentionally caused a battery. As discussed below, publicly available real-world data demonstrates Plaintiffs' allegations are not plausible, and Plaintiffs' conclusory allegations do not support the claims at issue.

Not only do Plaintiffs attempt to upend a state regulatory system that strictly governs a longstanding agricultural practice, many of Plaintiffs' claims should be dismissed for failure to state a cause of action. Plaintiffs' Section 1983 claim fails because it does not plead state action or the elements necessary for a takings claim. Plaintiffs' medical monitoring claim should be dismissed because Plaintiff's computer model of hypothetical air quality impacts is not plausible and thus cannot support Plaintiffs' allegations about exposures greater than normal background levels.

## PLAINTIFFS' ALLEGATIONS VS. PUBLIC AIR DATA

Plaintiffs' claims hinge on flawed computer modelling, which Plaintiffs allege demonstrates that each Defendant contributed to exceedances of national ambient air quality standards ("NAAQS") at "every point modelled" in seven communities stretching across four counties. *See* SAC ¶¶ 12, 14, 156-160. Plaintiffs allege Defendants "caused exceedances of the NAAQS $PM_{2.5}$ 24-hr standard of 35 ug/m$^3$ at all receptors[1] in all seven communities, in many cases by a factor of several hundred."[2] SAC ¶ 156. For example, Plaintiffs' model predicted the highest 24-hour concentration of $PM_{2.5}$ in Belle Glade in 2016 was 3,934 μg/m$^3$. SAC ¶ 158; Exhibit B, Table B-8.

---

[1] The "receptors" referenced by Plaintiffs throughout the SAC are computer generated locations in a hypothetical grid used to project the estimated modeling results throughout the putative class area. SAC ¶ 152.

[2] $PM_{2.5}$ is defined by the Florida Department of Environmental Protection ("FDEP") to mean "particulate matter with an aerodynamic diameter less than or equal to a nominal 2.5 micrometers." FDEP Rule 62-210.200(198), Florida Administrative Code ("F.A.C."). "With respect to concentrations in the atmosphere," FDEP defines "particulate matter" to mean "*any* airborne finely divided solid or liquid material." FDEP Rule 62-210.200(191)(a), F.A.C. (emphasis added). The 24- hour NAAQS for $PM_{2.5}$ is described in an excerpt from the FDEP webpage found on page 5, *infra*.

A review of publicly available data on the official website[3] of the Florida Department of Environmental Protection ("FDEP") demonstrates these allegations are false. The FDEP website shows that there is an air quality monitoring station in the City of Belle Glade, where $PM_{2.5}$ concentrations have been measured from 2009 to the present.[4] FDEP reports that the highest daily average for $PM_{2.5}$ in Belle Glade in 2016 was 23.7 ug/m$^3$. The actual measured value was *3,910 ug/m$^3$ less* than the value predicted by Plaintiffs' model. This discrepancy between the measured data and the hypothetical calculations is even greater than it appears. Plaintiffs' model only considered the $PM_{2.5}$ from pre-harvest burning of sugar cane. The actual measured concentrations include the $PM_{2.5}$ generated by all sources, such as motor vehicles, power plants, quarries, and other industrial, natural, agricultural and consumer activities that generate dust. Plaintiffs' model purports to estimate $PM_{2.5}$ solely from pre-harvest sugarcane burning, but it fails to address the multiple sources of the fine particles of dust that make up $PM_{2.5}$.

FDEP has determined that the putative class area complies with *all* NAAQS.[5] The official website of the U.S. Environmental Protection Agency ("USEPA") also confirms that Palm Beach, Martin, Hendry, and Glades counties are not part of a "Nonattainment Area" (i.e., an area where the air quality does not attain compliance with the applicable NAAQS).[6] *See* Ex. 1 (EPA Map of Non-Attainment Areas).

---

[3] The Court can take judicial notice of the information contained on FDEP's official government website. *Rubinstein*, 2018 WL 8899230, at *4-5 (collecting cases); *see also Nebraska v. EPA*, 331 F.3d 995, 998 n.3 (D.C. Cir. 2003) (taking judicial notice of information on the EPA's database).

[4] https://fldep.dep.state.fl.us/air/flaqs/SiteDetail.asp?SiteID=120990008&RequestYear=2016

[5] https://floridadep.gov/sites/default/files/FL_Ozone_PM_Trends_2018_data.pdf.

[6] FDEP defines a "Nonattainment Area" as "Any area not meeting ambient air quality standards and designated as a nonattainment area under Rule 62-204.340, F.A.C."

