# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 9:19-cv-80730-RS-MM

| | |
|---|---|
| WILLIAM ARMSTRONG, GLORIA ATKINS, JAMES BROOKS, CLOVER COFFIE, DEBRA JONES, SHANTE LEGRAND, DONALD MCLEAN, ROBERT REIMBOLD, ELIJAH SMITH, and LINDA WILCHER, each individually and on behalf of all others similarly situated;<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES SUGAR CORPORATION, a Delaware Corporation; SUGAR CANE GROWERS COOPERATIVE OF FLORIDA, a Florida not for profit corporation; FLORIDA CRYSTALS CORPORATION, a Delaware corporation; OKEELANTA CORPORATION, a Delaware corporation; OSCEOLA FARMS, a Florida corporation; SUGARLAND HARVESTING CO., a Florida not for profit corporation, TRUCANE SUGAR CORPORATION, a Florida corporation; INDEPENDENT HARVESTING, INC., a Florida corporation; and J & J AG PRODUCTS, INC., a Florida corporation,<br><br>Defendants. | **CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ....................................................................................................1

II.     LEGAL STANDARD...........................................................................................2

III.    ARGUMENT ........................................................................................................2

      A.      Plaintiffs have diligently prosecuted their case; the filing of the
            proposed TAC would not prejudice Defendants......................................................2

      B.      Amendment would not be futile. ........................................................................5

            1.      Plaintiffs' proposed amended complaint cures the standing
                    deficiencies previously identified by this Court. ........................................6

                  a.      Plaintiffs plausibly allege harm by each Defendant
                         to the entire class area. ....................................................................6

                  b.      Plaintiffs' complaint is not a shotgun pleading.............................10

            2.      Plaintiffs' claims for negligence, takings, and medical
                    monitoring are adequately pled.................................................................11

                  a.      The doctrine of primary jurisdiction does not bar
                         Plaintiffs' claims. ............................................................................11

                  b.      Plaintiffs sufficiently state a takings claim ...................................14

                  c.      Battery ............................................................................................17

                  d.      Medical monitoring.........................................................................20

IV.     CONCLUSION....................................................................................................20

010867-11/1336288 V1

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adinolfe v. United Techs. Corp.*,
768 F.3d 1161 (11th Cir. 2014) ........................................................................9

*Allstate Ins. Co. v. Regions Bank*,
No. CIV.A. 14-0067-WS-C, 2014 WL 4162264 (S.D. Ala. Aug. 19, 2014)............................5

*American Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999)........................................................................................14

*Barnette v. Grizzly Processing, LLC*,
809 F. Supp. 2d 636 (E.D. Ky. 2011) ..............................................................19

*Blum v. Yaretsky*,
457 U.S. 991 (1982)......................................................................................15

*Brantley v. Int'l Paper Co.*,
No. CV 2:09-230-DCR, 2017 WL 2292767 (M.D. Ala. May 24, 2017)..................................6

*C.B. v. State*,
810 So. 2d 1072 (Fla. Dist. Ct. App. 2002) .........................................................18

*Clark v. United States*,
8 Cl. Ct. 649 (Cl. Ct. 1985)............................................................................16

*Cockrell v. Sparks*,
510 F.3d 1307 (11th Cir. 2007) ........................................................................2

*Coffie v. Florida Crystals Corp.*,
2020 WL 2739724 (S.D. Fla. May 8, 2020) ................................................ *passim*

*In re E.I. DuPont de Nemours & Co. C-8 Personal Injury Litig.*,
No. 2:13-md-2433, 2015 WL 4092866 (S.D. Ohio July 6, 2015) ..........................................19

*Flo-Sun, Inc. v. Kirk*,
783 So. 2d 1029 (Fla. 2001).......................................................................13, 14

*Florida Rock Indus. v. United States*,
18 F.3d 1560 (Fed. Cir. 1994).........................................................................15

*Focus on the Family v. Pinellas Suncoast Transit Auth.*,
344 F.3d 1263 (11th Cir. 2003) ......................................................................14

*Forman v. Davis*,
371 U.S. 178 (1962) ........................................................................................2

*Gallagher v. Neil Young Freedom Concert*,
49 F.3d 1442 (10th Cir. 1995) ......................................................................15

*Hansen v. United States*,
65 Fed. Cl. 76 (Fed. Cl. 2005) ......................................................................16

*Jacobini v. JP Morgan Chase, N.A.*,
No. 6:11-CV-231-ORL-31, 2012 WL 252437 (M.D. Fla. Jan. 26, 2012) .............18

*John R. Sand & Gravel Co. v. United States*,
457 F.3d 1345 (Fed. Cir. 2006) *aff'd*, 552 U.S. 130 (2008) ..........................16

*Kerns v. Chesapeake Exploration, L.L.C.*,
762 F. App'x 289 (6th Cir. 2019) ................................................................15

*Knick v. Township of Scott, Pa.*,
139 S. Ct. 2162 (2019) ................................................................................17

*Lombardozzi v. Taminco US Inc.*,
No. 3:15CV533/MCR/EMT, 2016 WL 4483856 (N.D. Fla. Aug. 24, 2016) .........13

*Long v. Baker*,
37 F. Supp. 3d 1243 (M.D. Fla. 2014) .........................................................18

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ...................................................................................16

*Moorer v. U.S. Bank N.A.*,
No. 3:17-CV-56 (VAB), 2018 WL 587319 (D. Conn. Jan. 29, 2018) ...............15

*Navelski v. Int'l Paper Co.*,
244 F. Supp. 3d 1275 (N.D. Fla. 2017) .......................................................18

*Paul v. Holbrook*,
696 So. 2d 1311 (Fla. Dist. Ct. App. 1997) ................................................18

*Petito v. A.H. Robins Co., Inc.*,
750 So. 2d 103 (Fla. Dist. Ct. App. 1999) ..................................................20

*Powell v. Tosh*,
942 F. Supp. 2d 678 (W.D. Ky. 2013) .....................................................6, 10

*Powell v. Tosh*,
No. 5:09CV-121-R, 2011 WL 1674957 (W.D. Ky. May 3, 2011) ..................19

*Rayburn v. Hogue*,
  241 F.3d 1341 (11th Cir. 2001) ........................................................14

*Roeder v. Atl. Richfield Co.*,
  No. 3:11-CV-00105-RCJ, 2011 WL 4048515 (D. Nev. Sept. 8, 2011)...................................19

*Siegmund v. Bian*,
  No. 12-62539-CIV, 2014 WL 11531628 (S.D. Fla. Mar. 26, 2014) ........................................2

*Tokyo Gwinnett, LLC v. Gwinnett Cty.*,
  940 F.3d 1254 (11th Cir. 2019) ........................................................10

*United States v. Dickinson*,
  331 U.S. 745 (1947)........................................................16

*Waverley View Inv'rs, LLC v. United States*,
  135 Fed. Cl. 750 (Fed. Cl. 2018) ........................................................15

*Weiland v. Palm Beach Cty. Sheriff's Office*,
  792 F.3d 1313 (11th Cir. 2015) ........................................................11

### STATUTES

Fla. Stat. § 823.14 ........................................................17

010867-11/1336288 V1

## I.      INTRODUCTION

On August 11, 2020, the day after Defendants filed their motions to dismiss Plaintiffs' Second Amended Complaint ("SAC") [DE 141 & 142], Plaintiffs' air modeling expert proactively ran an additional quality check of the air modeling data, and discovered an input error in one of the computational formula conversions for the trillions of data points underlying the AERMOD results submitted as Exhibit B to the SAC [DE 129-2].  As detailed in the declaration attached to Plaintiffs' motion[1], this error stemmed from the inadvertent conversion of minutes to seconds, causing the tables in Exhibit B to overstate air concentration values.  Plaintiffs' expert corrected this error and provided Plaintiffs with updated modeling results.  Though lower, these new concentrations do not undermine the factual allegations and legal claims set forth in the SAC, nor do they undermine the reliability of the EPA-approved AERMOD modeling.  To the contrary, they continue to affirm that (i) the impacts of each Defendant's burning are felt by each plaintiff and throughout the class area and (ii) both individually and in the aggregate, Defendants put the health of Glades' residents at risk and damage their property—and thus cure the standing defects previously identified by this Court.  *See Coffie v. Florida Crystals Corp.*, 2020 WL 2739724, at *3–4 (S.D. Fla. May 8, 2020).

