## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 9:19-cv-80730-RS-MM

| | |
|---|---|
| WILLIAM ARMSTRONG, GLORIA ATKINS, JAMES BROOKS, CLOVER COFFIE, DEBRA JONES, SHANTE LEGRAND, DONALD MCLEAN, ROBERT REIMBOLD, ELIJAH SMITH, and LINDA WILCHER, each individually and on behalf of all others similarly situated;<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES SUGAR CORPORATION, a Delaware Corporation; SUGAR CANE GROWERS COOPERATIVE OF FLORIDA, a Florida not for profit corporation; FLORIDA CRYSTALS CORPORATION, a Delaware corporation; OKEELANTA CORPORATION, a Delaware corporation; OSCEOLA FARMS, a Florida corporation; SUGARLAND HARVESTING CO., a Florida not for profit corporation, TRUCANE SUGAR CORPORATION, a Florida corporation; INDEPENDENT HARVESTING, INC., a Florida corporation; and J & J AG PRODUCTS, INC., a Florida corporation,<br><br>Defendants. | **[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT**<br><br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................................1

II.    PARTIES ..............................................................................................................18

    A.    Plaintiffs ....................................................................................................18

        1.    William Armstrong ......................................................................18

        2.    Gloria Atkins ..............................................................................21

        3.    James Brooks ..............................................................................22

        4.    Clover Coffie ..............................................................................24

        5.    Debra Jones ................................................................................25

        6.    Shante Legrand ..........................................................................27

        7.    Donald Mclean ............................................................................28

        8.    Robert Reimbold ........................................................................29

        9.    Elijah Smith ................................................................................30

        10.    Linda Wilcher ............................................................................30

    B.    Defendants ................................................................................................31

        1.    United States Sugar Corporation ................................................31

        2.    Sugar Cane Growers Cooperative of Florida..............................32

        3.    Florida Crystals Corporation......................................................32

        4.    Okeelanta Corporation ...............................................................33

        5.    Osceola Farms ............................................................................34

        6.    Sugarland Harvesting Co. ...........................................................34

        7.    Trucane Sugar Corporation.........................................................34

        8.    Independent Harvesting, Inc. ......................................................35

        9.    J & J Ag Products, Inc. ...............................................................35

010867-11/1337062 V1

III.    JURISDICTION AND VENUE ....................................................................36

IV.     GENERAL ALLEGATIONS .......................................................................36

        C.      History of Defendants' sugarcane agriculture ......................................36

        D.      The sugarcane burning process and its effects.......................................42

                1.      Defendants burn hundreds of thousands of acres of sugarcane each year. 42

                2.      Each burn is a toxic stew of smoke and particulate matter.......................52

                3.      Toxic smoke and particulate matter from Defendants' burns blankets the
                        Hazard Zone...........................................................................62

                        a.      Each one of the thousands of annual burn events generates a plume
                                of material that, depending on wind and weather, can travel for
                                tens of miles. ...............................................................62

                        b.      Preliminary modeling based on Florida Forest Service burn records
                                demonstrates that each Defendant's burning activity discharges
                                pollutants that cause or contribute to the injuries alleged by each
                                Named Plaintiff.............................................................74

                4.      Defendants' burning is harmful to residents' health and damages their
                        property. ................................................................................85

                        a.      Smoke, particulate matter, and "black snow" from Defendants'
                                burning settle outside and inside the homes and property of
                                residents of the Hazard Zone. ........................................85

                        b.      Health risks of the particles and pollutants emitted by Defendants'
                                burning ......................................................................86

                                (1)     Defendants' burning puts residents of the Hazard Zone at
                                        significantly increased risk of developing lung cancer....100

        E.      Defendants refuse to embrace a healthy and cost-effective alternative to sugarcane
                burning that has been demonstrated to work in Florida.......................102

V.      CLASS ACTION ALLEGATIONS ...............................................................108

VI.     CAUSES OF ACTION ...............................................................................112

COUNT I – NEGLIGENCE (PROPERTY OWNER CLASS; AGAINST ALL
        DEFENDANTS) ........................................................................................112

COUNT II – STRICT LIABILITY PURSUANT TO FLA. STA. § 376.313 (PROPERTY
        OWNER CLASS; AGAINST ALL DEFENDANTS) ...................................114

COUNT III – 42 U.S.C. § 1983 (PROPERTY OWNER CLASS; AGAINST ALL DEFENDANTS) ........................................................................................................116

COUNT IV – MEDICAL MONITORING (MEDICAL MONITORING CLASS; AGAINST ALL DEFENDANTS) ..............................................................................................118

COUNT V – BATTERY (BATTERY CLASS; AGAINST ALL DEFENDANTS) .................121

DEMAND FOR JURY TRIAL ...................................................................................................122

PRAYER FOR RELIEF .............................................................................................................122

010867-11/1337062 V1

Plaintiffs William Armstrong, Gloria Atkins, James Brooks, Clover Coffie, Debra Jones, Shante Legrand, Donald Mclean, Robert Reimbold, Elijah Smith, and Linda Wilcher (collectively the "Named Plaintiffs"), on behalf of themselves, and all others similarly situated, bring this Second Amended Class Action Complaint against Defendants United States Sugar Corporation, a Delaware Corporation; Sugar Cane Growers Cooperative of Florida, a Florida not for profit corporation; Florida Crystals Corporation, a Delaware corporation; Okeelanta Corporation, a Delaware corporation; Osceola Farms, a Florida corporation; Sugarland Harvesting Co., a Florida not for profit corporation; Trucane Sugar Corporation, a Florida corporation; Independent Harvesting Inc., a Florida corporation; and J & J Ag Products Inc., a Florida corporation; to obtain redress for those damaged by Defendants' sugarcane agriculture activities. The allegations in this Complaint are based on the personal knowledge of the Named Plaintiffs, as to themselves, and upon the investigation of counsel, who have consulted an expert in environmental engineering and air dispersion modeling as well as a medical expert.

## I.       INTRODUCTION[1]

1.       This class action arises from Defendants' use of an archaic and environmentally damaging method of harvest: the burning of vast acreages of sugarcane within and adjacent to

---

[1] On May 8, 2020, this Court issued an Order [D.E. 120] dismissing Plaintiffs' First Amended Complaint [D.E. 10] without prejudice, and granting Plaintiffs leave to amend.  In response to the deficiencies identified in the Court's May 8 Order, Plaintiffs include the following in their Second Amended Complaint: (1) detailed allegations regarding the manner in which each named Defendant deposited or caused to be deposited pollutants throughout the Hazard Zone, causing injury to each Named Plaintiff and to members of the proposed Classes (*see infra* ¶¶ 136–162 & Exhibit B); and (2) detailed allegations regarding the factual underpinnings of Plaintiffs' medical monitoring claim and specific relief sought (*see infra* ¶¶ 179–184, 234–246).  Plaintiffs have also added eight new Named Plaintiffs to this suit, expand substantially on the core allegations set forth in the First Amended Complaint, and add a claim for battery on behalf of a putative Battery Class, *see, e.g.*, Order on Motion for Class Certification, *In re Theranos, Inc.*, 2:16-cv-2138 (D. Ariz. Mar. 6, 2020) (certifying battery claims), as well as a claim for takings under 42 U.S.C. § 1983.

this judicial district as part of the pre-harvest process.  Defendants are sugar companies and sugar growers that together grow much of the sugarcane produced in the United States on approximately 400,000 acres along the southern and southeastern shore of Lake Okeechobee.[2]

2.      The scope of this burning—on which Defendants rely to clear fields of excess organic material, and thus make harvesting more efficient—is staggering: in the ten years between 2009 and 2019, Defendants burned approximately 3,244,971 acres of sugarcane field as part of 83,382 individual burns in Palm Beach County alone.  In 2019, Defendants burned an additional 284,615 acres as part of 7,891 fires during the "burn season," which begins each year in October and runs through March—and sometimes as late as May.[3]  Assuming a six-month burn season, this means there were approximately 43 fires per day in 2019.

3.      Though the overwhelming majority of sugarcane burning in Florida takes place within the boundaries of Palm Beach County, Defendants also farm and burn sugarcane in Hendry County, Glades County, and Martin County, the other major counties bordering Lake Okeechobee.  In 2019, for instance, the totals for each county were: Palm Beach (284,615 acres burned/7,891 separate fires), Hendry (67,725 acres burned/1,345 separate fires), Glades (24,555 acres burned/628 separate fires), and Martin (10,341 acres burned/435 separate fires).

---

[2] The major sugarcane producing regions in the United States are in Florida, Louisiana, and, to a lesser extent, Texas.  Between 2019 and 2020, the three states produced 16,992, 12,243, and 1,052 short tons of sugarcane, respectively.  *See* U.S. Dep't of Agric. Econ. Research Serv., *Sugar and Sweeteners Outlook for 2019-2020* (Apr. 15, 2020) at 5, available at https://www.ers.usda.gov/webdocs/publications/98275/sss-m-380.pdf?v=8422.7.

[3] These figures are taken from the Florida Forest Service's burn authorization summary page, available at http://tlhforucs02.doacs.state.fl.us/fmis.publicReports/BurningAuthorizationsSummary.aspx.

4.      The communities most damaged by Defendants' burning—Belle Glade, South Bay, Pahokee, Clewiston, Moore Haven, Canal Point, and Indiantown—ring the southern shore of Lake Okeechobee, sitting in and among Defendants' sugarcane fields.  The figures below show where these communities lie in relation to historical sugarcane burning events.  Each red dot in Figure 2 represents one of approximately 40,000 individual burns between 2014 and 2018 alone.



Figure 1: Major communities in the class area

010867-11/1337062 V1



Figure 2: Visualization of 2014-18 burn events (each square = 1 burn) (black circles correspond to towns labeled in Fig. 1)

010867-11/1337062 V1

5.    Each one of these fires releases large quantities of noxious black smoke in plumes that, depending on wind and weather, travel anywhere from a few thousand feet to twenty miles, if not more.  The scale and scope of these plumes is such that, on a near-daily basis for much of the year, Defendants' burning effectively fumigates and blankets the region.  The picture below shows one such fire outside of Belle Glade, Florida:



Figure 3: Burn near Belle Glade

6.    Though burns can vary in size, burn rate, and other factors, the burn event process is essentially the same at sugarcane fields throughout the world: the perimeter of the field is ignited using diesel or other fuel, and the field then naturally burns.  Drone footage[4] of one such burn illustrates the magnitude of the event:

---

[4] The still images below are taken from the following video: https://www.youtube.com/watch?v=nC3J750sUMM.





Figure 4: Aerial footage of pre-harvest burns

010867-11/1337062 V1



Figure 5: Aerial photograph of visible burn event in Florida

7.     This smoke is toxic.  It contains a wide range of pollutants, including particulate matter ("PM")[5], dioxins, polycyclic aromatic hydrocarbons ("PAHs"), volatile organic compounds ("VOCs"), carbon monoxide, sulfur oxides, nitrogen oxides, ammonia, elemental carbon, and organic carbon.  And it is so ubiquitous that residents of the region have a name for

---

[5] As described in detail below, other pollutants are "sorbed" (attached) onto this particulate matter, thus allowing them to migrate on to property and people.

the soot and cane residue that often blankets their homes and cars: "black snow."  The picture below shows a car that has been showered with this material:



Figure 6: "Black snow" accumulation on a vehicle

8.     The people who bear the brunt of this toxic smoke, ash, and particulate matter live in and around the areas south and east of Lake Okeechobee and the towns of Belle Glade, South Bay, Pahokee, Clewiston, Moore Haven, Canal Point, Indiantown, and others.  These are some of the poorest communities in Florida.

9.     The disparate impact of Defendants' conduct is striking.  Current regulations promulgated by the State of Florida deny burn permits to sugarcane growers if winds are projected to blow smoke and ash plumes toward the more affluent Eastern Palm Beach County and Eastern Martin County communities near the coast.  And if smoke does blow into these areas, residents are advised to take shelter.  When smoke from sugarcane burns recently intruded into Coral Springs, for example, fire officials encouraged residents with respiratory problems to

stay indoors, warning that those with chronic heart and lung diseases faced particular risk from microscopic particles in smoke that can penetrate deep into the lungs.[6]

10.     Meanwhile, burn permits are subject to little scrutiny when the wind blows toward the poorer, predominantly non-white residents of Western Palm Beach County, Western Martin County, Hendry County, and Glades County, who receive no such warnings from public health officials.[7]

11.     To the contrary, as many as 60 permits can be approved each day for these areas during burn season.  The following maps, which the Florida Forest Service produces daily, illustrate the projected effect of burns on such days, and project that smoke can travel up to 26

---

[6] *See* Leon Fooksman, *Everglades Fires Prompt Fire Officials to Issue Health Warning*, TAP INTO PARKLAND (Jan. 21, 2020), https://www.tapinto.net/towns/parkland/articles/everglades-fires-prompt-fire-officials-to-issue-health-warning.

[7] Attached as Exhibit A to Plaintiffs' Second Amended Complaint is a true and correct copy of the Florida Forest Service's "zone definitions and restrictions" for sugarcane burning.  These generally prohibit burning on days when there are southwest, west, or northwest winds—that is, on days when the wind is generally blowing eastwards.

miles from each burn.  Each point represents an approved burn and the estimated direction that smoke and ash will travel:





Figure 7: Sample maps of approved daily burns

12.     The effect of Defendants' burning—both individually and cumulatively—is vast. Preliminary air dispersion modeling by Plaintiffs demonstrates to a high degree of certainty that byproducts from burning conducted by *each Defendant* impacts receptors[8] in *all seven communities* in the class area, and that Defendants' burning cumulatively exceeds air quality standards for several hazardous and/or carcinogenic pollutants at *many points modeled* in these communities as well.  In many instances, these exceedances are remarkable: for example, during a 24-hour period in Pahokee in 2014, the average $PM_{2.5}$ value at one receptor was 200 $\mu g/m^3$—or roughly *5.7 times* the U.S. National Ambient Air Quality Standard ("NAAQS") of 35 $\mu g/m^3$.

13.     In other words, this modeling demonstrates that smoke and pollutants from each Defendant's burning contributes[9] to and causes each Named Plaintiff's injuries, as well as injuring all Class members in the class area.

14.     More broadly, Plaintiffs' modeling demonstrates that the harm from Defendants' conduct extends well beyond the class area: during the five years (2014-18) modeled, all receptors analyzed in a hypothetical 130 km by 100 km "airshed" overlying the Glades region were affected by particulate matter from Defendants' burning, and approximately 16.3% of

---

[8] Receptors are points of impact overlaid on a grid; they are used to model the impacts of air pollution on certain places at certain times.

[9] As discussed *infra*, Defendant Florida Crystals conducts burning through its subsidiaries, which include Defendants Okeelanta, Osceola, and Trucane.

these—or 575 of 3,531—of receptors analyzed experienced exceedances of the 24-hr NAAQS standard for PM$_{2.5}$ of 35 µg/m$^3$.[10]



Figure 8: PM2.5 exceedances in class area (red dots indicate receptors with NAAQS exceedances)

15.    In other words, Defendants' sugarcane burning generates quantities of toxic particulate matter so immense that, in the period between 2014 and 2018, emissions from Defendants' burning—individually and in the aggregate—were present at every receptor in the class area and at each named plaintiff's property.  These emissions were also present at every receptor in the 13,000-square kilometer grid above (i.e., every yellow dot above).

_____

[10] Although Plaintiffs use the NAAQS standard here as a convenient benchmark for assessing severity of harm, it is irrelevant to the question of whether Defendants' conduct impacts plaintiffs and the putative class area.

16.     Defendants' burning damages property.  Smoke and ash—not only toxic "black snow," but equally insidious, invisible, and pollutant-laden particulate matter that the winds can carry for tens of miles—accumulates on buildings and property and infiltrates homes, where it then recirculates in the air.  Because of the damage to real property caused by Defendants' smoke plumes and "black snow," many homes must be pressure washed annually, and residents in the area affected by Defendants' burning (hereafter the "Hazard Zone") are forced to change the clogged filters in their air conditioning systems far more often than usual.  Schools are particularly affected: according to the 2019-20 Palm Beach County School District's budget, each of the twelve Palm Beach County schools located in the Hazard Zone receives one additional custodian "to assist with the additional cleaning requirements associated with Glades muck and burning of sugar cane in the area."[11]

17.     Defendants' burning also makes both residents and field workers sick.  Medical research has linked exposure to pre-harvest sugarcane burning to a range of health issues, including respiratory diseases like asthma, cancer, kidney disease, and poor infant health outcomes.  The elderly and children are most at risk.

18.     Specifically, the spectacularly high amounts of $PM_{2.5}$ pollution generated by Defendants' burning puts Plaintiffs and members of the Medical Monitoring Class at heightened risk of developing lung cancer, and requires a medical monitoring program for residents of the region who are above or attain age 40 and have lived through more than one harvest season.  As explained in more detail *infra*, the International Agency for Research on Cancer has concluded that "[p]articulate matter in outdoor air pollution causes cancer of the lung."  Consistent with

---

[11] School District of Palm Beach County, 2019-2020 Budget at 242 (Sept. 11, 2019), https://www.palmbeachschools.org/UserFiles/Servers/Server_270532/File/Budget-Resources%20&%20Tools/Executive_Summary%20-%20Revised11222019.pdf.

this, multiple studies have found a dose-response between higher levels of $PM_{2.5}$ and lung cancer incidence.

19.     Since Plaintiffs filed their First Amended Complaint in 2019, the health risks posed by Defendants' conduct have been drawn into particularly stark relief by the COVID-19 crisis.  According to a recent study by researchers at Harvard University, an increase of just one microgram of particulate matter pollution (or "$PM_{2.5}$") per cubic meter of air (or $\mu g/m^3$) is associated with an 8% increase in the COVID-19 death rate.[12]  As discussed in more detail below, $PM_{2.5}$ is one of the primary byproducts of Defendants' burning, and those in the Hazard Zone are exposed to significantly elevated concentrations of $PM_{2.5}$ during the burn season.  The CDC has recently recognized that "[p]eople with or recovering from COVID-19 may have diminished lung function and therefore might be at particularly high risk of respiratory health effects after exposure to smoke from open burning," and recommends "implementing a temporary ban on open burning as a quick and effective way to reduce smoke exposure for people with COVID-19."[13]

20.     But rather than suspend burning or otherwise seek to mitigate the effect of their burning on residents of the Hazard Zone (e.g., by creating buffer zones), Defendants have continued to burn with abandon during the COVID crisis.  The following is a map of approved burns for March 17, 2020, just as the full magnitude of the COVID-19 crisis began to come into focus:

---

[12] *See* Xiao Wu et al., *Exposure to air pollution and COVID-19 mortality in the United States: a nationwide cross-sectional study* (Preprint), MEDRXIV (Apr. 27, 2020), https://www.medrxiv.org/content/10.1101/2020.04.05.20054502v2.

[13] Centers for Disease Control and Prevention, *Open Burning During the Covid-19 Pandemic*, https://www.cdc.gov/coronavirus/2019-ncov/php/openburning.html (last updated June 16, 2020).



Figure 9: Approved burns for March 17, 2020

21.     And here is a map of approved burns for March 31, 2020, just one day before

Governor Ron DeSantis ordered a state-wide lockdown:



Figure 10: Approved burns for March 31, 2020

22.     To add insult to injury, pre-harvest burning is no longer necessary.  Instead,

Defendants cling to this increasingly archaic method because they believe it to be cheaper than a

sustainable alternative, "green harvesting," a process by which the leaves around the stalks or

biomass (known as "trash") are used as mulch.  But this is an illusion.  Over the last few decades,

sugarcane growers around the world—including most growers in Brazil, the world's largest

sugarcane producer—have increasingly abandoned pre-harvest burning in favor of green

harvesting, in the process boosting their yields and reducing their dependence on chemical

fertilizers and pesticides.  While Defendants have so far taken the position that this method does

not work in Florida's purportedly unique soil, researchers at the University of Florida recently

found, after a three-year trial conducted in Belle Glade, that green harvesting produces roughly as many tons of sugar as in cane fields that have been burned.[14]  Other research has echoed this finding, concluding that green harvesting would in fact boost Defendants' profits—which are already padded by the nearly $4 billion in federal subsidies the U.S. sugar industry receives each year, some of the most generous corporate welfare in the country.

23.    The affected area for purposes of this action (i.e., the "Hazard Zone") encompasses the towns of Belle Glade, Pahokee/Canal Point, South Bay, Clewiston, Moore Haven, and Indiantown, and is defined as that area of Florida contained within the following township ("T") and range ("R") areas: T39S, R37E; T39S, R38E; T39S, R39E; T40S, R37E; T40S, R38E; T40S, R39E; T41S, R32E; T41S, R37E; T41S, R38E; T42S, R30E; T42S, R31E; T42S, R32E; T42S, R33E; T42S, R36E; T42S, R37E; T42S, R38E; T43S, R33E; T43S, R34E;

---

[14] *See* Hardev S. Sandhu et al., *Harvest management effects on sugarcane growth, yield and nutrient cycling in Florida and Costa Rica*, 214 FIELD CROPS RESEARCH 253 (2017).

T43S, R35E; T43S, R36E; T43S, R37E; T44S, R35E; T44S, R36E; T44S, R37E. A map of the

Hazard Zone is below:



Figure 11: map of Hazard Zone

## II.    PARTIES

**A.    Plaintiffs**

**1.    William Armstrong**

24.    Plaintiff William Armstrong ("Armstrong") is a resident of Glades County,

Florida. Plaintiff Armstrong resides at and owns real property located at 1136 Dolphin Lane,

Moore Haven, Florida, 33471 (T42S, R30E). Plaintiff Armstrong has lived at this property since

he retired approximately six years ago. He and his wife moved to Moore Haven in part because

they were looking forward to what they thought would be the area's clean air.

