UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

WILLIAM ARMSTRONG, GLORIA ATKINS,
JAMES BROOKS, CLOVER COFFIE, DEBRA
JONES, SHANTE LEGRAND, DONALD
MCLEAN, ROBERT REIMBOLD, ELIJAH
SMITH, and LINDA WELCHER, each individually
and on behalf of all others similarly situated;

Plaintiffs,

vs.

UNITED STATES SUGAR CORPORATION,
a Delaware corporation; SUGAR CANE
GROWERS COOPERATIVE OF FLORIDA,
a Florida not for profit corporation; FLORIDA
CRYSTALS CORPORATION, a Delaware
corporation; OKEELANTA CORPORATION,
a Delaware corporation; OSCEOLA FARMS CO.,
a Florida corporation; SUGARLAND HARVESTING
CO., a Florida not for profit corporation;
TRUCANE SUGAR CORPORATION,
a Florida corporation; INDEPENDENT
HARVESTING, INC., a Florida corporation; and
J & J AG PRODUCTS, INC., a Florida corporation;

Defendants
_____

Case No. 19-cv-80730-RS

CLASS ACTION

Hon. Rodney Smith

**DEFENDANTS FLORIDA CRYSTALS CORPORATION, OSCEOLA FARMS CO., OKEELANTA CORPORATION AND SUGAR CANE GROWERS COOPERATIVE OF FLORIDA'S REPLY IN SUPPORT OF MOTIONS TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

4852-0984-6218

I.   **PLAINTIFFS HAVE NOT CURED THE ARTICLE III STANDING DEFICIENCIES.**

Plaintiffs have failed to state any plausible claims and still lack Article III standing. The Second Amended Complaint (SAC) makes no attempt to trace visible or invisible ash to each or any Defendant, and Plaintiffs offer no actual air quality data showing that injurious levels of particulate matter or other constituents exist in the putative class area. The SAC should be dismissed.

A.   **Plaintiffs Fail to State a Plausible Claim.**

Instead of rebutting the actual data showing that air quality in the putative class area meets and exceeds regulatory levels designed to protect human health and the environment, Plaintiffs confess their modeling is wrong.[1] This admission alone is fatal to the SAC.

Plaintiffs' only attempt to address the startling disparity between actual data and their hypothetical, inflated, and admittedly flawed air modeling results is to summarily claim that the Florida Department of Environmental Protection ("FDEP") air quality monitoring station in Belle Glade has a "checkered operational past." Br. at 3.[2] Plaintiffs cannot, however, refute that the Belle Glade monitoring station collects valid data as part of FDEP's air monitoring network. Nor can Plaintiffs refute that their "expert" made no effort to compare their modeling results to the publicly available data collected at this monitoring station or any other FDEP/EPA approved monitoring station, or any actual data of their own, before filing their SAC and then issuing an inflammatory press release.[3]

The FDEP 2020 Annual Ambient Air Monitoring Network Plan ("FDEP Monitoring Plan") states:

> The Florida Department of Environmental Protection (DEP) has developed and maintains a comprehensive ambient air monitoring network that covers over 90 percent of the 21 million people living in Florida, the third most populous state in the United States. This network is designed to provide the public with accurate air

---

[1] Br. at 1. ("Plaintiffs' air modeling expert . . . discovered an input error. . . .").

[2] While Plaintiffs confess that the air modeling is faulty due to input errors, they wholly fail to address the fact that the modeling does not address the myriad of contributing emissions sources in addition to agriculture such, as power plants, industrial facilities, construction sites, diesel trucks and automobiles. https://www.epa.gov/pm-pollution/particulate-matter-pm-basics#PM. The failure to account for such alternative sources magnifies the disparity between Plaintiffs' modeling output and actual air monitoring data. This failure also renders the model results unreliable and implausible. *See e.g.*, *Coleman v. Union Carbide Corp.*, 2013 WL 5461855 (S.D.W.V. Sept. 30, 2013) at *38-39.

[3] ECF 145 at 3 n.4 and Ex. A.

