# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

WILLIAM ARMSTRONG, GLORIA ATKINS,
JAMES BROOKS, CLOVER COFFIE, DEBRA
JONES, SHANTE LEGRAND, DONALD
MCLEAN, ROBERT REIMBOLD, ELIJAH
SMITH, and LINDA WELCHER, each individually
and on behalf of all others similarly situated;

       Plaintiffs,

vs.

UNITED STATES SUGAR CORPORATION,
a Delaware corporation; SUGAR CANE
GROWERS COOPERATIVE OF FLORIDA,
a Florida not for profit corporation; FLORIDA
CRYSTALS CORPORATION, a Delaware
corporation; OKEELANTA CORPORATION,
a Delaware corporation; OSCEOLA FARMS CO.,
a Florida corporation; SUGARLAND HARVESTING
CO., a Florida not for profit corporation;
TRUCANE SUGAR CORPORATION,
a Florida corporation; INDEPENDENT
HARVESTING, INC., a Florida corporation; and
J & J AG PRODUCTS, INC., a Florida corporation;

       Defendants

Case No. 19-cv-80730-RS

CLASS ACTION

Hon. Rodney Smith

_____

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED CLASS ACTION COMPLAINT AND SUPPORTING MEMORANDUM OF LAW

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

I.    Plaintiffs' Modeling is Inconsistent with Real World Data .......................................... 2

II.    Plaintiffs' Modeling Has No Relevance to Visible Ash .................................................. 6

ARGUMENT ...................................................................................................................... 6

I.    Plaintiffs Have Not Cured The Article III Standing Deficiencies ................................... 7

    A.    Plaintiffs Have Not Plausibly Traced Visible Ash To Each Defendant ............... 7

    B.    Plaintiffs Have Not Adequately Alleged The Actual Presence Of Injurious Or Any Other Level Of Particulate Matter And Other Pollutants, Let Alone Plausibly Traced Those Pollutants To Each Defendant ............................. 9

II.    Plaintiffs Fail To State A Plausible Claim Against Each Defendant ............................. 11

III.    The TAC Fails To State A Takings/Section 1983 Claim ............................................. 12

    A.    There Is No State Action To Support A Section 1983 Claim ............................. 12

    B.    Plaintiffs Fail To State A Takings Claim .......................................................... 13

    C.    Plaintiffs Cannot Seek Injunctive Relief For Alleged Takings ......................... 14

IV.    The TAC Fails To State A Battery Claim .................................................................... 15

    A.    The RTFA Bars Plaintiffs' Battery Claim ......................................................... 15

    B.    Plaintiffs Do Not Allege The Requisite Intent To State A Claim For Battery ............................................................................................................ 16

V.    The TAC Fails To State A Medical Monitoring Claim ................................................ 17

CONCLUSION ................................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adinolfe v. United Techs. Corp.*,
768 F.3d 1161 (11th Cir. 2014) .......................................................................................9, 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................................6, 9, 11, 12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................6, 9, 11, 12

*Bishop v. Hybud Equip. Corp.*,
536 N.E.2d 694 (Ohio Ct. App. 1988)...................................................................................15

*Blum v. Yaretsky*,
457 U.S. 991 (1982)...........................................................................................................13

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271 (11th Cir. 1999) .............................................................................................3

*Campos v. I.N.S.*,
32 F. Supp. 2d 1337 (S.D. Fla. 1998) .............................................................................3, 9, 17

*Chorak v. Naughton*,
409 So. 2d 35 (Fla. Dist. Ct. App. 1981) ..............................................................................16

*City of Miami v. Sanders*,
672 So. 2d 46 (Fla. Ct. App. 1996)......................................................................................16

*Coffie v. Florida Crystals Corp.*,
460 F. Supp. 3d 1297 (S.D. Fla. May 8, 2020)..............................................................*passim*

*Coleman v. Union Carbide Corp.*,
2013 WL 5461855 (S.D.W.V. Sept. 30, 2013)...........................................................................6

*First Nationwide Bank v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994).....................................................................................................9

*Flagg Bros., Inc. v. Brooks*,
436 U.S. 149 (1978)..........................................................................................................13

*Gallagher v. Neil Young Freedom Concert*,
49 F.3d 442 (10th Cir. 1995) ..............................................................................................13

*Hoyte v. Stauffer Chem. Co.*,
   2002 WL 31892830 (Fla. Cir. Ct. Nov. 2, 2002)..................................................................16

*Jackson v. Metro. Edison Co.*,
   419 U.S. 345 (1974).............................................................................................................13

*Jacobs v. Osmose, Inc.*,
   2002 WL 34241682 (S.D. Fla. Jan. 3, 2002) .......................................................................17

*Johnson v. Paynesville Farmers Union Co-op Oil Co.*,
   817 N.W.2d 693 (Minn. 2012)............................................................................................15

*Kerns v. Chesapeake Expl., LLC*,
   762 F.App'x 289 (6th Cir. 2019) .........................................................................................13

*Knick v. Township of Scott, Pa.*,
   139 S. Ct. 2162 (2019)........................................................................................................15

*Lingle v. Chevron U.S.A. Inc.*,
   544 U.S. 528 (2005).............................................................................................................14

*Loretto v. Teleprompter Manhattan CATV Corp.*,
   458 U.S. 419 (1982).............................................................................................................14

*Lucas v. S. Carolina Coastal Council*,
   505 U.S. 1003 (1992)...........................................................................................................14

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..........................................................................................................7, 9

*Major v. Astrazeneca, Inc.*,
   2006 WL 2640622 (N.D.N.Y. Sept. 13, 2006) ..................................................................16

*Moorer v. U.S. Bank N.A.*,
   2018 WL 587319 (D. Conn. Jan. 29, 2018).......................................................................13

*Murray Energy Corp. v. EPA*,
   936 F.3d 597 (D.C. Cir. 2019) ..............................................................................................4

*In re Oil Spill by the Oil Rig Deepwater Horizon*,
   2011 WL 4575696 (E.D. La. Oct. 4, 2011) ........................................................................16

*Patrick v. Floyd Med. Ctr.*,
   201 F.3d 1313 (11th Cir. 2000) ...........................................................................................12

*Penn Central Transp. Co. v. New York City*,
   438 U.S. 104 (1978).......................................................................................................13, 14

*Petito v. A.H. Robins Co., Inc.*,
  750 So. 2d 103 (Fla. 3d DCA 1999) ...................................................................17

*Prior v. White*,
  80 So. 347 (Fla. 1938) ....................................................................................16

*Shamblin v. Obama for Am.*,
  2015 WL 1754628 (M.D. Fla. Apr. 17, 2015) .......................................................7

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) .....................................................................................7

*Stewart v. Bureaus Inv. Grp. #1, LLC*,
  24 F. Supp. 3d 1142 (M.D. Ala. 2014) ..............................................................7

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
  137 S. Ct. 1645 (2017) ....................................................................................7

**Statutes & Regulations**

42 U.S.C. § 1983 ....................................................................................2, 12, 13

42 U.S.C. § 7409 .............................................................................................4

40 C.F.R. Part 50, App. N, §§ 1.0(c), 4.2 ........................................................3, 4

40 C.F.R. Part 51, App. W, § 1.0(b) .................................................................6

40 C.F.R. Part 51, App. W, § 8.0 ...................................................................12

Fla. Stat. § 376.313 .......................................................................................15