The NAAQS are designed to protect human health and the public welfare, in accordance with the requirements in the Clean Air Act, 42 U.S.C. § 7401 et seq. As explained by the D.C. Circuit:

> Pursuant to Title I [of the Clean Air Act], EPA must establish, publish, and periodically review primary and secondary national ambient air quality standards ("NAAQS") for air pollutants that "may reasonably be anticipated to endanger public health or welfare. *The primary NAAQS are to be set at levels the attainment and maintenance of which in the judgment of the Administrator, . . . allowing an adequate margin of safety, are requisite to protect the public health.* The secondary NAAQS shall specify a level of air quality the attainment and maintenance of which in the judgment of the Administrator . . . is *requisite to protect the public welfare from any known or anticipated adverse effects.* Thus, primary NAAQS protect the public health, while the secondary NAAQS protect the public welfare. "Public health" includes adverse health effects for both the population at large and sensitive populations, such as *children, older adults, and people with asthma or other lung diseases.* The term "public welfare" encompasses a wide variety of effects on soil, plants, wildlife and biota, property damage, aesthetic concerns, and other non-health-related impacts such as hazards to economic values and personal comfort.

*Murray Energy Corp. v. Envt'l. Prot. Agency*, 936 F.3d 597, 604–05 (D.C. Cir. 2019) (internal citations and quotation marks omitted; emphasis added).

The FDEP website provides the following information about Florida's air quality:

### Florida's Ozone and Particulate Matter Air Quality Trends

**Introduction**

Ozone and fine particulate matter are two of the most common and widespread air pollutants. While these pollutants are naturally present in outdoor air, certain areas can have elevated levels that become unhealthy. Fortunately, the air quality across the State of Florida is consistently ranked among the best in the nation with respect to ozone and fine particulate matter. The American Lung Association's 2019 "State of the Air" report ranks 228 cities in 24 counties across Florida as among the cleanest in the country. In addition, all areas in the State meet the air quality standards for these pollutants and levels continue to decrease as they have for many years.

* * * * *

**How Do Florida's Particulate Matter Levels Compare to the Standard?**

EPA also sets NAAQS for both $PM_{10}$ and $PM_{2.5}$. There are two standards for $PM_{2.5}$, an annual average standard set at 12.0 micrograms per cubic meter ($\mu g/m^3$) and a 24-hour average standard set at 35 $\mu g/m^3$. Compliance with the annual standard is based on the 3-year average of the annual average concentration. Compliance with the 24-hour standard is based on the 3-year average of the annual eighth-high concentrations. These design values are calculated for every monitor in the State and compared to the standard. As can be seen in **Figure 9**, every monitor in the state meets both standards.

$PM_{10}$ has a 24-hour average standard of 150 $\mu g/m^3$. Compliance with this standard is based on the number of exceedances of the standard. The standard is not to be exceeded more than once per year on average over three years. All of Florida is designated as attaining the $PM_{10}$ standard.

https://floridadep.gov/sites/default/files/FL_Ozone_PM_Trends_2018_data.pdf.

FDEP's air quality monitoring network operates in accordance with a robust air quality-monitoring plan, which FDEP submits to USEPA for review and approval each year. *See* 40 C.F.R. 58. The outdoor monitoring data is collected by FDEP using a statewide network of air monitoring equipment located near ground level and external to buildings or other structures.[7] The monitoring data is used by FDEP and USEPA to assess and confirm the State's compliance with the NAAQS and other requirements. FDEP's 2020 Annual Air Monitoring Network Plan "is designed to provide the public with accurate air quality information, and currently meets or exceeds federal air monitoring requirements. . . . The network is comprised of more than 190 monitors at 95 sites strategically positioned across the state."[8]

As noted above, FDEP has monitored $PM_{2.5}$ concentrations in Belle Glade since May 1, 2009.[9] FDEP's website identifies the ten highest daily average (24 hour) concentrations for the $PM_{2.5}$ actually measured with air monitoring instruments in Belle Glade in each of the years that Plaintiffs predicted the 24-hour concentrations with their model. As shown below, Plaintiffs'

---

[7] https://floridadep.gov/air/air-monitoring/content/about-air-monitoring

[8] https://floridadep.gov/sites/default/files/Florida-Annual%20Network%20Plan%202020%20-FINAL_0.pdf

[9] https://fldep.dep.state.fl.us/air/flaqs/sitedetail.asp?SiteID=120990008

hypothetical $PM_{2.5}$ concentrations are inexplicably higher than the actual concentrations of $PM_{2.5}$

from all sources as measured in Belle Glade:

| Year | Highest Measured Value (ug/m3) | Plaintiffs' Highest Predicted Value (ug/m3) |
|------|-------------------------------|---------------------------------------------|
| 2014 | 23  (measured on August 18) | 780 |
| 2015 | 22.9  (measured on July 5) | 1,068 |
| 2016 | 23.7  (measured on March 7) | 3,934 |
| 2017 | 30.1  (measured on May 29) | 766 |
| 2018 | 23.7  (measured on March 6) | 319 |