Plaintiffs respectfully request leave under Federal Rule 15(a)(2) to file a corrected Third Amended Complaint ("TAC") for the narrow purpose of curing this error.[2]  For the reasons set forth below, Plaintiffs' request is made in good faith, without dilatory motive, and would not cause undue prejudice to Defendants if granted.  Nor would amendment be futile: the proposed TAC withstands the grounds for dismissal raised in Defendants' motions, which seek to prematurely end this suit by closing the book on disputed issues of fact.[3]  At the heart of this case remains

---

[1] Attached as Exhibit A to Plaintiffs' Motion is the Declaration of Randy D. Horsak, PE ("Horsak Decl."), the engineer retained by Plaintiffs to perform air dispersion modeling using the U.S. Environmental Protection Agency's (USEPA) AERMOD model.  In it, Mr. Horsak explains in more detail how this error occurred, its implications, and, more generally, the work involved in the AERMOD modeling done so far in this case.

[2] As attachments to this motion, Plaintiffs submit both their proposed TAC as well as a redlined version of the same.  *See* Exs. B (Proposed TAC), C (redlined TAC).

[3] To the extent this Court grants Plaintiffs' request for leave to amend, Defendants' motions to dismiss the Second Amended Complaint [DE 141 & 142] will be rendered moot.  However, because Defendants seek dismissal of the SAC on grounds equally applicable to Plaintiffs' proposed corrected Third Amended Complaint, and that would—if accepted by this Court—make amendment futile (either in whole or in part), Plaintiffs respond to them here as well.  *See* Section

egregious conduct: thousands of acres burned each day by Defendants—amounting to hundreds of thousands of acres burned each year—in an unrelenting six- to eight-month stream.  In their complaint, Plaintiffs describe in detail the toll this burning takes on putative class members' health and property, and demand that these effects be taken seriously.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 15(a)(2) allows amendments to the pleadings before trial "with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, a party's request may be denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment . . . ."  *Forman v. Davis*, 371 U.S. 178, 182 (1962).  "Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant."  *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007).  "Unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial."  *Siegmund v. Bian*, No. 12-62539-CIV, 2014 WL 11531628, at *1 (S.D. Fla. Mar. 26, 2014) (quoting *Epsey v. Wainwright*, 734 F.2d 748, 750 (11th Cir. 1984)).

## III.     ARGUMENT

**A.     Plaintiffs have diligently prosecuted their case; the filing of the proposed TAC would not prejudice Defendants.**

On August 11, 2020, after reviewing Defendants' motions to dismiss Plaintiffs' SAC, Plaintiffs' air modeling expert, Randy Horsak, conducted an additional quality check of the AERMOD results submitted as Exhibit B to the SAC [DE 129-2] and discovered an input error.  *See* Horsak Decl. ¶ 24.  This error stemmed from the inadvertent formula conversion of minutes to seconds as part of an emissions factor calculation performed by employees of Spirit Environmental, an environmental consulting firm based in Houston, Texas, engaged by Mr. Horsak to perform air dispersion modeling using the USEPA AERMOD model.  *Id.* ¶¶ 16–18, 25–32.  Regrettably, this input error caused the concentrations in the tables in Exhibit B to the SAC to be overstated by a factor of 60.  *Id.* ¶ 32.  Plaintiffs have worked diligently to correct it since its

---

III.B, *infra*.  Plaintiffs raise an identical set of arguments in a concurrently-filed opposition to Defendants' motions.

discovery on August 11. An updated set of tables attached as an exhibit to Plaintiffs' proposed TAC provides the corrected values.  *See id.* ¶¶ 33–35.

Defendants will no doubt argue that this error was obvious, and Plaintiffs should have been on notice of it.  However, at the time the SAC was filed, Plaintiffs relied on assurances by Mr. Horsak that the data set forth in the SAC—the product of an extensive modeling project requiring weeks of work, involving trillions of lines of data, and undertaken on short notice—was accurate. *See* Horsak Decl. ¶ 21.  Although the values in that data set were high ("fiction," by Defendants' estimation), so too is the remarkable volume of Defendants' burning—hundreds of thousands of acres each year, amounting to thousands of acres each day[4]—and prior AERMOD analysis performed in Mexico has yielded similar figures.  *Id.*[5]

Furthermore, while Defendants imply that publicly-available air monitoring data from the putative class area should have demonstrated Plaintiffs' earlier results to be facially "implausible" (*see* DE 141 at 1), this claim does not withstand scrutiny—to the contrary, for the reasons set forth in Mr. Horsak's declaration and below, this monitoring data is facially suspect and therefore inappropriate for comparison to Plaintiffs' modeling.  *See* Horsak Decl. ¶ 22 (explaining why Florida DEP data is not reliable and "could not be used as a comparison to modeled results").  There are three reasons for this.

---

[4] In their briefing, Defendants draw attention to the Camp Fire in Butte County, California, during which approximately 153,336 acres burned over a seventeen-day period in November 2018, which amounts to approximately 9,020 acres burned each day. DE 141 at 10.  Plaintiffs allege, based on publicly-available data maintained by the Florida Forest Service, that approximately 387,236 acres of sugarcane were burned in Palm Beach, Hendry, Glades, and Martin counties in the calendar year 2019, as part of 10,229 individual fires.  *See* TAC ¶ 3.  Assuming a six to eight month burn season of between 180 and 240 days, this means that between 1,614 and 2,151 acres were burned each day of the 2019 "season."  In other words, for at least six months of every year, residents of the Hazard Zone—who in many cases live next door to these fires—are subject to unceasing smoke and particulate matter from burning whose scope and magnitude rivals, if not exceeds, that of the Camp Fire.

[5] As Mr. Horsak explains in his declaration, these initial values were compared to, and considered consistent with, AERMOD modeling of similar sugarcane burning in Mexico, which estimates "[h]ourly concentrations of over 175,000 $\mu g/m^3$ . . . corresponding to 24-hour concentrations of 730 $\mu g/m^3$[.]"  *See* Horsak Decl. ¶ 21 (citing Wellens et al., *Modelling the Effect of Sugar Refinery Pollution in a Rural Area in Central Mexico*, Proceedings of the European Modeling and Simulation Symposium (2012) at 215 & Fig. 10, available at https://pdfs.semanticscholar.org/edcb/5615847d5a669f218963f2bad12b10e2f840.pdf).

*First*, Defendants base their claim that air quality standards are met in the whole of the putative class area on data from a single air quality monitor, for a single pollutant type ($PM_{2.5}$), in a remote Belle Glade parking lot, which is (Defendants fail to note) the *only* such monitor in the entire 675-square-mile class area.[6]  Even assuming this data is accurate, it is of vanishingly little utility in assessing the impact of Defendants' burning over the whole of the Glades, as it provides information about a single data point in an otherwise vast class area.  *See* DE 141 at 7.  Defendants conduct thousands of burns each year, each of which generates a unique plume.  *See* TAC ¶¶ 144–46.  As discussed in more detail below, it is the sheer complexity and scale of this conduct that requires USEPA approved modeling—rather than data from a single monitor—to plausibly assess the impact of Defendants' burns.