25.     Plaintiff Armstrong's home is several miles to the west of the closest of Defendants' fields.  Nevertheless, between two and three days a week—and sometimes more often—Plaintiff Armstrong notices black snow/ash fall (which drops like rain from the sky in pieces ¼ to ½ inch thick) and smoke from Defendants' fields, and can see the plumes from these burns, which look like explosions, from miles away.  On burn days, the whole of the area surrounding Plaintiff Armstrong's home smells like a bonfire, and Plaintiff Armstrong cannot have outdoor guests or otherwise engage in the normal use of his property.

26.     The ash that falls on Plaintiff Armstrong's home and property has a greasy, sticky quality, and will accumulate on any surface, including the railings, deck, and siding; because the wind does not blow this material away, it must be washed off.  From the gutters down, ash and particulate matter leave large black streaks on Plaintiff Armstrong's home almost constantly during the burn season.  As a result, Plaintiff Armstrong must pressure wash the exterior of his house multiple times a year, and must wash his car at least once a week.  This soiling is so regular that Plaintiff Armstrong purchased his own pressure washer.  Furthermore, the unpredictable nature of the black snowfall from Defendants' burning makes it difficult, if not impossible, to know when to repaint a house: because ash and particulate matter stick to surfaces, a paint job must be started anew if a "storm" kicks up when paint is still wet.

27.     This ash and particulate matter are intrusive in other ways.  For example, if Plaintiff Armstrong does not cover his hot tub, large amounts of ash get into the water and clog the filter.  Furthermore, an outdoor table on a second floor screened-in porch in Plaintiff Armstrong's home (which the Armstrongs often use as a dinner table) collects so much ash that it turns a washcloth black nearly every time it is cleaned.  Finally, Plaintiff Armstrong's

- 19 -

neighbors, many of whom own boats, complain that they must wash these boats at least once each week to prevent the accumulation of ash and particulate matter.

28.     The photos below show "black snow" and ash accumulation on Plaintiff Armstrong's home and property:







Figure 12: Photographs of black snow accumulation on Plaintiff Armstrong's home and property

29.     In addition, Plaintiff Armstrong has been and will continue to be exposed to hazardous and dangerous pollutants from Defendants' sugarcane agriculture activities, and is concerned about the health effects of Defendants' sugarcane burns.  During the burn season,

Plaintiff Armstrong has serious congestion, drainage from his sinuses, and a regular headache.

To manage these symptoms, Plaintiff Armstrong must use a neti pot each morning, takes sinus

medications, and uses a CPAP machine at night as well.  These symptoms generally go away

when the burn season ends.  Furthermore, when Plaintiff Armstrong's children (who do not live

in the Glades region) come to visit during the burn season, they, too, develop congestion.

      30.     All Defendants' conduct has damaged Plaintiff Armstrong's property, and has

also caused or contributed to Plaintiff Armstrong's loss of use and enjoyment of the same.

      **2.**     **Gloria Atkins**

      31.     Plaintiff Gloria Atkins ("Atkins") is a resident of Hendry County, Florida.

Plaintiff Atkins resides at and owns real property located at 1117 Kentucky Avenue, Clewiston,

Florida, 33440 (T43S R34E), which is in close proximity to many of Defendants' sugarcane

fields.  Plaintiff Atkins has lived in her current home for thirteen years, and has lived in the

Harlem/Clewiston area for fifteen years.

      32.     For between six and eight months of the year, Plaintiff Atkins is exposed to and

inhales smoke and particulate matter from Defendants' burns, cannot escape this exposure, and is

denied the normal use and enjoyment of her property.  Plaintiff Atkins smells smoke on her

property approximately five days each week, and ash falls on her property approximately five

days per week as well.

      33.     Indeed, the smoke and ash from Defendants' sugarcane burning are sometimes so

intrusive that Plaintiff Atkins cannot sit outside, and Plaintiff Atkins has stopped landscaping

because of the burning.  Plaintiff Atkins also cannot barbeque during the burn season because

ash lands on her food.

      34.     Because of Defendants' sugarcane burning, Plaintiff Atkins must pressure wash

her house approximately three times per year, and must paint her home more often, including in

2015 and twice in 2017.  The increased pressure washing necessitated by Defendants' sugarcane burns also causes the siding on Plaintiff Atkins' house to deteriorate.

35.     Plaintiff Atkins has been and will continue to be exposed to hazardous and dangerous pollutants from Defendants' sugarcane agriculture activities.

36.     All Defendants' conduct has damaged Plaintiff Atkin's property, and has also caused or contributed to Plaintiff Atkin's loss of use and enjoyment of the same.

**3.     James Brooks**

37.     Plaintiff James Brooks ("Brooks") is a resident of Hendry County, Florida. Plaintiff Brooks resides at 2109 13th Street, Clewiston, Florida, and also owns real property located at 727 Carolina Avenue, Clewiston, Florida (T43S R34E).  Both properties are in close proximity to many of Defendants' sugarcane fields.

38.     For between six and eight months of the year, Plaintiff Brooks is exposed to and inhales smoke and particulate matter from Defendants' burns, cannot escape this exposure, and is denied the normal use and enjoyment of his property.  In fact, on days when Defendants burn near Plaintiff Brooks' 727 Carolina Ave. property, still-lit embers sometimes rain down from the fields, which are only approximately 60 yards away.

010867-11/1337062 V1

39.     Plaintiff Brooks must pressure wash each property at least twice each year, which in turn rips the paint off Plaintiff Brooks' house and requires regular repainting.  Each pressure wash costs approximately $250.  Plaintiff Brooks estimates that, to properly protect his property from the damage caused by Defendants' burning, he should be pressure washing his homes at least four times each year.


Figure 13: Photograph of ash/soot accumulation on Plaintiff Brooks' property

40.     Soot and ash from Defendants' sugarcane burning also accumulate on and damage Plaintiff Brooks' car, requiring that he wash it regularly and repaint it.  If Plaintiff Brooks does not wash his car as soon as possible after a burn, it causes permanent damage to the paint.  The same material also kills plants: Plaintiff Brooks recalls that constant soot and ash

- 23 -

accumulation have killed flowers planted outside his home when they were not washed off regularly.

41.    At some point this past year, Plaintiff Brooks went to Defendant U.S. Sugar's Clewiston headquarters to complain about the damage to his car from the ash from the sugarcane burning.  When Plaintiff Brooks was finally able to speak to someone, he was rebuffed.

42.    Plaintiff Brooks would like to add an addition onto his house, but he has not done so because he feels like he would lose money.  Specifically, Plaintiff Brooks believes that, as a result of Defendants' sugarcane burning, his property would likely not increase in value even with an addition that would otherwise enhance its value.

43.    Plaintiff Brooks has been and will continue to be exposed to hazardous and dangerous pollutants from Defendants' sugarcane agriculture activities.  For the past two or three years, Plaintiff Brooks has been having problems with his breathing: when he takes a deep breath, he starts coughing.

44.    All Defendants' conduct has damaged Plaintiff Brooks' property, and has also caused or contributed to Plaintiff Brooks' loss of use and enjoyment of the same.

**4.    Clover Coffie**

45.    Plaintiff Clover Coffie ("Coffie") is a resident of Palm Beach County, Florida. Plaintiff Coffie resides at and owns real property located at 34 NE Avenue H, Belle Glade, Florida 33430 (T43S, R37E), which is in close proximity to many of Defendants' sugarcane fields.  Plaintiff Coffie has owned his home since 2002.  Plaintiff Coffie also owns real property located at the following addresses, all of which are in Belle Glade: 520 SW 5th Street, 528 SW 7th Street, 524 SW 7th Street, 1501 NW Avenue F, and 1508 NW Avenue F.

46.    For between six and eight months of the year, Plaintiff Coffie is exposed to and inhales smoke and particulate matter from Defendants' burns, cannot escape this exposure, and is

denied the normal use and enjoyment of his property.  The fields closest to Plaintiff Coffie's property are approximately three blocks away; other fields are approximately 300-400 yards away.

47.    Plaintiff Coffie estimates that, during burn season, ash from Defendants' preharvest sugarcane burning falls on his property approximately five days per week for several hours each day.  As a result of this burning, Plaintiff Coffie's wife must clean this ash off of their home's patio almost every day, and Plaintiff Coffie must wash his car approximately once a week.  Plaintiff Coffie is also forced to pressure wash and paint his home more often, and must pay someone to clean ash out of his pool approximately once a month.

48.    All Defendants' conduct has damaged Plaintiff Coffie's property, and has also caused or contributed to Plaintiff Coffie's loss of use and enjoyment of the same.

### 5.    Debra Jones

49.    Plaintiff Debra Jones ("Jones") is a resident of Palm Beach County, Florida. Plaintiff Jones resides at and owns real property located at 140 Banyan Avenue, Pahokee, Florida 33476 (T42S R37E), which is approximately half a mile from many of Defendants' sugarcane fields.  Plaintiff Jones has lived at this property since 2005, and currently lives there with her son, daughter, and husband.

50.    During the burn season Plaintiff Jones is exposed to and smells smoke on her property every day, and ash from Defendants' sugarcane burning falls on her property between two and three days each week, depending on the wind.  The consequences of Defendants' burning has many serious negative impacts on Plaintiff Jones' daily life, as well as on her family members.  During the burn season, Plaintiff Jones has breathing problems, itchy eyes, and sneezes and coughs often.  As a result, when Defendants burn sugarcane, Plaintiff Jones generally has to stay inside her house.  To prevent the onset of similar respiratory symptoms, all

four members of the Jones family generally take their clothes off and wash them upon entering the house.

51.     All four members of the Jones family are affected by Defendants' burning. Plaintiff Jones estimates that she, her husband, her daughter—who has been diagnosed with asthma—and her son must use a nebulizer approximately three times a day during the burn season to manage their respiratory issues, and must also take medicine to manage their symptoms; by contrast, Plaintiff Jones estimates that she uses her nebulizer approximately once every other day during the non-burn season.  In fact, according to Plaintiff Jones, each member of the family has his/her own nebulizer.  Sometimes, when Plaintiff Jones cannot afford the medication the doctor prescribes for her respiratory symptoms (which her insurance company will not pay for), she takes Zyrtec instead.

52.     Ash and smoke from Defendants' sugarcane burning have caused issues with Plaintiff Jones' landscaping, damaged the exterior paint on her house, and caused her roof to turn black in some spots.  Regular ash and particulate matter accumulation cause long, black streaks to form on the side of Plaintiff Jones' house, which makes it look dirty.  As a result, during the burn season, Plaintiff Jones must pay someone to wash her car once every other week, must pressure wash her house and sidewalk approximately once a month during the burn season (which costs approximately $150 for each wash), and cannot hang her laundry outside to dry. Although Plaintiff Jones' neighbors have the same problems, some cannot afford the monthly expenses associated with cleaning and pressure washing.

53.     Furthermore, black snow from Defendants' sugarcane burns regularly falls on Plaintiff Jones' garden, which includes greens, tomatoes, turnips, okra, and scallions.  Plaintiff

Jones is concerned about the health effects for her and her family of ingesting the sugarcane ash; as a result, she now usually only plants a garden during the non-burn season.

54.      Plaintiff Jones has been and will continue to be exposed to hazardous and dangerous pollutants from Defendants' sugarcane agriculture activities and, as a result, is concerned about developing cancer—in part because her family members have asthma and other breathing difficulties, and her husband has cancer.

55.      All Defendants' conduct has damaged Plaintiff Jones' property, and has also caused or contributed to Plaintiff Jones' loss of use and enjoyment of the same.

**6.      Shante Legrand**

56.      Plaintiff Shante Legrand ("Legrand") resides at 1501 Calusa Drive, Apt. 12105, Belle Glade, Florida, 33430 (T44S, R37E).

57.      Plaintiff Legrand's apartment is immediately across the street from Defendants' sugarcane fields.   During the burn season, Defendants' burn their fields multiple times each week, thus causing smoke to inundate the area in and around Plaintiff Legrand's apartment building.

58.      Plaintiff Legrand has two minor children who live with her: an eight-year-old daughter and a three-year-old son.  Both children were diagnosed with asthma at approximately one-year old, and must use a nebulizer approximately three times per day; in addition to the nebulizer, Plaintiff Legrand's daughter also uses an albuterol inhaler for her asthma.  Plaintiff Legrand must generally keep her children inside during Defendants' burns; if she has to work, she takes them to her parents' or grandparents' house, where they must stay inside.  The primary care provider who treats Plaintiff Legrand's children has told her that her children should remain inside to avoid the smoke created by Defendants' burns.

59.     At times during the burning season—Plaintiff Legrand estimates approximately five times each year—Plaintiff Legrand's children have asthma symptoms so severe that they cannot go to school.  On these days, Plaintiff Legrand notices that her daughter's and son's eyes are watery, and their coughing becomes so intense that they sometimes gag.  To alleviate these symptoms, which are so distracting that they prevent Plaintiff Legrand's children from attending school, Plaintiff Legrand brings her children to a relative's house, where they must then be treated every four hours with albuterol.  Plaintiff Legrand is also aware of other children at the same school who suffer from asthma.

### 7.     Donald Mclean

60.     Plaintiff Donald Mclean ("Mclean") is a resident of Palm Beach County, Florida. Plaintiff Mclean resides at and owns real property located at 490 1st Street, South Bay, Florida, 33493 (T44S, R36E), which is in close proximity to many of Defendants' sugarcane fields. Plaintiff Mclean has lived in the Hazard Zone for thirty-five years.

61.     During the burn season, sugarcane ash and smoke intrude on Plaintiff Mclean's property almost every day.   As a result, Plaintiff Mclean is exposed to and inhales smoke and particulate matter from Defendants' burns, cannot escape this exposure, and is denied the normal use and enjoyment of his property.  Plaintiff Mclean must hire someone to pressure wash his house approximately twice each month during burn season, has deferred painting his house, and is forced to wash his car approximately two times per week.  Ash from Defendants' burning also drops onto Plaintiff Mclean's garden, where he grows mint, fruit, and scotch bonnet peppers.

62.     All Defendants' conduct has damaged Plaintiff Mclean's property, and has also caused or contributed to Plaintiff Mclean's loss of use and enjoyment of the same.

### 8.   Robert Reimbold

63.     Plaintiff Robert Reimbold ("Reimbold") is a resident of Glades County, Florida. Plaintiff Reimbold resides at and owns real property located at 2200 Williams Rd., Moore Haven, Florida, 33471 (T42S, R30E), which is in close proximity to many of Defendants' sugarcane fields.  Plaintiff Reimbold has lived at this address for approximately twenty-five years.

64.     For six to eight months of the year, Plaintiff Reimbold is exposed to and inhales smoke and particulate matter from Defendants' burns, cannot escape this exposure, and is denied the normal use and enjoyment of his property.  During the burn season, Plaintiff Reimbold smells smoke from his property approximately two days each week, and ash from Defendants' burning falls on his property approximately three to four days each week.  Plaintiff Reimbold must pressure wash his house one to two times per year, and must clean the ash that is tracked (by foot) into his house.

65.     As a result of Defendants' burning, Plaintiff Reimbold estimates that he must wash his boat approximately twenty to thirty times more often than he would otherwise, which in turn washes the wax off the boat and causes its paint to degrade more quickly—thus ultimately forcing Plaintiff Reimbold to repaint his boat roughly twice as often as would otherwise be required (specifically, every seven to eight years, as opposed to every fifteen years under regular conditions).  The black snow from Defendants' burning also soils the canvas on Plaintiff Reimbold's boat, which must then be periodically replaced.

66.     All Defendants' conduct has damaged Plaintiff Reimbold's property, and has also caused or contributed to Plaintiff Reimbold's loss of use and enjoyment of the same.

**9.      Elijah Smith**

67.      Plaintiff Elijah Smith ("Smith") is a resident of Hendry County, Florida.  Plaintiff Smith resides at and owns real property located at 1006 Virginia Avenue, Clewiston, Florida, 33440 (T43S, R34E), which is in close proximity to many of Defendants' sugarcane fields. Plaintiff Smith has lived at this address for approximately forty years, and has lived in the area since 1961.  Plaintiff Smith also owns real property at the following two addresses in Clewiston: 801 Maryland Ave., and 714 Mississippi Ave.

68.      For six to eight months of the year, Plaintiff Smith is exposed to and inhales smoke and particulate matter from Defendants' burns, cannot escape this exposure, and is denied the normal use and enjoyment of his property.   During the burn season, ash from Defendants' sugarcane burning rains down on Plaintiff Smith's property and car between four and five days per week.  As a result, Plaintiff Smith must wash his car once per week, and must pressure wash his home more often than he otherwise would.

69.      All Defendants' conduct has damaged Plaintiff Smith's property, and has also caused or contributed to Plaintiff Smith's loss of use and enjoyment of the same.

**10.      Linda Wilcher**

70.      Plaintiff Linda Wilcher ("Wilcher") is a resident of Palm Beach County, Florida. Plaintiff Wilcher resides at and owns real property located at 235 NW 10th Ave, South Bay, Florida, 33493 (T44S, R36E), which is in close proximity to many of Defendants' sugarcane fields.  Plaintiff Wilcher has lived at this address for approximately eight years, and has lived in the Glades area her whole life.

71.      For six to eight months of the year, Plaintiff Wilcher is exposed to and inhales smoke and particulate matter from Defendants' burns, cannot escape this exposure, and is denied the normal use and enjoyment of her property.  Almost every day during burn season, Plaintiff

Wilcher smells smoke from Defendants' burns, and ash rains down on her property for between four and eight hours.  As a result of Defendants' burning, Plaintiff Wilcher must also (1) clean her house more often; (2) have someone wash her car approximately four to five times per week; (3) and have the exterior of her house pressure washed regularly during the burn season.  Like other Named Plaintiffs, Plaintiff Wilcher has also had to delay painting her house because of Defendants' burning.

72.     Plaintiff Wilcher has been and will continue to be exposed to hazardous and dangerous pollutants from Defendants' sugarcane agriculture activities, which have harmed her health.  Sometimes, when the burning gets very bad, Plaintiff Wilcher must leave South Bay and stay with family in Georgia for between two and three months.  Plaintiff Wilcher has been on oxygen for approximately ten years, and has to leave her house every day, even when there is a lot of smoke and ash, in order to receive dialysis.

73.     All Defendants' conduct has damaged Plaintiff Wilcher's property, and has also caused or contributed to Plaintiff Wilcher's loss of use and enjoyment of the same.

**B.     Defendants**

**1.     United States Sugar Corporation**

74.     Defendant United States Sugar Corporation ("U.S. Sugar") is a Delaware corporation with its principal place of business located at 111 Ponce De Leon Avenue, Clewiston, FL 33440.

75.     At all relevant times Defendant U.S. Sugar, and/or its subsidiaries, agents, and entities over which it exercised operational control (including Defendant Sugarland), conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Hazard Zone and adjacent to the Hazard Zone, that damaged Named Plaintiffs and Class members.  Defendant deposited or caused to be deposited particulate matter and black

snow throughout the Hazard Zone, causing injury to each Named Plaintiff and to members of the proposed Classes.

76.     Defendant U.S. Sugar managed, directed, and/or conducted its subsidiaries' operations specifically related to sugarcane burning, including those subsidiaries' decisions regarding what, where, when, and/or whether to burn.

## 2.     Sugar Cane Growers Cooperative of Florida

77.     Defendant Sugar Cane Growers Cooperative of Florida ("SCGC") is a Florida not for profit corporation with its principal place of business located at 1500 West Sugarhouse Road, Belle Glade, FL 33430.  Defendant SCGC is composed of approximately 44 member farms that cultivate sugarcane on approximately 70,000 acres in the area south of Lake Okeechobee.

78.     At all relevant times Defendant SCGC, by and through its constituent member farms, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Hazard Zone and adjacent to the Hazard Zone, that damaged Named Plaintiffs and Class members.  Defendant deposited or caused to be deposited particulate matter and black snow throughout the Hazard Zone, causing injury to each Named Plaintiff and to members of the proposed Classes.

79.     Defendant SCGC managed, directed, and/or conducted its members' operations specifically related to sugarcane burning, including those subsidiaries' decisions regarding what, where, when, and/or whether to burn.

## 3.     Florida Crystals Corporation

80.     Defendant Florida Crystals Corporation ("Florida Crystals") is a Delaware corporation with its principal place of business located at One North Clematis Street, Suite 200, West Palm Beach, FL 33401.

010867-11/1337062 V1

81.     At all relevant times Defendant Florida Crystals, though its subsidiaries, agents, and entities over which it exercised operational control (including Defendants Okeelanta, Osceola, and Trucane), conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Hazard Zone and adjacent to the Hazard Zone, that damaged Named Plaintiffs and Class members.  Defendant deposited or caused to be deposited particulate matter and black snow throughout the Hazard Zone, causing injury to each Named Plaintiff and to members of the proposed Classes.

82.     Defendant Florida Crystals Defendant managed, directed, and/or conducted its subsidiaries' operations specifically related to sugarcane burning, including those subsidiaries' decisions regarding what, where, when, and/or whether to burn.

### 4.     Okeelanta Corporation

83.     Defendant Okeelanta Corporation ("Okeelanta") is a Delaware corporation with its principal place of business location at One North Clematis Street, Suite 200, West Palm Beach, FL 33401.  On information and belief, Defendant Okeelanta is a subsidiary of Defendant Florida Crystals.