1

>quality information, and currently meets or exceeds federal air monitoring requirements.
>
>The network is comprised of more than 190 monitors at 95 sites strategically positioned across the state. As shown in Figure 1.1, these sites are concentrated in areas of higher population density, along the coast, and near interstate highways. In addition, the Department established three rural monitoring sites as representative locations for comparison to regional background levels of pollution: one in the panhandle, one in the northern area of the peninsula, and one in the southern area of the peninsula.[4]

The FDEP Monitoring Plan includes the monitoring station at Belle Glade (*Id*. at 1, 10-11, and App. B), which is reported by FDEP as having "NO Issues." *Id*. at 35. The Belle Glade monitor operates continuously to provide information for the Air Quality Index ("AQI") concerning $PM_{2.5}$ air concentrations in and around Belle Glade.[5] Yet, Plaintiffs ignore it, because it does not align with their narrative, and instead rely on defective air *modeling*.

Given FDEP's stated goal of "provid[ing] the public with accurate air quality information," FDEP would not use the data from the Belle Glade monitoring station for the AQI if the data was not accurate. The classification of the Belle Glade monitor for AQI does not render the monitor or the data it records and produces unreliable. Just the opposite is true: the monitor remains part of the FDEP's monitoring network and is relied on by the State and EPA for assessing, determining and reporting air quality. And to that end, "Florida's air quality is among the best in the nation and as the state's air quality continues to improve, it will remain so." [ECF No. 141, Ex. A at 13].

Plaintiffs cannot sidestep the fact that their air modeling results are at odds with actual real-world data and that the entire State meets "the air quality standards for [fine particulate matter] and levels continue to decrease as they have for years." [ECF No. 141, Ex. A at 1]. That AERMOD is a generally accepted modeling technique or that it has passed *Daubert* challenges is a non-sequitur. Whether AERMOD <u>can</u> be a reliable technique is irrelevant to whether the output in this case is plausible. Regardless of whether the modeling software is generally accepted, the inputs to the model and the way in which the software is run may render the modeling results unreliable. It's a garbage in, garbage out issue.

---

[4] https://floridadep.gov/sites/default/files/Florida-Annual%20Network%20Plan%202020%20-FINAL_0.pdf at 1.

[5] The "EPA's standardized method of reporting air quality information and forecast to the public." *Id*. at 31; App. B. "The Air Quality Index (AQI) is an index for reporting daily air quality. It tells you how clean or polluted your air is, and what associated health effects might be a concern for you. The AQI focuses on health affects you may experience within a few hours or days after breathing polluted air. It takes all the monitored pollutants and relates them to a single scale value to communicate air quality." *Id*. at 31 (Glossary).

2

In *Holder, et al. v. Gold Fields Mining Corp.*, 2007 WL 188130 (N.D. Okla. 2007), the court addressed the very issue presented here. Plaintiffs' air modeler used a flawed input when running an air dispersion model that resulted in an "error" in his output being 100 times higher than it should have been. *Id*. at 1-3. Using an EPA Wind Erosion Equation, Plaintiffs' modeler attempted to predict the concentrations of lead in the air and at receptor locations using a computer model called the Industrial Source Complex Model ("ISCST3"). When entering the climatic factor which "incorporates local weather conditions, such as wind velocity, surface moisture, and evaporation rates," the modeler made an inadvertent conversion that rendered the result 100 times higher than if the error had not been made. *Id*. at 1.

The issue before the court was not whether the ISCST3 model is based on a reliable algorithm or can be a reliable methodology, but whether the flawed input rendered the results unreliable. "[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Id*. at 3; *see also Sadler v. Int'l Paper*, 2014 WL 4795167 (W.D.L.A. 2014) (excluding expert using AERMOD where the emission data used were projections made "*but were not the amounts of chemicals or substances actually released into the air.*") (emphasis added).

For these exact reasons, Plaintiffs' modeling results are also not reliable, and therefore their claims not plausible. *See Campos v. I.N.S.*, 32 F.Supp.2d 1337, 1343 (S.D. Fla. 1998) (the court need "not accept factual claims" "which run counter to facts of which the court can take judicial notice."); *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1071 (11th Cir. 2017); *Twombly*, 550 U.S. at 570 (a claim "has facial plausibility" when it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

Plaintiffs fare no better arguing Defendants failed to provide authority that that "*actual* air monitoring or other data" is necessary. Br. at 6. As a preliminary matter, it is Plaintiffs' burden to present a reliable application of its air modeling effort and allege claims that are plausible. Regardless, the Court need not look further than to Randy Horsak, who is sponsoring the Plaintiffs' modeling results. In *Coleman*, Horsak's opinions were found not to be reliable because of faulty AERMOD air modeling, and separately because of Horsak's failure to do exactly what Plaintiffs argue does not need to be done here—verify and validate with real world data.