Fla. Stat. § 590.125 .........................................................................................2

Fla. Stat. § 823.14 ..............................................................................2, 15, 16

Fla. Admin. Code § 5I.2.006..............................................................................2

**Other Authorities**

http://www.cdc.gov/coronavirus/2019-ncov/php/openburning.html ...........................11

http://www.epa.gov/pm-pollution/particulate-matter-pm-basics#PM ...........................4

https://www.fdacs.gov/Divisions-Offices/Florida-Forest-Service/Wildland-
  Fire/Prescribed-Fire ........................................................................................4

## INTRODUCTION

Plaintiffs' Third Amended Complaint ("TAC") does not cure the glaring deficiencies previously found by the Court and, in fact, creates new deficiencies demonstrating how far Plaintiffs' allegations depart from reality. The Court dismissed Plaintiffs' First Amended Complaint ("FAC") for lack of Article III standing because Plaintiffs' allegations against the entire sugar industry based on conduct across all of an approximately 675-square mile area were far too generic to plausibly trace their alleged injuries to each or any Defendant. *Coffie v. Florida Crystals Corp.*, 460 F. Supp. 3d 1297, 1304-06 (S.D. Fla. May 8, 2020). The Court gave Plaintiffs an opportunity to amend to cure these deficiencies, subject to Rule 11. *Id.* at *4, 11. Plaintiffs responded by filing a Second Amended Complaint ("SAC"), which relied on preliminary air modeling without any actual air quality data. After Defendants moved to dismiss the SAC, Plaintiffs acknowledged that their modeling overstated results ***by at least a factor of 60***. Plaintiffs sought and were granted leave to file a TAC "correcting" the "error." Plaintiffs' revised air modeling does not save their claims. Even after four attempts, the TAC still does not allege facts sufficient to establish Article III standing and fails to state plausible claims.

Plaintiffs still lack Article III standing. The TAC alleges that visible ash falls on Plaintiffs' properties and vehicles, but—contrary to the direction issued by the Court—the TAC makes no attempt to trace visible ash to each or any Defendant. Plaintiffs also claim that they were injured by smaller, invisible particulate matter and other constituents that allegedly cause respiratory issues and increase the risk of developing lung cancer. The TAC relies on preliminary air models that first attempt to ***project*** concentrations of constituents at hypothetical "receptors" and then attempt to trace those ***projected*** results to each Defendant. The results are demonstrably implausible. The models and the TAC entirely ignore ***actual***, publicly-available air monitoring data from within the putative class area published by the Florida Department of Environmental Protection ("FDEP"). The actual data are well ***below*** both Plaintiffs' revised hypothetical projections and the National Ambient Air Quality Standards ("NAAQS") that Plaintiffs invoke. The Court should reject Plaintiffs' attempt to rely on hypothetical projections over actual air quality data. Moreover, the TAC fails to tie the models' projections at hypothetical receptors in the putative class area to particular Plaintiffs or their properties. Even at the pleading stage, Plaintiffs' preliminary air models do not plausibly establish Article III standing.

These same pleading defects mean that, apart from standing, Plaintiffs fail to state plausible

claims against any Defendant, much less all of them. Plaintiffs rely on preliminary air modeling that the Court need not accept because it is flatly contradicted by actual, publicly-available data confirming that the air quality in the putative class area meets air quality standards. Plaintiffs' claims also fail because they do not plausibly trace their alleged injuries to each Defendant.

Plaintiffs' Section 1983/takings, battery, and medical monitoring claims also fail for other reasons. Plaintiffs fail to state a takings claim under Section 1983 because performing sugarcane burns under permits issued by the Florida Forest Service does not turn private parties into "state actors," and even if it did, Plaintiffs do not otherwise allege the elements of a takings claim. Plaintiffs also cannot use a takings claim to get around the Court's holding that their claims for injunctive relief are barred by the primary jurisdiction doctrine (*Coffie*, 460 F. Supp. 3d at 1308-11), nor is injunctive relief a permissible remedy for a Fifth Amendment takings claim.

Plaintiffs fail to state a claim for battery. Plaintiffs' battery claim simply recasts and relabels the nuisance and trespass claims that the Court already dismissed under Florida's Right to Farm Act ("RTFA"), Fla. Stat. § 823.14. Plaintiffs also cannot allege that Defendants acted with the requisite intent to harm Plaintiffs.

Finally, Plaintiffs again fail to state a claim for medical monitoring. Plaintiffs' preliminary models of hypothetical air quality impacts are not plausible and thus cannot support Plaintiffs' allegations about exposures greater than normal background levels.

## BACKGROUND

Plaintiffs again challenge the practice of pre-harvest sugarcane burning, which is a safe, century-old method of harvesting that is strictly regulated and performed under permits issued daily by the Forest Service. Fla. Stat. § 590.125; Fla. Admin. Code § 5I.2.006. As the Court acknowledged, "preharvest burning is an acceptable agricultural practice"—even if Plaintiffs might prefer another method. *Coffie*, 460 F. Supp. 3d at 1307.

The TAC relies on preliminary air modeling overseen by an environmental engineer, Randy Horsak (TAC at 1; ECF 143 Ex. A), in an attempt to address Article III standing and state plausible claims against each Defendant. Plaintiffs' preliminary modeling, however, remains divorced from real world data and does not even address visible ash.

### I. Plaintiffs' Modeling is Inconsistent with Real World Data.

Despite their efforts to fix "input errors" in the preliminary air modeling that formed the basis for the SAC, the TAC continues to hinge on demonstrably flawed modeling. Although

Plaintiffs have now reduced the values spit out by their model *by a factor of 60*, Plaintiffs' modeling remains flatly inconsistent with real world air quality data.[1]

Plaintiffs' preliminary air models purport to project concentrations of constituents from sugarcane burning at 3,531 hypothetical "receptors" located in and around the putative class area from 2014 to 2018 and then purport to trace those projected results to each Defendant. TAC ¶¶ 12-15, 147-62 & Ex. B. Plaintiffs' preliminary models are a black box. While Plaintiffs base their models on the location of permitted burns in Forest Service records, the TAC provides no details on any of the critically important inputs and assumptions that Plaintiffs used in their models or their methodology in making those decisions. The importance of these inputs and assumptions is readily illustrated by Plaintiffs' admission to one significant mistake already that remarkably led to all of their results being off by a factor of 60. *See generally* ECF 143.