Current measurements are consistent with historic data. For example, FDEP data

demonstrates that in January 2020–the middle of the harvest season–the daily average of actual

measured concentrations of $PM_{2.5}$ in Belle Glade from all sources were less than 8 ug/m$^3$ every

day of the month.[10] The highest value measured to date in 2020 was 19 ug/m$^3$. This value was

measured on July 9, 2020–after the conclusion of the 2019-2020 harvest season. SAC ¶ 2 (noting

the harvest season typically begins in October and ends in March). Indeed, six of the 10 highest

$PM_{2.5}$ concentrations measured in 2020 (again from all sources) occurred in June and July, when

there were no pre-harvest cane burning operations.[11] The FDEP data shows that $PM_{2.5}$

concentrations during the harvest season are comparable to the background concentrations when

there are no sugarcane burns. *See* Ex. 2 (FDEP data for Belle Glade showing the 10 Highest Daily

Averages for $PM_{2.5}$ for 2014, 2015, 2016, 2017, 2018, 2019, 2020).

Even a cursory review of the FDEP or USEPA websites would have alerted Plaintiffs that

the air quality in Palm Beach County and throughout the State of Florida complies with all of the

---

[10] https://fldep.dep.state.fl.us/air/flaqs/MonthlyReport.asp?SiteID=120990008&Month=1&Year=2020

[11] https://fldep.dep.state.fl.us/air/flaqs/HighReport.asp?HighestYear=2020&SiteId=120990008

applicable air quality standards. It appears that Plaintiffs did not attempt to verify, evaluate or validate their hypothetical model by comparing the model's predicted concentrations to actual measured air quality data. If the Plaintiffs had made any effort to verify the accuracy of their hypothetical modeled estimates, Plaintiffs would have realized that their model is fatally inaccurate and not at all representative of real-world conditions. *Cf. Coffie*, 2020 WL 2739724, at *11 ("Plaintiffs and their counsel shall be guided by the dictates of Federal Rule of Civil Procedure 11 in drafting their Second Amended Complaint.").

## STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (quotation omitted). A claim has facial plausibility only when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "Courts insist upon 'specificity in pleading' . . . to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope' of success." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59 (2007). While courts must liberally construe and accept as true allegations of fact in a complaint, the Court "need not accept factual claims," "which run counter to facts of which the court can take judicial notice." *Rubinstein v. Keshet Inter Vivos Tr.*, 2018 WL 8899230, at *5 (S.D. Fla. Oct. 17, 2018), report and recommendation adopted, 2018 WL 8899004 (S.D. Fla. Nov. 15, 2018).

## ARGUMENT

### I.     PLAINTIFFS' SHOTGUN PLEADING REQUIRES DISMISSAL.

Plaintiffs' Second Amended Complaint should be dismissed because it asserts multiple claims against multiple Defendants without specifying which Defendants are responsible for each Plaintiff's alleged harm. The Eleventh Circuit has instructed that "asserting multiple claims against

multiple defendants without specifying which of the defendants are responsible for which acts or omissions" is improper. *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015); *Davis v. Coca Cola Bottling Co.*, 516 F.3d 955, 979 n. 54 (11th Cir. 2008) ("[S]ince 1985 we have explicitly condemned shotgun pleadings upward of fifty times"), *abrogated on other grounds by Twombly*, 550 U.S. 544. This kind of shotgun pleading "fail[s] to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id*.

Plaintiffs claim the SAC now includes allegations of harm each Defendant has caused each named Plaintiff. SAC at p.75 n. 70. However, the SAC does not include a single allegation where a specific Defendant is said to have caused harm to a specific Plaintiff. Instead, Plaintiffs allege that each Defendant was aware that smoke would travel and invade property of each named Plaintiff, and even each resident of the class area. SAC ¶ 138. Moreover, Plaintiffs allege that each Defendant's smoke has gone into every "nook and cranny" of the class area, no matter how distant a Defendant's fields may be from a particular Plaintiff. SAC ¶ 165.

Plaintiffs have not identified which Defendants are responsible for which acts or omissions. For example, Plaintiffs' negligence claim does not detail any particular practice by any particular Defendant or explain how that practice impacts a particular Plaintiff. This lumping of all Defendants together does not provide notice to any Defendant of what conduct it did that Plaintiffs allege is causing harm. Plaintiffs' SAC should be dismissed on this ground alone. *See Jackson v. Bank of America*, 898 F.3d 1348, 1357 (11th Cir. 2018) (The court retains authority to dismiss a shotgun pleading on that basis alone).

## II.   PLAINTIFFS FAIL TO STATE A CLAIM THAT IS PLAUSIBLE ON ITS FACE BECAUSE THEIR MODELING OUTPUT IS CONTRADICTED BY ACTUAL AIR MONITORING DATA COLLECTED BY REGULATORY AGENCIES.