*Second*, publicly-available documents reveal that since 2013, the Florida Department of Environmental Protection has designated this very monitor ("AQS #12-099-0008") as "non-regulatory" because it fails tests necessary to "meet the required [federal equipment method ("FEM")] statistics in 40 CFR Part 53(C)"; as a result, the data it collects cannot be used for enforcement actions based on non-compliance with the NAAQS—and is instead limited in use, pursuant to a waiver granted by the EPA, only for Air Quality Index ("AQI") monitoring.[7]

*Third*, and relatedly, Defendants themselves note that "there is no correlation between the highest actual [$PM_{2.5}$] readings recorded [by AQS #12-099-0008] . . . each year and the sugarcane burn season."  *See* DE 141 at 8.  But in light of the sheer scale of Defendants' annual burning, together with AQS #12-099-0008's documented limitations, this is an eyebrow-raising data point: simply put, it is remarkable that there are no other monitors in an area where there are *hundreds of thousands of acres burned* each year.  Furthermore, a review of the Florida DEP's website for this

---

[6] *See* Florida DEP, *Florida's Ozone and Particulate Matter Trends* (last modified Aug. 22, 2019), at 8, available at
https://floridadep.gov/sites/default/files/FL_Ozone_PM_Trends_2018_data.pdf (map of locations of statewide $PM_{2.5}$ monitors).

[7] *See* Florida Department of Environmental Protection, 2020 Annual Ambient Air Monitoring Network Plan (June 2020) at 10–11, 43 (Appendix B), available at
https://floridadep.gov/sites/default/files/Florida-Annual%20Network%20Plan%202020%20-FINAL_0.pdf.  The DEP's 2013 Air Monitoring Network Plan states that this change was made after the monitor in question "fail[ed] to meet the Federal Reference Method like tests."   Florida Department of Environmental Protection, 2013 Annual Ambient Air Monitoring Network Plan (May 2013) at 4, 38–43, available at
https://www3.epa.gov/ttn/amtic/files/networkplans/FLPlan2013.pdf.

monitor reveals that there are large and regular gaps in the data it records, including a wholesale absence of data for January 2020.[8]  While these irregularities may ultimately be easily explained and/or prove inconsequential, they demand further investigation and explanation, including potential third-party discovery.

It is because of these profound limitations on existing air quality data—indeed, the wholesale absence of any state data from the class area that can be used for regulatory enforcement—that Plaintiffs undertook their modeling, credited its earlier results, and continue both to credit and rely on the revised modeling submitted as part of their proposed TAC.

Finally, Defendants would not be prejudiced by Plaintiffs' proposed amendment. Generally, "[t]he non-movant . . . carries the burden of persuading the court to deny the [Rule 15(a)] motion," *Allstate Ins. Co. v. Regions Bank*, No. CIV.A. 14-0067-WS-C, 2014 WL 4162264, at *6 (S.D. Ala. Aug. 19, 2014) (quoting *Uzoukwu v. Metro. Wash. Council of Gov'ts*, 983 F. Supp. 2d 67, 83 (D.D.C. 2013)) (second alteration in original), and meets this burden only where it "demonstrate[s] that its ability to present its case would be seriously impaired were the amendment allowed." *Id.* (quoting *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*, 256 F. Supp. 2d 329, 332 (E.D. Pa. 2003)).  "It is well-settled that '[a]llegations that an amendment will require the expenditure of some additional time, effort, or money do not constitute undue prejudice.'" *Allstate Ins. Co.*, 2014 WL 4162264, at *6 (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 300 F.R.D. 193, 200 (S.D.N.Y. 2014)) (alteration in original).  Here, discovery has not yet begun, and this case remains in its infancy; the only burden amendment will impose on Defendants is the need to respond to this motion, which likely entails many of the same arguments.

**B.      Amendment would not be futile.**

In their motions to dismiss, Defendants set forth a variety of reasons why Plaintiffs' SAC should be dismissed in its entirety, and also argue that Plaintiffs fail to state claims for takings (under 42 U.S.C. § 1983) (Count III), medical monitoring (Count IV), and battery (Count V).

---

[8] *See*
https://fldep.dep.state.fl.us/air/flaqs/MonthlyReport.asp?SiteID=120990008&Month=1&Year=2020 (no Jan. 2020 data);
https://fldep.dep.state.fl.us/air/flaqs/MonthlyReport.asp?SiteID=120990008&Month=4&Year=2020 (no data April 9-13, 2020);
https://fldep.dep.state.fl.us/air/flaqs/MonthlyReport.asp?SiteID=120990008&Month=11&Year=2019 (no data Nov. 1-5, 2019).

Plaintiffs anticipate that Defendants will raise these same arguments in support of the claim that amendment would be futile, and address them here.

> **1.      Plaintiffs' proposed amended complaint cures the standing deficiencies previously identified by this Court.**
>
> > **a.      Plaintiffs plausibly allege harm by each Defendant to the entire class area.**

Plaintiffs rely on AERMOD, an atmospheric modeling system developed jointly by the American Meteorological Society and the EPA, as well as INPUFF, an alternative model developed by the EPA, to model the air dispersion of multiple pollutant categories across the class area.  *See* TAC ¶¶ 147–162.  The EPA, state, and local regulatory agencies—including those in the State of Florida[9]—use AERMOD for a range of purposes, including permit applications, state implementation programs, impact analysis, and exposure analysis.  It is also commonly used to establish class-wide harm in litigation, including damage to property, *see, e.g.*, *Brantley v. Int'l Paper Co.*, No. CV 2:09-230-DCR, 2017 WL 2292767, at *10 (M.D. Ala. May 24, 2017) (expert "reasonably linked the plaintiffs' claims of property damage to the mill's emissions through his AERMOD study" sufficient to withstand *Daubert* challenge), and has been expressly deemed a "reliable model" and "reliable methodology" by federal courts.  *See, e.g.*, *Powell v. Tosh*, 942 F. Supp. 2d 678, 717–18 (W.D. Ky. 2013) (concluding, generally, that "the AERMOD model is a reliable methodology" and citing, *inter alia*, *Adams v. Cooper Indus., Inc.*, 2007 WL 1805586, *9–10 (E.D. Ky. June 21, 2007) ("[T]he court finds that AERMOD is a reliable methodology.")).

As set forth in detail in Plaintiffs' proposed TAC and the exhibits thereto, updated air modeling demonstrates that for all categories of particulate matter and pollutants measured, over almost all averaging times, and by each Defendant, there is an impact to the receptor groups of each of the seven communities in the class area.  *See* TAC ¶ 152.  In other words, particulate matter from each Defendant's burns impacts and harms each named Plaintiff, as well as all putative class members in the seven communities encompassed by the allegations in Plaintiffs' complaint.

---

[9] *See* State of Florida Dep't of Envtl. Protection, Division of Air Resource Mgmt., *Prevention of Significant Deterioration (PSD) Air Quality Modeling Best Practices* at 6, available at https://floridadep.gov/air/air-business-planning/documents/prevention-significant-deterioration-psd-air-quality-modeling (last revised Aug. 10 2020) (noting that "[t]here are two air quality models that are generally used to assess source impacts: AERMOD and CALPUFF.").

As a threshold matter, Defendants suggest that data regarding just one pollutant ($PM_{2.5}$), from a single ambient air quality monitoring site in Belle Glade with a checkered operational past, is sufficient to foreclose any further investigation of the impacts of their burning on the whole of the putative class area. This is an untenable claim. In this case, the use of air dispersion modeling is not only appropriate but essential to identifying and evaluating the impacts of Defendants' air pollution. Even were its reliability ironclad, the Belle Glade monitor provides information about the impacts of Defendants' burning at only a single receptor point for a single pollutant, and is incapable of assessing pollutant contributions from individual or multiple burn events, fields, or—crucially—individual Defendants. By contrast, air dispersion modeling provides trillions of bits of data that can be sorted, analyzed, and rigorously audited. Indeed, the preliminary modeling undertaken by Plaintiffs takes into account 40,248 individual burn events over a five-year period (2014-18), 1,502,826 total acres burned, 13 individual pollutant categories, and 8,760 hours of meteorological data; and assesses impact across five individual ambient air concentration averaging times to 52,000 receptor points on a 130 km by 100 km grid[10], including receptor points in all seven communities included in the class area. *See* Horsak Decl. ¶¶ 39–42 (noting input files represent more than 647 trillion data points).