84.     At all relevant times Defendant Okeelanta, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Hazard Zone and adjacent to the Hazard Zone, that damaged Named Plaintiffs and Class members.  Defendant deposited or caused to be deposited particulate matter and black snow throughout the Hazard Zone, causing injury to each Named Plaintiff and to members of the proposed Classes.

- 33 -

### 5.     Osceola Farms

85.     Defendant Osceola Farms is a Florida corporation with its principal place of business location at One North Clematis Street, Suite 200, West Palm Beach, FL 33401.  On information and belief, Defendant Osceola Farms is a subsidiary of Defendant Florida Crystals.

86.     At all relevant times Defendant Osceola Farms, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Hazard Zone and adjacent to the Hazard Zone, that damaged Named Plaintiffs and Class members.  Defendant deposited or caused to be deposited particulate matter and black snow throughout the Hazard Zone, causing injury to each Named Plaintiff and to members of the proposed Classes.

### 6.     Sugarland Harvesting Co.

87.     Defendant Sugarland Harvesting Co. ("Sugarland") is a Florida not for profit corporation with its principal place of business location at 1023 Fox Lane, Moore Haven, FL 33471.  On information and belief, Defendant Sugarland is a subsidiary of Defendant U.S. Sugar.

88.     At all relevant times Defendant Sugarland, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Hazard Zone and adjacent to the Hazard Zone, that damaged Named Plaintiffs and Class members.  Defendant deposited or caused to be deposited particulate matter and black snow throughout the Hazard Zone, causing injury to each Named Plaintiff and to members of the proposed Classes.

### 7.     Trucane Sugar Corporation

89.     Defendant Trucane Sugar Corporation ("Trucane") is a Florida corporation with its principal place of business location at 625 N. Flagler Drive, Suite 507, West Palm Beach, FL

- 34 -

44301. On information and belief, Defendant Trucane is a subsidiary of Defendant Florida Crystals.

90. At all relevant times Defendant Trucane, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Hazard Zone and adjacent to the Hazard Zone, that damaged Named Plaintiffs and Class members. Defendant deposited or caused to be deposited particulate matter and black snow throughout the Hazard Zone, causing injury to each Named Plaintiff and to members of the proposed Classes.

**8.    Independent Harvesting, Inc.**

91. Defendant Independent Harvesting Inc. ("Independent Harvesting") is a Florida corporation with its principal place of business located at US Highway 27 South, Moore Haven, FL 33471.

92. At all relevant times Defendant Independent Harvesting, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Hazard Zone and adjacent to the Hazard Zone, that damaged Named Plaintiffs and Class members. Defendant deposited or caused to be deposited particulate matter and black snow throughout the Hazard Zone, causing injury to each Named Plaintiff and to members of the proposed Classes.

**9.    J & J Ag Products, Inc.**

93. Defendant J & J Ag Products Inc. ("J & J") is a Florida corporation with its principal place of business located at 1813 Davidson Rd., Clewiston, FL 33440.

94. At all relevant times Defendant J & J, and/or its subsidiaries, agents, and entities over which it exercised operational control, conducted sugarcane cultivation activities, including burning of sugarcane fields and sugarcane waste material in the Hazard Zone and adjacent to the

- 35 -

Hazard Zone, that damaged Named Plaintiffs and Class members.  Defendant deposited or caused to be deposited particulate matter and black snow throughout the Hazard Zone, causing injury to each Named Plaintiff and to members of the proposed Classes.

## III.    JURISDICTION AND VENUE

95.    This Court has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005 (CAFA) and 28 U.S.C. § 1332(d).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000, there exists minimal diversity between parties in that the majority of Class members are citizens of Florida, at least one Defendant is incorporated and has its principal place of business in a state other than Florida, and there are over 100 putative Class members.  The Court also has federal question jurisdiction under 28 U.S.C.A. § 1331, as Plaintiffs assert a claim for taking under 42 U.S.C. § 1983.

96.    This Court has personal jurisdiction over Defendants because Defendants conduct substantial activities, including the conduct causing harm to Named Plaintiffs and Class members, in Florida and this District and have sufficient contacts in Florida and this District to permit the exercise of jurisdiction by this Court.

97.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the events or omissions giving rise to Named Plaintiffs' and Class members' claims occurred in this District.  Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact substantial business in this District.

## IV.    GENERAL ALLEGATIONS

**C.    History of Defendants' sugarcane agriculture**

98.    Florida's sugar industry is an accident of history.  Before 1900, most of the more than 400,000 acres on which sugarcane is now grown in Florida were part of the Everglades.

But beginning in the early 20th century, much of the wetlands along Lake Okeechobee's south shore were drained and turned into farmland.

99.     The cultivation of sugarcane in the region got off to a slow start.  In 1931, Charles Stuart Mott purchased assets near Clewiston, Florida, from the bankrupt Southern Sugar Company and formed Defendant U.S. Sugar.  Before 1959, however, only 50,000 acres of sugarcane were grown in Florida, most of them by U.S. Sugar.

100.     The 1959 Cuban revolution jump-started sugar cultivation and production in the United States.  After the revolution, the U.S. government imposed an economic embargo on Cuba—formerly a major producer and exporter of sugar—and lifted restrictions on domestic sugar production.  U.S. Sugar subsequently expanded and, in 1960, Defendant SCGC was founded.

101.     Furthermore, in 1960, brothers Alfonso "Alfy" and Jose "Pepe" Fanjul immigrated to Palm Beach County, Florida from Cuba, where their family had built and established a sugar empire dating back to the 19th Century.  At the time, the family company, Fanjul Corp., consisted of many large businesses, including sugarcane mills, refineries, distilleries, and real estate, and was Cuba's largest sugar producer.  The brothers re-founded their business upon their arrival in the United States and grew it rapidly.

102.     By the mid-1960s, sugarcane was a major industry in southern Florida: more than 200,000 acres of sugarcane were planted, and eight mills had opened.

103.     This growth has continued to the present.  Since the late 1990s, approximately 450,000 of acres of sugarcane have been planted annually in Florida, of which roughly 90% is grown in western Palm Beach County.  More sugar is produced in Florida than anywhere else in the United States.

010867-11/1337062 V1

104.    And today, Defendants Florida Crystals, U.S. Sugar, and SCGC remain the major sugarcane growers in Florida.

105.    Defendant U.S. Sugar currently farms over 230,000 acres of land in the counties of Hendry, Glades, and Palm Beach.  It is the largest producer of sugarcane in the United States by volume, producing over 700,000 tons of raw sugar per year.  It is also a large sugar refiner and, on information and belief, owns and operates Defendant Sugarland as a subsidiary.

106.    Defendant SCGC is now composed of 44 members/grower-owners who collectively farm sugarcane on approximately 70,000 acres.

107.    The Fanjul brothers currently own approximately 190,000 acres[15] in Palm Beach County, where they farm sugarcane, as well as sweet corn and rice.  Meanwhile, Fanjul Corp. has grown into a sugar and real estate empire in both the United States and the Dominican Republic.  Its primary company holdings include Defendants Florida Crystals, as well as Domino Sugar, C+H Sugar, Redpath Sugar, American Sugar Refining, La Romana International Airport, and numerous resorts in La Romana, Dominican Republic.  The company is worth an estimated $8.2 billion and is the third largest private company in Florida.

108.    Of these various Fanjul holdings, Defendant Florida Crystals has the closest ties to the Hazard Zone: the company farms approximately 187,000 acres of sugarcane and produces

---

[15] In total, the Fanjuls own approximately 400,000 acres of sugar plantations worldwide, approximately half of which are in Florida and half of which are in the Dominican Republic. The latter allow Fanjul Corp. to be one of the top sugar exporters to the United States, with 63% of the Dominican Republic's sugar exports attributable to the Fanjul sugar empire.  Fanjul Corp.'s subsidiary companies in the Dominican Republic sell sugar to Fanjul Corp.'s subsidiary companies in the United States.  The Fanjuls also operate two sugar mills, a sugar refinery, a rice mill, a packaging and distribution center for various items, and the largest biomass renewable power plant in North America, all of which are in Palm Beach County, Florida.

over 660,000 tons of sugar per year.  On information and belief, Defendants Okeelanta, Osceola, and Trucane are subsidiaries of Defendant Florida Crystals.

109.    Together, Defendants Florida Crystals, U.S. Sugar, and SCGC have come to be known as "Big Sugar" for their production, profitability, and political clout.  Together, they own and/or operate—either directly or through their subsidiaries—the overwhelming majority of land on which sugarcane is farmed in the Hazard Zone.

110.    But this influence comes at a substantial price to all but a select few.  A recent report estimates that the U.S. sugar industry costs taxpayers approximately $4 billion each year in market allotments,[16] import quotas,[17] and price supports[18] (or roughly $50/year for a family of

---

[16] The U.S. sugar market is divided into delegated allotments, and sugar produced beyond these allotments is blocked from sale—thus forcing prices higher and eliminating the need for competition by producers.  Specifically, allotments are made between cane and beet sugar, then divided between each company that markets these products.  For example, for the fiscal year 2019, Defendants Florida Crystals (the brand name of Defendant Okeelanta), SCGC, and U.S. Sugar were allocated a collective 2,554,794 (or 1,051,876, 459,570, and 1,043,348, respectively) short tons (raw value).  *See* U.S. Dep't of Agric. Farm Serv. Agency, *USDA Announces Fiscal Year 2019 Sugar Loan Rates, Allotment and Marketing Allocations* (Sept. 28, 2018), https://www.fsa.usda.gov/news-room/news-releases/2018/nr_2018_0928_rel_0148.

[17] The USDA establishes annual quota volumes, pursuant to which a certain quantity of sugar is allowed to enter the U.S. under a low tariff; only sugar subject to high tariffs may enter the U.S. in unlimited quantities, thus restricting supply and inflating prices.  These tariffs apply to imports of raw cane sugar, refined sugar, sugar syrups, specialty sugars, and sugar containing products.  U.S. Dep't of Agric. Foreign Agric. Serv., *Sugar Import Program*, , https://www.fas.usda.gov/programs/sugar-import-program (last visited May 30, 2020).

[18] Price supports are provided through a nonrecourse loan program authorized by the 2014 Farm Bill.  Pursuant to this program, loans are made to sugar processors at a predetermined price per pound for every pound of sugar provided as collateral; if the processor cannot obtain a higher price on the market, it can forfeit sugar to the U.S. government as full repayment for the loan.  *See* U.S. Dep't of Agric. Econ. Research Serv., *Policy*, https://www.ers.usda.gov/topics/crops/sugar-sweeteners/policy.aspx#price (last updated April 7, 2020).  Because processors simply forfeit their sugar if the market price dips below the government-set price, the latter effectively serves as a price target for the USDA, which in turn must supply the sufficient restriction of domestic supply.  *See* Colin Grabow, *Candy-Coated Cartel: Time to Kill the U.S. Sugar Program*, Policy Analysis No. 837, CATO INSTITUTE (Apr.

---

four), and that these same subsidies are a net job killer—leading to "reductions in U.S. manufacturing employment opportunities in the order of 10,000 to 20,000 jobs every year."[19] Defendants spend prolifically on lobbying and political contributions: in each of the past five years, the sugar cane and sugar beet industry has spent more than $10 million annually on lobbying,[20] and contributed a total of approximately $5.5, $7.2, and $8.5 million to political candidates in the 2020, 2018, and 2016 election cycles, respectively.[21]  It is estimated that "[t]he welfare transfer to sugar growers and processors is quite large in the aggregate, hovering around $1.2 billion."[22]

111.     The harm from these subsidies stretches far and wide.  U.S. consumers pay, on average, approximately 50% more for sugar than consumers elsewhere in the world,[23] as a result

---

10, 2018), https://www.cato.org/publications/policy-analysis/candy-coated-cartel-time-kill-us-sugar-program.

[19] Vincent H. Smith, *The U.S. spends $4 billion a year subsidizing 'Stalinist-style' domestic sugar production*, MARKETWATCH (June 26, 2018), https://www.marketwatch.com/story/the-us-spends-4-billion-a-year-subsidizing-stalinist-style-domestic-sugar-production-2018-06-25; *see also* John C. Beghin & Amani Elobeid, *Analysis of the US Sugar Program*, American Enterprise Institute (Nov. 2017), *available at* https://www.aei.org/research-products/report/analysis-of-the-us-sugar-program/; Grabow, *supra* note 18.

[20] OpenSecrets.org, *Sugar Cane & Sugar Beets: Lobbying, 2019*, Center for Responsive Politics, https://www.opensecrets.org/industries/lobbying.php?ind=A1200 (last visited May 31, 2020).

[21] OpenSecrets.org, *Sugar Cane & Sugar Beets: Long-Term Contribution Trends*, Center for Responsive Politics, https://www.opensecrets.org/industries/totals.php?cycle=2020&ind=A1200 (last visited May 31, 2020).

[22] Beghin & Elobeid, *supra* note 19.

[23] *See* Smith, *supra* note 19.

of which Florida's sugar industry pockets hundreds of millions of dollars in extra profit each year:[24]



Figure 14: Sugar prices (in cents/pound)

112.    Meanwhile, Fanjul-owned company Central Romana—the biggest employer and landowner in the Dominican Republic—enjoys a uniquely privileged position among sugar importers.  According to 2015 reporting by Al Jazeera, 17 percent of the tariff rate quota (or amount of sugar a country can export to the U.S. subject to reduced tariffs) is allocated to the

---

[24] In comments submitted to the EPA in 2015, the nonprofit organization Earthjustice estimated that, in 2014, Defendants Okeelanta and U.S. Sugar received an estimated $92 and $90 million in profits, respectively, thanks to these subsidies.  *See* Comments by Earthjustice on Behalf of the Sierra Club on the Draft Title V Air Operation Permit Renewal for the United States Sugar Corporation's Clewiston Facility (Facility ID No. 0510003) (July 10, 2015) at 17 ("Earthjustice U.S. Sugar Comments"); Comments by Earthjustice on Behalf of Sierra Club on the Draft/Proposed Title V Air Operation Permit Renewal for the Okeelanta Corporation's Okeelanta Sugar Mill and Refinery (Facility ID No. 0990005) and the New Hope Power Company's Okeelanta Cogeneration Plant (Facility ID No. 0990332) (April 14, 2015) at 15 ("Earthjustice Okeelanta Comments").

Dominican Republic—the most of any country—63 percent of which is allocated to Central

Romana.[25]  A 2013 investigation by the U.S. Department of Labor found

> evidence of apparent and potential violations of labor law in the Dominican sugar sector concerning (1) acceptable conditions of work with respect to minimum wages, hours of work, and occupational safety and health, such as payments below the minimum wage, 12-hour work days, seven-day work weeks, lack of potable water, and the absence of safety equipment; (2) a minimum age for the employment of children and the prohibition and elimination of the worst forms of child labor; and (3) a prohibition on the use of any form of forced or compulsory labor.[26]

113.    And closer to home, Defendants today continue—despite their receipt of generous

federal subsidies that ensure evergreen profits—to employ an anachronistic method of sugarcane

harvest that rains toxic ash down on some of Florida's poorest communities, even as COVID-19

has rendered these communities particularly fragile.

**D.      The sugarcane burning process and its effects**

**1.      Defendants burn hundreds of thousands of acres of sugarcane each year.**

114.    A typical sugarcane harvest in Florida yields approximately 17 million tons of

pure sugarcane, which in turn is milled, processed, and otherwise produced into approximately

two million tons of sugar.

115.    Before harvesting sugarcane stalks, Defendants first burn their crop.  This process

consists of setting large fires to whole sugarcane fields to burn off the outer leaves from the cane

stalks.  Because the stalks are full of water, they do not ignite or burn.

---

[25] *See* Amy Bracken, *A sweet deal: The royal family of cane benefits from political giving*, AL JAZEERA AMERICA (July 23, 2015), http://america.aljazeera.com/multimedia/2015/7/fanjul-family-benefits-political-donations.html.

[26] *See* U.S. Dep't of Labor, News Release, *US Labor Department Issues Report on Labor Concerns in Dominican Sugar Sector, Announces $10 Million Project in Agriculture* (Sept. 27, 2013), https://www.dol.gov/newsroom/releases/ilab/ilab20130927; *see also* Amy Bracken, *Blood, sweat and sugar: Trade deal fails Haitian workers on DR plantations*, AL JAZEERA AMERICA (July 16, 2015), http://america.aljazeera.com/multimedia/2015/7/blood-sweat-and-sugar-trade-deal-fails-haitian-workers-in-dr.html.

116.     Pre-harvest burning occurs primarily during a six- to eight-month period that begins in October and ends between March and May.  The volume of this burning is staggering in its volume and frequency: in the ten years between 2009 and 2019, Defendants burned approximately 3,244,971 acres of sugarcane field as part of 83,382 individual burns in Palm Beach County alone, as well as hundreds of thousands more in Hendry, Glades, and Martin counties.  In 2019, Defendants burned an additional 284,615 acres in Palm Beach County as part of 7,891 fires during the "burn season," or approximately 43 fires each day.  On some days, as many as 60 permits can be approved.

117.     Defendants burn sugarcane because they believe this is the cheapest and fastest way to harvest and process it.  Specifically, pre-harvest burning is done: (a) to facilitate the harvesting process by quickly and cheaply removing the excess leaves around the stalks or biomass (referred to in the industry as the "trash"); (b) to reduce dangers from snakes and insects; and (c) to increase the sugar content of the stalk by water evaporation.

118.    A burn event is generally the same at sugarcane fields throughout the world, and follows a simple process: first, the perimeter of the field is ignited using diesel (or some other accelerant); then, the field itself naturally burns.



Figure 15: Aerial view of burn event

119.    Pre-harvest burns in the Hazard Zone are generally done on 40-80 acre tracts of land at a time, and are regulated by the Florida Forest Service ("FFS").  Prior to each burn, Defendants must apply for and receive burn permits from the FFS.  Specifically, on the day before a burn event, the operator must notify the FFS of the location and date of the planned burn.  The FFS then grants or denies approval based on anticipated meteorological conditions and other factors.  There are no source performance standards—that is, no pollution control standards.

010867-11/1337062 V1

120.    Crucially, the FFS approves or denies burn permits based on wind conditions. During the year, wind conditions in the Hazard Zone vary greatly.  The following diagram shows annual wind rose data from 2018 for West Palm Beach, Florida[27]:

---

[27] Wind data taken from Boca Raton, Florida, also confirms wind directions from all compass directions throughout the year, but with the following dominant wind directions by month:

January = Northwest / Southeast

February = Northwest/ Southeast

March = Southeast

April = Southeast

May = Southeast

June = Southeast

July = Southeast

August = Southeast

September = East

October = Northeast

November = Northwest / East

December = Northwest / East



Figure 16: annual wind rose data for West Palm Beach

121.     Remarkably, current regulations promulgated by the State of Florida deny burn permits to Defendants if winds are projected to blow smoke and ash plumes toward the more affluent Eastern Palm Beach County and Eastern Martin County communities near the coast.  By contrast, burn permits are subject to little scrutiny when the wind blows toward the areas of Western Palm Beach County, Western Martin County, Hendry County, and Glades County.  *See* Exhibit A;[28] *see also* D.E. 81-2 (Florida Forest Service "Procedures for Burning Sugarcane" and map of zones).

---

[28] The Zones discussed in Exhibit A correspond with the four zones demarcated with purple lines in the Florida Forest Service map (Figure 17) below.  Zone I is the easternmost block; Zones II and III (further broken down into northern and southern zones) are the narrow, rectangular bands to the west of Zone I; and Zone IV is the large area to the west of Zone III.

122.    Consistent with this, the following Florida Forest Service map shows zones where sugarcane burning is allowed (demarcated with purple lines) and "smoke sensitive buffer" zones where it is not (demarcated with orange dots).  Though there are a small number of buffer zones in the Hazard Zone, the majority form, in effect, a wall around east Palm Beach and Broward counties:



Figure 17: FFS map of sugarcane areas (with buffer zones)

123.    On information and belief, the FFS' wind-based regulations were first put into place in the 1990s, after residents of wealthy Wellington—a "world-famous equestrian

destination" that sits east of Belle Glade, and was incorporated in 1995—and others to the east

complained.  When ash, smoke, or debris affect these communities today, it is a newsworthy

event, and residents are often advised to take shelter.  For example:

- When smoke from sugarcane burns recently intruded into Coral Springs, fire officials encouraged residents with respiratory problems to stay indoors, warning that those with chronic heart and lung diseases faced particular risk from microscopic particles in smoke that can penetrate deep into the lungs.[29]

- When unusually cold temperatures in December 2010 caused sugarcane ash to waft into Loxahatchee and Wellington, state officials advised residents to avoid outdoor activities if they smelled smoke.[30]

124.    Complaint logs maintained by the Florida Department of Health between 1988

and the present offer another stunning picture of this double standard.  When residents of the

Glades complain about burning, for instance, it appears that they are simply told to contact the

Department of Forestry to register their displeasure.  A 2008 log of a complaint filed by a

resident of Pahokee reads:

> [Complainant] is upset with the ongoing sugarcane burning.  It is impacting the quality of his life and he believes it is a health threat and something should be done. I informed him of our regulatory limitations, suggested he contact DOF.  Second complaint.

125.    By contrast, when residents of wealthier parts of Palm Beach County—for

instance, those residing in Loxahatchee, Wellington, West Palm Beach, and Delray Beach—

complain to the County about smoke or ash drifting into their communities, these same logs

reveal a robust investigative process that includes detailed sample collection (and microscopic

---

[29] Fooksman, supra note 6.