In *Coleman*, Horsak served the same role as here. He was retained to opine on alleged class wide impacts from a facility's air emissions. *Id*. at 1, 34. Remarkably, the plausibility of Horsak's work was evaluated by the court for the same two reasons that the air modeling at issue in this case

3

4852-0984-6218

is not plausible. First, Horsak relied on an air modeler's AERMOD modeling results (coincidentally using particulate matter as a surrogate constituent for alleged air impact). *See id*. at 30, 34. Second, in an attempt to verify and validate the modeling results, and in order to provide "credible evidence," Horsak advised his lawyers of the importance of corroborating the air modeling results with actual data. *Id.* at 35. After excluding Plaintiffs' AERMOD air modeling expert, the court noted that it could have deemed Horsak's opinions inadmissible solely due to Horsak's reliance on faulty air modeling results. *Id*. at 33. Horsak was excluded on alternative grounds as well. Despite Horsak's professed importance of validating his work with real world data, the court found: "[i]t is particularly surprising that Mr. Horsak never conducted any air sampling, despite noting that ambient air should be pursued and despite that being the only exposure medium at issue in this case." *Id*. at 35.

Plaintiffs should not be able to base claims on faulty modeling efforts, especially given Plaintiffs' failure to corroborate/validate/verify their modeling and an abundance of real world actual data contradicting their hypothesis. Plaintiffs' air quality allegations are not plausible because their modeling effort is admittedly wrong. "[T]he accuracy of the model depends upon the rigor applied in the input gathering process." *Id*. at 24. In addition, the model's output bears no resemblance to the actual air quality data and conditions documented by FDEP and USEPA, and Plaintiffs present no actual data of their own. These implausible allegations cannot support a claim that Defendants are responsible for the injuries alleged. The SAC should be dismissed with prejudice.

      **B.**    **Plaintiffs Have Not Plausibly Traced Visible Ash to Each or Any Defendant and Plaintiffs Have Not Adequately Alleged the Actual Presence of Injurious Levels of Particulate Matter and Other Pollutants.**

Plaintiffs have not traced any visible ash to each or any Defendant. Plaintiffs' defective modeling of invisible ash does not trace a specific Defendant's conduct to a specific Plaintiff. Plaintiffs duck this issue and fail to provide any example where a specific Defendant is alleged to have caused harm to a specific Plaintiff. The same holds true with regard to the alleged visible ash. Plaintiffs did not attempt to model visible ash. And, any suggested inference that the defective modeling of invisible ash serves as a surrogate for visible ash is not credible to trace such visible ash from a particular Defendant to a particular Plaintiff.[6]

---

[6] Plaintiffs' arguments about joint and several liability and Fla. Stat. § 376.313 are irrelevant. First, it is Plaintiffs' burden to show that each named Plaintiff was harmed by each named Defendant—a burden they have not met. Second, at the pleading stage, it is not Defendants' burden to present evidence on divisibility of damages.

4

Plaintiffs also have failed to adequately allege the actual presence of injurious level of particulate matter. Plaintiffs argue Defendants have identified no authority requiring that actual data is necessary to plead contamination or risk of harm. This is false. As explained above, even if Plaintiffs are using a reliable method for air modeling, it is still necessary to verify and validate the air modeling with real world data—something Plaintiffs have admittedly failed to do here. Plaintiffs also ignore that Defendants cited the Eleventh Circuit's decision in *Adinolfe* for exactly this point. [ECF No. 141 at 6]. Here, Plaintiffs rely on admittedly faulty "preliminary" air models that only project concentrations of constituents from sugarcane burning. However, Plaintiffs fail to account for or even acknowledge that "FDEP has found that 'air quality across the State . . . is consistently ranked among the best in the nation with respect to . . . fine particulate matter' and that "*all areas in the State meet the air quality standards for these pollutants . . . .*"). [ECF No. 141 at 7]. Because Plaintiffs fail to allege facts sufficient to establish their standing, the SAC should be dismissed with prejudice.

## II. PLAINTIFFS INVITE THIS COURT TO CREATE GENERAL FEDERAL COMMON LAW UNDER THE GUISE OF NEGLIGENCE, SECTION 1983, AND MEDICAL MONITORING CLAIMS, WHICH SHOULD BE DISMISSED BASED ON PRIMARY JURISDICTION.