Plaintiffs allege that the preliminary models "demonstrate" to a "high degree of certainty" that each Defendant's burns emitted particulate matter and other constituents that reached "every nook and cranny" of the putative class area and that burning results in cumulative exceedances of NAAQS. TAC ¶¶ 12, 158, 162. The TAC focuses on 24-hour $PM_{2.5}$ concentrations and compares the highest daily projected concentrations generated by Plaintiffs' preliminary models to the NAAQS $PM_{2.5}$ 24-hour standard of 35 μg/m$^3$. *Id.* ¶¶ 12, 153-55. However, the NAAQS $PM_{2.5}$ 24-hour standard is an *average* of daily measurements—not a reading of the highest single day. 40 C.F.R. Part 50, App. N, §§ 1.0(c), 4.2.[2] The TAC does not include any attempt to run those calculations and therefore does not allege *any* actual exceedances of the 24-hour $PM_{2.5}$ standard in the putative class area. Nonetheless, based on their revised modeling output, Plaintiffs continue to allege that the hypothetical receptors experienced "spectacularly high" 24-hour $PM_{2.5}$ concentrations—up to 66, 163, 200, and 117 μg/m$^3$ for a single day. TAC ¶¶ 18, 155. Plaintiffs

---

[1] The Court may disregard allegations that are in conflict with facts upon which the Court may take judicial notice, including U.S. EPA's and FDEP's regulatory determinations, which are based on actual field data these agencies have collected and demonstrate that air quality in the putative class area complies with all applicable NAAQS. *See Campos v. I.N.S.*, 32 F. Supp. 2d 1337, 1343 (S.D. Fla. 1998) (the court "need not accept factual claims" "which run counter to facts of which the court can take judicial notice."); *Bryant v. Avado Brands, Inc*., 187 F.3d 1271, 1279-80 (11th Cir. 1999) (court may take judicial notice of public records when considering a motion to dismiss without converting to motion for summary judgment).

[2] Specifically, the 24-hour $PM_{2.5}$ standard is a rolling average that must be calculated over 365 days of daily readings, using the 98th percentile value during a year, averaged over 3 consecutive years. *Id.*

further allege that over the course of five years, 16.3% of the hypothetical receptors experienced at least one daily "exceedance" above 35 μg/m$^3$. *Id.* ¶¶ 14, 157 & Fig. 37.[3]

Plaintiffs' projections are flatly contradicted by—and do not even attempt to take into account—actual, publicly available air quality data. FDEP oversees an extensive network of air monitoring stations located throughout the State and publishes the data on its website. FDEP and U.S. EPA use this data to assess compliance with the NAAQS and other requirements. *See, e.g., Murray Energy Corp. v. EPA*, 936 F.3d 597, 604-05 (D.C. Cir. 2019) (explaining that NAAQS are designed to protect public health and welfare, including against adverse health effects). Based on actual air quality data collected throughout the State, FDEP has found that "air quality across the State … is consistently ranked among the best in the nation with respect to … fine particulate matter" and that "***all areas in the State*** meet the air quality standards for these pollutants and levels continue to decrease as they have for many years." Ex. A at 1 (FDEP, Florida's Ozone and Particulate Matter Air Quality Trends) (emphasis added).

One of the air monitoring stations overseen by FDEP is located in Belle Glade—right in the middle of the putative class area. Actual readings from the Belle Glade monitoring station show that even the highest single-day 24-hour $PM_{2.5}$ concentrations from 2014-18 were all well below 35 μg/m$^3$, with the highest single-day reading at 30.1 μg/m$^3$. Ex. B (FDEP, Air Quality Monitoring, Highest Particle Pollution 2.5 Readings by Year, AQS # L099-0008, Belle Glade). Moreover, the actual data includes not just sugarcane burning, but all sources of $PM_{2.5}$.[4] And there is no correlation between the highest $PM_{2.5}$ readings recorded in Belle Glade each year and the sugarcane

---

[3] Under the Clean Air Act, U.S. EPA set the 24-hour $PM_{2.5}$ standard at a level that is protective of health, with a margin of safety, when calculated according to U.S. EPA's methodology (*i.e.*, 365 days of daily readings using the 98th percentile value and then averaged over 3 consecutive years). 42 U.S.C. § 7409; *Murray Energy*, 936 F.3d 597, 604-05. Plaintiffs' allegations, based on their faulty models, of "daily exceedances" of the NAAQS at hypothetical receptor locations are therefore erroneous. If an area complies with the NAAQS, as all of Florida does, its air quality is protective of health with regard to $PM_{2.5}$ and other regulated constituents.

[4] There are numerous contributing sources to particulate matter in addition to agricultural burning, such as power plants, industrial facilities, construction sites, and automobiles. *See, e.g.,* http://www.epa.gov/pm-pollution/particulate-matter-pm-basics#PM. The TAC also fails to account for or model particulate matter from natural wildfires or governmental burning, which occur regularly. The Forest Service "oversees one of the most active prescribed fire programs in the country" and in an average year "will issue approximately 88,000 authorizations allowing landowners and agencies to prescribe burn over 2.1 million acres." https://www.fdacs.gov/Divisions-Offices/Florida-Forest-Service/Wildland-Fire/Prescribed-Fire.

burning season.[5] Yet Plaintiffs' "corrected" preliminary model predicts 24-hour $PM_{2.5}$ concentrations in Belle Glade from sugarcane burning alone as high as 66 µg/m$^3$ (in 2016) (TAC ¶ 155 & Ex. B at ECF p. 8 of 84)—three times higher than the five highest daily concentrations (19.3 to 23.7 µg/m$^3$) actually measured in Belle Glade that year from all sources.  Ex. B.

Current air data measurements are consistent with the 2014-18 data. Actual readings from the Belle Glade monitoring station show that in 2020 to date, the highest single-day 24-hour $PM_{2.5}$ concentration was 22.7 µg/m$^3$. Ex. C (FDEP, 10 Highest Daily Averages for Year 2020, AQS # L099-0008, Belle Glade). That reading was taken in September 2020, outside sugarcane burning season. *Id.* Indeed, seven of the ten highest 24-hour $PM_{2.5}$ concentrations measured in 2020 occurred in June, July, and September, when there was no sugarcane burning. *Id.*[6]

Plaintiffs' modeling results are also inconsistent with actual daily $PM_{2.5}$ readings from other FDEP monitoring stations bordering the putative class area. For example, data from Royal Palm Beach (Lamstein Lane)—which is outside the putative class area but within the "airshed" modeled by Plaintiffs—shows that the West Palm Beach area is uniformly below 35 µg/m$^3$. Ex. E. The same holds true in every direction. Data from FDEP's Stuart monitor (located northeast of Belle Glade), Winkler Pump Station monitor (located west of Belle Glade), Laurel Oak Elementary monitor (located southwest of Belle Glade), and Fort Lauderdale Near Road monitor (located southeast of Belle Glade) are all consistently below 35 µg/m$^3$. Ex. F. While the air quality in all of these areas complies with the NAAQS, a comparison of the data shows that the air quality in Belle

---

[5] Burn season, Plaintiffs allege, begins in October and runs through March or as late as May. TAC ¶ 2. The actual 24-hour $PM_{2.5}$ concentrations recorded in Belle Glade were often highest in June, July, August, and September, outside of even the longest burn season alleged by Plaintiffs.