Plaintiffs' allegations are largely based on the output of a computer model, which predicts hypothetical emissions reaching hypothetical receptors in a futile attempt to show that each Defendant's operations affect each Plaintiff and cause the air quality to far exceed national standards. *See* SAC ¶¶ 12-15, 150-165. But Plaintiffs' modeling output is not plausible and cannot support any claim for relief because it is squarely at odds with real-world data, collected over the course of decades by the regulatory agencies charged with protecting air quality—FDEP and USEPA. The Court may disregard allegations that are in conflict with facts upon which the Court may take judicial notice, including USEPA's and FDEP's regulatory determinations, which are based on actual field data these agencies have collected, and which demonstrates the air quality complies with all applicable NAAQS. *See Campos v. I.N.S.*, 32 F. Supp. 2d 1337, 1343 (S.D. Fla. 1998) (the court "need not accept factual claims" "which run counter to facts of which the court can take judicial notice."); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1279-80 (11th Cir. 1999) (court may take judicial notice of public records when considering a motion to dismiss). Because the hypothetical modeling on which Plaintiffs' allegations are premised directly conflicts with regulatory determinations and actual monitoring data, the Court should find Plaintiffs' allegations implausible and dismiss the SAC as insufficient under federal pleading standards. *See Twombly*, 550 U.S. at 558 (deficient, non-plausible allegations should be "exposed at the point of minimum expenditure of time and money by the parties and the court.").

According to Plaintiffs, their modeling shows "remarkable" and repeated exceedances of the 24-hour NAAQS for $PM_{2.5}$ at nearly every location modeled in the putative class area. SAC ¶¶ 12, 14, 156-160. Indeed, Plaintiffs claim that at one location in Pahokee, the model predicted levels of $PM_{2.5}$ that were *340 times* higher than the applicable NAAQS. SAC ¶ 12. This remarkable

disparity between real-world actual data and Plaintiffs' modeling effort is magnified by the fact that Plaintiffs' hypothetical values for $PM_{2.5}$ are based on modeling for sugarcane burning only, while the actual-measured concentrations include emissions from all potential sources.

The governmental agencies tasked with monitoring, assessing, and ensuring air quality across the state have an extensive network of actual monitors and are continually working to ensure compliance with standards set to protect human health. Plaintiffs have not explained how their modeled concentrations could be possible, much less plausible, when actual air quality data measured by the FDEP from its comprehensive monitoring network demonstrates and USEPA confirms the entire State of Florida is in full attainment (compliance) with all NAAQS standards, including the 24-hour $PM_{2.5}$ standard that Plaintiffs' model predicts is repeatedly violated at nearly every hypothetical receptor "in many cases by a factor of several hundred." *See* SAC ¶¶ 156, 160; *c.f. supra* fn. 10-12. Contrary to Plaintiffs' allegations, FDEP confirms, "all areas in the State meet the air quality standards for [ozone and fine particulate matter] and levels continue to decrease as they have for many years."

https://floridadep.gov/sites/default/files/FL_Ozone_PM_Trends_2018_data.pdf.

This Court should not permit Plaintiffs' claims to proceed based upon Plaintiffs' modeling effort. While the SAC goes on at length with technical soundbites, Plaintiffs have failed to provide even the most basic information to flesh out the details of their modeling effort, such as source data and other modeling inputs, and instead hide behind a lengthy print-out of hypothetical modeling results. Plaintiffs' allegations about air quality issues are not plausible because their model's output bears no resemblance to the real-world conditions documented by FDEP and USEPA. These implausible allegations cannot provide the evidentiary support to state a claim that Defendants are responsible for the injuries alleged. Accordingly, the Court should dismiss Plaintiffs' Second Amended Complaint.

III.   **PLAINTIFFS' NEGLIGENCE, SECTION 1983, AND MEDICAL MONITORING CLAIMS SHOULD BE DISMISSED BASED ON PRIMARY JURISDICTION BECAUSE THEY ARE IN FACT CHALLENGES TO THE FFS'S REGULATIONS FOR PRESCRIBED BURNING AND THE EPA'S AIR QUALITY STANDARDS.**

The SAC provides an opportunity for the Court to re-examine the application of primary jurisdiction as barring not only injunctive relief, but other claims as well. Defendants are aware of the Court's due consideration of the issue, but Plaintiffs' new allegations demonstrate that a decision by this Court without the benefit of the expertise of the relevant agencies would upend the regulatory process and cause inconsistency in public policy as it relates to agriculture and air quality.