In its previous order, this Court found that Plaintiffs did not adequately demonstrate that each named Plaintiff was harmed by each named Defendant—specifically, that each Plaintiff (as well as his or her property[11]) has been harmed by smoke and ash generated by each Defendant—and thus lacked standing. *See Coffie*, 2020 WL 2739724, at *4. Plaintiffs submit that the updated and expanded allegations in their proposed TAC address the Court's concern. Specifically, in their TAC, Plaintiffs rely chiefly on AERMOD modeling, as well as a confirmatory sample INPUFF run, to demonstrate that every receptor in each of the receptor groups modeled—which correspond

---

[10] Defendants accuse Plaintiffs of "ignor[ing] U.S. EPA guidance that AERMOD models are appropriate only for distances of 50 km or less[.]" DE 141 at 6 n.3. This reflects either a misunderstanding of the guidance or the modeling performed. Specifically, the guidance cited by Defendants indicates that AERMOD is appropriate out to distances of 50 km for an individual plume (that is, the quality of output information is diminished for distances greater than 50 km), but does not limit the size of the Class Area in any manner whatsoever. The 130 km x 100 km grid is the Class Area—not the plume-limited area—and includes thousands of plumes, each of which complied with the 50-km limitation.

[11] Excepting those class representatives whose claims are brought only on behalf of the proposed Medical Monitoring and Battery Classes.

to the communities in the Hazard Zone—has been affected by each Defendant's individual burning.  TAC ¶¶ 148–152, 158.  Among other things, Plaintiffs now allege that for all categories of particulate matter/pollutants measured, over almost all averaging times, by each Defendant, there is an impact to the receptors evaluated by Plaintiffs' expert; furthermore, each of the named Plaintiffs resides in or around these receptors.  *Id.*  Consistent with the Court's order, Plaintiffs also include other, detailed allegations that support the results of their modeling, including information about wind direction, *id.* ¶¶ 11, 120 & n.27, the properties and behavior of burn plumes, *id.* ¶¶ 136–146, the composition of the smoke and ash generated by each burn, *id.* ¶¶ 128–135, and the documented ill health effects of these pollutants individually and sugarcane burning generally, *id.* ¶¶ 132, 134, 176 (collecting studies), 177–178.  Named Plaintiffs also describe in detail the damage to their property caused by Defendants' burning, as well as the health effects suffered by them and their loved ones.  *See generally id.* ¶¶ 24–73.

Defendants make two main arguments regarding standing.  *First*, they contend that Plaintiffs improperly conflate particulate matter and "visible ash," and that their failure to model the latter is fatal to their claims for property damage.  In other words, Defendants insist that the mere intrusion of particulate matter from each Defendant's burning to each Plaintiff's property does not suffice to establish that this matter caused or contributed to property damage.  *See* DE 141 at 4–6.[12]  But this argument flies in the face of the well-pled allegations in Plaintiffs' TAC, and rests on a false dichotomy: Plaintiffs allege, *inter alia*, that not only larger, "visible" pieces of ash (e.g., burnt pieces of sugarcane, *see, e.g.*, TAC ¶¶ 7, 25, 28) but also "pollutant-laden particulate matter" —that is, particulate matter (including both $PM_{2.5}$ and $PM_{10}$) on to which other contaminants are "sorbed"—"accumulates on buildings and property and infiltrates homes, where it then recirculates in the air" and causes various kinds of property damage.  *See id.* ¶¶ 16, 131–

---

[12] As part of this argument, Defendants make the sophistical argument that certain pictures of sugarcane burns in Plaintiffs' complaint "show smoke from sugarcane burns rising up into the otherwise blue sky (as they are designed to do), not impacting adjacent properties" —suggesting that when smoke visibly rises "into the sky" it cannot also damage people and property.  DE 141 at 5–6.  But Defendants provide no scientific reference or citation for this claim, which is at odds with the laws of physics.  Specifically, the phenomenon of plumes "going upward" is a result of the heat associated with the burn event, local wind speed, and other meteorological conditions, all of which combine to give plumes buoyancy.  But downwind houses are indeed impacted by such a burn event, even if the primary observed plume appears to go upward.  Furthermore, many plumes stay near the ground, which is well documented by science and observation, including observations of actual burn events in Florida.

132, 134, 163–167; *see also id.* Section II.A.1 (description of property damage suffered by various named Plaintiffs).[13]   In other words, Plaintiffs plausibly allege that, because a wide range of pollutants capable of contaminating and damaging property (and of harming human health), are sorbed on to small particles, particulate matter functions as an important vector for their spread— and is thus an appropriate proxy for alleging property damage at this stage.   This dynamic can be appreciated by anyone who has ever woken up, for instance, to a vehicle covered in springtime pollen, or whose property has been gradually discolored by smoke.[14]

Furthermore, to the extent some Defendants' contributions to this harm may be smaller than others, the Eleventh Circuit has rejected the proposition that Fla. Stat. § 376.313, the statute under which Plaintiffs bring their property damage claims in Count II, imposes a "minimum contamination level requirement" (i.e., proof of contamination above some regulatory threshold) in order to state a claim.   *See Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1175 (11th Cir. 2014).   And Fla. Stat. § 376.308(4), which sets forth the "only defenses" to a claim brought under § 376.313, states that liability "shall be joint and several" under the statute and that, where multiple discharges occurred and damages are divisible and attributable to specific parties, "[t]he burden shall be on the defendant to demonstrate the divisibility of damages."   In other words, even if certain Defendants only contribute low levels of property damage-causing particulate matter and pollutants to certain parts of the class area (relative to other Defendants), this is nevertheless sufficient under § 376.313 to hold them jointly and severally liable for the concrete harms suffered by all putative class members.

*Second*, Defendants argue that, to the extent Plaintiffs' allegations of class-wide harm are based primarily on modeling rather than "actual" air monitoring or other data, they do not

---

[13] Consistent with this, as Plaintiffs note in the TAC, preliminary sampling of three homes in the Hazard Zone has identified sugar cane plant burn residue in attic dust and wipe samples taken from around these homes.  TAC ¶ 165.

[14] Defendants argue that that Plaintiffs' air model "focus[es] on tiny, invisible particulate matter" that has "no relevance whatsoever to visible ash."  DE 141 at 5.  But while one particle may be small, a mass of them over time—like grains of sand on a beach—can accumulate and cause property damage.  This proposition is consistent not only with named Plaintiffs allegations, but with the EPA's own recognition that particulate matter "can stain and damage stone and other materials."   *See* U.S. EPA, *Health & Environmental Effects of Particulate Matter (PM)*, https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm   (last updated Apr. 13, 2020).

- 9 -

adequately allege that "injurious levels" of "particulate matter and other constituents" are actually present in the class area.  *See generally* DE 141 at 6–9.[15]  To the extent Defendants suggest that "*actual* air monitoring or other data" is necessary to adequately plead contamination or risk of harm, *see* DE 141 at 6 (emphasis in original), they identify no authority for this unusual proposition—which not only turns the federal rules on their head, *see generally Tokyo Gwinnett, LLC v. Gwinnett Cty.*, 940 F.3d 1254, 1262 (11th Cir. 2019) ("When the defendant challenges standing via a motion to dismiss, both . . . trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.") (quotation marks omitted) (alteration in original), but also flies in the face of the acceptance of AERMOD as "generally reliable" by courts, *see, e.g.*, *Powell*, 942 F. Supp. 2d at 718.  It is also contrary to (i) the widespread use of modeling methodologies like AERMOD by federal, state, and local regulatory agencies, as well as (ii) the other well-pled allegations in Plaintiffs' TAC describing the harm that results from Defendants' burning, including descriptions of this harm by individual class representatives.  For the reasons set forth in detail above, the use of AERMOD and INPUFF here is not merely appropriate but essential, given both (i) the severe limitations on— and potentially troubling questions about—existing data collected by the State of Florida; and (ii) the need to model and disaggregate the harms caused by tens (and possibly hundreds) of thousands of individual fires, over multiple years, across more than a dozen pollutant categories, consistent with the Court's previous order regarding standing.