[30] Mitra Malek, *December freezes intensity ash fall from sugar cane fields*, SOUTH FLORIDA SUN SENTINEL (Jan. 30, 2011), https://www.sun-sentinel.com/news/fl-xpm-2011-01-30-fl-palm-cane-ash-falling-20110129-story.html.

analysis), diligent contact with complainants and even, in some cases, direct contact between the

Palm Beach County Health Department and the Florida Department of Forestry.  For example:

- When a resident of Delray Beach called to complain about "flakey black ash" in January 2009, an investigator from the Palm Beach County Public Health Unit visited the site to collect ash samples, "showed the owner how to collect" these herself, then submitted these samples to the Florida Department of Health for microscopic particulate sample analysis—which revealed them to be sugar cane ash.

- When a resident of Palm Beach called to complain about suspected sugarcane burning in 2009, investigators from the Palm Beach County Health Department—though doubtful that sugarcane burning was the culprit—followed up with the complainant on numerous occasions.  An internal department e-mail between investigators instructs: "Would you please contact the complainant for an [indoor air quality] review/inspection (if necessary)?  I have also asked that she maintain a log of dates, times and wind directions for future events to see if we can confirm or rule out sugar cane burning.  She seems to be located too far east for severe smoke irritant reactions; an event log can help us determine validity."

- When a resident of Loxahatchee called to complain about "black smoke" from sugarcane burning in November 2010, investigators contacted the Department of Forestry directly to investigate.  A "summary of findings and actions taken" states: "Reviewed complaint with Harry of DOF.  Harry advised that burning was allowed today; requiring law enforcement to attend afternoon burns due to increased winds. Harry advised he would send a truck out to this one and check conditions.  I gave him the complainant's information."

- When a resident of Loxahatchee contacted the Florida Department of Health, in January and February of 2012, to express concerns about the health effects of sugarcane burning on her family and community, health department employees conducted an extensive investigation, and ultimately sent the complainant the following letter:

    Thank you for the January 20 letter expressing your health concerns related to air pollution from sugarcane burning.  In your letter, you indicated that air pollution (smoke and odors) in your area was particularly bad on January 19.  Our air program staff conducted an investigation in an effort to identify the circumstances that may have led to the high levels of air pollution on that date.  We contacted the Division of Forestry (DOF), who as you know regulates sugarcane burning, and were advised that 61 burns were authorized for that day.  Information obtained from the National Weather Service for that day indicated that a cold front had moved through the area. As indicated previously in the DOH email, the changing weather conditions that occur when a front moves through the area can result in sugarcane smoke being transported close to the ground and impacting urban areas.

The Health Department operates an air monitoring station in Royal Palm Beach near the intersection of Okeechobee Blvd and Crestwood Blvd. One of the pollutants monitored at this station on a continuous basis is fine particulate matter which is made up of particles equal to or less than 2.5 micrometers in size (PM2.5).   A major constituent of smoke is fine particulate matter.  The health based air quality standard for PM2.5 is 35.0 micrograms per cubic meter averaged over 24 hours.    The daily concentration obtained from the continuous monitor at Royal Palm Beach on January 19 was 13.4 micrograms per cubic meter, which is well below the standard.   However, higher hourly values were observed in the late afternoon and early evening that is consistent with your observations.

We have forwarded a copy of your complaint to the DOF.  The information derived from your complaint, and others like it, is very important as it is used by the DOF to assess the effectiveness of their best management practices established to minimize the impacts from sugarcane burning on populated areas.  In the event you should again experience smoke levels in your area that are affecting you and your family, we encourage you to contact the Health Department's air program at (561) 837-5900.  Our staff will attempt to verify your complaint and make an effort to collect ash samples for examination if requested.  It is also suggested that you contact the DOF Loxahatchee Station at (561) 791-4725.

- When a resident of the Eastpointe Country Club in Palm Beach Gardens called to complain about "black soot" on his patio and roof from sugar cane burning in March 2012, a Department of Health employee visited the complainant's home, collected samples, submitted these samples for microscopic analysis, then sent the complainant a formal letter detailing (and enclosing the results of) this analysis—which included the finding that sugarcane ash was present in the samples collected, "typical of what we observe in dust samples throughout Palm Beach County, especially this time of year during our dry season."

- When a resident of Riviera Beach complained about "black particulate matter" coating boats in the Riviera Beach Marina in 2017, investigators from the Florida Department of Health conducted a site visit (including a walk-through of the Riviera Beach Marina), "[i]nterviewed various boat owners with regards to the residue observed on their boats," and collected samples that were subsequently submitted for microscopic observation.  According to the complaint investigation record, a "microscopic analysis report" indicated that three of five samples taken included sugarcane ash; the complainant was subsequently advised "to contact [the] Florida Forest Services [sic] for sugar cane ash complaints."

- When a resident of Palm Beach complained about "a lot of something that looks like strings of ASH floating in the air" in November 2018, a Florida Department of Health investigator analyzed a sample of this material and confirmed, via microscopic analysis, that it was sugarcane ash.  In an e-mail, an environmental manager for the health department assured the complainant that "[a]sh particles are usually much

larger than 10 microns and more of a nuisance than a health threat.  Please note that sugar cane harvest is in-progress (mainly in the western communities of Belle Glades, Pahokee, & Canal Point).  Ash and smoke may sometimes impact eastern Palm Beach County caused by meteorological changes and wind shifts."

126.    Furthermore, when residents of the Hazard Zone complain to the State of Florida about Defendants' burning, evidence indicates that these complaints are passed on directly to the sugarcane industry itself.  According to a 2018 article, for instance, when Shanique Scott—the mayor of South Bay—called the Florida Forestry Service to complain about smoke drifting into town, a dispatcher took her contact information and promised to follow up, only for a sugar company employee to call Scott back hours later with detailed information about the complaint as well as Scott's contact information.[31]  On another instance, when a resident of Glades County, Steve Laporte, wrote to the Florida Department of Health in 2016 about his concerns with pre-harvest burning, he received an email from an environmental consulting company sent on behalf of the "Florida Sugar Cane League," an industry trade association whose members include Defendants U.S. Sugar, the Sugar Cane Growers Cooperative, and Florida Crystals,[32] seeking to "discuss his concerns."

127.    In other words, sugarcane burning is a novel, newsworthy health concern for wealthier Florida residents to the east, and something worthy of diligent investigation when complaints arise.  For residents who live in the Hazard Zone, it is a fact of life.

---

[31] *Love Thy Neighbor: Florida's Fight to Stop Sugarcane Burning*, BULLSUGAR.ORG (July 5, 2018), https://bullsugar.org/florida_fights_glades_sugarcane_burning/.

[32] *See* Susan Salisbury, *Sugar Cane Growers Cooperative joins industry group as farm bill looms*, PALM BEACH POST (Apr. 10, 2018), https://www.palmbeachpost.com/news/sugar-cane-crowers-cooperative-joins-industry-group-farm-bill-looms/HWNy (noting that Defendants SCGC, Florida Crystals, and U.S. Sugar were "represented by the Florida Sugar Cane League, the industry trade association," in lobbying related to the 2018 farm bill).

**2.      Each burn is a toxic stew of smoke and particulate matter.**

128.    When sugarcane is burned, an estimated 70% of the approximately 30 tons of foliage per acre is removed, much of which then becomes smoke and particulate matter.  As this material goes up in flame, each burn emits billows of thick black smoke, and causes small pieces of black ash and particulate matter to rain down on the surrounding area.

129.    Residents call this byproduct of burning "black snow."  It is known to travel for miles from the area of a burn.



Figure 18: Aerial view of sugarcane burn in the Hazard Zone



Figure 19: Aerial view of a sugarcane burn in Maui, Hawaii

130.    Both this smoke and the black snow that accompanies it have long been known to be toxic.  Since at least 1975, when the EPA studied the particle size distribution associated with air pollution emissions from sugarcane field burn events, it has been known that approximately 90 percent are the particles emitted by burns are less than 0.5 microns in size.[33]  These small particles include, among other things, dangerous substances like polycyclic aromatic hydrocarbons, many of which are carcinogenic.

131.    There are two reasons why emitted particles are harmful to people and property: first, the particulate matter emitted by burning—that is, the byproduct of burning organic material like Defendants' "trash"—is itself harmful and can infiltrate the lungs (e.g., $PM_{0.5,}$ $PM_{2.5}$, discussed *infra*); and second, other pollutants are "sorbed" (attached) onto this particulate matter, thus allowing them to migrate on to property and people.

132.    Although the composition of emitted plumes may vary somewhat from field to field and from burn event to burn event, the "black snow" emitted by Defendants' pre-harvest burns generally includes the following pollutants, many of which are carcinogenic, recognized as "hazardous substances" under the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) and Florida law,[34] and/or otherwise harmful to human health:

---

[33] *See* Ellis F. Darley & Shimshon L. Lerman, U.S. EPA, *Air Pollutant Emissions from Burning Sugar Cane and Pineapple Residues*, Publication No. EPA-450/3-75-071 (July 1975).

[34] 42 U.S.C. § 9601(14) defines "hazardous substance" to include:

(A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress), (D) any toxic

a. **Particulate matter ("PM")**, including $PM_{0.5}$, $PM_{2.5}$, and $PM_{10}$.[35]  Particulate matter is the residue from the combustion process, and is sometimes referred to as "smoke" or "soot" or "fly ash."  The ash is a residual substance from the destruction of waste and is common to any type of burning or organic material.

Particles with diameters of less than 10 microns have significant health effects, and particles with diameters less than 2.5 microns are especially harmful, as they can easily penetrate or be deposited on the alveolus zone of the lung—and can absorb and bind to numerous toxic compounds, including (but not limited to) PAHs.  According to a recent study, "[f]ine particulate matter ($PM_{2.5}$) exposure is the largest environmental health risk factor in the United States," and is responsible for 63% of deaths from environmental causes and 3% of deaths from all causes.[36]  The Independent Particulate Matter Review Panel, a group of 20 independent experts on particulate matter pollution and health that previously existed to advise the EPA in its review of the National Ambient Air Quality Standards ("NAAQS"), has recently "unequivocally and unanimously concluded," on the basis of more recent evidence concerning the "numerous adverse health outcomes" associated with $PM_{2.5}$ exposure and "in the interests of environmental justice," "that the current $PM_{2.5}$ standards do not adequately protect public health" and should be revised downwards.[37]

A robust literature ties particulate matter pollution, even at concentrations lower than the current NAAQS levels, to a wide range of negative health effects and outcomes, including increases in all-cause mortality.[38]  In studies, exposure to particulate

---

pollutant listed under section 307(a) of the Federal Water Pollution Control Act, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act, and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act.

*See also* Fla. Stat. § 376.301(21) (defining "hazardous substances" to include those substances that are hazardous substances under CERCLA).

[35] Particulate matter is denoted as "PM" with a subscript indicating the diameter of the particles, such as $PM_{2.5}$ (particulate matter with a diameter of less than 2.5 micrometers), $PM_{10}$ (diameter of less than 10 micrometers), or $PM_{0.5}$ (diameter of less than 0.5 micrometers).

[36] Christopher W. Tessum, *Inequity in consumption of goods and services adds to racial-ethnic disparities in air pollution exposure*, 116 PROCEEDINGS OF THE NAT'L ACADEMY OF SCIENCES 6001 (2019).

[37] Independent Particulate Matter Review Board, *The Need for a Tighter Particulate-Matter Air-Quality Standard*, NEW ENGLAND J. OF MED. (June 10, 2020), https://www.nejm.org/doi/full/10.1056/NEJMsb2011009.

[38] *See, e.g.*, Cong Liu et al., *Ambient Particulate Air Pollution and Daily Mortality in 652 Cities*, 381 NEW ENGLAND J. OF MED. 705 (2019) (finding, *inter alia*, that (i) an increase of 10 μg per cubic meter in the 2-day moving average of $PM_{10}$ concentration was associated with increases of 0.44% in daily all-cause mortality, 0.36% in daily cardiovascular mortality, and

pollution has been linked to premature death,[39] emphysema,[40] difficulty breathing,[41] aggravated asthma,[42] cancer[43] (including lung cancer[44]), increased hospital admissions and emergency room visits,[45] adverse pregnancy and birth outcomes,[46] and increased respiratory symptoms in children.[47]  A recent study of all Medicare beneficiaries (60,925,443) in the United States between 2000 and 2012 estimated that increases of 10 µg per cubic meter in $PM_{2.5}$ and of 10 parts per billion in ozone—concentrations lower than the current NAAQS of 12 µg per cubic meter for $PM_{2.5}$ and 50 parts per billion of ozone—were associated with increases in all-cause mortality of 7.3% and 1.1%, respectively; when the analysis was restricted to person-years with exposure to $PM_{2.5}$ of less than 12 µg per cubic meter and ozone of less than 50 ppb, the same increases in $PM_{2.5}$ and ozone were associated with increases in the risk of death of 13.6% and 1.0%, respectively.  For $PM_{2.5}$, the "risk of death among men, blacks, and people with Medicaid eligibility was higher than that in the rest of the population."[48]

Children are at particular risk from PM pollution.  In a study funded in part by the EPA, researchers have found that children exposed to $PM_{10\text{-}2.5}$ were more likely to

---

0.47% in daily respiratory mortality; and (ii) the corresponding increases in daily mortality for the same change in $PM_{2.5}$ concentration were 0.68%, 0.55%, and 0.74%, respectively).

[39] Robert D. Brook et al., *Particulate Matter Air Pollution and Cardiovascular Disease*, 121 CIRCULATION 2331 (2010).

[40] Meng Wang et al., *Association Between Long-term Exposure to Ambient Air Pollution and Change in Quantitatively Assessed Emphysema and Lung Function*, 322 J. AM. MED. ASS'N 546 (2019).

[41] EPA, *Particulate Matter (PM) Pollution*, , https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm (last updated Apr. 13, 2020).

[42] *Id.*

[43] C. Arden Pope III et al., *Lung Cancer, Cardiopulmonary Mortality, and Long-term Exposure to Fine Particulate Air Pollution*, 287 J. AM. MED. ASS'N 1132 (2002).

[44] *See, e.g.*, International Agency for Research on Cancer, *Outdoor Air Pollution*, Vol. 109 (2016) at 443 (finding "sufficient evidence in humans for the carcinogenicity of outdoor air pollution" and finding that such pollution "causes cancer of the lung").

[45] J.E. Cançado et al., *The Impact of Sugar Cane-Burning Emissions on the Respiratory System of Children and the Elderly*, 114 ENVTL. HEALTH PERSPECTIVES 725 (2006)

[46] *See* Independent Particulate Matter Review Board, *The Need for a Tighter Particulate-Matter Air-Quality Standard*, *supra* note 37.

[47] *Id.*

[48] Qian Di et al., *Air Pollution and Mortality in the Medicare Population*, 376 NEW ENGLAND J. OF MED. 2513 (2017).

develop asthma and need emergency room or hospital treatment for it.[49]  According to the EPA,

> This finding is significant because while researchers have generally found that exposure to fine particulate matter ($PM_{2.5}$) is associated with the development of asthma and other respiratory and cardiovascular diseases. Coarse particulate matter was thought to be less harmful, in part because the larger particle size prevents penetration deep into the lungs. However, coarse PM can deposit into the airways, and recent research suggests that short-term exposure may be associated with cardiovascular and respiratory disease.[50]

Another recent study funded by the EPA found that found that short-term and long-term exposures to high levels of carbon monoxide, nitrogen dioxide, and $PM_{2.5}$ were associated with alterations to two genes involved in immune tolerance in children, and that those alterations were significantly associated with asthma.[51]  According to the EPA,

> While researchers do not fully understand how air pollution exposure increases asthma prevalence, evidence suggests air pollutants suppress genes that regulate the immune system's ability to differentiate an allergen from a dangerous foreign substance, such as a virus or bacteria. The immune system then goes into action, setting up an inflammatory response whether the substance is harmful or not, which leads to asthma.[52]

Consistent with this, a 2015 study found that long-term improvements in air quality— and with declining levels of nitrogen dioxide and $PM_{2.5}$ in particular—were associated

---

[49] Corinne A. Keet et al., *Long-Term Coarse Particulate Matter Exposure is Associated with Asthma among Children in Medicaid*, 197(6) AM. J. OF RESPIRATORY AND CRITICAL CARE MEDICINE 737 (2018).  As part of this study, researchers analyzed a dataset of nearly eight million children ages 5-20 enrolled in Medicaid in 34 states between 2009 and 2010.  They found that exposure to coarse PM was associated with increased asthma diagnosis, hospitalization, and emergency department visits, and that children ages 11 years and younger were most susceptible to adverse health effects from exposure to coarse PM.  Researchers hypothesized that this was because younger children traditionally spend more time outdoors and their respiratory systems are still developing.  *See id.*

[50] *See* EPA, *The Links Between Air Pollution and Childhood Asthma* (last updated Oct. 23, 2018), https://www.epa.gov/sciencematters/links-between-air-pollution-and-childhood-asthma.

[51] Mary Prunicki et al., *Exposure to NO2, CO, and PM2.5 is linked to regional DNA methylation differences in asthma*, 10:2 CLINICAL EPIGENETICS (2018).

[52] EPA, *The Links Between Air Pollution and Childhood Asthma*, *supra* note 50.

with statistically and clinically significant positive effects on lung-function growth in children.[53]

b. **Dioxins/furans**.  Dioxins/Furans are complex chlorinated organic compounds that are generated during the combustion process.  According to the EPA, certain dioxins/furans are likely to cause cancer in humans.  Furthermore, people exposed to dioxins and furans have experienced changes in hormone levels, and animal studies show that animals exposed to dioxins and furans experienced changes in their hormone systems, changes in the development of the fetus, decreased ability to reproduce and suppressed immune system.[54]

c. **Polycyclic aromatic hydrocarbons ("PAHs")**.  PAHs are semi-volatile organic compounds ("SVOCs") that are generated from the combustion of organic material.  Many PAHs are classified by the International Agency for Research on Cancer ("IARC") as confirmed carcinogens or suspected carcinogens, and have half-lives of several years.  PAHs are generally concentrated in particles of less than 1 micrometer in diameter, which is significant because particles of that diameter are able to penetrate more deeply into lung tissue, making them more hazardous; there is a close correlation between human lung cancer and inhaled PAHs.[55]  Among the PAHs released by Defendants' sugarcane burning are the following:

    i. acenaphthene; acenaphthylene; anthracene; benzo[*a*]anthracene (classified by IARC as a possible human carcinogen); benzo[*a*]pyrene (classified by IARC as a confirmed human carcinogen); benzo[*b*]flouranthene (classified by IARC as a possible human carcinogen); benzo[*k*]flouranthene (classified by IARC as a possible human carcinogen); benzol[*ghi*]perylene; chrysene (classified by IARC as a possible human carcinogen); fluoranthene; flourene; indeno[1,2,3-*cd*]pyrene (classified by IARC as a possible human carcinogen); naphthalene (classified by IARC as a possible human carcinogen); phenanthrene; and pyrene.[56]

---

[53] W. James Gauderman, *Association of Improved Air Quality With Lung Development in Children*, 372 NEW ENGLAND J. OF MED. 905 (2015).

[54] EPA, Dioxins and Furans Fact Sheet, https://archive.epa.gov/epawaste/hazard/wastemin/web/pdf/dioxfura.pdf (last visited June 2, 2020).

[55] *See* Szu-Chich Chen et al., *Health risk assessment on human exposed to environmental polycyclic aromatic hydrocarbons pollution sources*, 336 SCIENCE OF THE TOTAL ENV'T 112 (2006).

[56] *See generally* Donata Lerda, European Commission Joint Research Centre, Polycyclic Aromatic Hydrocarbons (PAHs) Factsheet (2011), *available at* https://ec.europa.eu/jrc/sites/jrcsh/files/Factsheet%20PAH_0.pdf (cataloguing PAHs by IARC classification for carcinogenicity at pp. 8–13 and compiling risk assessments by other agencies).

010867-11/1337062 V1

d. **Volatile organic compounds ("VOCs")**.  VOCs are highly mobile in the atmosphere, and many are carcinogenic and/or highly toxic.   Among the VOCs released by Defendants' sugarcane burning are the following:

   i.  benzene (classified as a known human carcinogen[57]); ethylbenzene (classified by IARC as a possible human carcinogen[58]); o,m,p-xylene (mixture); styrene; and toluene.

e. **Carbonyls**.  Many carbonyl compounds are toxic, carcinogenic, or mutagenic. Among the carbonyls released by Defendants' sugarcane burning are the following:

   i.  acetaldehyde; formaldehyde (classified by IARC as a confirmed human carcinogen[59]); and propionaldehyde.

f. **Sulfur oxides**.  Short-term exposures to SO2 can harm the human respiratory system and make breathing difficult.  People with asthma, particularly children, are especially sensitive to these effects.[60]

g. **Nitrogen oxides ("$NO_x$")**.  $NO_x$—and the pollutants formed from it—can be transported over long distances and can cause a wide variety of health and environmental impacts because of the various compounds and derivatives in the family of nitrogen oxides.  For example, children, the elderly, people with lung diseases (like asthma), and those who work or exercise outside are susceptible adverse effects from $NO_x$ exposure, including damage to lung tissue and reduction in lung function.  Furthermore, $NO_x$ reacts with ammonia, moisture, and other compounds to form toxic particles and vapor that can penetrate deeply into the lungs, damage lung tissue, and cause or worsen respiratory disease and/or existing heart disease.[61]

h. **Ammonia**.  Chronic exposure to airborne ammonia can increase the risk of respiratory irritation, cough, wheezing, chest tightness, and impaired lung function.[62]

---

[57] *See* Agency for Toxic Substances & Disease Registry, Benzene, https://www.atsdr.cdc.gov/substances/toxsubstance.asp?toxid=14 (last updated March 3, 2011).