Plaintiffs take fundamentally inconsistent positions on whether they are challenging agency regulations and permits. On the one hand, Plaintiffs argue that this case presents a "simple" tort claim against private activity. In so doing, they choose to ignore the elaborate scheme of statutes, regulatory framework, and directives that attend to state permitting decisions and regulations, as well as available regulatory avenues of review. Then, in their civil rights claim, which requires a "state actor," Plaintiffs turn this position on its head and argue that the FFS, through its regulations and permits, so pervasively controls the scope, nature and timing of agricultural burning, that longstanding farming practices rise to the level of state action. Thus, Plaintiffs' theory is that FFS regulations and permits, and Defendants' compliance with those mandates, are the cause of the harm.

Plaintiffs cannot have it both ways, and, at bottom, they want this Court to create and then enforce principles of presumably *general* federal common law tort law to be followed. Plaintiffs are directly challenging the government regulations and permitting decisions on agricultural burning, and claiming that Defendants bear liability for following those rules and permits. The main focus of the SAC is that there is a damages-awardable disparate impact on Plaintiffs due to "regulations promulgated by [FFS that] deny burn permits to sugarcane growers if winds are projected to blow smoke and ash plumes toward the more affluent Eastern Palm Beach County

5

and Eastern Martin County communities near the coast" and only authorize burning when winds have a greater effect on Plaintiffs. SAC ¶¶ 9, 122-24.

Plaintiffs repeatedly claim that agency regulations and permits adversely target them so as to harm them and lessen impacts to other communities, and that the air pollution regulations are not adequately protective. *See* SAC ¶¶9, 122-130, 182, 228-229. This underpins every theory of liability set out in the SAC, and underscores that this case far more directly implicates—and involves the court in challenges to—regulatory programs than the straightforward injury claims in *Sher* or *Lombardozzi* did, where the allowed tort claims were based on conduct that allegedly violated, not followed, regulatory decisions.

Plaintiffs' Complaint is replete with attacks on the state's program, regulations and permitting decisions, while their civil rights claim is premised on obedience with those agency decisions as the basis for the requisite state action. *See* SAC ¶¶ 228-29, 234. The same allegations underpin the negligence and medical monitoring claim, where Plaintiffs view the agency decisions on wind conditions as targeting their communities and creating the basis of liability. *See* SAC ¶¶122-30. This places the very regulatory program itself on trial. The doctrine of primary jurisdiction and the disfavor of the creation of general federal common law claims counsels this Court to decline to exercise its jurisdiction over these matters until the relevant state agencies have been able to address Plaintiffs' complaints. *Flo-Sun, Inc. v. Kirk*, 783 So. 2d 1029, 1037 (Fla. 2001).

### III. PLAINTIFFS' SECTION 1983 CIVIL RIGHTS CLAIM FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Plaintiffs' Section 1983 claim should be dismissed because: (1) Plaintiffs have failed to allege sufficient facts to demonstrate Defendants are state actors; and (2) Plaintiffs have failed to allege sufficient facts to state a takings claim in any event. Plaintiffs' request for injunctive relief should be dismissed under the Court's previous ruling and the Supreme Court's decision in *Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162, 2176 (2019).

#### A. There is no state action to support a Section 1983 claim.

Plaintiffs ignore the authority cited by Defendants in a misguided attempt to cast decade's long private farming activity into state action. As Plaintiffs spin it, since farmers are regulated by state agencies, they are state actors. That argument would turn the concept of takings into a super regulatory structure, where everyone and anyone that receives a permit becomes a state actor and is liable to everyone else for even minor impacts from the permitted activity.

6

Plaintiffs argue that because FFS approves burn events, establishes each burn's timing, generates burn maps, and denies burn permits under certain conditions, FFS "encourages the harmful conduct at issue." Br. at 11. These allegations do nothing but demonstrate Defendants' compliance with a robust regulatory process, which under Supreme Court jurisprudence is insufficient to turn an otherwise private activity into state action. *See Jackson v. Metro Edison Co.*, 419 U.S. 345, 357 (1974); *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Indeed, farming does not require use of state power, and the agricultural burning at issue long predates the regulatory agencies and regulations. Plaintiffs' Section 1983 claim should be dismissed.