[6] Plaintiffs' only attempt to address the disparity between actual data and their hypothetical air modeling results is to summarily claim that the FDEP air quality monitoring station in Belle Glade has a "checkered operational past." ECF 143 at 7. But that so-called "checkered operational past" involved a finding that the Belle Glade monitoring station was producing **higher** $PM_{2.5}$ readings (by approximately 2.4 µg/m$^3$, on average) than a monitor installed at the same location as a quality control check. *See* FDEP's 2013 Annual Ambient Air Monitoring Network Plan at 33-37 (Ex. D). Thus, actual $PM_{2.5}$ levels in Belle Glade are, if anything, even lower than the daily $PM_{2.5}$ measurements taken at the Belle Glade monitoring station—all of which are below 35 µg/m$^3$ in the first place.  And Plaintiffs cannot refute that FDEP still uses $PM_{2.5}$ data from the Belle Glade monitoring station as part of the Air Quality Index. *Id.* at 34. Nor can Plaintiffs refute that their expert made no effort to compare their modeling results to the publicly available data collected at this monitoring station or any other FDEP/U.S. EPA approved monitoring station, or any actual data of their own, before filing a complaint that hinges on this modeling.

Glade is consistently comparable to or cleaner than the air in other areas.

As U.S. EPA has explained, actual air quality data is "particularly useful in assessing the accuracy of model estimates." 40 C.F.R. Part 51, App. W, § 1.0(b). Indeed, Plaintiffs' engineer, Mr. Horsak, has acknowledged the importance of corroborating air modeling with actual data and has had opinions excluded where he failed to do so. *See Coleman v. Union Carbide Corp.*, 2013 WL 5461855, at *35 (S.D.W.V. Sept. 30, 2013) ("It is particularly surprising that Mr. Horsak never conducted any air sampling, despite noting that [sampling] should be pursued…."). Plaintiffs' TAC, however, never even acknowledges, let alone attempts to account for, publicly-available air quality data. Nor did Plaintiffs perform any monitoring of their own. Even a cursory review of the data on FDEP's website would have alerted Plaintiffs that air quality in Palm Beach County—including in the putative class area—complies with air quality standards.

## II. Plaintiffs' Modeling Has No Relevance to Visible Ash.

Plaintiffs' preliminary air modeling does not model or trace the dispersion of visible ash. To the contrary, the TAC alleges that Plaintiffs' air modeling focused on tiny, invisible particulate matter and other constituents measuring only microns in diameter. TAC ¶ 148 (identifying pollutant categories included in Plaintiffs' air model, including particulate matter less than 10 microns ($PM_{10}$), 2.5 microns ($PM_{2.5}$), and 0.5 microns ($PM_{0.5}$) in diameter; *see id.* ¶¶ 16, 139-140, 158. A micron is one-millionth of a meter and one inch contains 25,400 microns. Thus, when Plaintiffs allege that ash ¼ to ½ of an inch thick fell on their properties (*id.* ¶ 25), they are addressing material that is approximately 6,350 to 12,700 microns thick—material much larger than the smaller, invisible particulate matter that they purported to model, and with entirely different properties. Plaintiffs' preliminary air models—which are defective even as to modeled particulate matter—have no relevance whatsoever to visible ash.

## ARGUMENT

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility" only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Courts insist upon "'specificity in pleading' … to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope'" of success. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59 (2007). Plaintiffs' TAC fails to satisfy this standard.

I.      **Plaintiffs Have Not Cured The Article III Standing Deficiencies.**

Article III standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The injury must be "concrete and particularized" and "'actual or imminent, not 'conjectural' or 'hypothetical.'"" *Lujan*, 504 U.S. at 560-61. At the pleading stage, a "'plaintiff must clearly allege facts demonstrating each element'" of Article III standing. *Coffie*, 460 F. Supp. 3d at 1304 (quoting *Spokeo*, 136 S. Ct. at 1547). Moreover, "'standing is not dispensed in gross.' To the contrary, 'a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief sought.'" *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (internal citations omitted).

While Plaintiffs need not prove proximate causation at this stage, as the Court ruled, they "must still show that the injuries they allege are fairly traceable to each Defendant." *Coffie*, 460 F. Supp. 3d at 1305; *see Spokeo*, 136 S. Ct. at 1547 n.6; *Shamblin v. Obama for Am.*, 2015 WL 1754628, at *4 (M.D. Fla. Apr. 17, 2015) ("'The plaintiff's standing to bring an action against each defendant named in the complaint must be established independently of [Rule] 23.'"); *Stewart v. Bureaus Inv. Grp. #1, LLC*, 24 F. Supp. 3d 1142, 1154 (M.D. Ala. 2014) ("the class representative herself must have Article III standing to sue each named defendant").

Although the TAC repeatedly conflates them, Plaintiffs allege injuries from two distinct purported consequences of sugarcane burning: (i) visible ash that allegedly falls on properties and vehicles (which Plaintiffs tendentiously label "black snow") (TAC ¶¶ 7, 25-27, 32-34, 38-40, 5-53, 61, 64-65, 68, 71 & Figs. 6, 12, 13, 21); and (ii) the emission of small, invisible particulate matter and other constituents attached thereto that allegedly cause respiratory issues and increase the risk of developing lung cancer. *Id.* ¶¶ 16, 18, 131, 134, 139. As shown below, the TAC does not even attempt to trace visible ash to each and every Defendant. And as to invisible particulate matter and other constituents, the TAC does not adequately allege a concrete and particularized injury (e.g., that injurious levels of particulate matter or other constituents actually exist), nor does it plausibly trace Plaintiffs' alleged injuries to each Defendant.

A.      **Plaintiffs Have Not Plausibly Traced Visible Ash To Each Defendant.**

Critically, the TAC does nothing to plausibly trace visible ash allegedly on Plaintiffs' properties or vehicles to any Defendant, let alone all of them. The TAC largely rehashes the same

conclusory allegations from the FAC that Plaintiffs reside "in close proximity to many of Defendants' sugarcane fields" (TAC ¶¶ 31, 37, 45, 50, 63, 67, 70) that the Court already found deficient. *Coffie*, 460 F. Supp. 3d at 1303-05. Even when the TAC alleges that a Plaintiff resides "immediately across the street" (TAC ¶ 57) or "blocks away" (*id.* ¶ 46) from "Defendants' sugarcane fields," the TAC is conspicuously silent on *which* Defendants' fields Plaintiffs are referencing. Nor does the TAC allege the wind direction on the days those fields were burned or exclude ash from natural wildfires or governmental burning, which occur regularly. *See supra* at 4 n.4.

The TAC includes maps showing the towns in the putative class area and the locations of historical burn events in "close proximity," compiled from Forest Service permit data. TAC ¶ 138 & Figs. 1-2, 22-27. Although the permit data reviewed by Plaintiffs would identify the applicant for each burn permit, the TAC is again conspicuously silent as to which Defendant (or other entity) farmed and conducted burns in close proximity to Plaintiffs and their properties. The TAC does not even attempt to trace anything to each Plaintiff from each Defendant. This is important because some Defendants burn more than others (e.g., TAC Fig. 33) and each Defendant's farmland is concentrated in different parts of the putative class area.

The TAC includes sample burn maps from the Forest Service depicting daily burns. TAC Figs. 7, 9, 10. Plaintiffs appear to allege that the maps depict the distance smoke—not visible ash— can travel, although Plaintiffs appear to suggest that ash can travel in the same direction. *Id.* ¶¶ 11, 142. Regardless, the TAC makes no effort to connect burns plotted on the maps to particular Defendants or to particular Plaintiffs and their properties.