Plaintiffs' attempt to end the longstanding agricultural practice of burning sugarcane before it is harvested challenges the regulatory schemes of two different agencies—the Florida Forest Service ("FFS") and EPA. The doctrine of primary jurisdiction allows this Court the opportunity to decline to exercise its jurisdiction over these matters until the relevant agencies have been able to address them in an effort to promote the regulatory framework and consistency in public policy. *Flo–Sun, Inc. v. Kirk,* 783 So. 2d 1029, 1037 (Fla. 2001). Plaintiffs' challenge to FFS's regulatory program should be rejected in this forum because FFS has exclusive control over prescribed burning in Florida pursuant to state law. Fla. Stat. § 590.02(10); SAC ¶ 228. Plaintiffs attack EPA's NAAQS for $PM_{2.5}$, alleging that "the current $PM_{2.5}$ standards do not adequately protect human health" and "the 24 hour [$PM_{2.5}$] standard should be revised downwards to between 30 and 25 µg/m." SAC ¶ 182. However, any action challenging the adequacy of the NAAQS must, by statute, be brought in the U.S. Court of Appeals for the D.C. Circuit. 42 U.S.C. § 7606(b)(1); *see also Sierra Club v. EPA*, 955 F.3d 56, 60-61 (D.C. Cir. 2020). At bottom, this action seeks to have this Court put an end to a longstanding agricultural practice in the state of Florida and impose a more stringent air quality standard in the putative class area, effectively superseding the state and federal agency standards.

11

Since Plaintiffs' grievance is one that goes to the heart of the regulatory scheme, and given Florida's public policy regarding burning and agriculture, the SAC should be dismissed so that Plaintiffs can raise these issues at the agency level before asking this Court to determine what air quality requirements are needed to protect the public and whether Plaintiffs are entitled to the relief they seek. Plaintiffs advocate for a harvesting practice that does not include burning, but Plaintiffs' view does not make agricultural burning an improper farming practice. (Order at 10). Adopting Plaintiffs' preferences over the decades-old practice that has been and continues to be extensively regulated by the state agencies offends concepts of federalism. Plaintiffs cannot ask this Court to reevaluate the state's air quality standards without first having raised their concerns with the agencies charged with monitoring and protecting Florida's air quality. Federalism aside, the practice Plaintiffs challenge is not the only alleged contributor to the air quality in the state, so to the extent their harm allegedly is caused by poor air quality, the remedy must address the contributions of many others who are not named Defendants.

The SAC clarifies that the supposed "negligence" at issue is really compliance with state agency permits, regulations, and air quality standards, which squarely implicates primary jurisdiction and places this matter far afield from cases such as *Sher*[12] and *Lombardozzi*[13], which presented straightforward damages actions that did not conflict with regulatory decisions. *Sher v. Raytheon Co.*, involved actions relating to a discrete plume of water pollution. There was no claim that the pollutant levels complied with regulatory requirements, nor that permit conditions created the impacts to plaintiffs. The court based its decision, in part, on the finding that "[t]he efficiency of the progress of the agency action will not be impeded in any way by the resolution of damages

---

[12] *Sher v. Raytheon Co.*, 2008 WL 2756570 (M.D. Fla. July 14, 2008), *see also Swartout v. Raytheon Co.*, 2008 WL 2756577 (M.D. Fla. July 14, 2008) (companion case).

[13] *Lombardozzi v. Taminco US Inc.*, 2016 WL 4483856 (N.D. Fla. Aug. 24, 2016).

in this case." 2008 WL 2756570 at 3. Similarly, *Lombardozzi,* involved claims related to odors, and rather than complying with regulations, the facility was operating in violation of its permit condition on objectionable odors. *See* 2016 WL 4483856, at *4. Thus, in both *Sher* and *Lombardozzi*, there was no conflict between finding liability and the agency regulations or permits. Here, by contrast, it is the agency policies that are allegedly the cause of Plaintiffs' injuries and the SAC alleges that there is no permissible way to conduct sugarcane burning at all. This eviscerates the regulatory program and the authorizing legislation in a way that is not comparable to *Sher* and *Lombardozzi*.

This case presents a backdoor challenge to agency rules and decisions. The main focus of the SAC is that there is a disparate impact on Plaintiffs due to "regulations promulgated by [FFS that] deny burn permits to sugarcane growers if winds are projected to blow smoke and ash plumes toward the more affluent Eastern Palm Beach County and Eastern Martin County communities near the coast" and only authorize burning when winds have a greater effect on Plaintiffs. SAC ¶¶ 9, 122-24. Plaintiffs then claim impact from certain constituents, including particulate matter, and notwithstanding any compliance with the regulatory air quality standards, allege harm because the NAAQS are themselves "inadequate." SAC ¶ 182.

The FFS decides when and under what conditions burning is allowed, and those conditions are in part what creates the harm Plaintiffs allege support their claims. *See* SAC ¶¶ 122. Tellingly, there is no claim that any burning itself was conducted negligently. Plaintiffs formulate the duty prong of negligence as relating, "to exercise reasonable care in their sugarcane harvesting," rather than reasonable care in conducting approved prescribed burning, because their theory is that any act of burning, as opposed to Plaintiffs' preferred "green" harvesting, is the breach of the duty. *See* SAC ¶ 213.