### b.  Plaintiffs' complaint is not a shotgun pleading

Defendants' motion to dismiss also devotes two brief paragraphs to the peculiar claim that Plaintiffs' complaint is a shotgun pleading, and thus must be dismissed, because it does not adequately specify "which Defendants are responsible for which acts or omissions"—for example, which Defendants were responsible for "visible ash falling on properties and vehicles."  DE 141 at 11–12.  But this is the very purpose for which Plaintiffs' air modeling exists: it uses years of public data about tens of thousands of individual fires, together with a variety of other inputs (e.g., meteorological data)—collectively, trillions of data points—to model the impact of each Defendant's conduct on an hourly basis over a period of years.  To the extent this data can be disaggregated at the level of individual burn event (and by hour), the notion that Plaintiffs must

---

[15] Defendants' challenges to the plausibility of Plaintiffs' prior modeling data are now moot for the reasons set forth in detail above.

also enumerate and individually allege the impact of each of Defendants' burns is not only impractical but facially absurd: such a complaint would run the length of an encyclopedia and serve no purpose other than to clog hard drives and consume paper.  Though Defendants contend that Plaintiffs' allegations do not provide them with sufficient notice "of what conduct [each] did that Plaintiffs allege is causing harm" —the original sin of a shotgun complaint, *see Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015)—this objection strains credulity here: as masters of their own corporate conduct and records, Defendants are aware of who burned what, and when, and are no doubt capable of modeling the impact of this conduct themselves (and subjecting Plaintiffs' expert to the crucible of *Daubert*) in preparing their defenses.[16]

### 2. Plaintiffs' claims for negligence, takings, and medical monitoring, as alleged, are adequately pled without further amendment.[17]

#### a. The doctrine of primary jurisdiction does not bar Plaintiffs' claims.

In a separately-filed motion [DE 142], Defendants Florida Crystals, Osceola, and Okeelanta (hereafter "Florida Crystals Defendants") seek to breathe new life into an argument previously rejected by this Court: that the doctrine of primary jurisdiction should bar Plaintiffs' claims for negligence, takings (under 42 U.S.C. § 1983), and medical monitoring.  Defendants justify this request with vague gestures to "new allegations" in Plaintiffs' complaint, which (they contend) "demonstrate that [Plaintiffs] seek to upend an established regulatory process, end sugarcane burning, and dictate public policy as to agriculture and air quality." DE 142 at 2.

As a threshold matter, the Florida Crystals Defendants fail to identify or explain just which new aspects of Plaintiffs' amended complaint support their motion, and instead again raise arguments identical to those rejected by this Court in its previous order.  *See Coffie*, 2020 WL 2739724, at *7.  Defendants insist, for example, that Plaintiffs seek to "place[] the FFS' regulatory scheme on trial" because "there is no way to conduct preharvest sugarcane burning in compliance

---

[16] Furthermore, as noted above, Defendants are subject to joint and several liability under Plaintiffs' statutory claim, and bear the burden of demonstrating the divisibility of damages.

[17] In a single line of their brief, Defendants state that "[t]he Court did not grant Plaintiffs leave to amend to add new claims."  But the Court did not prohibit Plaintiffs from adding new counts and, as noted above, the standard for amendment is liberal.  Defendants fail to explain why they are, or would be, prejudiced by the need to defend against these newly-added claims—nor could they for the reasons set forth above.

with agency permits without a necessary finding that the duty prong of negligence is breached and the agency's prescribed burn program itself created the harm." DE 142 at 2. But the only paragraph of the SAC cited for this proposition, paragraph 122, merely elaborates on a point made in the First Amended Complaint ("FAC") and recognized by the Court in its prior order: that the Florida Forest Service regulates sugarcane burning, *see* FAC ¶¶ 47–49, as part of which it approves (and denies) burn permits, *see id.* ¶ 57. *See Coffie*, 2020 WL 2739724, at *7. Though the Florida Crystals Defendants contend that "[t]here is no claim that any pre-harvest burning was conducted negligently," and that Plaintiffs' formulation of the "duty prong of negligence" should therefore trigger the primary jurisdiction doctrine, *see* DE 142 at 2, the only paragraph they cite for this claim—paragraph 213 of the SAC, which sets forth the duty owed by Defendants to Plaintiffs—is virtually unchanged from the prior FAC, as is the operative language of Plaintiffs' negligence claim. *Compare* FAC ¶¶ 135–140 *with* SAC ¶¶ 212–217. As the Court previously recognized, Plaintiffs' claims for negligence and strict liability are "basic tort claims" well within the "ordinary experience of judges and juries," and therefore withstand this challenge to their legal sufficiency. *See Coffie*, 2020 WL 2739724, at *7. Defendants' argument presupposes that burning is necessary in the first place and ignores that, even if a permit is lawfully obtained, a burn can be conducted negligently.

The Florida Crystals Defendants attempt to shore up this point by arguing that Plaintiffs now also "challeng[e] air quality standards" and "seek to impose a more stringent air quality standard in the putative class area," thus "effectively superseding the state and federal agency standards[.]" DE 142 at 3. This argument flows from a fundamental misreading of the complaint and the purpose of Plaintiffs' modeling data. Contrary to Defendants' claims, Plaintiffs nowhere "challenge" the NAAQS[18] or seek to impose a more stringent air quality standard on the class area. Instead, Plaintiffs refer to the NAAQS for $PM_{2.5}$ solely for the purpose of demonstrating the severity of the harm caused by Defendants to the health of Glades residents—that is, as just one point of reference, alongside extensive academic research, that helps demonstrate why the levels

---

[18] The Florida Crystals Defendants state, misleadingly, that *Plaintiffs* allege that the current $PM_{2.5}$ standard "does not adequately protect human health" and that "the 24 hour standard should be revised downwards[.]" DE 124 at 2 (quoting SAC ¶ 182). Plaintiffs make no such claim; instead, the complaint clearly attributes this position to the Independent Particulate Matter Review Panel, and nowhere alleges that the EPA or FDEP should be forced to adopt a lower standard for $PM_{2.5}$. *See* TAC ¶¶ 132(a), 179.

of pollutants generated by Defendants' burning are harmful to human health—and need not prove these exceedances in order to prevail on their claims. Nor do Plaintiffs' seek "to alter or change the emission or permitting standards" under which Defendants operate. *See Lombardozzi v. Taminco US Inc.*, No. 3:15CV533/MCR/EMT, 2016 WL 4483856, at *3 (N.D. Fla. Aug. 24, 2016).

By the Florida Crystals Defendants' logic, the mere grant of a burn permit by the FFS—considered against the backdrop of the FDEP and EPA's air quality regulations—gives Defendants carte blanche to fill the air with as many harmful pollutants as they like; this is tantamount to the claim that, because the State issues driver's licenses, any finding that a driver has been negligent calls the State's regulatory scheme into question. Not only is this contrary to basic principles of tort law, but it also flies squarely in the face of the Court's prior order allowing Plaintiffs' claims for negligence and strict liability to proceed.