[58] *See* Agency for Toxic Substances & Disease Registry, Ethylbenzene, https://www.atsdr.cdc.gov/substances/toxsubstance.asp?toxid=66 (last updated March 3, 2011).

[59] *See* Agency for Toxic Substances & Disease Registry, Formaldehyde, https://www.atsdr.cdc.gov/substances/toxsubstance.asp?toxid=39 (last updated March 3, 2011).

[60] *See* EPA, Sulfur Dioxide (SO2) Pollution, https://www.epa.gov/so2-pollution/sulfur-dioxide-basics#:~:text=Short%2Dterm%20exposures%20to%20SO,sulfur%20oxides%20(SOx). (last updated Apr. 2, 2019).

[61] *See* EPA Office of Air Quality Planning and Standards, *$NO_x$: How nitrogen oxides affect the way we live and breath*, EPA-456/F-98-005 (Sept. 1998).

[62] *See* Nat'l Ctr. for Envtl. Assessment Ofc. of Research and Development, *Toxicological Review of Ammonia Noncancer Inhalation: Executive Summary*, EPA/635/R-16/163Fc

Ammonia molecules are "sticky" and, once aloft, combine easily with other compounds (like $NO_x$) to create tiny particles less than 2.5 microns in diameter that can lodge in the lungs and bloodstream.

i.  **Ozone**.  $NO_x$ and other pollutants (like VOCs or ammonia) react to create ozone. Even at relatively low levels, exposure to ozone can cause a number of health problems, including trouble breathing, shortness of breath, coughing, inflammation of the airways, aggravation of lung disease (like asthma and emphysema), lung damage, and chronic obstructive pulmonary disease ("COPD").[63]  A 2009 study found that the estimated relative risk of death from respiratory causes associated with an increment in ozone concentration of 10 ppb was 1.04, or what the study terms "a significant increase in the risk of death."[64]

According to the EPA, an increase in ozone concentrations has been found to be associated with a decrease in lung function; a 2018 study found low levels of outdoor ozone were associated with respiratory changes and other outcomes in African American children with difficult-to-treat asthma, even when they used asthma therapies such as inhalers to modify the adverse effects of air pollutants, and that ozone exposure at levels lower than the National Ambient Air Quality Standards for ozone was associated with pulmonary and other changes in African-American children with persistent asthma, including (i) a decrease of lung function even at low levels, and when participants were treating their asthma with medication and (ii) an increase in the level of fatty substances in the blood, a finding previously only documented in adults.[65]  The study concluded that ozone may impact at-risk populations even at low concentrations, and that its impact is more widespread than "just respiratory outcomes."

j.  **Carbon monoxide ("CO")**.  Carbon Monoxide is generated from incomplete combustion of waste material.

k.  **Elemental carbon/organic carbon ("EC" and "OC")**.  EC and OC are particle-related pollutants that can adversely affect human health.

---

(September 2016), https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/0422_summary.pdf.

[63] EPA, Health Effects of Ozone Pollution, https://www.epa.gov/ground-level-ozone-pollution/health-effects-ozone-pollution (last updated July 30, 2019).

[64] Michael Jerrett et al., *Long-Term Ozone Exposure and Mortality*, 360 NEW ENGLAND J. OF MED. 1085 (2009).

[65] *See* EPA, *The Links Between Air Pollution and Childhood Asthma*, *supra* note 50; *see* Michelle L. Hernandez et al., *Low-level ozone has both respiratory and systemic effects in African American adolescents with asthma despite asthma controller therapy*, 142 J. OF ALLERGY & CLINICAL IMMUNOLOGY 1974–1977 (2018).

133.    Furthermore, sugarcane growers in Florida, including Defendants, utilize a number of pesticides, fungicides, and herbicides (hereafter "pesticides") to manage insects, mites, fungal diseases and weeds in sugarcane crops.[66]  Because of pre-harvest burning, Defendants' pesticides also migrate as part of the "black snow."

134.    Many of the pollutants listed above are designated as "hazardous substances" under CERCLA and Florida law, including (but not limited to): acenaphthene, acenaphthylene, anthracene, benzo[*a*]anthracene, benzo[*b*]flouranthene, benzo[*k*]flouranthene, benzo[a]pyrene, benzol[*ghi*]perylene, chrysene, fluoranthene, flourene, indeno[[1,2,3-*cd*]pyrene, naphthalene, phenanthrene, pyrene, ethylbenzene, o,m,p-xylene, styrene, toluene, acetaldehyde, formaldehyde, propionaldehyde, nitrogen oxide, and ammonia.  *See* 40 C.F.R. § 302.4 (listing all hazardous substance currently recognized under CERCLA); Fla. Stat. § 376.301(13), (21).  Furthermore, because these same pollutants are often "sorbed" onto small particles, particulate matter functions as an important vector for their spread.

135.    Each Defendant was aware that emissions from its burning contained pollutants and toxic chemicals, was aware of the impact of burn emissions on the Hazard Zone, and proceeded to burn in spite of its knowledge of safe alternatives.  Specifically, each Defendant was aware, among other things, that the smoke from its burns travels for miles and invades the lands and property of each Named Plaintiff, each resident of the seven affected communities, and members of the Class.

---

[66] Specifically, two organophosphate insecticides, phorate and ethoprop, are used on sugarcane seed pieces in open furrow planting.  A mix of lambda-cyhalothrin and chlorantraniliprole is commonly used on sugarcane foliage.  A number of fungicides are used to manage orange and brown rust, including pyraclostrobin, azoxystrobin, metconazole, and propiconazole, as well as mixes of these chemicals.  Herbicides commonly used on Florida sugarcane include atrazine, metribuzin, ametryn, 2, 4-D amine, asulam pendimethalin, mesotrione, trifloxysulfuron, dicamba, and glyphosate.

**3.      Toxic smoke and particulate matter from Defendants' burns blankets the Hazard Zone.**

**a.      Each one of the thousands of annual burn events generates a plume of material that, depending on wind and weather, can travel for tens of miles.**

136.     Images demonstrate vividly that, in general, each of Defendants' burns releases

looming, visible clouds of particulate matter that travel at least several thousand feet—and often

several miles—from the burn source.  Because the Hazard Zone is bordered by sugarcane fields

010867-11/1337062 V1

that Defendants burn, residents and their property are uniformly fumigated by smoke from these fires, which are often literally next door and rain down "black snow."



Figure 20: Burns in the Hazard Zone



Figure 21: "Black snow" accumulation outside of a home in the Hazard Zone

137.     Many of these burns take place in close proximity to places where particularly
vulnerable people reside, as cane fields in the Hazard Zone run up to the property lines of homes,
schools, stores, and businesses.  In 2008, for example, more than a dozen children at Rosenwald
Elementary School in South Bay were taken to the hospital with respiratory problems because of
"heavy smoke from burning cane fields."[67]  Nor does this appear to be an isolated incident: as
noted above, each of the twelve Palm Beach County schools located in the Hazard Zone receives
one additional custodian "to assist with the additional cleaning requirements associated with
Glades muck and burning of sugar cane in the area."[68]

---

[67] *Students hospitalized due to cane smoke*, UNITED PRESS INTERNATIONAL (Feb. 7, 2008), https://www.upi.com/Top_News/2008/02/07/Students-hospitalized-due-to-cane-smoke/63381202365877/.

[68] *See* Palm Beach County School District 2019-2020 Budget, *supra* note 11.

138.    The figures below (as well as Figures 1 and 2, *supra*) illustrate the close proximity of each community in the Hazard Zone to many historical burn events.  The approximate locations of these events are indicated below with red squares (blue dots indicate receptor locations used for modeling, discussed *infra*):



Figure 22: Aerial map of Belle Glade and immediate surrounding burn events



Figure 23: Aerial map of Clewiston and immediate surrounding burn events



Figure 24: Aerial map of Moore Haven and immediate surrounding burn events



Figure 25: Aerial map of Canal Point and immediate surrounding burn events



Figure 26: Aerial map of Pahokee and immediate surrounding burn events

010867-11/1337062 V1



Figure 27: Aerial map of Indiantown and immediate surrounding burn events

139.    Furthermore, most of the toxic particulate matter generated by Defendants' burns has a very low "settling velocity," or rate of fall; because many of these particles are so fine, they remain suspended for long periods of time.  In practice, this means that particulate matter (e.g., $PM_{0.5}$, $PM_{2.5}$, $PM_{10}$) can remain suspended in the atmosphere for several hours, or even days, depending on meteorological conditions.  It can also easily become "re-suspended" —that is, re-enter the air after initially settling on a surface (e.g., vegetation, houses, structures, automobiles, etc.)—in response to human activity or forces likes wind.  Re-suspension can be a major secondary source of particulate matter pollution.

140.    Thus, while a single burn event may last for only a short period of time, when these particles are released into the atmosphere, they are either carried by the wind or removed from the atmosphere by rain, and can travel extremely long distances.

141.    For example, if the wind speed is 5 miles per hour, then particles from a single burn will travel approximately 5 mph and can be transported very long distances over a span of hours or days.  Assuming that such a burn plume does not "meander" (i.e., shift in response to shifting wind direction), it will travel 25 miles after 5 hours, and 100 miles after 20 hours.

142.    This is roughly consistent with Florida Forest Service's own burn maps, which indicate that smoke from a single burn can travel up to 26 miles.  It is also consistent with guidelines for sugarcane harvesting issued by the Louisiana Department of Agriculture and Forestry, which advise farmers/growers that, in advance of a burn, "all potential sensitive areas within 20 miles in all directions from your farm or field" should be identified.[69]

---

[69] La. Dep't of Agric. & Forestry, *Louisiana Smoke Management Guidelines for Sugarcane Harvesting* 3 (2000), available at https://www.lsuagcenter.com/NR/rdonlyres/8AAEF1B2-EFA6-40A0-AC59-654C15894EE9/12567/smoke_management3.pdf.

143.    The figure below illustrates the hypothetical long-term impact of a single burn event over time:



Figure 28: Illustration of long-term impact of single burn event (with locations of historical burn events in red)

144.    In reality, the dispersion of Defendants' burn plumes over the Hazard Zone is complicated by varying wind,[70] weather, and other meteorological conditions at the time of the burn event itself.  Therefore, each plume varies in shape, trajectory, lateral extent (i.e., width), concentration isopleths (i.e., the contour lines demarcating the varying concentrations of particulate matter/pollutants in a plume) and, ultimately, its impact on "receptors" (i.e., the people, homes, and property on which particulate matter and pollutants are deposited).  This

---

[70] As noted above, *see supra* note 27, the dominant wind direction in the Hazard Zone varies from month to month.

means that the decision to burn a given field on a given set of *X* days will result in *X* number of different plumes:



Figure 29: Hypothetical plume configurations from varying field burn events

145.    Given tens of thousands of individual burn events under varying conditions over a period of years, the massive plumes from Defendants' burns impact the entirety of the Hazard Zone in a "popped popcorn"-like series of overlapping patterns similar to those illustrated below:

- 71 -



Figure 30: Hypothetical illustration of multiple plumes over time

010867-11/1337062 V1

146.    For those who live in the Hazard Zone, the net result of these many plumes is that, over the course of just one year, a single resident of—or home, business, or school in—the Hazard Zone is subject to at least hundreds, and most likely thousands, of pollutant exposures from individual burn events both near and far.  The figures below illustrate the way in which a single receptor in the Hazard Zone, like a home or school, might be cumulatively exposed to pollutants from many burn events over the course of a burn season and/or over multiple years.



Figure 31: Illustration of hypothetical multiple exposures to a receptor during a sample 12-month period (assuming six-month burn season between October and March)

- 73 -



Figure 32: Illustration of plume trajectory showing decreasing concentration with increasing distance

**b.** **Preliminary modeling based on Florida Forest Service burn records demonstrates that each Defendant's burning activity discharges pollutants that cause or contribute to the injuries alleged by each Named Plaintiff.[71]**

147.    According to the Florida Forest Service database, between 2014 and 2018,

Defendants Okeelanta, Osceola, U.S. Sugar, SCGC, Sugarland Harvesting, Independent

Harvesting, J & J, and Trucane burned a collective 1,502,826 acres of sugarcane across a total of

40,248 burn events.[72]

---

[71] On May 8, 2020, the Court dismissed Plaintiffs' First Amended Complaint without prejudice, finding that they failed to sufficiently allege that "each of the Plaintiffs has been harmed by all of the Defendants" and thus allege standing to sue each Defendant.  *See* D.E. 120 at 7–8.  In this section, Plaintiffs set forth detailed allegations with respect to the harm each Defendant has caused Named Plaintiffs and members of the putative Classes.

[72] As discussed *supra*, Florida Crystals conducts burning through its subsidiaries, which include Defendants Okeelanta, Osceola, and Trucane.

| Summary of Burn Events and Acres by Company 2014 – 2018 | | |
|---|---|---|
| | Burn Events | Acres Burned |
| Okeelanta | 5,609 | 263,628 |
| Osceola Farms | 4,433 | 189,604 |
| US Sugar | 8,480 | 480,364 |
| Sugar Cane Growers Coop | 14,666 | 255,442 |
| Sugarland Harvesting | 4,293 | 190,731 |
| Independent Harvesting | 695 | 26,715 |
| J&J Ag Products | 1,804 | 85,547 |
| Trucane | 268 | 10,795 |
| TOTAL | 40,248 | 1,502,826 |

Figure 33: 2014-2018 burns (by number of burns and acreage)

148.   Using location data obtained from this same database, Plaintiffs have used AERMOD, an atmospheric dispersion modeling system developed jointly by the American Meteorological Society and the EPA,[73] to model the air dispersion of the following pollutant categories for each Defendant's burns: (1) particulate matter (including total PM, $PM_{0.5}$, $PM_{2.5}$, and $PM_{10}$); (2) carbon monoxide and carbonyl (CO); (3) sulfur oxides (SOx); (4) nitrogen oxides (NOx); (5) ammonia ($NH_3$); (6) VOCs; (7) elemental carbon (EC); (8) organic carbon (OC); and (9) PAHs.[74]

---

[73] *See* EPA, *Air Quality Dispersion Modeling - Preferred and Recommended Models*, https://www.epa.gov/scram/air-quality-dispersion-modeling-preferred-and-recommended-models#aermod (last updated April 20, 2020).

[74] As noted above, the burning of sugarcane fields may also release other substances that are used as part of the routine farming practice, such as fertilizers, pesticides, and herbicides. However, Plaintiffs do not have access to information regarding the timing of these products' application or the quantities in which they were applied, and intend to obtain this information through discovery.  Thus, emissions resulting from the use of fertilizers, pesticides, and herbicides may be evaluated at a later date.

010867-11/1337062 V1

149.     To conduct this analysis, Plaintiffs constructed a 130 km by 100 km grid of "receptors" —i.e., locations on the map representing points of impact—overlaid over the region, or "airshed," surrounding Lake Okeechobee:



Figure 34: Defined airshed with receptors

150.     Plaintiffs then modeled impacts to groups of receptors in Belle Glade, Canal Point, Clewiston, Indiantown, Moore Haven, Pahokee, and South Bay.  These receptor groups are marked as blue dots in Figures 22–27 above, and marked in black in the figures below:



Figure 35: Locations of receptor points within communities in the defined airshed



Figure 36: Map of defined airshed with receptors and 2014-18 burn events

- 77 -

151.     The results of this modeling are attached to Plaintiffs' complaint as Exhibit B. The concentrations shown in the tables are for all pollutants and ambient air concentration averaging times for each community for the years 2014 through 2018.  The values shown are the maximum concentrations within the receptor group of that community (e.g., the groupings of dots above), expressed as the lowest highs and highest highs within each community, and are presented for 1-hour, 4-hour, 8-hour, 24-hour, and annual time intervals.[75]  Data is also broken out by each company.

152.     According to these results, every receptor in each of the receptor groups above— which correspond to the communities in the Hazard Zone—has been affected by each of Defendants Okeelanta, Osceola, U.S. Sugar, SCGC, Sugarland Harvesting, Independent Harvesting, J & J, and Trucane's *individual* burning.  As these tables demonstrate, for all categories of particulate matter/pollutants measured, over almost all averaging times, by *each Defendant*, there is an impact to the receptors evaluated.  Each of the Named Plaintiffs resides in or around these receptors.

153.     Plaintiffs' modeling demonstrates that the effect of Defendants' conduct on all seven of the communities in the Hazard Zone is profound.  Using 24-hr $PM_{2.5}$ values as a benchmark, for instance, between 2014 and 2018 the emissions from Defendants' burn events caused exceedances of the NAAQS $PM_{2.5}$ 24-hr standard[76] of 35 $\mu g/m^3$ at receptors in Belle

---

[75] Phrased otherwise, the "lowest" value in these tables is the lowest "high" value over time interval $X$ at any receptor modeled in town $X$.  For example, if receptors A, B, C, and D had 1-hr maximum values of 15, 24, 8, and 92 $\mu g/m^3$, respectively, for contaminant $X$ over the whole of 2016, the "lowest" high value in Exhibit B for town $X$ would be 8, and the "highest" high value would be 92.  2018 data for Trucane is not available because the company did not record any burn events in that year.

[76] This is a "primary" (rather than "secondary") standard set pursuant to the Clean Air Act, meaning that it is intended to "provide public health protection, including protecting the health of

Glade, Canal Point, Pahokee, and South Bay, in many cases by several multiples. According to the attached tables, Plaintiffs' model demonstrates that each of the above-listed Defendants has individually contributed pollutants to all of the receptors modeled in each of these seven communities. As noted above, each of the Named Plaintiffs resides in or around the areas covered by these receptors.

154. For example, during the year 2016, Plaintiffs' model demonstrates that there was a 24-hour period during which, at one receptor in Pahokee (the town in which Named Plaintiff Jones resides), $PM_{2.5}$ concentrations averaged 164 μg/m$^3$ over a 24-hour period—or approximately *4.6 times* the NAAQS.

155. Similarly striking examples can be found in all seven communities: for the period between 2014-2018, Plaintiffs' model demonstrates that individual receptors in Belle Glade, Canal Point, Pahokee, and South Bay recorded "highs" of 66; 163; 200; and 117 μg/m$^3$, respectively, over at least one 24-hour period.[77]

156. Using benzo[a]pyrene, a confirmed human carcinogen, as an alternative bellwether, the same model demonstrates that the emissions from Defendants' burn events caused exceedances of the US EPA's May 2020 Regional Screening Level (RSL) of 1.7 E-03[78] μg/m$^3$ for benzo[a]pyrene in all seven communities.[79] Once again, the attached results

---

'sensitive' populations such as asthmatics, children, and the elderly." *See* EPA, *NAAQS Table*, https://www.epa.gov/criteria-air-pollutants/naaqs-table (last updated December 20, 2016).

[77] Plaintiffs Coffie and Legrand are located in Belle Glade; Plaintiffs Armstrong and Reimbold live in Moore Haven; Plaintiffs Atkins, Brooks, and Smith live in Clewiston; Plaintiff Jones lives in Pahokee; Plaintiffs Mclean and Wilcher live in South Bay.

[78] Due to a typographical error in Plaintiffs' previous complaint, this value was previously stated as 1.7 E-06.

[79] According to the EPA, RSLs are "risk-based concentrations derived from standardized equations combining exposure information assumptions with EPA toxicity data," and are "considered by the Agency to be protective for humans (including sensitive groups) over a

010867-11/1337062 V1

demonstrate that each of the above-listed Defendants has individually contributed to PAH

emissions at each of the receptors modeled, and has thus exposed each of the Named Plaintiffs to

toxic materials.

157.   And more broadly, Plaintiffs' modeling demonstrates that the harm from

Defendants' conduct extends well beyond the Hazard Zone: during the five years modeled, *all*

receptors analyzed (indicated in yellow below) in the 130 km by 100 km airshed above were

affected by particulate matter from Defendants' burning, and approximately 16.3% of these—or

575 of 3,531—experienced exceedances of the NAAQS $PM_{2.5}$ 24-hr standard of 35 μg/m$^3$:

---

lifetime." *See* EPA, *Regional Screening Levels Frequent Questions: May 2020*,
https://www.epa.gov/risk/regional-screening-levels-frequent-questions (last updated May 11,
2020).



Figure 37: PM2.5 exceedances in class area (red dots indicate receptors with NAAQS exceedances)

158.    All Named Plaintiffs have been exposed to smoke, particulate matter, and toxic pollutants from each Defendant's burning.  Furthermore, the modeling so far done—*which demonstrates that the byproducts of each Defendant's burning have effectively blanketed the entirety of the Hazard Zone*—indicates each Defendant has individually contributed smoke, particulate matter, and toxic pollutants to every nook and cranny of the Hazard Zone, including to where each of the Named Plaintiffs resides and to each resident of the seven communities in

the Hazard Zone.  As demonstrated in Exhibit B, these contributions happen annually—i.e., during each burn season.

159.    Finally, there several reasons why even these dramatic modeling results understate the impact of Defendants' emissions on the Hazard Zone:

- Only a five-year period was modeled.  But Defendants' burning has been ongoing for decades, and continues through the present.