### B. Plaintiffs fail to state a takings claim.

In addition to lacking the requisite state action, the SAC fails to state an alleged taking as a matter of law. This is not a case where a party has been denied use of all or a portion of their land, nor one where exercise of property rights is infringed. Plaintiffs' properties continue to be used for residential purposes. Plaintiffs also fail to claim any residential or other use that predates agricultural burning, and thus there can be no interference with any investment backed expectation of any land use free from nearby agriculture, including the use of burning.

Plaintiffs mistakenly emphasize partial takings cases in an attempt to claim that the migration of pollutants is a physical taking of land. The difference is that in those other cases a portion of the land was denied to plaintiffs whether by mandated physical installations as in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982), by fencing off a portion of a property as *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1357 (Fed. Cir. 2006) or by flooding that precluded the use of a property as in *United States v. Dickinson*, 331 U.S. 745, 748 (1947). Nothing comparable has allegedly occurred here.

Nor are cases where pollution renders groundwater unusable applicable, because in those cases there was an established use of groundwater that had been prevented by contamination of the water supply. By contrast in this case, nothing has been installed on any Plaintiffs' property, no obstruction to their use of the property has been imposed, and there is no allegation of any established use predating agricultural burning that has been prevented. Migration of atmospheric constituents, from practices that predate Plaintiffs' land uses, is not a physical occupation and Plaintiffs cite no case to support such a theory.

### C. Plaintiffs cannot seek injunctive relief for the alleged taking.

Plaintiffs' request for injunctive relief (SAC ¶ 236) fails because their takings claim fails as a matter of law, as shown above. In addition, the requested injunction is improper. Plaintiffs confuse the requirement of a public purpose to support eminent domain confiscation of property

7

to argue that in the present case they can seek an injunction based on a claimed impact to property from a regulatory program. The Supreme Court has been clear that a takings claim brought by a landowner is not a basis for injunction, so long as there is a basis to obtain compensation for the taking.[7] *See Knick*, 139 S. Ct. at 2176.

Under Plaintiffs' theory, the fact that the government sets limitations or requires permits turns private activity into state action for one purpose, to allow the action to proceed, but then allows the same private activity to be enjoined because it serves a private business. This circular logic would allow claims that any regulated private business activity can be enjoined because, by virtue of being regulated, it somehow must be undertaken only for public benefit. They cite no support for that absurd result.

## IV.  PLAINTIFFS FAIL TO STATE A BATTERY CLAIM

Plaintiffs' battery claim fails for two reasons. Plaintiffs' battery claim is premised on the nuisance aspects of pre-harvest burning barred by the RTFA. Second, Plaintiffs fail to allege the requisite intent to sustain a battery claim under Florida law.

### A.  The RTFA Bars Plaintiffs' Battery Claim.

Plaintiffs concede the Court has determined that the RTFA bars claims that are nothing more than "relabeled" nuisance claims. *Coffie*, 2020 WL2739724, at *4-6. Instead, Plaintiffs argue that trespass and nuisance remedy different harms than battery claims, so the RTFA does not operate to bar their battery claim. Not so. The allegations supporting Plaintiffs' battery claim are nearly identical to the trespass and nuisance allegations the Court has already found were barred by the RTFA. *Compare* SAC ¶ 256 ("Plaintiffs have been exposed without consent to carcinogens, hazardous pollutants, and particulate matter from each Defendant's sugarcane burning.") *with* FAC ¶ 159 ("Defendants, without the consent or authority and against the will of [Plaintiffs] . . . voluntarily and intentionally caused the toxic and damaging "black snow" plumes, to enter and contaminate Plaintiffs' and Class Members' homes and properties."); ¶ 164 ("acts and/or omissions of Defendants that cause the toxic and damaging 'black snow' and its many contaminants . . . to pass through, be deposited on , and to enter and otherwise infiltrate and remain upon [Plaintiffs' property]. . . ."). As demonstrated, Plaintiffs' battery claim is based on the alleged

---

[7] An attempted confiscation of property through eminent domain can be denied where there is a lack of public purpose, which usually occurs when there is an attempt to condemn the property of one party to transfer it to private party. Here, however, the government is not seeking to condemn property so a showing a public purpose is not triggered. Nor is any Plaintiff's property being transferred for private use.

8

4852-0984-6218

nuisance aspect of sugarcane burning and is simply a variation of Plaintiffs' failed nuisance and trespass claims. Plaintiffs' battery claim should be dismissed.