The TAC also includes pictures of sugarcane burns. Like the visible ash allegations, the TAC does not attempt to attribute the pictures to any particular Defendant at any particular location in the putative class area. Indeed, at least one picture in the TAC was taken in Hawaii, not Florida. TAC Fig. 19. Other pictures show smoke from sugarcane burns rising up into the sky (as it is designed to do), not impacting adjacent properties. *Id.* Figs. 4, 5, 15, 18. Even a picture purporting to show a burn in close proximity to houses shows smoke rising straight up, away from the houses. *Id.* Fig. 20. Plaintiffs' pictures do not make up for the TAC's failure to trace cane ash to each Defendant. To the contrary, the pictures demonstrate that any smoke is localized, evanescent, and does not uniformly cover the putative class area.

**B.      Plaintiffs Have Not Adequately Alleged The Actual Presence Of Injurious Or Any Other Level Of Particulate Matter And Other Pollutants, Let Alone Plausibly Traced Those Pollutants To Each Defendant.**

With respect to the emission of small, invisible particulate matter and other constituents, the TAC fails to adequately allege an injury that is "concrete and particularized," not "'conjectural' or 'hypothetical.'"" *Lujan*, 504 U.S. at 560-61. The TAC also fails to plausibly trace Plaintiffs' alleged injuries from invisible constituents to each Defendant.

Importantly, unlike most cases where plaintiffs file suit over alleged contamination, Plaintiffs offer no *actual* air monitoring or other data to show the existence of injurious (or any other) concentrations of particulate matter or other constituents. *See, e.g., Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1173 (11th Cir. 2014) (allowing toxic tort claims to survive dismissal where "plaintiffs alleged that they tested for and found contaminants [attributable to defendant] on at least some of [the] properties [at issue], and the plaintiffs' hydrologists and toxicologists verified the presence of these chemicals in [the area] and the plaintiffs' groundwater").

Instead, Plaintiffs rely entirely on "preliminary" hypothetical air modeling—both to establish injury and to trace that purported injury to each Defendant. TAC Ex. B. Although Plaintiffs have now reduced their model projections by a factor of 60, Plaintiffs continue to allege that Defendants emitted "spectacularly high" levels of $PM_{2.5}$ from sugarcane burning. TAC ¶ 18. As shown above, however, Plaintiffs' "spectacularly high" projections are flatly contradicted by— and do not even attempt to take into account—actual, publicly-available air quality data confirming that air quality in the putative class area meets air quality standards, including NAAQS. Thus, in contrast to Plaintiffs' *projected* $PM_{2.5}$ concentrations, *actual* readings from the FDEP monitoring station in Belle Glade show that even the highest 24-hour $PM_{2.5}$ concentrations from 2014-18 from all sources (not just sugarcane burning) were all *well below 35 µg/m³*. Ex. B.

The Court need not accept allegations in the TAC that are shown by publicly-available air quality data to be pure fiction. *See, e.g., Campos*, 32 F. Supp. 2d at 1343 (the court "need not accept factual claims" "which run counter to facts of which the court can take judicial notice"). Such allegations fail to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 570. The Court can rely on its "judicial experience and common sense" to conclude that numbers that are derived from unexplained, black-box models and that are contradicted by government-collected, publicly-available measurements of which Plaintiffs take no account are not facts that must be accepted, but are simply implausible conclusions. *Id.*; *Iqbal*, 556 U.S. at 678-80; *see First*

*Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (affirming dismissal because plaintiffs' "methodology … is so defective, and the conclusions reached so defy logic, that no 'reasonable inferences' can be drawn therefrom," and finding that "[n]o amount of detail can save [plaintiffs'] complaint when the detail is based on flawed and unreasonable methodologies that lead to unsupported conclusions").

Even setting aside the conflict between Plaintiffs' preliminary air models and publicly-available air quality data, Plaintiffs' models are insufficient to establish standing. Although Plaintiffs allege that 16.3% of the hypothetical receptors across the putative class area experienced at least one daily $PM_{2.5}$ "exceedance" above 35 $\mu g/m^3$ over the course of five years (*id.* ¶¶ 14, 157 & Fig. 37), the TAC makes no effort to tie those hypothetical receptors to the named Plaintiffs. Indeed, the TAC is devoid of any modeled projections specific to particular Plaintiffs or their residences. As a result, even if the Court were to accept Plaintiffs' preliminary air modeling at face value, the TAC is insufficient to show that any Plaintiff experienced a concrete, particularized injury, let alone to trace that injury to each Defendant.

Plaintiffs' apparent claim that they can establish standing in the absence of NAAQS exceedances (TAC ¶ 14 n.10) fares no better. While regulatory thresholds are not necessarily dispositive under Florida tort law (*Adinolfe*, 768 F.3d at 1173-74), Plaintiffs still must allege that they were injured by the constituents at issue.[7] The TAC fails to do so. For example, the TAC attempts to attribute projected 24-hour $PM_{2.5}$ concentrations to particular Defendants at levels far below 35 $\mu g/m^3$—even reaching as low as ***0.01 to 0.02 $\mu g/m^3$***. TAC Ex. B at ECF pp. 8, 20, 32, 44, 56, 68, 80 of 84. But the TAC does not allege that miniscule levels of $PM_{2.5}$ cause injury. To be sure, the TAC alleges that the NAAQS $PM_{2.5}$ 24-hour standard of 35 $\mu g/m^3$ should be lowered to between 30 and 25 $\mu g/m^3$ (TAC ¶ 179), but the TAC does not provide any Plaintiff-specific projections alleging that Plaintiffs were exposed to $PM_{2.5}$ levels above 25 $\mu g/m^3$ as a result of Defendants' sugarcane burning. The TAC also alleges (at ¶ 19) that a mere 1 $\mu g/m^3$ increase in $PM_{2.5}$ levels can increase the COVID-19 death rate, but the TAC does not allege that any of the Plaintiffs contracted COVID-19, let alone experienced complications due to $PM_{2.5}$.[8]

---

[7] In *Adinolfe*, 768 F.3d at 1170, for example, the plaintiffs alleged that the constituents at issue were genotoxic, "which means that they do not require any specific concentration … individually or in combination for them to cause clear cell renal carcinoma, a certain type of cancer."

[8] The TAC (at ¶¶ 19-20) also alleges that the CDC recommended a temporary ban on open burning to address COVID-related concerns, but the CDC recently confirmed that its recommendation

Because Plaintiffs have failed to allege facts sufficient to establish their standing, this Court lacks subject matter jurisdiction over their claims and should dismiss the TAC with prejudice.

## II.     Plaintiffs Fail To State A Plausible Claim Against Each Defendant.

Plaintiffs have not stated plausible claims against each Defendant. *Iqbal*, 556 U.S. at 678-79; *Twombly*, 550 U.S. at 558-59. The TAC does not include factual allegations that would allow this Court to reasonably infer that Defendants are liable for Plaintiffs' claimed injuries. Plaintiffs fail to link their allegations about visible ash in the TAC to any Defendant. And Plaintiffs' claims about invisible particulate matter are based solely on hypothetical models that publicly-available data demonstrates are not plausible or even possible, and do not tie the modeled projections to particular Plaintiffs or their residences in any event

The TAC includes numerous allegations concerning visible ash purportedly falling on Plaintiffs' properties and vehicles (*e.g.,* TAC ¶¶ 7, 25-27, 32-34, 38-40 & Figs. 6, 12, 13, 21), but the TAC makes no attempt to trace visible ash to particular Defendants. As discussed above, Plaintiffs cannot rely on their air modeling to trace their alleged injuries from visible ash to each Defendant because Plaintiffs' model does not and cannot model the dispersion of visible ash.