This places the very regulatory program itself on trial, as there is no way to conduct the permitted activity—agricultural burning—in compliance with agency permits without concluding Defendants are negligent. The proper remedy would be to challenge the permits under Florida's Administrative Procedure Act ("APA"), which provides a robust set of remedies to address agency decisions. *See, Flo–Sun, Inc.*, 783 So. 2d at 1037; Fla. Stat. §§ 120.54, .68. Indeed, there are administrative remedies to challenge the permitting decisions that the SAC claims adversely impact Plaintiffs by relying on certain wind conditions for permitting burning. *See, e.g.,* Fla. Stat. §§ 120.569, 120.57. And to the extent Plaintiffs challenge the adequacy of the NAAQS PM$_{2.5}$, such a challenge falls within the exclusive jurisdiction of the D.C. Circuit and is inappropriate here. *See* 42 U.S.C. § 7606(b)(1). Any attempt to lower air quality standards would need to look at the myriad of other contributing sources in addition to sugarcane burning, which includes power plants, industrial facilities, construction sites, and automobiles.[14]

Plaintiffs' claims concerning negligence, Section 1983, and medical monitoring should all be dismissed so their challenges to the regulatory scheme, air quality standards, and issues of public policy can be considered by the appropriate agency in the first instance.

## IV. PLAINTIFFS' SECTION 1983 CIVIL RIGHTS CLAIMS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Count III raises a civil rights claim under 42 U.S.C. § 1983 for alleged takings. Because Section 1983 is a remedy provision for an underlying civil rights violation, Plaintiffs pin their claim on a takings theory due to migration of airborne particulate matter. This fails on two fronts. First, Plaintiffs have failed to allege sufficient facts to show that Defendants are state actors. Second, even if Plaintiffs could meet their burden of showing Defendants are state actors, Plaintiffs

---

[14] https://www.epa.gov/pm-pollution/particulate-matter-pm-basics#PM

fail to allege facts sufficient to maintain a claim for takings. Finally, Plaintiffs' request for injunctive relief is barred by this Court's prior ruling and Supreme Court precedent.

### A.   There is no state action to support a Section 1983 claim.

A Section 1983 claim can only be brought against a governmental party or one acting under the color of state law. *See, e.g., Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000). The SAC argues there is state action because there was a physical invasion authorized by FFS. SAC ¶¶ 229-32 ("Before Defendants may engage in pre-harvest burning, they must apply to the FFS and the FFS must grant them a permit, authorizing the specific location, timing, and terms of the requested burn event...."). The SAC continues, "Defendants sought the FFS' approval to burn sugarcane and the FFS specifically approved the Defendants' burn events that caused Class members' property damage and deprived them of constitutionally guaranteed property rights." SAC ¶ 234. These allegations do not show that any Defendant is a state actor.

Central to any Section 1983 claim is that the defendant has exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (citation omitted).The color-of-law requirement is a "'jurisdictional requisite for a § 1983 action,' which ... furthers the fundamental goals of 'preserv[ing] an area of individual freedom by limiting the reach of federal law ... [and] avoid[ing] imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed.'" *Jojola v. Chavez*, 55 F.3d 488, 492 (10th Cir. 1995).

Plaintiffs have failed to allege any facts demonstrating a basis for finding state action. Instead, the takings claim rests on the allegation that the Defendants are parties acting in compliance with state law in undertaking a regulated activity, and are obeying permit requirements from a regulatory agency. This falls far short of the state action requirement.

The Supreme Court has expressly held that the existence of governmental regulations, standing alone, does not provide the required nexus to state action. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Jackson v. Metropolitan Edison Co*., 419 U.S. 345, 350 (1974). "Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State [actor] responsible for those initiatives under the terms of the Fourteenth Amendment." *Blum*, 457 U.S. at 1004–05; *see also, Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164 (1978) (same). There are no allegations demonstrating that the permits at issue provide any special basis to convert regulated activity into state action for Section 1983 purposes. *See Jackson*, 419 U.S. at 345 (affirming dismissal of Section 1983 claim against private but heavily regulated utility company); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 442, 1448-53 (10th Cir. 1995). Indeed, numerous courts have rejected similar takings claims against private actors for the same reasons. *See, e.g., Kerns v. Chesapeake Expl., LLC*, 762 F.App'x 289, 294-95 (6th Cir. 2019) (affirming dismissal of takings claim against private oil-drilling company); *Moorer v. U.S. Bank, N.A.*, 2018 WL 587319 (D. Conn. Jan. 29, 2018) (dismissing takings claim against bank and debt collectors). Plaintiffs' Section 1983 claim should be dismissed.