Finally, the Florida Crystals Defendants argue that Plaintiffs' request for injunctive relief, brought pursuant to their takings claim, is foreclosed by this Court's dismissal of an earlier, independent claim for injunctive relief pled in Plaintiffs' FAC—which the Court found to be "nearly identical" to the public nuisance claim pled by the Plaintiffs in *Flo-Sun, Inc. v. Kirk*, 783 So. 2d 1029 (Fla. 2001), and thus barred. *See Coffie*, 2020 WL 2739724, at *7. But Defendants' argument ignores the basis of this Court's reasoning: in relevant part, the Court found that Count VII of the FAC, though styled as an independent claim for "Injunctive Relief," was in all but name a "claim[] for public nuisance" and thus foreclosed by the reasoning in *Kirk*. *See id.*[19] By contrast, Plaintiffs' present request for injunctive relief is brought pursuant to a substantively different claim and, more importantly, theory of relief: specifically, their claim for takings under 42 U.S.C. § 1983.[20] Save for the stale arguments discussed above, Florida Crystals Defendants make no attempt to explain why Plaintiffs' takings claim, a claim well within the "ordinary experience of judges and juries," *see Coffie*, 2020 WL 2739724, at *7, is barred by the primary jurisdiction

---

[19] Specifically, in *Kirk*, the Supreme Court of Florida's conclusion that the primary jurisdiction doctrine applied turned not on the remedy sought (i.e., injunctive relief vs. damages) but instead the nature of the claim itself: in relevant part, the Court found that the plaintiffs' claim for public nuisance was inappropriate because it implicated a "comprehensive legislative scheme established to deal with environmental concerns" that was "aptly suited to address the complex technical issues which may arise in this case." *See Kirk*, 783 So. 2d. at 1040.

[20] Plaintiffs set forth this theory in more detail below in Section B.2.b.3.

doctrine, nor do they explain why *Kirk*—where the court was faced only with a public nuisance claim—should apply to foreclose such a constitutional claim.

### b.   Plaintiffs sufficiently state a takings claim

Defendants raise several challenges to Plaintiffs' newly added takings claim in their motion to dismiss.  *See* DE 141 at 12–14.  Plaintiffs respond to these individually below.

### (1)   Plaintiffs sufficiently allege state action

"To state a claim for relief in an action brought under § 1983, [plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law.  Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999) (quotations omitted).  In the Eleventh Circuit, courts use several tests to determine whether the actions of a private entity are properly attributed to the state.

The allegations in Plaintiffs' complaint fall squarely in line with the "nexus/joint action test," which applies when "the state has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1277 (11th Cir. 2003) (citing and quoting *Willis v. Univ. Health Servs.*, 993 F.2d 837, 840 (11th Cir. 1993)).  Under this test, the state need only have "some affirmative role, albeit one of encouragement short of compulsion, in the particular conduct underlying a claimant's civil rights grievance." *Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001).  Here, the FFS not only approves each burn event, but also (i) establishes each burn's timing, *see* TAC ¶¶ 119, 225; (ii) generates burn maps to evaluate the expected results of burns, *id.* ¶¶ 11, 142, 225; and (iii) expressly denies permits to Defendants if winds are projected to blow into the more affluent Eastern Palm Beach County and Eastern Martin County communities near the coast, *id.* ¶¶ 120–123, all of which make it more likely for toxins to be deposited on class properties.  In other words, the FFS plays an active role in not only directing but encouraging the harmful conduct at issue in this case, particularly through its wind-based restrictions.  *Compare Rayburn*, 241 F.3d at 1347 (state did not act jointly with abusive foster parents because, while it approved the foster parents, it did not encourage or approve the abusive conduct complained of).

Defendants suggest that, because they choose whether or not to burn, no joint participation can be attributed to the State and Plaintiffs' takings claim fails on first principles.  DE 141 at 13.[21] But this misses the forest for the trees: here, Plaintiffs' takings claim turns not on whether the FFS directs or endorses burning generally; rather, in approving burn permits and implementing wind-based regulations, the agency plays a decisive role in creating, approving, and enforcing a rule (and Defendants' related conduct), when Defendants *do* decide to burn, that ensures that *only* putative class members (rather than more affluent Florida residents living to the east) bear the brunt of Defendants' conduct.  That is, the harm in this case directly results, in part, from the FFS' joint participation in determining where particulate matter and pollutants should go.  This is sufficient to satisfy the nexus/joint action test.

### (2)    Plaintiffs' partial takings claim is properly alleged

Next, Defendants argue that Plaintiffs fail to state a takings claim because they do not allege "a deprivation of 'all economically beneficial or product use of land[.]'"  DE 141 at 13–14. "Nothing in the language of the Fifth Amendment compels a court to find a taking *only* when the Government divests the total ownership of . . . private property without reference to the owner's remaining property interests."  *Florida Rock Indus. v. United States*, 18 F.3d 1560, 1568 (Fed. Cir. 1994).  Plaintiffs' takings claim alleges a partial, and not complete, taking.  *See* TAC ¶ 232.

---

[21] Defendants' cite three out-of-circuit cases rejecting purportedly "similar" takings claims. *See* DE 141 at 13.  On close inspection, each is inapposite, and does little more than reiterate the well-established principle that "the existence of governmental regulations, standing alone, does not provide the required nexus" to satisfy the test for state action."  *Vdare Found. v. City of Colorado Springs*, No. 18-CV-03305-CMA-KMT, 2020 WL 2309613, at *3 (D. Colo. Jan. 29, 2020) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).  In *Kerns v. Chesapeake Exploration, L.L.C.*, 762 F. App'x 289 (6th Cir. 2019), there was no allegation that the State of Ohio played any role in encouraging, approving, or otherwise carrying out the harm alleged by plaintiffs, aside from the "mere" approval of a so-called pooling order authorizing the private defendant's challenged conduct.  *See id.* at 294–95.  Likewise, in *Moorer v. U.S. Bank N.A.*, No. 3:17-CV-56 (VAB), 2018 WL 587319 (D. Conn. Jan. 29, 2018), the plaintiff failed to allege that the State of Connecticut did anything to encourage or abet the conduct at issue other than grant the defendant, a bank, a corporate charter.  *Id.* at *6.  And in *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442 (10th Cir. 1995), the Tenth Circuit concluded that several university rules and policies governing event security were "simply too general to supply the required nexus" to challenged pat-down searches, but nevertheless emphasized that, "if the appellants could demonstrate that the pat-down searches directly resulted from the University's policies then the required nexus would be established."  *Id.* at 1450.

010867-11/1336288 V1

A compensable taking occurs when the government physically invades, appropriates or requires the landowner to submit to physical occupation of its land. *Waverley View Inv'rs, LLC v. United States*, 135 Fed. Cl. 750, 791 (Fed. Cl. 2018). Property damage of the kind alleged by Plaintiffs can support a takings claim if it makes sufficient "inroads" upon an owner's use of his or her property such that it constitutes a "servitude" between private parties. *See United States v. Dickinson*, 331 U.S. 745, 748 (1947). In *Dickinson*, for example, this test was met when construction of a federal dam caused surrounding property owners' land to gradually erode. The situation here is no different: cumulative deposits from burning—a "continuing process of physical events," *see Dickinson* 331 U.S. at 749—have caused (and will continue to cause) injury to class properties, and Defendants would need an easement from class members to legally deposit these toxins on their properties. Furthermore, since *Dickinson* was decided, courts have recognized that ongoing contamination can constitute "the taking of an easement in the property or its subjection to a servitude which partially destroyed its value" sufficient to entitle a plaintiff to damages under the Fifth Amendment. *See Clark v. United States*, 8 Cl. Ct. 649, 652 (Cl. Ct. 1985) ("If plaintiff can prove at trial that seepage from the government's chemical dump renders her water supply useless for residential purposes . . . she may be able to prove the taking of an easement in the property or its subjection to a servitude which partially destroyed its value."); *see also Hansen v. United States*, 65 Fed. Cl. 76, 122 (Fed. Cl. 2005) (summary judgment inappropriate on takings claim where evidence indicated that plaintiff's ranch "sustained a permanent and substantial invasion in the form of [ethylene dibromide] contamination" of its groundwater supply as the "direct, natural, and probable result" of government conduct). Plaintiffs have alleged similarly substantial, invasive conduct.