- Further, re-suspension of particulate matter was not modeled.  As noted above, this can be a major secondary source of particulate matter pollution.

- Pollutants like $PM_{10}$, $PM_{2.5}$, $PM_{0.5}$ (and others) may be suspended in the atmosphere for long periods due to the very low settling velocities of fine particles in the atmosphere.  In theory, such particulate matter can remain in the atmosphere for hours or even days.  Thus, while burn event emissions themselves last a short period (approximately 30 to 60 minutes), the resultant air pollution remains for longer periods (hours or days) and thus can travel great distances.

- Furthermore, the long-distance transport of pollutants like $PM_{10}$, $PM_{2.5}$, $PM_{0.5}$ (and others) is not accounted for by AERMOD.  This transport can be tens of miles, depending on many factors, even extending well beyond the defined airshed. Specifically, AERMOD assumes that an individual field burn event lasts only for the durations recorded by the Florida Forest Service, which is typically between 30 and 60 minutes of actual "burn time," and that a burn event generates a continuous plume only during that period under the meteorological conditions during that period.  Thus, the plume travel distance is essentially governed and limited by wind vectors.  After termination of the burn event, however, AERMOD assumes that the generated plume has terminated.  *Thus, the downwind impacts are limited by plume travel distance only for the burn time period.*

160.    Because AERMOD may underestimates the impact of Defendants' burns on receptors in the Hazard Zone, Plaintiffs have also used INPUFF, an alternative model developed by the EPA, to preliminarily model select burns.  The key difference between these two models is that INPUFF calculates downwind concentrations not only for the duration of the burn event but also for the duration of the plume (which may be hours or days) using actual (variable) wind conditions.  By contrast, as explained above, AERMOD calculates downwind concentrations

only for the duration of the burn event, not the duration of the plume, and thus may greatly underestimates impacts to receptors.[80]

161.    The results of one such INPUFF run is shown below.  The figure depicts a single 2014 burn of an 80-acre field by Defendant SCGC that began on February 27 at 1:00 p.m. and was modeled for the 24-hour period following its end.  According to this model run, the plume travelled 20 miles from the time the fire began to the end of the period modeled.  The pink areas below represent a median value for $PM_{2.5}$ of 1.8 μg/m$^3$, the red areas represent concentrations above the median, and the yellow areas represent areas below the median.  The red dot at the top

---

[80] For example, if the wind speed is 10 mph, a generated plume from a single burn event would travel in a straight trajectory for a maximum of 10 miles downwind of the burn source, assuming that there is no plume meander: the plume dimensions are zero at the beginning of the burn event, and are then calculated to be 0–10 miles (maximum) at the termination of the burn event (t = 60 minutes).  AERMOD modeling would show that any receptor located at a downwind distance from the burn event of greater than 10.0 miles would have zero theoretical impact.  However, this is not consistent with the reality of Defendants' burns: a plume does not simply stop after the end of this period, but instead continues to disperse and travel downwind, often tens of miles.  In this hypothetical, because AERMOD does not account for the plume > 10.0 miles, the impact to receptors at distances > 10.0 miles is underestimated

of the map is the maximum 1-hour concentration (1,900 µg/m$^3$), and the centerline of the plume at the bottom of the map—*twenty miles south*—is 4.38 µg/m$^3$:



Figure 38: INPUFF modeling results of February 27, 2014 burn

162.    This result further supports the conclusion that each Defendant has individually contributed smoke, particulate matter, and toxic pollutants to every nook and cranny of the Hazard Zone.  Specifically, it indicates that the results of Plaintiffs' preliminary AERMOD-

010867-11/1337062 V1

based modeling, which already demonstrates Hazard Zone-wide harm by each Defendant, likely

understate the intensity and breadth of this harm—potentially by a significant margin.

> **4.     Defendants' burning is harmful to residents' health and damages their property.**
>
> **a.     Smoke, particulate matter, and "black snow" from Defendants' burning settle outside and inside the homes and property of residents of the Hazard Zone.**

163.    Defendants' fields are adjacent to residential neighborhoods containing thousands

of homes, as well as to parks, schools, roads, hospitals, restaurants, and shopping areas.  This

includes Named Plaintiffs' and Hazard Zone residents' homes, workplaces, and businesses.

164.    Smoke, particulate matter, and "black snow" released by Defendants' burning

settles on the exterior of homes and buildings, as well as on playgrounds, parks, lawns, pools,

recreational items, and vehicles.  As Named Plaintiffs' experiences demonstrate, Defendants'

burning causes unrelenting, unsightly, costly damage to buildings—homes, businesses, schools,

hospitals, churches—and property throughout the year, requiring regular pressure washing and

repainting of homes, businesses, and property.

165.    Smoke, particulate matter, and "black snow" also migrate inside homes and

buildings, where they settle in interior living and working spaces, and clog air conditioning

filters.  On information and belief, the smoke, particulate matter, and "black snow" from

Defendants' burns have likely permeated portions of structures in the Hazard Zone, including

external siding, internal drywall and wood surfaces, HVAC systems, and attics in the homes and

businesses of Named Plaintiffs and Class members.  Preliminary sampling of three homes in the

Hazard Zone has identified sugar cane plant burn residue in attic dust and wipe samples taken

from around these homes.

166.     Plaintiffs and members of the Class in the Hazard Zone have been, and continue to be, continually exposed to the threat of inhaling and ingesting smoke, particulate matter, and "black snow," including the pollutants listed above.  Plaintiffs and members of the Class, as well as those who visited their homes, are also exposed to this same toxic mélange when they drive through the Hazard Zone, as their vehicles' heating and air conditioning systems circulate particulates from the outside air.

167.     Given the scale and far-reaching impact of Defendants' burns, as detailed above, the whole of the Hazard Zone suffers the above consequences.  This area has been exposed to the smoke, particulate matter, and "black snow" that emanated from Defendants' burns in quantities that are visible, damaging to property, and that pose significant dangers to human health on a repeated and continual basis.

### b.     Health risks of the particles and pollutants emitted by Defendants' burning

168.     The particulate matter and "black snow" emitted by Defendants' pre-harvest burns generally includes a wide range of pollutants known to be carcinogenic, mutagenic, and/or otherwise correlated with adverse effects on human health.  These include dioxins, PAHs, VOCs, carbon monoxide, sulfur oxides, nitrogen oxides, ozone, ammonia, elemental carbon, organic carbon and, most significantly, particulate matter—the last of which has been linked to premature death, emphysema, difficulty breathing, aggravated asthma, cancer (including lung cancer), increased hospital admissions and emergency room visits, and increased respiratory symptoms in children.  *See supra* ¶¶ 132–35.  Furthermore, particulate matter (e.g., $PM_{2.5}$) poses particular risks to individuals because, as explained above (*see supra* ¶ 131), other hazardous and/or carcinogenic pollutants are "sorbed" (attached) onto it, thus allowing them to more easily migrate on to property and people.

- 86 -

169.    Upon information and belief, as a result of exposure to the air pollution created by Defendants' pre-harvest sugarcane burning, residents of the Hazard Zone are at higher risk, compared to the rest of the population, for developing various diseases, including respiratory conditions (like asthma) and cancer.  In fact, community members are often told by area doctors that the best long-term solution for their recurring, burn-related health issues is to simply leave the Hazard Zone—which is often simply not an option.

170.    In addition to the preliminary air modeling so far completed by Plaintiffs, existing studies and data indicate that the air in Palm Beach County is some of the most polluted in the country.  According to EPA National Emissions Inventory data from 2014, Palm Beach County (followed by Hendry County) emitted more pollution from agricultural fires annually than any other county in the nation for 34 different pollutant categories.[81]  And annually, Florida is responsible for producing approximately 17% of total national $CO_2$, CO, and $PM_{2.5}$ burn

---

[81] *See* U.S. EPA, 2014 National Emissions Inventory (NEI) Data, available at https://www.epa.gov/air-emissions-inventories/2014-national-emissions-inventory-nei-data.

010867-11/1337062 V1

emissions, 12% of $PM_{10}$ burn emissions, and 9.5% of $CH_4$ burn emissions.[82]  The following map

shows the areas in which $PM_{2.5}$ emissions from crop burning are highest in the United States:



Figure 39: $PM_{2.5}$ emissions by region

171.    A recent air quality study conducted in southeastern Florida found that during the

winter sampling period, when pre-harvest burns are at their peak, $PM_{10}$ levels were 50% or

higher than otherwise measured, indicating that sugarcane harvesting and processing is a major

local source for $PM_{10}$.[83]  Similarly, concentrations of PAHs associated with $PM_{10}$ were found to

---

[82] Jessica L. McCarty, *Remote Sensing-Based Estimates of Annual and Seasonal Emissions from Crop Residue Burning in the Contiguous United States*, 61 J. OF THE AIR & WASTE MGMT. ASS'N 22–34 (2011).

[83] Orhan Sevimoglua & Wolfgang F. Rogge, *Seasonal size-segregated $PM_{10}$ and PAH concentrations in a rural area of sugarcane agriculture versus a coastal urban area in Southeastern Florida, USA*, 28 PARTICUOLOGY 52–59 (2016).

010867-11/1337062 V1

be up to 15 times higher than those measured during the summer growing season, indicating that the Hazard Zone's population is exposed to these often mutagenic and carcinogenic compounds at a substantially higher rate.[84]

172.    The same study also found that total PAH levels in Belle Glade were 7.36 nanograms per cubic meter during the burn season, but only 0.49 nanograms per cubic meter during the rest of the year (or roughly fifteen times less), leading the study's authors to conclude that it was "highly likely that the elevated PAH levels in Belle Glade during the sugarcane harvest season are caused by the pre-harvest burning of sugarcane foliage."[85]

173.    Consistent with this data, a 2005 study of one area in southeastern Brazil concluded that sugarcane fires were the largest source of particulate matter in the area, making up 60% of the area's fine particulate matter (i.e., $PM_{2.5}$) and 25% of its coarse particulate matter (i.e., between $PM_{2.5}$ and $PM_{10}$).[86]  A separate 2016 study of a small Mexican city next to many sugarcane crops found that (i) concentrations of $PM_{10}$ and $PM_{2.5}$ increased by approximately 41% and 32%, respectively, during burn season, and that the concentration of carcinogenic PAHs increased to 50% of total PAHs present; (ii) most emitted particles from sugarcane burning were in the $PM_{2.5}$ range (approximately 70%); and (iii) during burn season, populations living near sugarcane harvesting operations were exposed to $PM_{10}$ and $PM_{2.5}$ at rates 1.7 and 1.5 times higher, respectively, than during growing season.[87]

---

[84] *Id.*

[85] *Id.*

[86] L.L. Lara et al., *Properties of Aerosols from Sugar-Cane Burning Emissions in Southeastern Brazil*, 39 ATMOSPHERIC ENV'T 4627 (2005).

[87] Violeta Mugica-Alvarez et al., *Black Carbon and Particulate Organic Toxics Emitted by Sugarcane Burning in Veracruz, Mexico*, 7 INT'L J. OF ENVTL. SCI. & DEVELOPMENT 290 (2016).

174.    Furthermore, other studies have estimated at least 2,800 tons of hazardous air pollutants—including large amounts of many of the above-listed pollutants known or suspected to be carcinogenic—are released every year from sugarcane field burns in Palm Beach County. For example, researchers at the University of Florida recently estimated that sugarcane burning may be responsible for a significant percentage of the PAHs and carbonyls emitted in Palm Beach County each year, including as much as 86% of the total formaldehyde emitted and up to 69% of the county's emissions of acenaphthylene, which has been linked to genetic mutations and cancer.[88]  They estimate the contribution of pre-harvest burning to emissions inventories for a range of pollutants as follows:

---

[88] Danielle Hall et al., *PAHs, Carbonyls, VOCs and PM2.5 Emission Factors for Pre-Harvest Burning of Florida Sugarcane*, 55 ATMOSPHERIC ENV'T 164 (2012).

| Contribution of sugarcane burning to emissions inventories. | | |
|---|---|---|
| Compound | Fraction of inventory (%) | |
| | Palm Beach County | Florida |
| **PAHs** | | |
| Naphthalene | 1.7 | 1.3 |
| Acenaphthylene | 69 | 11 |
| Acenaphthene | 52 | 6.2 |
| Fluorene | 78 | 17 |
| Phenanthrene | 75 | 9.5 |
| Anthracene | 69 | 3.6 |
| Fluoranthene | 69 | 3.7 |
| Pyrene | 61 | 2.5 |
| Benz[*a*]anthracene | 50 | 1.0 |
| Chrysene | 67 | 1.5 |
| Benzo[*b*]fluoranthene | 77 | 11 |
| Benzo[*k*]fluoranthene | 61 | 1.4 |
| Benzo[*a*]pyrene | 62 | 2.1 |
| Indeno[1,2,3-*cd*]pyrene | 54 | 0.9 |
| Benzo[*g,h,i*]perylene | 23 | 0.6 |
| **Carbonyls** | | |
| Formaldehyde | 86 | 16 |
| Acetaldehyde | 91 | 29 |
| Propionaldehyde | 89 | 37 |
| **VOCs** | | |
| Benzene | 3.2 | ND[a] |
| Toluene | 0.5 | ND[a] |
| Ethylbenzene | 0.4 | ND[a] |
| Styrene | 1.6 | ND[a] |
| *o,m,p*-xylene (mixture) | 1.8 | ND[a] |
| [a]  Not determined because of insignificance. | | |

Figure 40: Estimated contribution of Defendants' burning to emissions inventory for
selected pollutants

175.    Similarly, a pair of 2015 petitions filed by the organization Earthjustice asking the

EPA to regulate smoke pollution from Defendants Okeelanta's and U.S. Sugar's burning

estimates that, when HAP emissions just for Okeelanta- and U.S. Sugar-controlled fields are

totaled, they range between 139–3140 tons/year and 187–4217 tons/year, respectively.[89, 90] Consistent with this, a study conducted in Araraquara, Brazil, a city in São Paulo state affected by air pollution from sugarcane burning, has found that PAHs associated with atmospheric particulate matter were approximately ten times higher during the burn season.[91]

176.    The negative health effects of sugarcane burning are well-documented; many studies—a majority of which analyze data from Brazil, the world's largest sugarcane producer—indicate that burning harms and/or puts at risk the health of those affected by the resulting smoke and particulate matter, and that eliminating the practice leads to improved health outcomes. Plaintiffs summarize some of this literature below:

**Brazil**

- A 2019 paper by economists Marcos A. Rangel and Tom S. Vogl found a statistically significant relationship between *in utero* exposure to smoke from sugarcane fires in São Paulo state and reduced birth weight, shorter gestation, and increased risk of

---

[89] *See* Earthjustice U.S. Sugar Comments, *supra* note 24, at 13–14; Earthjustice Okeelanta Comments, *supra* note 24, at 12–13.

[90] According to the Comments submitted by Earthjustice, *supra*, these estimates of total HAP emissions were derived by using the formula $E_{TOT} = A \times \sum EF_i$, where $E_{TOT}$ represents total emissions, $A$ is the activity factor, and $\sum EF_i$ is the sum of all HAPs for which emissions factor data is available.

An emissions factor is a representative value that attempts to relate the quantity of a pollutant released to the atmosphere with an activity associated with the release of that pollutant. The "activity factor" is simply the amount of cane biomass burned per year on each Defendant's fields, which is calculated by multiplying the burn area of the fields (in acres) by the so-called "fuel loading factor," which is a value used to estimate the average number of tons per acre burned during pre-harvest burns each year. These estimates vary with the estimated "low," "medium," and "high" values used for both the fuel loading factor and emissions factors (for the HAPs at issue), which are taken from the EPA and recent academic research (*see* Hall, *supra* note 88).

[91] Joyce Cristale et al., *Influence of sugarcane burning on indoor/outdoor PAH air pollution in Brazil*, 169 ENVTL. POLLUTION 210 (2012).

stillbirth.[92] Among other things, Rangel and Vogl conclude that "one implication of [their] findings is that the dose-response relationship [between smoke exposure and these negative outcomes] is steep even at low pollution levels, so concerns about health effects of air pollution should not stop at the periphery of cities or industrial centers."[93] They also speculate that exposure to particulate matter (1) may contribute to oxidative stress, which affects the embryo in the earliest phases of growth; (2) may decrease fetal-placental exchange of oxygen and nutrients; (3) may increase pulmonary and placental inflammation in the mother, potentially resulting in premature contractions and membrane rupture; and (4) may affect blood viscosity and coagulability, thus slowing fetal growth and increasing the risk of several adverse outcomes (including maternal cardiovascular events, preeclampsia, and preterm delivery).[94]

- A 2016 study found that the "spillover effects" of sugarcane burning in São Paulo state on respiratory illness (measured in additional hospitalizations for respiratory illness per thousand) are almost as large (90%) in regions *bordering* sugarcane growing ("untreated") regions as in the sugarcane growing ("treated") regions themselves.[95] Specifically, the study found that sugarcane burning increases hospitalizations by 1.34 and 1.49 per thousand in untreated and treated regions, respectively.[96]

- A 2015 paper by economists Alexandre C. Nicolella and Walter Belluzzo found that a reduction in the area of São Paulo state where sugarcane is burned "reduced the number of inpatient visits [due to respiratory disease]," and that "the effect of pre-harvest burning is relatively large, as compared to the estimated effects of the total vehicle fleet and industrial pollution[.]"[97] Nicolella and Belluzzo also conclude that "[t]he effect of the area of raw sugar cane harvest is more important for the population younger than 15 years old and older than 60[.]"[98]

- A 2014 study found a positive association between total suspended particle ("TSP") concentration in Araraquara, a city in São Paulo state affected by air pollution from

[92] Marcos A. Rangel & Tom S. Vogl, *Agricultural Fires and Health at Birth*, 101 THE REVIEW OF ECON. AND STATISTICS 616 (October 2019), available at http://www.tomvogl.com/rangel_vogl_fires.pdf.

[93] *Id.* at 628.

[94] *Id.* at 619.

[95] André L.S. Chagas et al., *A spatial difference-in-differences analysis of the impact of sugarcane production on respiratory diseases*, 59 REGIONAL SCI. & URBAN ECON. 24 (2016).

[96] *See id.* at 19.

[97] *See* Alexandre C. Nicolella & Walter Belluzzo, *The effect of reducing the pre-harvest burning of sugar cane on respiratory health in Brazil*, 20 ENV'T & DEVELOPMENT ECON. 127, 138 (2015).

[98] *Id.* at 136.

sugarcane burning, and pneumonia-related emergency department visits—specifically, a 6% increase in such visits for two days following a TSP increase.[99]

- A 2013 study found sugarcane burning to be linked to increased genotoxicity among field workers in the Barretos region of São Paulo state.[100]

- A 2010 study found that, for the period between March 2003 and July 2004, hypertension-related admissions to the hospital in Araraquara, São Paulo were 53% higher during the sugarcane burning period than during the non-burning period.[101] Based on this result, the authors hypothesize that "short term fluctuations in ambient TSP pollution generated from sugar cane burning may increase the incidence of hypertensive episodes, thereby increasing the number of hospital admissions."[102]

- A 2009 study found that, in Brazilian municipalities with more than 50% of their area dedicated to sugarcane, 15% and 12% of cases of respiratory morbidity in the elderly and children, respectively, were attributable to fires associated with sugarcane

---

[99] Marco Abdo Arbex et al., *The effect of air pollution on pneumonia-related emergency department visits in a region of extensive sugar cane plantations: a 30-month time-series study*, 68 J. OF EPIDEMIOLOGY & COMMUNITY HEALTH 669 (2014).

[100] Henrique César Santejo Silveira et al., *Emissions Generated By Sugarcane Burning Promote Genotoxicity in Rural Workers: A Case Study in Barretos, Brazil*, 12 ENVTL. HEALTH 87 (2013).  Specifically, the study used a method known as micronucleus assessment, which is a test of genotoxic events (i.e., events likely to damage genetic information and cause cell mutation) and manifestations of chromosomal instability that are frequently observed in diseases like cancer—and can thus evaluate the potential risk of disease in exposed populations.

[101] Marcos Abdo Arbex et al., *Impact of outdoor biomass air pollution on hypertension hospital admission*, 64 J. OF EPIDEMIOLOGY & COMMUNITY HEALTH 573 (2010).

[102] *Id.* at 576.

burning, and that in total 38% of respiratory cases in children could be attributed to current or chronic exposure to fire:[103]



Figure 41: Estimated hospital respiratory admissions in São Paulo (state) directly attributable to fires by municipality for elderly and children (units = number of cases per 10,000 individuals)

- A 2008 review of the then-existent literature by researchers in Brazil concludes that studies from around the world "indicate health risks in adverse atmospheric

---

[103] María Uriarte et al., *Expansion of sugarcane production in São Paulo, Brazil: Implications for fire occurrence and respiratory health*, 132 Agric., Ecosystems, & Env't 48 (2009).