### B.     Plaintiffs Do Not Allege the Requisite Intent to State a Battery Claim.

Plaintiffs concede that Florida requires a "substantial certainty" of harm to state a battery claim. Br. at 15. But Plaintiffs point to no allegations in the SAC to show Defendants were substantially certain their actions would cause constituents to contact any Plaintiff.

Plaintiffs' authority misses the mark. Unlike in *In re E.I. du Pont de Nemours & Co. Personal Injury Litigation*, Defendants' disagreement with Plaintiffs is not over whether the substantial certainty standard should be applied. *See* 2015 WL 4092866, at *15 (S.D. Ohio July 6, 2015). Rather, Defendants contend that Plaintiffs have simply failed to satisfy this threshold requirement.[8] Similarly, although the court in *Powell v. Tosh*, 2011 WL 1674957 (W.D. Ky. May 3, 2011), initially allowed a battery claim under Kentucky law to proceed based on particulate touching, the court subsequently dismissed the plaintiffs' battery claim. In doing so, the court reasoned: "the record does not indicate any defendant raises hogs or ventilates the barns *with the purpose of releasing odors into the surrounding community*. Although defendants may have knowledge that odors could reach neighboring properties, like the courts in the aforementioned cases, the Court finds such *generalized knowledge is insufficient to satisfy the intent requirement for battery*." *Powell v. Tosh*, 929 F. Supp. 2d 691, 708 (W.D. Ky. 2013) (emphasis added), opinion vacated in part on reconsideration, 2013 WL 1878934 (W.D. Ky. May 3, 2013). The SAC does not allege any facts to support a claim that any Defendant intended to batter Plaintiffs when they performed sugarcane burns. Instead, Plaintiffs simply allege Defendants "knew or should have known" that sugarcane burns could expose Plaintiffs to certain constituents. [SAC ¶ 252].

---

[8] The E.I. du Pont court's further conclusion that a battery claim under Ohio law does not require that "the harm must be directed to a particular plaintiff," 2015 WL 4092866, at *15, is not persuasive as to the present claim under Florida law. Rather, as other jurisdictions have recognized, the substantial certainty standard requires more than generalized knowledge as to indirect contact by an indefinite number of individuals. *See, e.g., Major v. Astrazeneca, Inc.*, 2006 WL 2640622, at *21 (N.D.N.Y. Sept. 13, 2006) (granting summary judgment on battery claim in the absence of "any evidence in the record that indicates that Defendants intentionally physically contacted … Plaintiffs"); *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 548 (D. Md. 1997) (finding that "generalized knowledge" that defendants' cigarette smoke "would reach some non-smokers … is insufficient to satisfy the intent requirement for battery"); *Rose v. Braciszewski*, 2009 WL 3276431, at *1 (Mich. Ct. App. Oct. 13, 2009) (affirming dismissal of battery claim without finding of defendants' "intent to cause the smoke or fumes to come into contact with [plaintiff]"); *see also* Restatement (Second) of Torts § 16 cmt.b (1965) (observing that the actor must "intend[] to produce such an effect upon *some other person* and that his act so intended is the legal cause of a harmful contact to the other" (emphasis added)).

9

4852-0984-6218

Plaintiffs argue that anonymous complaints about sugarcane burning have been reported to the Palm Beach County Health Department and the Florida Department of Forestry. [SAC ¶¶ 127-129.] But generalized complaints to governmental entities about sugarcane burning do not establish a substantial certainty of contact as to any Defendant, much less all Defendants. *See, e.g., Powell*, 929 F. Supp. 2d at 708. Nor is Plaintiffs' conclusory statement that such complaints are "passed on directly to the sugarcane industry itself" sufficient, as Plaintiffs do not indicate which Defendants allegedly received complaints, or even when the complaints were allegedly made. Because Plaintiffs do not plead the intent required by Florida law, the battery claim should be dismissed.

## V.   PLAINTIFFS' MEDICAL MONITORING CLAIM SHOULD BE DISMISSED.

Plaintiffs do not dispute the elements required for alleging a medical monitoring cause of action. Nor do Plaintiffs dispute that their preliminary air modeling, supposedly showing exposure to "significant levels of confirmed carcinogenic pollutants," was built on flawed assumptions and receptor data. Indeed, as Plaintiffs' motion to amend concedes, the "factual underpinnings of Plaintiffs' medical monitoring claim" are demonstrably false. [SAC at 1 n.1; ECF 143 (noting that Plaintiffs' air modeling data was built using an erroneous computational formula)].