As to invisible particulate matter and other constituents, Plaintiffs' modeling output is squarely at odds with real-world, publicly-available data collected by the regulatory agencies charged with protecting air quality. Indeed, while actual daily measurements from the putative class area show that even the highest single-day 24-hour $PM_{2.5}$ concentrations were all well below 35 $\mu g/m^3$, Plaintiffs' model projects "remarkable" and repeated exceedances of 35 $\mu g/m^3$ at many of the modeled locations in the putative class area. TAC ¶¶ 12, 14, 153-157. This dramatic disparity between real-world data and Plaintiffs' modeling effort is magnified by the fact that Plaintiffs' hypothetical values for $PM_{2.5}$ are based on modeling for sugarcane burning only, while the actual measured concentrations include emissions from all potential sources.

The government agencies tasked with monitoring, assessing, and ensuring air quality across the State have an extensive network of monitors and continually work to ensure compliance with standards set to protect human health. Plaintiffs have not explained how their modeled concentrations could be possible, much less plausible, when actual air quality data demonstrates

---

applied only to "backyard burning," not prescribed or controlled burns permitted by state agencies. CDC, Open Burning during the COVID-19 Pandemic (updated Nov. 13, 2020), *available at* http://www.cdc.gov/coronavirus/2019-ncov/php/openburning.html.

that the entire State is in full attainment with NAAQS, including the 24-hour $PM_{2.5}$ standard that Plaintiffs' model predicts is purportedly violated at hypothetical receptors throughout the putative class area "in many cases by a factor of several multiples." TAC ¶¶ 153, 157. Contrary to Plaintiffs' allegations, FDEP confirms that "all areas in the State meet the air quality standards for [fine particulate matter] and levels continue to decrease as they have for many years." Ex. A.

While the TAC goes on at length with technical soundbites, Plaintiffs have failed to provide even the most basic information to flesh out the details of their model inputs. *See e.g.,* 40 C.F.R. Part 51, App. W, § 8.0 (explaining that "[d]atabases and related procedures for estimating input parameters are an integral part of the modeling process" and that "[m]odeled concentrations can vary widely depending on the source data or meteorological data used"). Plaintiffs instead hide behind a lengthy printout of hypothetical results (TAC Ex. B)—results that Plaintiffs have already admitted were wrong once and had to be corrected. Plaintiffs' allegations about air quality issues are not plausible because their models' output still bears no resemblance to the real-world conditions documented by FDEP. These implausible allegations cannot support a claim for alleged injuries and damages. *Iqbal*, 556 U.S. at 678-79; *Twombly*, 550 U.S. at 558-59.

## III.    The TAC Fails To State A Takings/Section 1983 Claim.

Count III raises a civil rights claim under 42 U.S.C. § 1983 for alleged takings without just compensation. Because Section 1983 is a remedy provision for an underlying civil rights violation, Plaintiffs pin their claim on a takings theory due to alleged migration of airborne particulate matter. This fails on two fronts. First, private parties are not state actors simply because they operated under government-issued permits. Second, even if Defendants were state actors, Plaintiffs fail to allege facts sufficient to state a takings claim. Moreover, Plaintiffs' request for injunctive relief is barred by this Court's prior ruling and U.S. Supreme Court precedent.

### A.    There Is No State Action To Support A Section 1983 Claim.

Plaintiffs bring their takings claim pursuant to 42 U.S.C. § 1983, which prohibits "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" "under the color" of state law. To state their claim, therefore, Plaintiffs must allege facts sufficient to show that Defendants "'may fairly be said to be … state actor[s].'" *Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000). The TAC alleges that Defendants became state actors by performing sugarcane burns under Forest Service permits and regulations. TAC ¶¶ 225-28, 230 ("Before Defendants may engage in pre-harvest burning, they must apply to the FFS and the FFS must grant

them a permit, authorizing the specific location, timing, and terms of the requested burn event…."). These allegations do not show that Defendants are state actors.

The actions of private entities may constitute state action only in the narrow circumstance when the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). "Mere approval of or acquiescence in the initiatives of a private party is not sufficient." *Id.* at 1004–05; *see Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974) (the "exercise of the choice allowed by state law where the initiative comes from [the regulated entity] and not from the State, does not make [the regulated entity's] action in doing so 'state action'"); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164 (1978) (a regulated entity's action is state action only if it is "'compelled'" or "'order[ed]'" by the state).

Plaintiffs have failed to allege any facts demonstrating a basis for finding state action. Instead, the takings claim rests on the allegations that Defendants perform sugarcane burns under Forest Service permits and regulations. This falls far short of the state action requirement. In opposing Defendants' motion to dismiss the FAC, Plaintiffs even argued that sugarcane burning is ***not*** "endorsed" or "required" "by the State" and that the Forest Service instead "merely provides Defendants the opportunity to request authorization for a burn." ECF 104 at 8. Plaintiffs' own argument precludes any finding of state action on the facts alleged here.

There are no allegations demonstrating that the burn permits at issue provide any special basis to convert regulated activity into state action for Section 1983 purposes. *See Jackson*, 419 U.S. at 345 (affirming dismissal of Section 1983 claim against private but heavily regulated utility company). Indeed, numerous courts have rejected similar takings claims against private actors for the same reasons. *See, e.g., Kerns v. Chesapeake Expl., LLC*, 762 F.App'x 289, 294-95 (6th Cir. 2019) (affirming dismissal of takings claim against private oil-drilling company); *Moorer v. U.S. Bank N.A.*, 2018 WL 587319, at *6 (D. Conn. Jan. 29, 2018) (dismissing takings claim against bank and debt collectors); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 442, 1448-53 (10th Cir. 1995) (affirming dismissal of takings claim against concert promoter and security company for pat down searches at public university). Plaintiffs' Section 1983 claim should be dismissed.

### B. Plaintiffs Fail To State A Takings Claim.

A takings claim provides a basis to seek compensation where property is affected by government regulations that limit the use of property or by a physical appropriation for

governmental purposes of a portion of the property. *See, e.g., Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 123–25 (1978); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982). Plaintiffs fail to allege either type of taking. Government regulations do not effect a taking every time they negatively impact property rights. Instead, courts "must remain cognizant that 'government regulation—by definition—involves the adjustment of rights for the public good.'" *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005).

In determining whether government regulation effects a taking, courts look to whether a property owner has been deprived of all economically viable use or of a distinct investment-backed expectation. *Lingle*, 544 U.S. at 539; *Penn Central*, 438 U.S. at 123–125; *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992). Courts also look to whether there is a physical invasion, which means a physical appropriation for government use. *See Lingle*, 544 U.S. at 539; *Lucas*, 505 U.S. at 1015; *Loretto*, 458 U.S. at 426. No Plaintiff alleges a deprivation of "all economically beneficial or productive use of land." *Lucas*, 505 U.S. at 1015. Here, Plaintiffs admittedly continue to use their properties for residential purposes.