### B.    Plaintiffs fail to state a takings claim.

A takings claim provides a basis to seek compensation where property is affected by governmental regulations that limit the use of property or by a physical appropriation for governmental purposes of a portion of the property. *See, e.g., Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 123–125 (1978); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982). Plaintiffs fail to allege either type of taking. Governmental regulations do not effect a taking every time they negatively impact property rights. Instead, courts "must remain cognizant that 'government regulation—by definition—involves the adjustment of rights for the public good.'" *Lingle v. Chevron U.S.A. Inc*., 544 U.S. 528, 538 (2005).

In determining whether a governmental regulation or policy effects a taking, courts look to the extent to which the regulation has prevented economically viable use of property or interfered with distinct investment-backed expectations. *Lingle*, 544 U.S. at 539; *Penn Central*, 438 U.S. at 123–125. Takings occur when an owner has been deprived of all economically viable use of property or of a distinct investment backed expectation of a future use. *See id.*; *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992).

Courts also look to whether there is a physical invasion of property, which means a physical appropriation of a portion of a property to governmental use, either permanently or temporarily. *See Lingle*, 544 U.S. at 539; *Lucas,* 505 U.S. at *1015; Loretto*, 458 U.S. at 426.  Whether a physical invasion effects a taking turns on "the character of the land at issue and the owner's "reasonable investment-backed expectations" regarding the land's use." *Arkansas Game & Fish Comm'n v. United States,* 568 U.S. 23, 39 (2012), *citing Palazzolo v. Rhode Island,* 533 U.S. 606, 618 (2001).

No Plaintiff alleges a deprivation of "all economically beneficial or productive use of land." *See Lucas*, 505 U.S. at 1015. The alleged practical and economic impact of the FFS regulations allowing burning are incidental and do not deprive Plaintiffs of the economically viable use of their property, nor do they make any particular land use to which the properties had been put untenable. Nor are there allegations that any property cannot continue its present and historic use for residential or business purposes.

There is also no claim establishing any property use by any Plaintiff that predates farming in the area or the use of agricultural burning. Given the longstanding nature of agriculture—and, in particular, sugar cultivation—in the area, no property owner could have a reasonable expectation that agricultural burning would not occur in the predominantly agricultural region in question. Moreover, there is no allegation that any Plaintiff enjoyed or expected a use of his or her property

that was subsequently prevented by nearby agriculture, much less that any Plaintiff is left with no remaining economically viable use of their property.

As to physical invasion, which the SAC raises in a conclusory allegation,  SAC ¶¶ 232; 236, there is no showing that any portion of any property has been physical occupied, or that any owner has been denied use access or other incident of ownership to any portion of their property. S*ee Loretto,* 458 U.S. at 435-46; *Lingle*, 544 U.S. at 539 ("A permanent physical invasion ... eviscerates the owner's right to exclude others from entering and using her property."). The only allegation is that particulate matter migrates through the atmosphere over and onto Plaintiffs' properties. That is true of all air emissions and does not convert every case of air emissions into an invasion of nearby property. Such a view would mean that every automobile, power plant, and industrial facility is constantly "invading" properties by emitting particulates or other air constituents—even where the area is in full attainment of air quality standards. The concept that particulate matter in the atmosphere "takes" everything it touches has no support in caselaw or common sense.

### C.     Plaintiffs cannot seek injunctive relief for the alleged taking.

The Court has already held that Plaintiffs' claims for injunctive relief to stop future burning are barred by the primary jurisdiction doctrine. *Coffie*, 2020 WL 2739724, at *6-8. Plaintiffs' attempt to evade that ruling by seeking injunctive relief on a takings claim fails. First, the Court should reject Plaintiffs' request for injunctive relief (SAC ¶ 236) because their takings claim fails as a matter of law, as shown above. Second, the requested injunction is improper anyway. As the Supreme Court held just last year, "there is no basis to enjoin the government's action effecting a taking" "[a]s long as an adequate provision for obtaining just compensation exists." *Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162, 2176 (2019). Here, even if Plaintiffs could show that there

was state action, they have not even tried to suggest that just compensation is unavailable, meaning

that "injunctive relief will be foreclosed." *Id.* at 2179.

## V.    PLAINTIFFS' MEDICAL MONITORING PROGRAM CLAIM SHOULD BE DISMISSED.

The Court previously dismissed Plaintiffs' medical monitoring claim because Plaintiffs had

"merely pled a formulaic recitation of the elements for their medical monitoring claim." Order at

21-22. In response to the Court's Order, Plaintiffs claim that the SAC contains additional "factual

underpinnings of Plaintiffs' medical monitoring claim." SAC at 1 n.1. These new allegations

include exposure to "significant levels of confirmed carcinogenic pollutants from Defendants'

burns, including (but not limited to) $PM_{2.5}$ and benzo[a]pyrene," that "Defendants' burning has led

to $PM_{2.5}$ exceedances about [sic] the 24-hour NAAQS standards and benzo[a]pyrene exceedances

of the US EPA's May 2020 Regional Screen Level (RSL)," and that the Medical Monitoring Class

is "at a significantly increased risk of developing lung cancer." SAC ¶¶ 238-39; 242.