A takings also occurs when the "government authorize[s] the permanent occupation of the [owner's] property by a third party." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982). "In the context of physical takings," an occupation qualifies as "permanent" if it is "a substantial physical occupancy of private property . . . even if it is not exclusive, or continuous and uninterrupted." *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1357 (Fed. Cir. 2006) *aff'd*, 552 U.S. 130 (2008) (quotation and citation omitted). In *Loretto*, for example, the property owner established a takings claim when a state law authorized a cable company to install cable boxes and wiring on her apartment building with only nominal compensation. Like the apartment owner in *Loretto*, Plaintiffs and Class members did not consent to the physical invasion

of their properties and are entitled to just compensation for the physical occupation of their properties.

### (3) Plaintiffs are entitled to seek injunctive relief in conjunction with their takings claim

Finally, Defendants argue that Plaintiffs' request for injunctive relief is foreclosed by the Supreme Court's ruling in *Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162 (2019), where the court held that "there is no basis to enjoin the government's action effecting a taking" "[a]s long as an adequate provision for obtaining just compensation exists." DE 142 at 14 (citing *Knick*, 139 S. Ct. at 2176). But the Supreme Court has previously made clear that a taking executed solely to confer a private benefit on a particular private party—as here—is constitutionally impermissible, even if compensated. *See Kelo*, 545 U.S. at 478. Specifically, in *Kelo*, the Court held that condemning a depressed area to encourage economic development was a sufficiently public purpose to defeat the takings claim at issue, but was careful to add that the defendant "would no doubt be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a *particular* private party." 545 U.S. at 469 (emphasis added). The FFS' permitting scheme and wind-based regulations confer to Defendants, as permit seekers, the private benefit of using class members' property as a personal dumping ground. *See* TAC ¶ 233. This is constitutionally impermissible, and is therefore sufficient to justify Plaintiffs' request for injunctive relief.

### c. Battery

Defendants also raise two challenges to the sufficiency of Plaintiffs' battery claim: *first*, they argue that this claim is little more than a re-branded nuisance claim, and thus barred by Florida's Right to Farm Act ("RTFA" or "Act"), Fla. Stat. § 823.14; and *second*, they argue that Plaintiffs do not allege the requisite intent to state a claim for battery. *See* DE 141 at 15–16.

### (1) The RTFA does not bar Plaintiffs' battery claim

Under the RTFA, "[n]o farm operation which has been in operation for 1 year or more since its established date of operation and which was not a nuisance at the time of its established date of operation shall be a public or private nuisance if the farm operation conforms to generally accepted agricultural and management practices," subject to certain enumerated exceptions. Fla. Stat. § 823.14. In its previous order, the Court rejected Plaintiffs' argument that certain of these exceptions applied here, and dismissed not only Plaintiffs' nuisance claim but their trespass claim as well—reasoning that the latter merely re-labeled the same conduct as "trespass." *Coffie*, 2020 WL 2739724, at *5.

Defendants argue that, to the extent Plaintiffs' battery claim also "has the characteristic of a nuisance," it is little more than a third attempted bite at the same apple.  DE 141 at 15.  But while trespass and battery may share a historical origin, they have since diverged considerably: today the two not only have different elements, but seek to remedy profoundly different harms—a difference Defendants acknowledge only in passing, but that is dispositive in assessing whether the RTFA should apply as a bar here.  For example, while trespass is an intentional tort, "the requisite intention is to enter upon the particular land in question, irrespective of whether the actor knows or should know that he or she is not entitled to enter."  *Jacobini v. JP Morgan Chase*, N.A., No. 6:11-CV-231-ORL-31, 2012 WL 252437, at *3 (M.D. Fla. Jan. 26, 2012).  By contrast, as discussed above, to establish a claim for battery under Florida law, a plaintiff must prove "(1) the intent to cause a harmful or offensive contact with another person, and (2) an offensive contact that directly or indirectly results."  *Long v. Baker*, 37 F. Supp. 3d 1243, 1252 (M.D. Fla. 2014). Furthermore, unlike a claim for trespass, "[o]ffensiveness is an essential element of the tort" of battery.  *Paul v. Holbrook*, 696 So. 2d 1311, 1312 (Fla. Dist. Ct. App. 1997)

This is not just a matter of semantics.  For under Florida law, a nuisance is "[a]nything which annoys or disturbs one in the free use, possession, or enjoyment of his *property*, or which renders its ordinary use or occupation *physically uncomfortable*."  *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1308 (N.D. Fla. 2017) (quoting *Jones v. Trawick*, 75 So. 2d 785, 787 (Fla. 1954)) (emphasis added).  In other words, the tort of nuisance focuses on intrusions to (and enjoyment of) *property*, and is thus easily harmonized with the elements of and purpose underlying the doctrine of trespass.  By contrast, it is impossible to square the same aspects of the doctrine of battery— which exists not just to prevent "annoyance or disturbance" but "to protect the integrity of the *person*," and thus focuses heavily on such factors as the plaintiff's "mental disturbance, such as fright, revulsion or humiliation," as well as "personal dignity."  *Paul*, 696 So. 2d at 1312.  Save for a brief lesson in common law history, Defendants make no attempt to explain why, in spite of these crucial differences, the RTFA's bar should apply to Plaintiffs' battery claim—nor do they identify any case law or legislative authority to support so sweeping a construction.

### (2)  Plaintiffs adequately plead intent

Florida's battery statute "prohibits either a specific voluntary act or something that is *substantially certain* to result from the act."  *See C.B. v. State*, 810 So. 2d 1072, 1073 (Fla. Dist. Ct. App. 2002) (emphasis added).  Consistent with this, Plaintiffs allege that "Defendants knew or

should have known that, as a result of their sugarcane burning, these carcinogens, hazardous pollutants, and particulate matter would be released, or were substantially certain to be released, into the air and impact residents of the Hazard Zone, including Battery Plaintiffs," and that their battery was intentional within the meaning of Florida law. *See* TAC ¶ 249.

Under this standard, a plaintiff need not demonstrate that the defendant acted with substantial certainty that its conduct would lead to contact with a *specific* plaintiff, but rather that this conduct would bring about a harmful or offensive conduct. *See, e.g.*, *In re E.I. DuPont de Nemours & Co. C-8 Personal Injury Litig.*, No. 2:13-md-2433, 2015 WL 4092866, *14–16 (S.D. Ohio July 6, 2015) (plaintiffs adequately alleged battery claim based on allegation that, by releasing C-8 from its plant, DuPont "knew with substantial certainty that its act . . . would bring about a harmful or offensive contact[.]"); *see also Roeder v. Atl. Richfield Co.*, No. 3:11-CV-00105-RCJ, 2011 WL 4048515, at *6–7 (D. Nev. Sept. 8, 2011).[22] Courts have sustained battery claims based on similar allegations harm from airborne pollutants. *See, e.g.*, *Powell v. Tosh*, No. 5:09CV-121-R, 2011 WL 1674957, at *1 (W.D. Ky. May 3, 2011) (concluding plaintiffs adequately stated battery claim based on harm from particulate matter originating from hog barn, and collecting cases); *see also Barnette v. Grizzly Processing, LLC*, 809 F. Supp. 2d 636, 647–48 (E.D. Ky. 2011) (plaintiffs sufficiently stated claim for battery based on "particulate touching," i.e., inhalation of coal dust emitted by defendants' coal processing plant).