010867-11/1337062 V1

conditions caused by sugarcane straw burning," with these risks "higher among children, elderly people and asthmatics."[104]

- A 2007 study found that, for the period between March 2003 and July 2004, asthma related admissions to the hospital in Araraquara, São Paulo were 50% higher during the sugarcane burning period than during the non-burning period.[105]  The authors found that there was a statistically significant association between these hospital admissions and TSP concentrations, that this effect was acute, and that it remained for almost a week following an increase in TSP concentrations: specifically, that an increase of ten micrograms per cubic meter of air in the 5-day moving average of TSP concentrations was associated with an increase of 11.6% in asthma hospital admissions.[106]

- A 2006 study of burn emissions in Piracicaba, a city in São Paulo state, found that increases of $PM_{10}$ and $PM_{2.5}$ were associated with increases of 12.4% and 31.03% increases in child and elderly hospital admissions, respectively, and that factor 1 emissions (i.e., emissions from biomass burning) were most associated with respiratory hospital admissions.[107]

- A 2000 study of found that, for the period between June 1 and August 31, 1995, in Araraquara, Brazil, there was a significant association between the amount of airborne smoke particles detected and the number of patients who presented to medical offices or clinics in need of inhalation therapy for acute respiratory distress.[108]

**United States**

- A 2015 study conducted in Maui found an association between sugarcane burning and acute respiratory illness events (defined as hospital/emergency department visits). Specifically, the authors found a clear dose-response relationship between sugarcane burning and respiratory illness: on the highest quartile burn days (by acres burned/day), there was "a statistically significant higher proportion of cases

---

[104] Helena Ribeiro, *Sugar Cane Burning in Brazil: Respiratory Health Effects*, 42 REVISTA DE SAÚDE PÚBLICA 370 (2008).

[105] Marcos Abdo Arbex et al., *Air pollution from biomass burning and asthma hospital admissions in a sugar cane plantation area in Brazil*, 61 J. OF EPIDEMIOLOGY AND COMMUNITY HEALTH 395 (2007).

[106] *Id.* at 398.

[107] Cançado et al., *supra* note 45.

[108] Marcos A. Arbex, *Assessment of the Effects of Sugar Cane Plantation Burning on Daily Counts of Inhalation Therapy*, 50 J. OF THE AIR & WASTE MGMT. ASS'N 1745 (2000).

corresponding to [a] 2.4 fold increase in the expected number of cases and a dose-response effect by quantity of acreage burned."[109]

- A 2002 study in Louisiana found an increase in the number of asthma attacks during the sugarcane burning season, as well as a 50% increase in hospital admissions for respiratory problems.[110] According to the study's authors, the months with the highest number of hospitalizations were October and December (33.06% of all hospitalizations), thus indicating an increase in asthma-related hospitalization during the months where pre-harvest burning were conducted.

### India

- A 1999 study of workers employed on sugar cane farms in India found that those whose work involved the "burning of the farm after harvesting" were at increased risk of developing lung cancer.[111]

177. Consistent with these studies, according to the EPA's Environmental Justice screening and mapping tool, Moore Haven, Clewiston, Belle Glade, and Pahokee rank in the 70–100th percentile national on the EPA's cancer risk and respiratory hazard index metrics as compared to the other EPA region, state, and national census block groups.

---

[109] Christina Mnatzaganian, et al., *Association between sugar cane burning and acute respiratory illness on the island of Maui*, 14 ENVTL. HEALTH 81 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4596502/. In 2016, sugarcane farming came to an end in Hawaii when the state's last sugar company closed as a result of drought, increased competition, and legal challenges that sought to end, among other things, the practice of pre-harvest burning. *See* Julie St. Louis, *Maui Says Aloha to Island's Last Sugar Cane Producer*, COURTHOUSE NEWS SERVICE (Dec. 16, 2016), https://www.courthousenews.com/maui-says-aloha-to-islands-last-sugar-cane-producer/.

[110] Ramaraj Boopathy et al., *Sugar Cane (Saccharum officinarum L) Burning and Asthma in Southeast Louisiana, USA*, 68 BULL. ENVTL. CONTAMINATION & TOXICOLOGY 173 (2001).

[111] Devendra K Amre et al., *Case-control study of lung cancer among sugar cane farmers in India*, 56 OCCUPATIONAL & ENVTL. MED. 548 (1999).



Figure 42: NATA cancer risk in the Glades region (by national percentile)



Figure 43: NATA respiratory hazard index in the Glades region (by national percentile)

- 98 -

178.    And consistent both with Rangel and Vogl's findings, *supra* note 92, and other existing research regarding the health effects of PM$_{2.5}$, *supra* ¶ 132(a) & note 46, data collected between 2010 and 2012 indicates that children born in Belle Glade fared worse than children in Palm Beach County on all birth indicators.  Specifically, in 2010, 13% of infants were low birth weight (compared with 9% in Palm Beach County), 19% of infants were born pre-term (compared with 14% in Palm Beach County), 34% of births were high risk (compared with 15% in Palm Beach County), and 14.4 infants died for every 1,000 live births (compared with 5.5 in Palm Beach County).[112]



Figure 44: Belle Glade infant health metrics (comparison with Palm Beach County)

---

[112] *Neighborhood Profile: Belle Glade*, Bridges at Belle Glade, available at https://www.bridgesofpbc.org/wp-content/uploads/2016/06/NeighborhoodProfile_Belle-Glade-06.pdf (last visited June 4, 2020).

010867-11/1337062 V1

**(1)      Defendants' burning puts residents of the Hazard Zone at significantly increased risk of developing lung cancer.**

179.     As noted above, among the most robust findings in recent public health research is the correlation between air pollution—and $PM_{2.5}$ in particular—and a wide range of negative health outcomes.  As noted above, *see supra* note 37, the Independent Particulate Matter Review Panel, a group of 20 independent experts on particulate matter pollution and health that previously existed to advise the EPA in its review of the National Ambient Air Quality Standards ("NAAQS"), has recently "unequivocally and unanimously concluded," on the basis of more recent evidence concerning the "numerous adverse health outcomes" associated with $PM_{2.5}$ exposure and "in the interests of environmental justice," "that the current $PM_{2.5}$ standards do not adequately protect public health" and that the 24 hour standard should be revised downwards to between 30 and 25 $\mu g/m^3$.  According to both the IARC and the World Health Organization ("WHO"), particulates are a Group 1 carcinogen, meaning that there is sufficient evidence of particulates' carcinogenicity in humans.

180.     Among these negative outcomes is lung cancer.  Specifically, in 2013, the WHO's specialized cancer agency, the IARC, concluded from a review of then-existing studies and data that (1) "[t]here is sufficient evidence in humans for the carcinogenicity of outdoor air pollution," and that "air pollution causes cancer of the lung"; and (2) that "[t]here is sufficient evidence in humans for the carcinogenicity of particulate matter in outdoor air pollution," and that "[p]articulate matter in outdoor air pollution causes cancer of the lung."[113]  According to the

---

[113] *See* IARC, *Outdoor Air Pollution*, *supra* note 44, at 443.

World Health Organization, the IARC's classification "provides indisputable evidence that air pollution is carcinogenic."[114]

181.    The IARC concludes in its "overall evaluation:"

Outdoor air pollution is carcinogenic to humans (Group 1)

Particulate matter in outdoor air pollution is carcinogenic to humans (Group 1)

The sufficient evidence in humans and experimental animals was also strongly supported by the multiplicity of documented genetic and related effects in humans and experimental systems.  This strong mechanistic evidence indicated that outdoor air pollution worldwide is mutagenic and is carcinogenic to humans via genotoxicity.  Human exposures to outdoor air pollution or particulate matter in polluted outdoor air are associated with increases in genetic damage that have been shown to be predictive of cancer in humans.  Moreover, exposure to outdoor air pollution can promote cancer progression via oxidative stress, responses to oxidative stress, and sustained inflammation.[115]

182.    Consistent with this, other studies have found a dose-response relationship between higher levels of $PM_{2.5}$ and lung cancer incidence:

- Using risk factor data for approximately 500,000 adults, together with air pollution data for metropolitan areas throughout the United States, a 2002 study in the New England Journal of Medicine found that each 10-$\mu$g/m$^3$ long-term elevation in $PM_{2.5}$ was associated with an 8% increase in lung cancer mortality.[116]

- A 2013 study involving 312,944 people across nine countries in Europe found that, for each 5 $\mu$g/m$^3$ increase in $PM_{2.5}$, participants' risk of developing lung cancer rose by 18%.[117]

---

[114] World Health Organization, *Outdoor air pollution a leading environmental cause of cancer deaths* (Dec. 17, 2013), https://www.euro.who.int/en/health-topics/environment-and-health/urban-health/news/news/2013/10/outdoor-air-pollution-a-leading-environmental-cause-of-cancer-deaths.

[115] *See* IARC, *Outdoor Air Pollution*, *supra* note 44, at 443–44.

[116] Pope, *supra* note 41.

[117] Ole Raaschou-Nielsen et al., *Air pollution and lung cancer incidence in 17 European cohorts: prospective analyses from the European Study of Cohorts for Air Pollution Effects (ESCAPE)*, 14 THE LANCET ONCOLOGY 813 (2013).

- A 2014 meta-analysis of 18 studies found that, for each 10 μg/m³ increase in $PM_{2.5}$, participants' risk of developing lung cancer rose by 9%.[118]

- A 2017 meta-analysis of 17 studies found that, for each 10 μg/m³ increase in $PM_{2.5}$, participants' risk of developing lung cancer rose by 8%.[119]

183.     Furthermore, according to the World Health Organization, studies of large populations have been "unable to identify a threshold concentration below which ambient PM has no effect on health: a no effect level."[120]

184.     As discussed above, Plaintiffs' preliminary modeling demonstrates that, as a result of Defendants' burning, (i) many residents of the Hazard Zone have been exposed to $PM_{2.5}$ well in excess of the NAAQS, and (ii) that all residents of the Hazard Zone have been exposed, at a minimum, to increased levels of $PM_{2.5}$, as well as to a toxic soup of other known or suspected carcinogens.  As a result, they are at significantly increased risk of developing lung cancer.

**E.     Defendants refuse to embrace a healthy and cost-effective alternative to sugarcane burning that has been demonstrated to work in Florida**

185.     As explained above, Defendants are the beneficiaries of a corporate welfare system that has for decades effectively guaranteed them at least tens, and likely hundreds, of millions of dollars of additional profit each year at the expense of U.S. consumers, *see supra* ¶¶ 110–13.

---

[118] Ghassan B. Hamra et al., *Outdoor Particulate Matter Exposure and Lung Cancer: A Systematic Review and Meta-Analysis*, 122 ENVTL. HEALTH PERSPECTIVES 906 (2014).

[119] FeiFei Huang et al., *Relationship between exposure to PM2.5 and lung cancer incidence and mortality: A meta-analysis*, 8 ONCOTARGET 43322 (2017).

[120] World Health Organization, *Particulate matter air pollution: how it harms health*, Fact Sheet EURO/04/05 at 3 (Apr 14, 2005).

186.    But meanwhile, many sugar producers elsewhere in the world—who, unlike Defendants, are subject to the crucible of market competition—have largely abandoned pre-harvest burning, and instead use a method known as green harvesting.[121]  This method involves leaving the "trash" as a blanket in cane fields, and has been shown to increase soil health, reduce dependence on herbicides, improve fertility and, ultimately, increase net profits and crop yields over time.[122]  Indeed, it is pressure to lower costs in farming, harvesting, and milling that has driven farmers in other parts of the world to adopt this more modern sugarcane growing method.

187.    As far back as 1991, agronomist Andrew Wood, Ph.D., one of the world's foremost experts on sugarcane harvesting, detailed trials conducted in Australia in the 1980s that proved to sugarcane farmers that leaving the biomass "trash" leaves as a mulch on the field floor, instead of burning them, improved cane yields, increased sugar content, and resulted in a progressive increase in soil organic matter over time.[123]  According to Dr. Wood, green harvesting ultimately results in a larger net profit for sugarcane growers, and carries with it a wide range of additional benefits, including:

---

[121] Nor is this the first time that Florida's sugar industry has fought tooth and nail to resist changes long adopted by sugarcane producers in other regions and countries.  In the 1990s, for instance, Florida's sugarcane growers finally shifted to mechanical harvesting after years of litigation related to their reliance on imported manual labor from the Caribbean.  *See* Marie Brenner, *In the Kingdom of Big Sugar*, VANITY FAIR (Feb. 2001), https://www.vanityfair.com/news/2001/02/floridas-fanjuls-200102; *see also* John Mulliken, *Relying on Machines, Not Men, Unlike in Florida, Louisiana Sugar Growers Since the 1940s Have Relied on Mechanical Harvesters, Not Imported Manpower, to Cut their Cane*, SUN SENTINEL (Dec. 2, 1986), https://www.sun-sentinel.com/news/fl-xpm-1986-12-02-8603140414-story.html.

[122] *See* Andrew Wood, *Time for a Transition from Pre-Harvest Burning of Sugarcane to Green Cane Harvesting in the Everglades Agricultural Area* (2015), available at https://drive.google.com/file/d/0B50HBF5vaoScTDdPdTNpeG1TWE0/view (last visited May 31, 2020).

[123] *See* Andrew Wood, *Management of crop residues following green harvesting of sugarcane in north Queensland*, 20 SOIL AND TILLAGE RESEARCH 69 (1991).

- 103 -

- reduced weed germination and growth;
- lower herbicide costs;
- reduced cultivation ("discing");
- reduced need for implements and tractors;
- reduced fuel use for cultivation;
- lower labor costs (due to substantially reduced time necessary to work in fields);
- reduced soil moisture losses;
- less frequent irrigation;
- reduced costs of water and pumping;
- reduced soil loss by erosion;
- increased soil fertility;
- reduced oxidation of muck soil;
- increased return of organic matter to the soil;
- recycling of nutrients;
- increased soil nutrient storage capacity;
- improved soil biological activity;
- increased earthworm populations;
- improved soil structure;
- reduced range of soil temperature (lower maximums and higher minimums);
- reduced air pollution;
- increased sequestration of carbon;
- reduced carbon dioxide emissions;
- fewer mill stoppages for wet weather;
- fresher cane with a higher sugar content;
- reduced rate of cane deterioration;
- reduced processing difficulties with stale cane; and
- increased fuel for electricity generation.[124]

---

[124] *See* Wood, *Time for a Transition from Pre-Harvest Burning*, *supra* note 122, at 6.

010867-11/1337062 V1

188.    In the past several decades, green harvesting has increasingly become the global standard.  This method has effectively displaced pre-harvest burning in several major sugar producing countries, and continues to take hold worldwide.  For example:

- In Brazil, the largest sugarcane producer in the world, pre-harvest burning has been largely abolished and replaced with green harvesting.  In 2007, Brazilian sugarcane mills in São Paulo, Brazil's main sugarcane-producing state, agreed to stop the practice of burning sugarcane fields by 2017.[125]  By state law, pre-harvest burning will become illegal in most parts of São Paulo in 2021.  A recent study concludes that this shift has been a "win-win strategy because of its benefits involving agronomic and environmental aspects[.]"[126]

- Australia recognized the problems associated with sugarcane burning in 1982, and eliminated over 60% of its pre-harvest burning by 1995.  Today, over 85% of Australia's sugarcane crop is harvested green.[127]

- In April 2019, Thailand's Ministry of Industry announced a plan to end sugarcane burning over the next three years due to concerns with the smog and pollution generated by burning in many areas.[128]  Thailand is the fourth largest sugarcane producer in the world.

- Sugar cane burning is also being phased out in Argentina and South Africa.  And nearly fifteen years ago, in 2006, it was reported that approximately 65% of the sugarcane crop in Louisiana—the country's second-largest sugarcane producer—was harvested green.[129]

---

[125] *Brazil sugarcane mills agree to end burning by '17*, REUTERS (Oct. 22, 2007), https://www.reuters.com/article/environment-brazil-cane-harvest-dc/brazil-sugarcane-mills-agree-to-end-burning-by-17-idUSN2245768620071022.

[126] Ricardo de Oliveira Bordonal et al., *Sustainability of sugarcane production in Brazil. A review*, AGRONOMY FOR SUSTAINABLE DEVELOPMENT (2018), available at https://link.springer.com/article/10.1007/s13593-018-0490-x.

[127] Queensland Farmers' Federation, *Sugar cane facts*, https://www.qff.org.au/farming-in-qld/cane/ (last visited May 31, 2020).

[128] *Industry Ministry plans end to sugarcane burning in three years*, THAI PBS WORLD (Apr. 8, 2019), https://www.thaipbsworld.com/industry-ministry-plans-end-to-sugarcane-burning-in-three-years/.

[129] *See* Susan Salisbury, *Study may clear sugar harvest haze*, PALM BEACH POST (Sept. 14, 2006), available at http://www.sweetbeet.com/growernet/news_events/Articles/2006/091406_c.htm.

189.     Defendants have publicly protested that green harvesting would not work in Florida's unique soil, and have so far resisted widespread change—in fact, when Dr. Wood was invited, in 2001, to give a seminar on green harvesting in Belle Glade, the seminar was cancelled because of pressure exerted by Defendants on the event organizer.[130]

190.     But experiments led by researchers at the University of Florida's Institute of Food and Agricultural Sciences have found that, were green harvesting adopted in Florida, farmers would produce roughly as many tons of sugar as in cane fields that have been burned.[131] Specifically, following a recent three-year trial conducted in Belle Glade, these researchers concluded that "no significant effect of harvest system [i.e., pre-harvest burning vs. green harvesting] was observed in final yields in Florida," and that "the effect of green cane harvest on sugarcane yields in Florida and Costa Rica was neutral compared to burnt cane harvest."[132]  Dr. Wood has also studied Florida's sugarcane industry and concluded that green harvesting would result in higher profits for the industry, despite Florida's purportedly unique soil.[133]

191.     Nor would Defendants need to make equipment changes in order to switch to green harvesting.  According to Dr. Wood, the same mechanical harvesters Defendants now use to harvest their crop following a burn can be used during a green harvest by slowing harvester speed and reducing the speed of extractor fans.[134]

---

[130] Wood, *Time for a Transition from Pre-Harvest Burning*, *supra* note 122, at 2.

[131] *See* Sandhu et al., *supra* note 14, at 259.

[132] *Id.* at 259.

[133] Wood, *Time for a Transition from Pre-Harvest Burning*, *supra* note 122, at 7.

[134] *Id.* at 4.

010867-11/1337062 V1

192.     Indeed, the adoption of green harvesting could offer Florida's sugarcane industry a crucial lifeline, as the future of sugarcane growing throughout Glades is currently threatened by deteriorating soil conditions resulting in part from decades of burning.  According to Dr. Wood,

> Agriculture as currently practised in the Everglades Agricultural Area has a limited future due to the continued oxidation of the peaty soils and their destruction by burning.  Extensive land subsidence has already occurred on the muck soils and this is likely to continue rapidly whilst crops like sugarcane are burnt and little organic matter is returned to the soil.  A system of sugarcane production where the soil is always covered with a thick trash blanket would be much more sustainable, and easy to achieve because the harvesters already in use can be used in green cane harvesting without any modifications.  This system would be equally applicable to sugar production on the very sandy soils outside the muck area.  A trash blanket would greatly reduce irrigation needs and would return much needed organic matter to the soil.[135]

193.     Furthermore, Defendants' insistence that green harvesting is infeasible in Florida is belied by their conduct.  In a 2006 interview, for instance, Barbara Miedema, a then-spokeswoman for Defendant SCGC, stated that the company had been green harvesting a portion of its fields for years, particularly on days when a burn permit could not be obtained but the company wished to keep to its harvesting schedule.[136]  And according to recent reporting in Bloomberg, Defendant U.S. Sugar today green harvests its sugarcane fields adjacent to a Walmart in Clewiston to avoid bothering customers.[137]

194.     For the reasons set forth in detail in this complaint, there is no reason that the same basic courtesy should not be extended to all residents of the Hazard Zone.

---

[135] *Id.* at 7.

[136] Salisbury, *Study may clear sugar harvest haze*, *supra* note 129.

[137] *See* Paul Tullis, *The Burning Problem of America's Sugar Cane Growers*, Bᴌᴏᴏᴍʙᴇʀɢ (Mar. 28, 2020), https://www.bloomberg.com/news/features/2020-03-28/america-s-sugar-cane-growers-have-a-burning-problem.

## V.    CLASS ACTION ALLEGATIONS

195.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

196.    Named Plaintiffs Armstrong, Atkins, Brooks, Coffie, Jones, Mclean, Reimbold, Smith, and Wilcher ("Property Owner Plaintiffs") bring this action, Counts I–III, as a class action pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3) and/or 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and those similarly situated, against all Defendants.  Property Owner Plaintiffs seek certification of a class (the "Property Owner Class") defined as follows:

> All persons and legal entities (past or present) who own or have owned real property located within the Hazard Zone during the applicable statute of limitations period, including the period following the filing date of this action.

197.    Named Plaintiffs Armstrong, Atkins, Brooks, Jones, Legrand, and Wilcher ("Medical Monitoring Plaintiffs") bring this action, Count IV, pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3) and/or 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and all others similarly situated, against all Defendants.  Medical Monitoring Plaintiffs seek certification of a class (the "Medical Monitoring Class") defined as follows:

> All persons (past or present) over the age of 40, or who will attain the age of 40, who have resided in the Hazard Zone for at least one pre-harvest sugarcane burn season during the applicable statute of limitations period, including the period following the filing date of this action.

198.    All Named Plaintiffs ("Battery Plaintiffs") bring this action, Count V, pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3) and/or 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and all others similarly situated, against all Defendants.  Battery Plaintiffs seek certification of a class (the "Battery Class") defined as follows:

> All persons (past or present) who have resided or currently reside in the Hazard Zone during the applicable statute of limitations period, including the period following the filing date of this action.

010867-11/1337062 V1

199.    Excluded from these Classes are the following: (1) the Defendants, and any parent, subsidiary or affiliate organizations, and the officers, directors, agents, servants, or employees of same, and the spouse and minor children of any such person; (2) all persons and entities who timely opt out of this proceeding; (3) all persons who have given valid releases releasing Defendants from the claims asserted in this Complaint; (4) governmental entities; (5) all persons who, prior to the filing of this Complaint, have filed a non-class action claim against any Defendant for the claims asserted in this Amended Complaint; and (6) the judge to whom this case is assigned, his employees and clerks, and immediate family members.