As explained above, the preliminary modeling underlying Plaintiffs' allegations of "exposure greater than normal background levels" is flatly inconsistent with real-world data. This applies with equal force even if the Court considers Plaintiffs' newly contrived air modeling. The Court "need not accept factual claims," "which run counter to facts of which the court can take judicial notice." *Rubinstein*, 2018 WL 8899230, at *5. Because Plaintiffs have (1) failed to demonstrate any Defendant's agricultural practices are the cause of any significant increase in pollution concentrations (*i.e.,* above general background) or in violation of any air quality standards set by FDEP or EPA,[9] or (2) that Defendants' conduct caused a greater than normal exposure to any proven hazardous substance, Plaintiffs' claims for medical monitoring should be dismissed.

## CONCLUSION

For these reasons, Plaintiffs' Second Amended Complaint should be dismissed.

---

[9] Not only is Plaintiffs' claimed class-wide harm built on defective modeling, the use of AERMOD, a "regulatory-based, not an exposure-based, model" "tells the fact finder in a medical monitoring case very little, if anything, however, about whether a class of individuals suffered significant exposure to a proven hazardous substance." *Coleman* at 24. The use of AERMOD "is a speculative conglomeration of data that is unreliable on the question of exposure." *Id.* at 25.

| | |
|---|---|
| Dated: September 9, 2020 | By: /s/ Mark D. Anstoetter<br>Jennifer A. McLoone, Esq.<br>Florida Bar No. 29234<br>SHOOK, HARDY & BACON L.L.P.<br>Citigroup Center, Suite 3200<br>201 S. Biscayne Blvd.<br>Miami, Florida 33131<br>Ph: (305) 358-5171<br>Fax: (305) 358-7470<br>jmcloone@shb.com<br><br>Mark D. Anstoetter, Esq.<br>(Pro hac vice)<br>David Brent Dwerlkotte, Esq.<br>(Pro hac vice)<br>SHOOK, HARDY & BACON L.L.P.<br>2555 Grand Blvd.<br>Kansas City, MO 64108<br>Ph:  (816) 474 6550<br>Fax: (816) 421-5547<br>manstoetter@shb.com<br>dbdwerlkotte@shb.com<br><br>Joseph P. Klock, Jr. Esq.<br>Florida Bar No. 156678<br>Gabriel E. Nieto, P.A.<br>Florida Bar No. 147559<br>RASCO KLOCK PEREZ NIETO PL<br>2555 Ponce de Leon Blvd., Suite 600<br>Coral Gables, Florida 333134<br>Ph:  (305) 467-711<br>Fax: (305) 675-7707<br>jklock@rascoklock.com<br>gnieto@rascoklock.com<br><br>David S. Dee, Esq.<br>Florida Bar No. 281999<br>GARDNER, BIST, BOWDEN, BUSH,<br>DEE, LAVIA & WRIGHT, P.A.<br>1300 Thomaswood Drive<br>Tallahassee, Florida 32308<br>Ph:  (850) 385-0070<br>Fax: (850) 385-5416<br>ddee@gbwlegal.com<br><br>***Counsel for Defendants Florida Crystals Corporation, Osceola Farms Co., and Okeelanta Corporation*** |

4852-0984-6218

*/s/ Gary K. Hunter*
Gary K. Hunter
Florida Bar No. 949779
Gary V. Perko
Florida Bar No. 855898
Mohammad O. Jazil
Florida Bar No. 72556
HOPPING GREEN & SAMS, P.A.
119 S. Monroe Street, Suite 300
Tallahassee, FL 32301
Ph:  (850) 222-7500
Fax:  (850) 224-8551
garyh@hgslaw.com
garyp@hgslaw.com
mjazil@hgslaw.com

Jennifer J. Kennedy, Esq.
Florida Bar No. 517267
David J. Abbey
Florida Bar No. 228222
ABBEY, ADAMS, BYELICK
& MUELLER, LLP
3201 U.S. Highway 19 South, 9th Floor
St. Petersburg, Florida 333711
Ph.: (727) 821-2080
Fax: (727) 822-3970
ServiceJKennedy@AbbeyAdams.com
dabbey@abbeyadams.com
jkennedy@abbeyadams.com

*Counsel for Sugar Cane Growers Cooperative of Florida*

4852-0984-6218