As to physical invasion, which the TAC raises in conclusory fashion (¶¶ 228-29), there is no showing that any portion of any property has been physically occupied, or that any owner has been denied use access or other incident of ownership. *See Loretto*, 458 U.S. at 435-46; *Lingle*, 544 U.S. at 539 ("A permanent physical invasion ... eviscerates the owner's right to exclude others from entering and using her property."). The only allegation is that particulate matter migrates through the atmosphere over and onto Plaintiffs' properties. That is true of all air emissions and does not convert every case of air emissions into an invasion of nearby property. Such a view would mean that every automobile, power plant, and industrial facility is constantly "invading" properties by emitting particulates or other air constituents—even where the area is in full attainment of air quality standards. The concept that particulate matter in the atmosphere "takes" everything it touches has no support in case law or common sense.

**C.    Plaintiffs Cannot Seek Injunctive Relief For Alleged Takings.**

The Court has already held that Plaintiffs' claims for injunctive relief to stop future burning are barred by the primary jurisdiction doctrine (*Coffie*, 460 F. Supp. 3d at 1308-11), which applies equally here. Plaintiffs' attempt to evade that ruling through a takings claim fails. First, the Court should reject Plaintiffs' request for injunctive relief (TAC ¶ 233) because their takings claim fails as a matter of law, as shown above. Second, the requested injunction is improper anyway. As the

U.S. Supreme Court held just last year, "there is no basis to enjoin the government's action effecting a taking" "[a]s long as an adequate provision for obtaining just compensation exists." *Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162, 2176 (2019). Here, even if Plaintiffs could show that there was state action (and they cannot), they have not even tried to suggest that just compensation is unavailable, meaning that "injunctive relief will be foreclosed." *Id.* at 2179.

**IV.    The TAC Fails To State A Battery Claim.**

In Count V, the TAC alleges a battery claim. Plaintiffs allege that sugarcane burning—an "acceptable agricultural practice" of the sort the RTFA is designed to protect (*Coffie*, 460 F. Supp. 3d at 1307)—has resulted in "harmful and offensive contact" by allegedly exposing Plaintiffs to pollutants without their consent. TAC ¶ 248. Plaintiffs further allege that Defendants "knew or should have known" that burning would release pollutants and expose Plaintiffs. *Id.* ¶ 249. Plaintiffs' battery claim fails to state a claim and should be dismissed.

**A.    The RTFA Bars Plaintiffs' Battery Claim.**

The Court previously dismissed Plaintiffs' nuisance and trespass claims under the RTFA. *Coffie*, 460 F. Supp. 3d at 1306-08. Although the RTFA on its face applies to nuisance claims, the Court also applied the RTFA to bar Plaintiffs' trespass claim because it was little more than a "relabeled" nuisance claim. *Id.* at 1307. But the Court declined to apply the RTFA to Plaintiffs' claims for negligence, strict liability under Fla. Stat. § 376.313, and medical monitoring because they were "not based solely on the nuisance aspect of pre-harvest burning." *Id.* at 1308.

Plaintiffs' battery claim is based on the alleged nuisance aspect of sugarcane burning and is just a variation of Plaintiffs' nuisance and trespass claims. For battery, Plaintiffs allege that burning caused "harmful and offensive contact" and "exposure without consent." TAC ¶ 248. For trespass, Plaintiffs had similarly alleged that burning caused pollutants to "enter and contaminate" their properties and constituted "an unpermitted intrusion." FAC ¶¶ 159-60. The only difference is that Plaintiffs' battery claim involves contact to persons while Plaintiffs' trespass claim involved contact to property. *See, e.g., Bishop v. Hybud Equip. Corp.*, 536 N.E.2d 694, 697 (Ohio Ct. App. 1988) (at common law, "[t]respass was the remedy for all forcible, direct and immediate injuries, whether occasioned to person or property," and "[t]he present-day intentional tort of battery evolved from the common-law trespass for battery"); *Johnson v. Paynesville Farmers Union Co-op Oil Co.*, 817 N.W.2d 693, 701 n.7 (Minn. 2012) (explaining how the common law tort of trespass split into four types of wrongs, including *trespass vi et armis* or assault or battery).

15

Like their dismissed trespass claim, Plaintiffs' battery claim has the characteristics of a nuisance: conduct that "either annoys, injures, or endangers the comfort, health, repose or safety of the citizen, or which unlawfully interferes with or tends to obstruct, or in any way renders unsafe and unsecure other persons in life or in the use of their property." *Prior v. White*, 80 So. 347, 355 (Fla. 1938). Plaintiffs should not be allowed to do an end-run around the RTFA by belatedly asserting a battery claim after the Court dismissed their nuisance and trespass claims.

**B.     Plaintiffs Do Not Allege The Requisite Intent To State A Claim For Battery.**

Under Florida law, "[t]o establish a battery, a plaintiff must suffer a harmful or offensive contact, and the tortfeasor must have intended to cause such contact." *Chorak v. Naughton*, 409 So. 2d 35, 39 (Fla. Dist. Ct. App. 1981); *see Hoyte v. Stauffer Chem. Co.*, 2002 WL 31892830, at *52 (Fla. Cir. Ct. Nov. 2, 2002) ("'a defendant must do a positive, affirmative act with the intent to cause an offensive contact with the plaintiff [and] the element of intent can only be established if the act is substantially certain to cause the offensive contact'"). The intent requirement is not satisfied where conduct merely "'involves an unreasonable risk of inflicting'" offensive contact. *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. Ct. App. 1996).

The TAC does not allege any facts to support a claim that each particular Defendant intended to batter Plaintiffs when they performed sugarcane burns—an "acceptable agricultural practice" (*Coffie*, 460 F. Supp. 3d at 1307)—under permits duly-issued by the Forest Service. Plaintiffs' allegation that Defendants' "knew or should have known" that burns would expose Plaintiffs to pollutants (TAC ¶ 249) is not enough. As discussed above, the TAC does not even allege that Plaintiffs lived in close proximity to burns performed by any particular Defendant. The TAC likewise does not allege any actual air monitoring data that could have somehow put Defendants on notice that their burning was emitting harmful levels of pollutants. To the contrary, the publicly-available air monitoring data for Belle Glade (and other areas) published by FDEP consistently showed that local ambient air concentrations were well within NAAQS.

Accordingly, neither each Defendants' subjective intent, nor "substantial certainty" that each Defendants' conduct would cause an offensive touching, are plausibly alleged. The battery claim should be dismissed. *See, e.g., Major v. Astrazeneca, Inc.*, 2006 WL 2640622, at *21 (N.D.N.Y. Sept. 13, 2006) (dismissing battery claims and holding that even "[t]he intentional disposal of wastes on someone's property is equivalent to an intentional physical contact with that person only if the disposer knows that the waste will contact that person"); *In re Oil Spill by the*

*Oil Rig Deepwater Horizon*, 2011 WL 4575696, at *11 (E.D. La. Oct. 4, 2011) (allegation that defendants deliberately sprayed chemicals "in the vicinity" of plaintiffs did not state battery claim).