Plaintiffs must establish the following elements:

> (1) exposure to greater than normal background levels; (2) to a proven
> hazardous substance; (3) caused by the defendant's negligence; (4) as a
> proximate result of the exposure, plaintiff has a significantly increased risk of
> contracting a serious latent disease; (5) a monitoring procedure exists that
> makes the early detection of the disease possible; (6) the prescribed monitoring
> regime is different from that normally recommended in the absence of the
> exposure; and (7) the prescribed monitoring regime is reasonably necessary
> according to contemporary scientific principles.

*Petito v. A.H. Robins Co., Inc.*, 750 So. 2d 103, 106-07 (Fla. 3d DCA 1999) (internal citations

omitted). Florida only allows a claim for medical monitoring under "limited and appropriate

circumstances" *Id*.

Plaintiffs cannot meet these requirements. Plaintiffs cannot show alleged exposure to

greater than normal background levels. Plaintiffs allege they "have been exposed to significant

levels of confirmed carcinogenic pollutants from Defendants' burns, including (but not limited to)

19

PM$_{2.5}$ and benzo[a]pyrene." SAC ¶ 238. As explained above, the modeling underlying Plaintiffs' allegations of "exposure greater than normal background levels" is flatly inconsistent with real-world data.

The Court "need not accept factual claims," "which run counter to facts of which the court can take judicial notice." *Rubinstein*, 2018 WL 8899230, at *5. Plaintiffs have failed to demonstrate any Defendant's agricultural practices are the cause of any significant increase in pollution concentrations (*i.e.,* above general background) or in violation of any air quality standards set by FDEP or EPA—nor could they. *See Jacobs v. Osmose, Inc.,* 2002 WL 34241682 (S.D. Fla. Jan. 3, 2002) (Altonaga) (dismissing claim for medical monitoring where plaintiff alleged nothing more than the use of flooring products in his deck, and the conclusory presumption that he was exposed to harmful chemicals). Plaintiffs also did not and cannot allege that it is Defendants' conduct that caused a greater than normal background level because there are many other sources that contribute to background levels. The Court should dismiss Plaintiffs' claims for medical monitoring.

## CONCLUSION

For these reasons, the Court should grant Defendants' motion to dismiss.

Dated: August 5, 2020

By: /s/  Mark D. Anstoetter

Jennifer A. McLoone, Esq.
Florida Bar No. 29234
SHOOK, HARDY & BACON L.L.P.
Citigroup Center, Suite 3200
201 S. Biscayne Blvd.
Miami, Florida 33131
Ph: (305) 358-5171
Fax: (305) 358-7470
jmcloone@shb.com

Mark D. Anstoetter, Esq.
(Pro hac vice)
David Brent Dwerlkotte, Esq.
(Pro hac vice)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
Ph:  (816) 474 6550
Fax: (816) 421-5547
manstoetter@shb.com
dbdwerlkotte@shb.com

Joseph P. Klock, Jr. Esq.
Florida Bar No. 156678
Gabriel E. Nieto, P.A.
Florida Bar No. 147559
RASCO KLOCK PEREZ NIETO PL
2555 Ponce de Leon Blvd., Suite 600
Coral Gables, Florida 333134
Ph:  (305) 467-711
Fax: (305) 675-7707
jklock@rascoklock.com
gnieto@rascoklock.com

David S. Dee, Esq.
Florida Bar No. 281999
GARDNER, BIST, BOWDEN, BUSH,
DEE, LAVIA & WRIGHT, P.A.
1300 Thomaswood Drive
Tallahassee, Florida 32308
Ph:  (850) 385-0070
Fax: (850) 385-5416
ddee@gbwlegal.com

***Counsel for Defendants Florida Crystals
Corporation, Osceola Farms Co., and
Okeelanta Corporation***

*/s/ Mark A. Hendricks*
Mark A. Hendricks, Esq.
Florida Bar No. 768146
Forrest L. Andrews, Esq.
Florida Bar No.: 17782
LYDECKER DIAZ, LLC
1221 Brickell Avenue
19th Floor
Miami, FL 33131
Ph.: (305) 416-3180
Fax: (305) 416-3190
mah@lydeckerdiaz.com
fla@lydeckerdiaz.com

***Attorneys for Trucane Sugar Corporation***

## CERTIFICATE OF SERVICE

I hereby certify that on this the 5th day of August, 2020, the above and foregoing document was filed electronically through the CM/ECF system which sent notification of such filing to all known counsel of record.

*/s/Jennifer McLoone*
Jennifer McLoone