Defendants protest that the allegations in Plaintiffs' complaint are insufficient to show that they were "substantially certain" their burning would cause an offensive touching to class members; specifically, they appear to stake this claim on Plaintiffs' failure to "allege any actual air monitoring data that could have somehow put Defendants on notice that their burning was emitting harmful levels of pollutants." DE 141 at 16. But this artificially narrow reading of the complaint flies not only in the face of common sense—that is, the fact that Defendants burn hundreds of thousands of acres each year—but also Plaintiffs' well-pled allegations, and thus seeks to prematurely foreclose what will likely be a central disputed fact in this case: just what did

---

[22] Defendants also cite two cases in which Courts dismissed purportedly similar battery claims. *See* DE 141 at 16 (citing *Major v. Astrazeneca, Inc.*, No. 500CV1736 FJS/GJD, 2006 WL 2640622, at *21 (N.D.N.Y. Sept. 13, 2006) and *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, No. MDL 2179, 2011 WL 4575696, at *11 (E.D. La. Sept. 30, 2011)). But in neither case was there any evidence or allegation that the defendant was aware of the impact of its conduct.

Defendants know about the harmfulness of their conduct?  Though Defendants plead ignorance, and seek to hide behind severely limited air monitoring data, this stance ignores a wealth of other facts that plausibly support the inference that Defendants were, or should have been, "substantially certain" that their burning inflicted class area-wide harm.  For example, Plaintiffs plead, among other things: (1) a decades-long record of public complaints about the impact of sugarcane burning, including evidence that these complaints are passed on directly to the industry itself, *see* TAC ¶¶ 124–126; (2) voluminous public health research and data concerning the negative health impacts of sugarcane burning, *id.* ¶¶ 168-178; and (3) FFS-produced burn maps that project that smoke can travel up to 26 miles from each burn, *id.* ¶ 142; as well as (4) the existence of a wind direction-based regulatory scheme that, in seeking to shelter more affluent Florida residents to the east from the byproducts of Defendants' burning, *see id.* ¶¶ 121–122, plainly recognizes that exposure to particulate matter from sugarcane burning constitutes a harmful and offensive contact.  These facts are sufficient to show that Defendants were "substantially certain" that their conduct would harm Plaintiffs.

### d.    Medical monitoring.

Finally, Defendants argue that Plaintiffs fail to adequately plead their medical monitoring claim because they "do not and cannot allege" that Defendants' practice of sugarcane burning resulted in putative class members' exposure to hazardous substances at "greater than normal background levels."  *Petito v. A.H. Robins Co., Inc.*, 750 So. 2d 103, 106-07 (Fla. Dist. Ct. App. 1999).  But the revised air modeling data submitted with Plaintiffs' complaint contradicts this claim: it shows that Defendants' burning exposes all putative class members to greater than normal background levels of $PM_{2.5}$ and carcinogenic PAHs, as well as other hazardous substances.  TAC ¶¶ 153–158.  Plaintiffs clearly explain why these heightened levels place Plaintiffs' health at risk. *See generally* TAC ¶¶ 168–184.  These allegations suffice to state a medical monitoring claim.

### IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant them leave to file their proposed corrected Third Amended Complaint.

## LOCAL RULE 7.1(3) CERTIFICATION OF COUNSEL

Pursuant to Local Rule 7.1(3), the undersigned hereby certifies that counsel for the Plaintiffs has conferred with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so.

Dated:  August 26, 2020

Respectfully submitted,

**THE BERMAN LAW GROUP**

By: */s/ Matthew T. Moore*
    Matthew T. Moore, Esq., Fla. Bar No. 70034
Primary: service@thebermanlawgroup.com
Secondary: mmoore@thebermanlawgroup.com
Zachary West, Fla. Bar No. 71134
Primary: service@thebermanlawgroup.com
Secondary: zwest@thebermanlawgroup.com
Joseph Schulz, Fla. Bar No. 660620
Primary: service@thebermanlawgroup.com
Secondary: jschulz@thebermanlawgroup.com
P.O. Box 272789
Boca Raton, FL 33427
Tel: (561) 826-5200
Fax: (561) 826-5201

Steve W. Berman (admitted *pro hac vice*)
Ted Wojcik (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel:  (206) 623-7292
Fax:  (206) 623-0594
steve@hbsslaw.com
tedw@hbsslaw.com

*Attorneys for Plaintiffs*

010867-11/1336288 V1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiffs' Motion for

Leave to File Amended Complaint was filed using the CM/ECF system which will send a notice

of electronic filing to all counsel or parties of record on the service list.

Dated:  August 26, 2020                    /s/ Matthew T. Moore
                                           Matthew T. Moore, Esq.

## SERVICE LIST

***Attorneys for Plaintiffs***
Matthew T. Moore, Esq.
Joseph C. Schultz, Esq.
Zachary West, Esq.
The Berman Law Group
PO Box 272789
Boca Raton, FL 33427
Tel: 561-826-5200
Fax: 561-826-5201
Primary Email:
service@thebermanlawgroup.com
Secondary Email:
mmoore@thebermanlawgroup.com;
jschulz@thebermanlawgroup.com;
zwest@thebermanlawgroup.com

Steve W. Berman, Esq.
Ted Wojcik, Esq.
HAGENS BERMAN SOBOL SHAPIRO LLC
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206 623-0594
steve@hbsslaw.com
tedw@hbsslaw.com

***Attorneys for Defendant J &J Ag Products, Inc. Andrew S. Connell, Jr., Esq.***
Litchfield Cavo LLP
600 Corporate Drive, Suite 600
Ft. Lauderdale, FL 33334
Tel: 954-689-3000
Fax: 954-689-3001
Connell@litchfieldcavo.com
deatley@litchfieldcavo.com

***Attorneys for Defendant Sugar Cane Growers Cooperative of Florida***
Jennifer J. Kennedy, Esq.
Abbey, Adams, Byelick & Mueller, LLP
360 Central Avenue, 11th Floor
St. Petersburg, FL 33711
T: 727-821-2080
F: 727-822-3970
jkennedy@abbeyadams.com
ServiceJKennedy@AbbeyAdams.com

010867-11/1336288 V1

David J. Abbey, Esq.
Abbey, Adams, Byelick & Mueller, LLP
3201 US Highway 19 South, 9th Floor
St. Petersburg, FL 33711
T: 727-821-2080
servicedabbey@abbeyadams.com
*Pro Hac Vice*

**Attorneys for Defendants United States Sugar Corporation, Sugarland Harvesting Co., and Independent Harvesting, Inc.**
Brian M. McPherson, Esq.
Gregor J. Schwinghammer, Jr., Esq.
Gunster, Yoakley & Stewart, PA
777 S. Flagler Drive, Suite 500 East
West Palm Beach, FL 33401
T: 561-655-1980
F: 561-655-5677
Primary Email: bmcpherson@gunster.com;
gschwinghammer@gunster.com;
Secondary Emails: eservice@gunster.com;
jhoppel@gunster.com

Mark R. Ter Molen, Esq.
Timothy S. Bishop, Esq.
Mayer Brown, LLP
71 South Wacker Drive
Chicago, IL 60606
Ter Molen – T: 312-701-7307
Bishop – T: 312-701-7829
mtermolen@mayerbrown.com;
tbishop@mayerbrown.com
*Pro Hac Vice*

**Attorneys for Defendants Florida Crystals Corporation, Flo Sun Incorporated, American Sugar Refining, Inc., Okeelanta Corporation, and Osceola Farms**
Jennifer Ann McLoone, Esq.
Shook, Hardy & Bacon, LLP
201 South Biscayne Blvd., Suite 3200
Miami, FL 33131
T: 305-358-5171
F: 305-358-7470
jmcloone@shb.com

- 24 -

David Brent Dwerlkotte, Esq.
Mark D. Anstoetter, Esq.
Shook, Hardy & Bacon, LLP
2555 Grand Boulevard
Kansas City, MO 64108
T: 816-474-6550
dbdwerlkotte@shb.com;
manstoetter@shb.com
*Pro Hac Vice*

010867-11/1336288 V1