200.    The Classes are so numerous such that joinder of claims is impracticable.  The population of the Hazard Zone is approximately 47,000 people, a substantial majority of whom have been affected by Defendants' wrongful conduct.

201.    There are numerous questions of law and fact common to the Classes that predominate over any questions affecting only individual members of the Classes.  Among these common questions of law and fact are the following:

a.    The scope of Defendants' sugarcane burning activities;

b.    Whether Defendants' sugarcane burning activities were negligent and/or reckless;

c.    Whether Defendants' sugarcane burning activities violates the laws as set forth in the causes of action;

d.    What pollutants are produced by Defendants' sugarcane burning activities;

e.    Whether those pollutants are hazardous to human health;

f.    Whether, and to what extent, Defendants' sugarcane burning activities have deposited byproducts of that burning onto Class members' properties;

g.    The impact of Defendants' sugarcane burning activities on properties in the Hazard Zone, including whether and to what extent pollutants from Defendants' burns have migrated onto Class members' properties;

h.    Whether Defendants' sugarcane burning activities have damaged Class members;

i.    Whether Defendants are strictly liable for Class members' exposure to Defendants' the byproducts of Defendants' sugarcane burning, and any detrimental effect Defendants' burning had on Class members' properties;

j.    Whether, and to what extent, Defendants' sugarcane burning activities are a hazard to the health of the population of the Hazard Zone;

k.    Whether and to what extent Class members have been exposed to particulate matter, hazardous pollutants and/or pesticides generated by Defendants' sugarcane burning;

l.    Whether Defendants were negligent in the application of pesticides;

m.    Whether Defendants' sugarcane burning activities have exposed Class members to greater than normal background levels of hazardous substances;

n.    Whether, as a result of such exposure, Class members are at significantly increased risks, as compared to the general population, of contracting serious latent diseases, including lung cancer;

o.    Whether medical monitoring procedures exist for the early detection of lung cancer, and whether such procedures are warranted for the Class members;

p.    Whether Defendants' acts and omissions have entitled the Class members to the relief requested in this Complaint;

q.    Whether Defendants' conduct constituted a battery against Class members; and

r.    Whether Defendants' conduct constituted a takings for which Class members are entitled to just compensation.

202.    The claims of the Named Plaintiffs are typical of the claims of each member of

the three Classes in that:

a.    The Named Plaintiffs' claims arise from the same course of conduct of Defendants giving rise to the claims of other Class members;

b.    The claims of the Named Plaintiffs and each member of the Classes are based upon the same legal theories;

c.    The Named Plaintiffs and each member of the Classes have an interest in prevailing on the same legal claims;

d.      The types of damages incurred by the Named Plaintiffs are similar to those incurred by the other Class members;

e.      The defenses asserted by Defendants will be similar, if not identical, as to all Named Plaintiffs and Class members.

203.    Named Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the members of the Classes they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and they intend to prosecute this action vigorously.  The interests of the Classes will be fairly and adequately protected by Named Plaintiffs and their counsel.

204.    The undersigned are competent counsel experienced in class action litigation, mass torts, and complex litigation involving such widespread harm.  Counsel will fairly and adequately protect the interests of the Classes

205.    The various claims asserted in this action are certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) because prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Classes; or adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of the other Class members who are not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

206.    The claims for injunctive relief in this case are certifiable under Fed. R. Civ. P. 23(b)(2).  Defendants have acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief and/or declaratory relief is appropriate respecting the Classes as a whole.

- 111 -

207.     Plaintiffs' legal claims are properly certified pursuant to Rule 23(b)(3) in that: (1) a class action is superior in this case to other methods of dispute resolution; (2) the Class members have an interest in class adjudication rather than individual adjudication because of their overlapping rights; (3) it is desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class members would protect their rights on their own without this class action case; (4) the disparity between the resources of Defendants and Class members would make prosecution of individual actions a financial hardship on Class members; (5) the prosecution of separate actions by individual Class members, or the individual joinder of all Class members is impractical and would create a significant and unnecessary burden on the Court's resources; and (6) management of the class will be efficient and far superior to the management of individual lawsuits.  Moreover, currently, undersigned counsel are unaware of any other pending litigation regarding this controversy with respect to the tort claims and medical monitoring claims.

208.     The issues particularly common to the Class members' claims, some of which are identified above, are alternatively certifiable pursuant to Fed. R. Civ. P. 23(c)(4), as resolution of these issues would materially advance the litigation, and class resolution of these issues is superior to repeated litigation of these issues in separate trials.

## VI.     CAUSES OF ACTION

### COUNT I – NEGLIGENCE
### (PROPERTY OWNER CLASS; AGAINST ALL DEFENDANTS)

209.     Property Owner Plaintiffs, individually and on behalf of the Property Owner Class, incorporate the foregoing paragraphs as though set forth at length here.

210.     Defendants owed a duty to Property Owner Plaintiffs and the Property Owner Class members to exercise reasonable care in their sugarcane harvesting processes to avoid

exposing Named Plaintiffs and Class members and their properties to the toxic and damaging "black snow" of pollutants, particulate matter, and pesticides that results from pre-harvest burning.

211.    Defendants breached their duty by failing to avoid the release and spread of the toxic and damaging "black snow" of pollutants and pesticides from Defendants' properties; by failing to adequately train and supervise their employees and agents with regard to proper procedures to prevent the release and spread of the toxic and damaging "black snow" of pollutants and pesticides from Defendants' properties; by failing to adequately warn of the nature of the toxic and damaging "black snow" of pollutants and pesticides; and by otherwise failing to exercise reasonable care in the operation of their sugarcane cultivation businesses to prevent to prevent the release and spread of the toxic and damaging "black snow" of pollutants and pesticides from Defendants' properties onto the properties of Property Owner Plaintiffs and Property Owner Class members.

212.    Defendants exercised exclusive control over their operations and the handling, storage, and disposal of contaminants and other hazardous materials produced by their burning processes.  In the normal course of events, contaminants would not escape from Defendants' property if Defendants had used reasonable care.

213.    Defendants knew or should have known that their conduct could, would, and does cause Property Owner Plaintiffs and Property Owner Class members to suffer harm and damages.

214.    As a direct and proximate cause of Defendants' acts and/or omissions, Property Owner Plaintiffs and Property Owner Class members have been harmed and have incurred

damages, economic harms, and losses associated with their properties being subjected to emissions from Defendants' burning.

## COUNT II – STRICT LIABILITY PURSUANT TO FLA. STA. § 376.313
## (PROPERTY OWNER CLASS; AGAINST ALL DEFENDANTS)

215.    Property Owner Plaintiffs, individually and on behalf of the Property Owner Class, incorporate the foregoing paragraphs as though set forth at length here.

216.    Pursuant to Fla. Stat. § 376.313, Defendants are strictly liable for the damages caused by their sugarcane burning activities as described herein.

217.    Furthermore, to the extent that any Defendant managed, directed, or conducted any of its subsidiaries', agents', and/or entities' operations specifically related to sugarcane burning—including their decisions regarding what, where, when, and/or whether to burn—it is liable for the acts of those subsidiaries pursuant to Fla. Stat. § 376.308 and § 376.301(27). *United States v. Bestfoods*, 524 U.S. 51, 67 (1998); *State Dep't of Envtl. Prot. v. Allied Scrap Processors, Inc.*, 724 So. 2d 151, 152 (Fla. 1st DCA 1998) (holding that "the language of the operative liability provisions in the [Water Quality Assurance Act of 1983[138]] closely mirrors comparable provisions in [CERCLA]," and that "state courts should give the Florida legislation the same construction as the federal courts give the federal legislation").

218.    The pollutants, pesticides, fungicides and contaminants that are contained in the particulate matter and "black snow" are a prohibited discharge under § 376.313.  These discharges contain numerous "pollutants" and "hazardous substances" as defined by Florida law, including (but not limited to): acenaphthene, acenaphthylene, anthracene, benzo[*a*]anthracene, benzo[*b*]flouranthene, benzo[*k*]flouranthene, benzo[a]pyrene, benzol[*ghi*]perylene, chrysene,

---

[138]  The Water Quality Assurance Act was passed in 1983 and is currently codified at sections 376.30–376.317 of the Florida Statutes.

fluoranthene, flourene, indeno[[1,2,3-*cd*]pyrene, naphthalene, phenanthrene, pyrene, ethylbenzene, o,m,p-xylene, styrene, toluene, acetaldehyde; formaldehyde, propionaldehyde, nitrogen oxide, and ammonia.  *See* Fla. Stat. §§ 376.301(13), (21), (37); 40 C.F.R. § 302.4 (listing all hazardous substance currently recognized under CERCLA).[139]

219.    Defendants' pre-harvest burning has occurred and continues to occur during each burning season, causing the prohibited discharge of pollutants, particulate matter, and "black snow" to migrate onto Property Owner Plaintiffs' and Property Owner Class members' properties.

220.    The prohibited discharge of these pollutants, particulate matter, and "black snow" has harmed and damaged Property Owner Plaintiffs' and Property Owner Class members' properties.

221.    Pursuant to § 376.313 and referenced sections, Property Owner Plaintiffs and Property Owner Class members are entitled to compensation for the harm to their properties, clean-up and remediation, and the costs of litigation (including reasonable attorneys' fees and expert fees), as it is a matter of public interest.

222.    Property Owner Plaintiffs' and Property Owner Class members' injuries and threatened injuries are indivisible injuries caused by Defendants' recurring discharges and deposits of pollutants, particulate matter, and "black snow" on Plaintiffs' and Class members' properties.

---

[139] As noted above, *see supra* note 34, and as recognized by this Court in its May 8, 2020 order, the WQAA defines "hazardous substances" to include those substances that are defined as hazardous substances under the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980.

223.     Pursuant to § 376.308(4), Defendants are jointly and severally liable for damages to Property Owner Plaintiffs and Property Owner Class members.

### COUNT III – 42 U.S.C. § 1983
### (PROPERTY OWNER CLASS; AGAINST ALL DEFENDANTS)

224.     Property Owner Plaintiffs, individually and on behalf of the Property Owner Class, incorporate the foregoing paragraphs as though set forth at length here.

225.     The Florida Forest Service (FFS) strictly regulates Defendants' pre-harvest burning.  Before Defendants' may engage in pre-harvest burning, they must apply to the FFS and the FFS must grant them a permit, authorizing the specific location, timing, and terms of the requested burn event.  *See* Fla. Stat. § 590.125(3); Fla. Admin. Code § 5I.2.006(2).  The permit applicant must provide the FFS the details of the proposed burn, including a site description, desired weather factors, desired fire behavior factors, and an evaluation of the anticipated impacts on smoke sensitive areas.  Fla. Admin. Code § 5I.2.006(2)(a).  The FFS also plots the burn on a map and generates a smoke plume to evaluate the expected results.  If conditions are not appropriate, the FFS will deny the Defendants burn permits, forcing them to use other harvesting methods.

226.     FFS approval of the burn event depends on wind conditions.  Current state regulations deny burn permits to sugarcane growers if the FFS projects that the winds will blow smoke and ash plumes toward the more affluent Eastern Palm Beach County and Eastern Martin County communities near the coast.  But the FFS regularly grants permits for burn events—as many as 60 burn permits a day—when the prevailing winds blow smoke and ash plumes toward the Hazard Zone.

227.     Property Owner Plaintiffs and Property Owner Class members own homes and real property within the Hazard Zone.

228.     The FFS-permitted burn events not only cause toxic "black snow," but equally insidious, invisible, and pollutant-laden particulate matter toxins to physically invade Class members' properties and interfere with Class members' use of their properties.

229.     This physical invasion of Property Owner Plaintiffs and Property Owner Class members' homes authorized by the FFS is a takings for which they are entitled to just compensation.  Property Owner Plaintiffs and Property Owner Class members have not consented to the toxic invasion of their properties, nor have they received compensation for the damage it causes their homes.

230.     Defendants acted under color of law and jointly engaged with state officials in conduct that caused the deprivation of Property Owner Plaintiffs and Property Owner Class members' rights secured by the Constitution.

231.     Defendants sought the FFS' approval to burn sugarcane and the FFS specifically approved of the Defendants' burn events that caused Class members' property damage and deprived them of constitutionally guaranteed property rights.  Defendants and the FFS both acted with knowledge of the damage the permitted burn events would cause homes in the Class area.

232.     Class members are entitled to fair and just compensation for the partial taking of and damage to their properties.

233.     Compensation alone does not provide a sufficient remedy.  A taking executed solely to confer a private benefit on a particular private party is constitutionally impermissible, even if compensated.  By issuing permits to Defendants and authorizing them to physically invade and damage the homes of the Property Owner Plaintiffs and Property Owner Class members, the FFS has impermissibly conferred a private benefit on particular private parties in violation of the Takings Clause of the Fifth Amendment as incorporated by the Fourteenth

010867-11/1337062 V1

Amendment Due Process Clause.  Class members are entitled to an injunction against any further burn events.

**COUNT IV – MEDICAL MONITORING**
**(MEDICAL MONITORING CLASS; AGAINST ALL DEFENDANTS)**

234.     Medical Monitoring Plaintiffs, individually and on behalf of the Medical Monitoring Class, incorporate the foregoing paragraphs as though set forth at length here.

235.      Medical Monitoring Plaintiffs have been exposed to significant levels of confirmed carcinogenic pollutants from Defendants' burns, including (but not limited to) $PM_{2.5}$ and benzo[a]pyrene.  As detailed above, modeling demonstrates that, many residents of the Hazard Zone have been exposed to $PM_{2.5}$ well in excess of the NAAQS, and (ii) that all residents of the Hazard Zone have been exposed, at a minimum, to increased levels of $PM_{2.5}$, as well as to numerous other known or suspected carcinogens.  Furthermore, for the reasons detailed above, it is likely that this preliminary modeling understates the cumulative impact of Defendants' carcinogenic emissions on Medical Monitoring Plaintiffs and members of the Medical Monitoring Class.  These emissions vastly exceed background levels.

236.     According to the IARC, air pollution of the kind released by Defendants' burning "causes cancer of the lung."

237.     Defendants were fully aware of the danger of exposing all residents of the Hazard Zone to the carcinogenic emissions resulting from their burning of millions of acres of sugarcane.

238.     As detailed above, by negligently burning millions of acres of sugarcane in close proximity to residents of the Hazard Zone, including Medical Monitoring Plaintiffs, Defendants exposed these residents to heightened risk of numerous adverse health outcomes.

- 118 -

239.    Specifically, as a result of Defendants' negligent conduct, Medical Monitoring Plaintiffs and the Medical Monitoring Class are at a significantly increased risk of developing lung cancer.

240.    The diagnosis of lung cancer requires specialized testing and treatment that is not given to the public at large and that is different from that normally recommended in the absence of exposure to harm.  This medical monitoring regime should include, but is not limited to:

      a.   annual screening for lung cancer with low-dose computed tomography (LDCT);

      b.   annual chemistry, blood count, and urinalysis; and

      c.   annual history and physical examination by a board-certified internist.

241.    This regime will facilitate the early diagnosis and treatment of lung cancer, and facilitate other treatments and/or interventions that will prevent or mitigate the various adverse consequences of lung cancer.

242.    This monitoring regime is reasonably necessary according to contemporary scientific principles within the medical community, and according to those who specialize in the diagnosis of cancers, including lung cancer.[140]

---

[140] The U.S. Preventive Services Task Force ("USPST") has "found adequate evidence that annual screening for lung cancer with LDCT in a defined population of high-risk persons can prevent a substantial number of lung cancer–related deaths," and recommends, for example, annual screening for lung cancer with LDCT in adults aged 55 to 80 who have a 30 pack-year smoking history and currently smoke or have quit within the past 15 years.  *See* U.S. Preventive Services Task Force, *Final Recommendation Statement for Lung Cancer Screening* (Dec. 31, 2013), https://www.uspreventiveservicestaskforce.org/uspstf/recommendation/lung-cancer-screening#:~:text=Recommendation%20Summary&text=The%20USPSTF%20recommends%20annual%20screening,within%20the%20past%2015%20years..

010867-11/1337062 V1

243.     As a result of monitoring and testing, the risk that Medical Monitoring Plaintiffs and Medical Monitoring Class members will suffer long-term injuries, disease, and losses without adequate treatment will be significantly reduced.

244.     Medical Monitoring Plaintiffs seek an injunction requiring the creation of a Court-supervised medical monitoring program, funded by Defendants, that will facilitate the diagnosis of Medical Monitoring Plaintiffs and the Medical Monitoring Class for lung cancer. This program should include a trust fund to pay for the costs of monitoring and diagnosis.

245.     Accordingly, Defendants should be required to establish a medical monitoring program that includes, among other things:

    a.  Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of Medical Monitoring Plaintiffs and all members of the Medical Monitoring Class;

    b.  Notifying all members of the Medical Monitoring Class in writing that they may require frequent medical monitoring for the purposes of diagnosis; and

    c.  Providing information to treating physicians to aid them in diagnosis.

246.     Medical Monitoring Plaintiffs and members of the Medical Monitoring Class have no adequate remedy at law; monetary damages alone cannot compensate them for the risk of long term physical and economic loss resulting from the development of lung cancer.  Absent the Court-approved medical monitoring program described here, Medical Monitoring Plaintiffs and members of the Medical Monitoring Class will continue to face an unreasonable risk of injury and remain undiagnosed.

## COUNT V – BATTERY
## (BATTERY CLASS; AGAINST ALL DEFENDANTS)

247.     Battery Plaintiffs, individually and on behalf of the Battery Class, incorporate the foregoing paragraphs as though set forth at length here.

248.     Defendants' sugarcane burning has resulted in harmful and offensive contact with Battery Plaintiffs and members of the Battery Class.  Specifically, Battery Plaintiffs have been exposed without consent to carcinogens, hazardous pollutants, and particulate matter from each Defendant's sugarcane burning.  These exposures take place on a near daily basis during each harvest season—that is, for between six and eight months of each year.  Battery Plaintiffs have no way to guard against or otherwise prevent this harmful, offensive, and unwanted contact.

249.     Defendants knew or should have known that, as a result of their sugarcane burning, these carcinogens, hazardous pollutants, and particulate matter would be released, or were substantially certain to be released, into the air and impact residents of the Hazard Zone, including Battery Plaintiffs.  Therefore, Defendants' harmful and offensive contact was intentional.

250.     Battery Plaintiffs and members of the Battery Class have been harmed and injured by Defendants' harmful and offensive touching.

251.     As a foreseeable, proximate, and direct result of each Defendant's conduct, Battery Plaintiffs and members of the Battery Class have been damaged, including as otherwise set forth in this complaint, and by invasion of their bodily integrity without their consent, and harm to their human dignity and corresponding damages therefrom.  Battery Plaintiffs and members of the Battery Class have also suffered annoyance, upset, aggravation, and inconvenience.

## DEMAND FOR JURY TRIAL

Named Plaintiffs, on behalf of themselves and all others similarly situated, demand trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Armstrong, Atkins, Brooks, Coffie, Jones, Legrand, Mclean, Reimbold, Smith, and Wilcher, individually and as putative Class Representatives, demand judgment against Defendants, and pray for relief as follows:

A.      Certification of the Classes under Federal Rule of Civil Procedure 23 and appointment of Named Plaintiffs as representatives of the respective Classes and their undersigned counsel as Class counsel;

B.      An order appointing Plaintiffs Armstrong, Atkins, Brooks, Coffie, Jones, Mclean, Reimbold, Smith, and Wilcher as representatives of the Property Owner Class;

C.      An order appointing Plaintiffs Armstrong, Atkins, Brooks, Jones, Legrand, and Wilcher as representatives of the Medical Monitoring Class;

D.      An order for the injunctive relief requested herein;

E.      An order appointing all Named Plaintiffs as representatives of the Battery Class;

F.      An order requiring that Defendants pay compensatory and other damages to Plaintiffs and the Class members, for their economic and non-economic damages identified herein, to the full extent permitted by the law;

G.      An order awarding all damages allowed by governing statutes;

H.      An order requiring medical monitoring;

I.      Statutory pre-judgment and post-judgment interest on any amounts;

J.      Costs and expenses in this litigation, including, but not limited to, expert fees, filing fees, and reasonable attorneys' fees; and

010867-11/1337062 V1

K.       Such other relief as the Court may deem just and proper.

010867-11/1337062 V1

Dated:  August 26, 2020

**THE BERMAN LAW GROUP**

By: */s/ Matthew T. Moore*
Matthew T. Moore, Esq., Fla. Bar No. 70034

Primary: service@thebermanlawgroup.com
Secondary: mmoore@thebermanlawgroup.com
Zachary West, Fla. Bar No. 71134
Primary: service@thebermanlawgroup.com
Secondary: zwest@thebermanlawgroup.com
Joseph Schulz, Fla. Bar No. 660620
Primary: service@thebermanlawgroup.com
Secondary: jschulz@thebermanlawgroup.com
P.O. Box 272789
Boca Raton, FL 33427
Telephone: (561) 826-5200
Fax: (561) 826-5201

Steve W. Berman (admitted *pro hac vice*)
Ted Wojcik (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel:  (206) 623-7292
Fax:  (206) 623-0594
steve@hbsslaw.com
tedw@hbsslaw.com

*Attorneys for Plaintiffs*

010867-11/1337062 V1