## V.     The TAC Fails To State A Medical Monitoring Claim.

The Court previously dismissed Plaintiffs' medical monitoring claim because Plaintiffs had "merely pled a formulaic recitation of the elements." *Coffie*, 460 F. Supp. 2d at 1313-14. Plaintiffs assert that the TAC contains additional "factual underpinnings" relevant to their medical monitoring claim. TAC at 1 n.1. These "factual underpinnings" hinge on Plaintiffs' preliminary air models—models Plaintiffs concede were designed using erroneous inputs. ECF 143 at 1. Undeterred, Plaintiffs now allege that they were exposed to "significant levels of confirmed carcinogenic pollutants," that Defendants' sugarcane burning has purportedly led to exposure of some residents to "$PM_{2.5}$ well in excess of the NAAQS," "increased levels of $PM_{2.5}$, as well as to numerous other known or suspected carcinogens" and that the Medical Monitoring Class is "at a significantly increased risk of developing lung cancer." TAC ¶¶ 235, 239.

To state a medical monitoring claim, Plaintiffs must adequately allege, among other things, that they were "expose[d] to greater than normal background levels" to a proven hazardous substance caused by a defendant's negligence. *Petito v. A.H. Robins Co., Inc.*, 750 So. 2d 103, 106-07 (Fla. 3d DCA 1999). Plaintiffs have not done so. As explained above, the preliminary modeling underlying Plaintiffs' allegations of "exposure greater than normal background levels" is flatly inconsistent with real-world data. The Court "need not accept factual claims" "which run counter to facts of which the court can take judicial notice." *Campos*, 32 F. Supp. 2d at 1343. Plaintiffs have failed to demonstrate that any Defendant's agricultural practices are the cause of a significant increase in pollutant concentrations (i.e., above general background) or in violation of any air quality standards set by FDEP or U.S. EPA—nor could they. *See Jacobs v. Osmose, Inc.*, 2002 WL 34241682 (S.D. Fla. Jan. 3, 2002). Plaintiffs also do not and cannot allege that it is Defendants' conduct that caused a greater than normal background level because there are many other sources of fires and other emissions that contribute to background levels. *Petito*, 750 So. 2d at 106-07. The Court should dismiss Plaintiffs' claims for medical monitoring.

## CONCLUSION

For the foregoing reasons, the Third Amended Complaint should be dismissed with prejudice.

Dated: November 25, 2020                    Respectfully submitted,

                                            By: /s/ Gregor J. Schwinghammer, Jr.
                                            Gregor J. Schwinghammer, Jr.
                                            Florida Bar No. 90158
                                            Brian M. McPherson
                                            Florida Bar No. 735541
                                            GUNSTER, YOAKLEY & STEWART, P.A.
                                            777 South Flagler Drive, Suite 500 East
                                            West Palm Beach, FL 33401
                                            Telephone:  (561) 833-1970
                                            Facsimile:  (561) 655-5677
                                            gschwinghammer@gunster.com
                                            bmcpherson@gunster.com

                                            By: /s/ Eugene Pettis
                                            Eugene K. Pettis
                                            Florida Bar No. 508454
                                            HALICZER PETTIS & SCHWAMM, P.A.
                                            100 SE 3rd Avenue
                                            Seventh Floor,
                                            Fort Lauderdale, FL 33394
                                            Telephone: (954) 523-9922
                                            Facsimile:  (954) 522-2512
                                            service@hpslegal.com

                                            Mark Ter Molen
                                            Timothy S. Bishop
                                            MAYER BROWN LLP
                                            71 South Wacker Drive
                                            Chicago, IL  60606
                                            Telephone:  (312) 782-0600
                                            Facsimile:  (312) 701-7711
                                            mtermolen@mayerbrown.com
                                            tbishop@mayerbrown.com

                                            *Counsel for Defendants U.S. Sugar Corporation,
                                            Independent Harvesting, Inc., and Sugarland
                                            Harvesting Co.*

                                            By: /s/ Gary K. Hunter
                                            Gary K. Hunter
                                            Florida Bar No. 949779
                                            Gary V. Perko
                                            Florida Bar No. 855898

18

Mohammad O. Jazil
Florida Bar No. 72556
HOPPING GREEN & SAMS, P.A.
119 S. Monroe Street, Suite 300
Tallahassee, FL 32301
Telephone: (850) 222-7500
Facsimile: (850) 224-8551
garyh@hgslaw.com
garyp@hgslaw.com
mjazil@hgslaw.com

David J. Abbey
Florida Bar No. 228222
Jennifer J. Kennedy
Florida Bar No. 517267
ABBEY, ADAMS, BYELICK & MUELLER, LLP
3201 U.S. Highway 19 South, 9th Floor
St. Petersburg, Florida 333711
Telephone: (727) 821-2080
Facsimile: (727) 822-3970
dabbey@abbeyadams.com
kennedy@abbeyadams.com

*Counsel for Defendant Sugar Cane Growers Cooperative of Florida*

By: /s/ Mark D. Anstoetter
Jennifer A. McLoone
Florida Bar No. 29234
SHOOK, HARDY & BACON L.L.P.
Citigroup Center, Suite 3200
201 S. Biscayne Blvd.
Miami, Florida 33131
Ph: (305) 358-5171
Fax: (305) 358-7470
jmcloone@shb.com

Mark D. Anstoetter
David Brent Dwerlkotte
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
Ph:  (816) 474 6550
Fax: (816) 421-5547
manstoetter@shb.com

19

dbdwerlkotte@shb.com

Joseph P. Klock, Jr.
Florida Bar No. 156678
RASCO KLOCK PEREZ NIETO PL
2555 Ponce de Leon Blvd., Suite 600
Coral Gables, Florida 333134
Ph:  (305) 467-711
Fax: (305) 675-7707
jklock@rascoklock.com

David S. Dee
Florida Bar No. 281999
GARDNER, BIST, BOWDEN, BUSH,
DEE, LAVIA & WRIGHT, P.A.
1300 Thomaswood Drive
Tallahassee, Florida 32308
Ph:  (850) 385-0070
Fax: (850) 385-5416
ddee@gbwlegal.com

*Counsel for Defendants Florida Crystals*
*Corporation, Osceola Farms Co., and Okeelanta*
*Corporation*

By: /s/ Mark A. Hendricks
Mark A. Hendricks
Florida Bar No. 768146
Forrest L. Andrews
Florida Bar No. 17782
LYDECKER DIAZ
1221 Brickell Avenue, 19th Floor
Miami, Florida 33131
Telephone: (305) 416-3180
Facsimile: (305) 416-3190
mah@lydeckerdiaz.com
fla@lydeckerdiaz.com

*Counsel for Defendant*
*Trucane Sugar Corporation*

By: /s/ Andrew S. Connell, Jr.
Andrew S. Connell, Jr.,
Florida Bar No. 038430
LITCHFIELD CAVO, LLP
600 Corporate Drive Suite 600

20

Ft. Lauderdale, Florida 33334
Telephone: 954/689-3000
Facsimile: 954/689-3001
connell@litchfieldcavo.com

*Counsel for Defendant J & J Ag Products, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of November, 2020, I filed the foregoing through the

Court's CM/ECF system, which sent notification to all counsel of record.

<u>/s/ Gregor J. Schwinghammer, Jr.</u>

22